## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
VALERIE PLAME WILSON and                    )
JOSEPH C. WILSON IV,                        )
4612 Charleston Terrace, N.W.               )
Washington, D.C. 20007                      )
                                            )
                Plaintiffs,                 )
                                            )
        v.                                  )
                                            )   Civil Action No. 06-1258 (JDB)
                                            )
I. LEWIS (a/k/a "SCOOTER") LIBBY JR.,        )
KARL C. ROVE, RICHARD B. CHENEY,            )
RICHARD L. ARMITAGE and                     )
JOHN DOES NOS. 1-9                          )
                                            )
                Defendants.                 )
_____)

### AMENDED COMPLAINT
**(First and Fifth Amendment Violations, Public Disclosure of Private Facts)**

### PRELIMINARY STATEMENT

1.      On April 26, 1999, at the dedication of the Central Intelligence Agency (CIA)

facility named for him, former President George H. W. Bush said: "[W]e need more protection

for the methods we use to gather intelligence and more protection for our sources, particularly

our human sources, people that are risking their lives for their country. . . . I have nothing but

contempt and anger for those who betray the trust by exposing the name of our sources. They

are, in my view, the most insidious of traitors." George H. W. Bush, 41st President of the United

States, Remarks at the Dedication Ceremony for the George Bush Center for Intelligence (Apr.

26, 1999). This lawsuit concerns the intentional and malicious exposure by senior officials of

the federal government of one such human source at the CIA, Valerie Plame Wilson, whose job

it was to gather intelligence to make the nation safer, and who risked her life for her country.

2.     This Complaint arises, in part, out of a conspiracy among current and former high-level officials in the White House and actions taken by and on behalf of those officials in 2003 to violate the constitutional and other legal rights of Valerie Plame Wilson and her husband, Joseph C. Wilson IV.  Those officials sought to punish Mr. Wilson for his public statements regarding assertions by the President of the United States in the 2003 State of the Union address that he used to justify war against Iraq.  As their chief method of punishment, the White House officials destroyed Mrs. Wilson's cover by revealing her classified employment with the CIA to reporters prior to and after July 14, 2003, the date on which a newspaper column by Robert Novak made public that employment.

3.     The Defendants chose *not* to address publicly, directly, and on the merits why they may have thought Mr. Wilson was wrong or unfair in his statements about the President's State of the Union address.  Rather, they embarked on an anonymous "whispering campaign" designed to discredit and injure the Plaintiffs and to deter other critics from publicly speaking out.  The audacity and malevolence of that campaign is compounded by the fact that at the same time the Wilsons were being attacked, the administration in fact was acknowledging the validity of Mr. Wilson's public statements.  Specifically, the administration admitted that claims in the 2003 State of the Union address about Iraqi attempts to buy uranium from Africa were a mistake. But for Mr. Wilson coming forward, it is unlikely that the administration ever would have acknowledged its error.  The fact that the administration had to admit its mistake is one likely reason why the Defendants chose to attack the Wilsons.

4.     As a direct result of the Defendants' conduct, both Mr. and Mrs. Wilson have suffered a violation of rights guaranteed them under the United States Constitution and the laws of the District of Columbia.  This is a civil action brought under the rule of *Bivens v. Six*

*Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), that also

includes statutory civil rights claims and pendent state-law claims. It is brought to recover

damages from the Defendants for the constitutional and other injuries they committed against

the Plaintiffs. Plaintiffs have no other remedies for the violations of their rights.

## JURISDICTION

5.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

2201 because it presents a federal question arising under the Constitution and laws of the United

States. With respect to Plaintiffs' claims based on 42 U.S.C. §§ 1985(3) and 1986, the Court

also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(1), (a)(2). Supplemental jurisdiction over

the Plaintiffs' pendent state-law claims is conferred by 28 U.S.C. § 1367.

## VENUE

6.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1332

because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred

in this district.

## PARTIES

7.      Plaintiff Valerie Plame Wilson is married to Plaintiff Joseph C. Wilson IV. Until

January 2006, she was an employee of the CIA. Her employment status was classified and not

publicly known until July 14, 2003, when a press report precipitated by leaks from senior

government officials revealed her status and exposed her.

8.      Plaintiff Joseph C. Wilson IV is a businessman and retired diplomat. From 1976

through 1998, Mr. Wilson was a member of the U.S. Diplomatic Service. From 1988 to 1991,

he was the Deputy Chief of Mission at the U.S. Embassy in Baghdad, Iraq. In that position, he

was recognized as "truly inspiring" and "courageous" by President George H. W. Bush after he

shielded more than fifty Americans at the Embassy in the face of threats from Saddam Hussein

to execute anyone who refused to turn over foreigners.  Mr. Wilson later served as U.S.

Ambassador to Gabon and São Tomé and Príncipe under President George H. W. Bush, and as

Senior Director for Africa at the National Security Council under President Clinton.

      9.     Defendant I. Lewis (a/k/a "Scooter") Libby is a senior advisor at the Hudson

Institute, in Washington, D.C.  He is the former Assistant to the President of the United States,

Chief of Staff to Vice President Richard B. Cheney and Assistant to the Vice President for

National Security Affairs.  On October 28, 2005, Libby resigned his positions in the White

House following his indictment for federal crimes.  At all times relevant to this Complaint, Libby

held senior positions at the White House, including serving as the Vice President's Chief of

Staff.  Libby is sued in his individual capacity only.

      10.     Defendant Karl C. Rove is a political consultant who has served in various

positions in the administration of President George W. Bush, including Deputy Chief of Staff,

head of the Office of Political Affairs, head of the Office of Public Liaison, and head of the

Office of Strategic Initiatives at the White House.  At all times relevant to this Complaint, Rove

held senior positions at the White House, including responsibility for political affairs.  Rove is

sued in his individual capacity only.

      11.     Defendant Richard B. Cheney is the Vice President of the United States, a

position he has held since January 20, 2001.  At all times relevant to this Complaint, Cheney held

supervisory authority over Defendant I. Lewis Libby.  Cheney is sued in his individual capacity

only.

      12.     Defendant Richard L. Armitage, originally named as one of the John Does in the

complaint filed on July 13, 2006, was the Deputy Secretary of the Department of

State, a position he held from 2001 through 2005.  On November 16, 2004, Armitage resigned

from that position, leaving the Department of State on February 22, 2005.  Armitage

is sued in his individual capacity only.

      13.    Defendants John Does No. 1–9 are persons whose identities currently are

unknown but who are believed to be persons who were either employed by the United States

Government in senior positions at all times relevant to this Complaint or who were political

operatives with close ties to such persons.

## FACTS

### Robert Novak's July 14, 2003 Newspaper Column, Based on White House Leaks, Destroyed Valerie Wilson's Cover as a Classified CIA Employee

      14.    On July 14, 2003, newspaper columnist Robert Novak wrote a column that was

published in the *Chicago Sun Times, The Washington Post,* and elsewhere, that contained the

following sentence: "[Joseph] Wilson never worked for the CIA, but his wife, Valerie Plame, is

an Agency operative on weapons of mass destruction.  Two senior administration officials told

me Wilson's wife suggested sending him to Niger" to investigate a report that Iraq was seeking

nuclear materials from Niger.  That publication, based on leaks from the administration, was the

first time that Mrs. Wilson's previously secret and classified CIA identity became public.  The

disclosure destroyed her cover as a classified CIA employee.

      15.    Two weeks later, on or about July 30, 2003, the CIA informed the Criminal

Division of the United States Department of Justice of a "possible violation of criminal law

concerning the unauthorized disclosure of classified information," namely Mrs. Wilson's

identity.

      16.    On or about September 21, 2003, the CIA requested that the United States

Department of Justice investigate the improper leaking of Mrs. Wilson's identity.  On September

30, 2003, the Justice Department announced an official criminal investigation.  On that same

day, the President of the United States said, "if there is a leak out of my administration, I want to know who it is. And if the person has violated law, the person will be taken care of."

17.    On December 30, 2003, then-U.S. Attorney General John Ashcroft recused himself from the investigation. Patrick Fitzgerald, the United States Attorney for the Northern District of Illinois, was appointed as Special Counsel to continue the investigation.

18.    On October 28, 2005, as a result of that investigation, criminal charges against Defendant Libby were brought in *United States v. I. Lewis Libby*, Cr. No. 05-394 (RBW) (D.D.C.).

### The Facts Set Forth in the Indictment of Scooter Libby Underlie the Causes of Action in this Complaint

19.    The further facts underlying the causes of action in this Complaint are recited herein on information and belief, and are set forth, in part, in the Charges of the Grand Jury in *United States v. Libby* and pleadings relating thereto, including the following:

#### *Events Leading up to July 2003*

a.    On or about January 28, 2003, President George W. Bush delivered his State of the Union address which included sixteen words asserting that "[t]he British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa."

b.    On May 6, 2003, the *New York Times* published a column by Nicholas Kristof which disputed the accuracy of the "sixteen words" in the State of the Union address. The column reported that, following a request from the Vice President's office for an investigation of allegations that Iraq sought to buy uranium from Niger, an unnamed former ambassador [now known to be Plaintiff Joseph C. Wilson IV] was sent on a trip to Niger in 2002 to investigate the allegations.

According to the column, the ambassador reported back to the CIA and State Department in early 2002 that the allegations were unequivocally wrong and based on forged documents.

c.    On or about May 29, 2003, in the White House, Libby asked an Under Secretary of State ("Under Secretary") for information concerning the unnamed ambassador's travel to Niger to investigate claims about Iraqi efforts to acquire uranium yellowcake.  The Under Secretary thereafter directed the State Department's Bureau of Intelligence and Research to prepare a report concerning the ambassador and his trip.  The Under Secretary provided Libby with interim oral reports in late May and early June 2003, and advised Libby that Wilson was the former ambassador who took the trip.

d.    On or about June 9, 2003, a number of classified documents from the CIA were faxed to the Office of the Vice President to the personal attention of Libby and another person in the Office of the Vice President.  The faxed documents, which were marked as classified, discussed, among other things, Wilson and his trip to Niger, but did not mention Wilson by name.  After receiving these documents, Libby and one or more other persons in the Office of the Vice President handwrote the names "Wilson" and "Joe Wilson" on the documents.

e.    On or about June 11 or 12, 2003, the Under Secretary of State orally advised Libby that, in sum and substance, Wilson's wife worked at the CIA and that State Department personnel were saying that Wilson's wife was involved in the planning of his trip.

f.      On or about June 11, 2003, Libby spoke with a senior officer of the CIA to ask about the origin and circumstances of Wilson's trip and was advised by the CIA officer that Wilson's wife worked at the CIA and was believed [erroneously] to be responsible for sending Wilson on the trip.

g.      Prior to June 12, 2003, *Washington Post* reporter Walter Pincus contacted the Office of the Vice President in connection with a story he was writing about Wilson's trip. Libby participated in discussions in the Office of the Vice President concerning how to respond to Pincus.

h.      On or about June 12, 2003, Libby was advised by the Vice President of the United States that Wilson's wife worked at the Central Intelligence Agency in the Counterproliferation Division. Libby understood that the Vice President had learned this information from the CIA.

i.      On June 12, 2003, the *Washington Post* published an article by reporter Walter Pincus about Wilson's trip to Niger, which described Wilson as a retired ambassador but not by name, and reported that the CIA had sent him to Niger after an aide to the Vice President raised questions about purported Iraqi efforts to acquire uranium. Pincus' article questioned the accuracy of the "sixteen words," and stated that the retired ambassador had reported to the CIA that the uranium purchase story was false.

j.      On or about June 14, 2003, Libby met with a CIA briefer. During their conversation, Libby expressed displeasure that CIA officials were making comments to reporters critical of the Vice President's office, and discussed with

the briefer, among other things, "Joe Wilson" and his wife "Valerie Wilson," in the context of Wilson's trip to Niger.

k.    On or about June 19, 2003, an article highly critical of Vice President Cheney appeared in *The New Republic* magazine online entitled "The First Casualty: The Selling of the Iraq War." Among other things, the article questioned the "sixteen words" and stated that following a request for information from the Vice President, the CIA had asked an unnamed ambassador to travel to Niger to investigate allegations that Iraq had sought uranium from Niger. The article included a quotation attributed to the unnamed ambassador alleging that the administration officials "knew the Niger story was a flat-out lie." The article also was critical of how the administration, including the Office of the Vice President, portrayed intelligence concerning Iraqi capabilities with regard to weapons of mass destruction, and accused the administration of suppressing dissent from the intelligence agencies on this topic.

l.    Shortly after publication of *The New Republic* article, Libby spoke by telephone with his then-Principal Deputy and discussed the article. The Principal Deputy asked Libby whether information about Wilson's trip could be shared with the press to rebut the allegations that the Vice President had sent Wilson. Libby responded that there would be complications at the CIA in disclosing that information publicly, and that he could not discuss the matter on a non-secure line.

m.    On or about June 23, 2003, Libby met with *New York Times* reporter Judith Miller. During this meeting, Libby was critical of the CIA, and disparaged what

he termed "selective leaking" by the CIA concerning intelligence matters. In discussing the CIA's handling of Wilson's trip to Niger, Libby informed Miller that Wilson's wife might work at a bureau of the CIA.

### The July 6 "Op-Ed" by Mr. Wilson

n.   On July 6, 2003, the *New York Times* published an Op-Ed article by Wilson entitled "What I Didn't Find in Africa." On that same day, the *Washington Post* published an article about Wilson's 2002 trip to Niger, which article was based in part upon an interview of Wilson. Wilson appeared as a guest on the July 6 television interview show "Meet the Press." In his Op-Ed article and interviews in print and on television, Wilson asserted, among other things, that he had taken a trip to Niger at the request of the CIA in February 2002 to investigate allegations that Iraq had sought or obtained uranium yellowcake from Niger, and that he doubted Iraq had obtained uranium from Niger recently, for a number of reasons. Wilson stated that he believed, based on his understanding of government procedures, that the Office of the Vice President had been advised of the results of his trip.

o.   In a May 12, 2006 court filing in *United States v. Libby*, the government proffered a copy of the July 6 Op-Ed annotated shortly after its publication in the handwriting of the Vice President of the United States. The government believes those notes of the Vice President "support the proposition that publication of the Wilson Op-Ed acutely focused the attention of the Vice President and [Libby] – his chief of staff – on Mr. Wilson, on the assertions made in his article, and on responding to those assertions."

### *Libby's Actions Following Wilson's July 6 "Op-Ed" Column*

p.    On or about July 7, 2003, Libby had lunch with the then-White House Press Secretary and advised the Press Secretary that Wilson's wife worked at the CIA and noted that such information was not widely known.

q.    On or before July 8, 2003, Vice President Cheney advised Libby that the President of the United States specifically had authorized Libby to disclose to *New York Times* reporter Judith Miller certain information from an October 2002 National Intelligence Estimate concerning Iraq and weapons of mass destruction in order to rebut Mr. Wilson. Just three days later, on July 11, 2003, Director of Central Intelligence George Tenet conceded that claims about Iraqi attempts to buy uranium from Africa in the January 2003 State of the Union address were a mistake and that the "16 words should never have been included in the text written for the President," an acknowledgment that the substance of Mr. Wilson's criticism was legitimate and correct.

r.    Rather than admit the validity of Wilson's criticisms, on or about the morning of July 8, 2003, Libby met with Judith Miller. When the conversation turned to the subject of Joseph Wilson, Libby asked that the information Libby provided on the topic of Wilson be attributed to a "former Hill staffer" rather than to a "senior administration official," as had been the understanding with respect to other information that Libby provided to Miller during this meeting. Libby thereafter discussed with Miller Wilson's trip and criticized the CIA reporting concerning Wilson's trip. During this discussion, Libby advised Miller of his belief that Wilson's wife worked at the CIA.

11

s.      Also on or about July 8, 2003, Libby met with the Counsel to the Vice President in an anteroom outside the Vice President's Office. During their brief conversation, Libby asked the Counsel to the Vice President, in sum and substance, what paperwork there would be at the CIA if an employee's spouse undertook an overseas trip.

t.      Not earlier than June 2003, but on or before July 8, 2003, the Assistant to the Vice President for Public Affairs learned from another government official that Wilson's wife worked at the CIA and advised Libby of this information.

u.      On or about July 10 or July 11, 2003, Libby spoke to a senior official in the White House [believed to be Karl Rove or one or more of John Does No. 1 - 10] who advised Libby of a conversation [Rove or the Does] had earlier that week with columnist Robert Novak in which Wilson's wife was discussed as a CIA employee involved in Wilson's trip. Libby was advised by [Rove or the Does] that Novak would be writing a story about Wilson's wife.

v.      On or about July 12, 2003, Libby flew with the Vice President and others to and from Norfolk, Virginia, on Air Force Two. On his return trip, Libby discussed with other officials aboard the plane what Libby should say in response to certain pending media inquiries, including questions from *Time* reporter Matthew Cooper.

w.      On or about July 12, 2003, in the afternoon, Libby spoke by telephone to Cooper, who asked whether Libby had heard that Wilson's wife was involved in sending Wilson on the trip to Niger. Libby confirmed to Cooper, without elaboration or qualification, that he had heard this information too.

      

x.    On or about July 12, 2003, in the later afternoon, Libby spoke by telephone with Judith Miller of the *New York Times* and discussed Wilson's wife, and that she worked at the CIA.

20.    On October 28, 2005, a federal grand jury returned a five-count indictment charging Defendant Libby with obstruction of justice, perjury, and making false statements to federal investigators in violation of 18 U.S.C. §§ 1503, 1623, and 1001, in connection with an investigation concerning leaks to reporters of classified information regarding the CIA employment of Mrs. Wilson.

21.    Also on October 28, 2005, Special Counsel Fitzgerald explained at a press conference announcing the indictment against Defendant Libby: "In July 2003, the fact that Valerie Wilson was a CIA officer was classified. Not only was it classified, but it was not widely known outside the intelligence community. Valerie Wilson's friends, neighbors, college classmates had no idea she had another life. The fact that she was a CIA officer was not well known for her protection and for the benefit of all of us. It is important that a CIA officer's identity be protected, that it be protected not just for the officer, but for the nation's security."

22.    At the same press conference, Special Counsel Fitzgerald also stated the following: "Valerie Wilson's cover was blown in July 2003. The first sign of that cover being blown was when Mr. Novak published a column on July 14th, 2003. But Mr. Novak was not the first reporter to be told that Wilson's wife, Valerie Wilson, Ambassador Wilson's wife Valerie, worked at the CIA. Several other reporters were told [by Libby]."

23.    According to an article in the *Washington Post* written by Walter Pincus and Mike Allen published on October 12, 2003, during the week of July 6, 2003, "two top White House officials disclosed Plame's identity to at least six Washington journalists, an

13

administration official told *The Post* for an article published Sept. 28[, 2003].  The source

elaborated on the conversations last week, saying that officials brought up Plame as part of their

broader case against Wilson.  'It was unsolicited,' the source said.  'They were pushing back.

They used everything they had.'"

24.     Upon information and belief, Defendants Cheney, Rove, Libby and John Does 1-

10 reached an agreement to discredit, punish and seek revenge against the Plaintiffs that

included, among other things, disclosing to members of the press Plaintiff Valerie Plame

Wilson's classified CIA employment.

### Additional Facts Concerning Defendant Rove

25.     Matthew Cooper, the reporter to whom Defendant Libby spoke on July 12, 2003,

as recited in paragraph 18(a) *supra,* is the author of a July 17, 2003 *Time* article entitled "A War

on Wilson?  Inside the Bush Administration's Feud with the Diplomat Who Poured Cold Water

on the Iraq-Uranium Connection."  In that article he wrote the following:

> Has the Bush Administration declared war on a former ambassador
> who conducted a fact-finding mission to probe possible Iraqi
> interest in African uranium?  Perhaps.  Former Ambassador Joseph
> C. Wilson raised the Administration's ire with an op-ed piece in
> The New York Times on July 6 saying that the Administration had
> "twisted" intelligence to "exaggerate" the Iraqi threat.  Since then
> Administration officials have taken public and private whacks at
> Wilson. . . .

26.     In the July 25, 2005 edition of *Time* Magazine, Cooper wrote an article entitled

"What I Told the Grand Jury" and subtitled "Matthew Cooper reveals exactly what Karl Rove

told him – and what the special counsel zeroed in on."  Cooper's account of his Grand Jury

testimony concerned his interviews with Defendants Rove and Libby which led to his published

suggestion that the Bush administration had declared "war on Wilson."

14

27.    On information and belief, based on Cooper's account of his Grand Jury testimony, on Friday, July 11, 2003, Cooper telephoned Defendant Rove at the White House.  In the ensuing conversation,  Defendant Rove instructed Cooper that the conversation was to be on "deep background," which Cooper has stated he understood to mean that he could use the information Defendant Rove was giving to him but not quote it, and that he must keep the identity of the source confidential.

28.    In the same telephone conversation, Defendant Rove clearly indicated to Cooper that Mrs. Wilson worked "at the agency," which Cooper understood obviously to mean the CIA.  Defendant Rove also told Cooper that Mrs. Wilson "worked on 'WMD' [weapons of mass destruction]" issues and that she was responsible for sending Mr. Wilson to Niger.  This was the first time that Cooper had heard anything about Joseph Wilson's wife.

29.    Cooper has said he has a distinct memory of Defendant Rove ending the call by saying, "I've already said too much."  That comment by Defendant Rove to Cooper is evidence of Defendant Rove's awareness of wrongdoing.

30.    On information and belief, in July 2003, shortly after Novak's column appeared, Defendant Rove called Chris Matthews, host of the MSNBC network program "Hardball," and told him that Mr. Wilson's wife was "fair game."  "Fair game" is a hunting term used to describe prey (an animal that is killed and eaten) and is used colloquially to describe a person who may legitimately be attacked.  Again, Defendant Rove attempted to make this statement targeting Mrs. Wilson off the record on the condition that he not be identified as its source, so as to avoid detection for the wrongdoing.

31.    White House Press Secretary Scott McClellan erroneously told reporters at the time that any suggestion that Defendant Rove had played a role in outing Mrs. Wilson was "totally ridiculous."

32.    On October 10, 2003, McClellan was asked if Defendant Rove and two other White House aides had ever discussed Mrs. Wilson with any reporters.  McClellan said he had spoken with all three, and "those individuals assured me they were not involved in this."

33.    According to a filing by Special Counsel Fitzgerald in *United States v. Libby*, "There is evidence that multiple officials in the White House discussed [Valerie Wilson's] employment with reporters prior to (and after) July 14."  Government's Resp. to Def.'s Third Mot. to Compel Disc. at 30 n.10 (Apr. 5, 2006) [Dkt. #80].  On information and belief, the multiple officials include Defendants Cheney, Rove, Libby, and John Does No. 1–10.

34.    Special Counsel Fitzgerald has stated in a court filing that "it is hard to conceive of what evidence there could be that would disprove the existence of White House efforts to 'punish' [Mr.] Wilson."  *Id.* at 30.

35.    On information and belief, the principal means of punishing Mr. Wilson for his public statements, both oral and written, was to disclose to selected reporters the classified CIA identity of his wife, Plaintiff Valerie Wilson.  Rather than publicly debate the merits *vel non* of Mr. Wilson's findings from Niger or his public statements, the Defendants secretly spread rumors about Mrs. Wilson's alleged role in the Niger mission, assuming they would never be identified and hoping that the leaks would be published, as they were.  An integral part of their scheme was the identification of Mrs. Wilson as a classified CIA employee.

**Additional Facts Concerning Defendant Armitage**

36.    Upon information and belief, on or before June 10, 2003, the Undersecretary of State received a memorandum prepared by an analyst in the State Department's Bureau of Intelligence and Research, which referred to Valerie Wilson as a CIA WMD manager.   The memorandum was stamped "Secret" and the paragraph that mentioned Mrs. Wilson was prefaced with the letters "S/NF" meaning Secret/No Foreign.  In other words, the information was classified and too sensitive to be shared with foreigners.

37.    Upon information and belief, on June 13, 2003, Defendant Armitage had a meeting with reporter Bob Woodward in his State Department office.  During the course of that meeting, Defendant Armitage told Woodward that Mrs. Wilson worked at the CIA as an analyst on weapons of mass destruction.  Defendant Armitage has acknowledged that he learned that Mrs. Wilson worked at the CIA from a State Department memo.  Defendant Armitage also acknowledged that he revealed this information to Woodward.

38.    Upon information and belief, on July 6, 2003, Defendant Armitage directed that the memorandum previously sent to the Undersecretary of State be updated and sent to the Secretary of State.  Like the earlier memo, this updated version was stamped "Secret" and the paragraph referring to Mrs. Wilson's employment with the CIA was prefaced with the letters "S/NF."

39.    Upon information and belief, on or about July 8, 2003, Defendant Armitage met with reporter Robert Novak in Defendant Armitage's State Department office.  During this meeting, Defendant Armitage revealed to Novak that Mrs. Wilson worked for the CIA on weapons of mass destruction.  Defendant Armitage has acknowledged that he revealed this information to Novak.

**The Plaintiffs' Injuries**

40.     The disclosure of Mrs. Wilson's identity has caused significant damage to each of the Plaintiffs.

41.     Both Mr. and Mrs. Wilson have suffered gross invasions of privacy as a result of the Defendants' conduct.

42.     Both Mr. and Mrs. Wilson fear for their safety and for the safety of their children as a result of the Defendants' conduct.  The disclosure of Mrs. Wilson's covert identity makes her and her family a target for those persons and groups who bear hostility to the United States and/or its intelligence officers.

43.     As a result of the Defendants' actions, Mrs. Wilson was impaired in her ability to carry out her duties at the CIA, and to pursue her career there serving her country, as she had planned.

44.     Both Mr. and Mrs. Wilson have been impaired in pursing professional opportunities as a result of the Defendants' actions.

45.     Both Mr. and Mrs. Wilson were deprived of their Constitutional rights under the First and Fifth Amendments as a result of the Defendants' action.

**FIRST CAUSE OF ACTION**
**Violation of First Amendment Right to Freedom of Speech**
**(On Behalf of Plaintiff Joseph C. Wilson IV against Defendants I. Lewis "Scooter" Libby, Jr., Karl C. Rove, Richard B. Cheney and John Does Nos. 1-9)**

46.     The Plaintiffs restate as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1 through 40 of this Complaint.

47.     The Defendants' actions described herein violate the Freedom of Speech Clause of the First Amendment to the United States Constitution, which prohibits government officials

from subjecting any individual to retaliatory action in reprisal for the exercise of the right to speech.

48.    In their conduct set forth in this Complaint, each of the Defendants acted under color of federal law.

49.    Defendants' actions, orders, approvals, and omissions in violation of the First Amendment give rise to a cause of action for damages directly under the Constitution under the rule of *Bivens*.

### SECOND CAUSE OF ACTION
**Violation of Fifth Amendment Right to Equal Protection of the Laws**
**(On Behalf of Plaintiffs Valerie Plame Wilson and Joseph C. Wilson IV against Defendants I. Lewis "Scooter" Libby, Jr., Karl C. Rove, Richard B. Cheney and John Does Nos. 1-9)**

50.    The Plaintiffs restate as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1 through 40 of this Complaint.

51.    The Defendants' actions described herein violate the Equal Protection Clause of the Fifth Amendment to the United States Constitution, which prohibits government officials from intentionally subjecting any individual to treatment that is different from that accorded to others similarly situated and is without legitimate basis.

52.    In addition, the Defendants' actions in subjecting the Plaintiffs to differential treatment were motivated by vindictiveness and an illegitimate animus, thereby violating the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

53.    In their conduct set forth in this Complaint, each of the Defendants acted under color of federal law.

54.    The Defendants' actions, orders, approvals, and omissions in violation of the Fifth Amendment give rise to a cause of action for damages directly under the United States Constitution under the rule of *Bivens*.

### THIRD CAUSE OF ACTION
### Violation of Fifth Amendment Right to Privacy
### (On Behalf of Plaintiff Valerie Plame Wilson against Defendants I. Lewis "Scooter" Libby, Jr., Karl C. Rove, Richard B. Cheney, Richard L. Armitage and John Does Nos. 1-9)

55.     The Plaintiffs restate as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1 through 40 of this Complaint.

56.     The Defendants' actions described herein violate the Due Process Clause of the Fifth Amendment to the United States Constitution, which prohibits government officials from violating any individual's right to privacy by publicly disclosing personal information.

57.     In their conduct set forth in this Complaint, each of the Defendants acted under color of federal law.

58.     The Defendants' actions, orders, approvals, and omissions in violation of the Fifth Amendment give rise to a cause of action for damages directly under the United States Constitution under the rule of *Bivens*.

### FOURTH CAUSE OF ACTION
### Violation of Fifth Amendment Right to Property
### (On Behalf of Plaintiff Valerie Plame Wilson against Defendants I. Lewis "Scooter" Libby, Jr., Karl C. Rove, Richard B. Cheney, Richard L. Armitage and John Does Nos. 1-9)

59.     The Plaintiffs restate as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1 through 40 of this Complaint.

60.     The Defendants' actions described herein violate the Due Process Clause of the Fifth Amendment to the Constitution, which prohibits government officials from depriving any individual of a property interest in employment without due process.

61.     In addition, the Defendants' actions violate the Due Process Clause of the Fifth Amendment to the United States Constitution because the exposure of the Plaintiff's covert status injured her ability to obtain other employment.

62.     In their conduct set forth in this Complaint, each of the Defendants acted under color of federal law.

63.     In their conduct set forth in this Complaint, each of the Defendants acted intentionally or at least with deliberate indifference in acting to deprive Valerie Wilson of her employment with the federal government by eliminating the secrecy of her status that was essential to her continuing to perform in her job.

64.     The Defendants' actions, orders, approvals, and omissions in violation of the Fifth Amendment give rise to a cause of action for damages directly under the United States Constitution under the rule of *Bivens*.

### FIFTH CAUSE OF ACTION
### Public Disclosure of Private Facts
**(On Behalf of Plaintiffs Valerie Plame Wilson and Joseph C. Wilson IV against Defendants I. Lewis "Scooter" Libby, Jr., Karl C. Rove, Richard B. Cheney, Richard L. Armitage and John Does Nos. 1-9)**

65.     The Plaintiffs restate as if fully set forth here each and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1 through 40 of this Complaint.

66.     The Defendants caused widespread publication of a private fact (namely, Plaintiff Valerie Plame Wilson's classified CIA employment) in a manner that would be deemed outrageous and highly offensive to a reasonable person of ordinary sensibilities.

67.     The public had no legitimate concern in learning Plaintiff Valerie Plame Wilson's classified CIA employment.

68.     The Plaintiffs were injured as a direct and proximate result of the Defendants' conduct as described herein.

69.     In their conduct set forth in this Complaint, each of the Defendants acted outside the scope of their employment.

70.    The Defendants' actions, orders, approvals, and omissions constituted an invasion of the Plaintiffs' privacy, satisfying the elements of the tort of publication of private facts.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request that the Court enter a judgment including, but not limited to:

A.    Compensatory damages for violation of the United States Constitution and laws of the District of Columbia in an amount that is fair, just and reasonable;

B.    Exemplary and punitive damages;

C.    Attorney's fees and costs; and

D.    All other appropriate relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated: September 13, 2006                     Respectfully submitted,


By:   _/s/ Melanie Sloan_____
       Melanie Sloan
       (D.C. Bar No. 434584)
       Anne Weismann
       D.C. Bar No. 298190)
       Citizens for Responsibility and Ethics in
       Washington
       1400 Eye Street, N.W.
       Suite 450
       Washington, DC 20005
       202.408.5565
       202.588.5020 (fax)

       Erwin Chemerinsky
       (D.C. Bar No. 289330)
       DUKE UNIVERSITY SCHOOL OF LAW
       Science Drive and Towerview Road

Durham, NC 27708-0360
919.613.7173
919.613.7231 (fax)

Joseph Cotchett
(D.C. Bar No. 325498)
Cotchett, Pitre, Simon & McCarthy
840 Malcolm Road
Suite 200
Burlingame, CA 94010
650.697.6000
650.697.9577 (fax)

*Counsel for Plaintiffs Valerie Plame Wilson
and Joseph C. Wilson IV*