UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VALERIE PLAME WILSON and<br>JOSEPH C. WILSON, IV,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>I. LEWIS LIBBY, JR. *et al.*,<br><br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Civ. A. No. 06-1258 (JDB) |

## DEFENDANT VICE PRESIDENT OF THE UNITED STATES RICHARD B. CHENEY'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Defendant Vice President of the United States Richard B. Cheney, by and through

counsel, hereby moves the Court pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of

Civil Procedure to dismiss Plaintiffs' Amended Complaint for lack of subject matter jurisdiction

and for failure to state a claim upon which relief can be granted. The grounds for this motion are

set forth in the accompanying memorandum. A proposed order is also attached.

Respectfully submitted,

/s/
_____
Terrence O'Donnell (D.C. Bar # 26849)
Emmet T. Flood (D.C. Bar # 448110)

Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: (202) 434-5000
Fax: (202) 434-5029
todonnell@wc.com
eflood@wc.com

*Attorneys for Vice President of the United States
Richard B. Cheney in his individual capacity*

Dated: November 14, 2006

**ORAL HEARING REQUESTED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VALERIE PLAME WILSON and JOSEPH C. WILSON, IV, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. A. No. 06-1258 (JDB) |
| I. LEWIS LIBBY, JR. *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT VICE PRESIDENT OF THE UNITED STATES RICHARD B. CHENEY'S MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 1

ARGUMENT .................................................................................................................... 4

I.   Plaintiffs' Suit Against the Vice President Must Be Dismissed as Time-
     Barred............................................................................................................................ 4

     A.      A One-Year Limitation Period Governs Plaintiffs' Fifth Count for
             Public Disclosure of Private Facts and Requires Its Dismissal. .................... 6

     B.      Plaintiffs' Constitutional Torts Must Also Be Dismissed as Time-
             Barred.............................................................................................................. 6

II.  This Court Lacks Jurisdiction Over Plaintiffs' Claims Because They Raise
     Non-Justiciable Political Questions and Are Barred by the *Totten* Doctrine. .................... 8

     A.      Plaintiffs' Claims Against the Vice President Should Be
             Dismissed Because They Present Nonjusticiable Political
             Questions.......................................................................................................... 9

     B.      Plaintiffs' Claims Are Barred Under the *Totten* Doctrine. ........................... 14

III. The Amended Complaint Must Be Dismissed Because the Vice President Is
     Absolutely Immune from Civil Suits Seeking Damages. .................................... 18

IV.  Special Factors Counsel Hesitation in the Recognition of the New *Bivens*
     Remedies Sought in the Amended Complaint. ................................................... 23

     A.      Supreme Court Precedent Requires Courts to Be Reluctant to
             Recognize New *Bivens* Remedies.................................................................. 23

     B.      Several Factors Counsel Hesitation in Recognizing New *Bivens*
             Remedies Here. .............................................................................................. 25

         1.      Congress Has Established Remedial Mechanisms for the Types
                 of Violations Alleged Here. ...................................................................... 25

             a.      The Privacy Act Is a Remedial Mechanism that Counsels
                     Hesitation. .................................................................................... 25

             b.      The Intelligence Identities Protection Act Counsels Hesitation. .............. 29

         2.      Additional Factors Counsel Hesitation. ..................................................... 30

V.   Qualified Immunity Shields the Vice President from all of Plaintiffs' Claims. ............... 31

A.      Count I, Mr. Wilson's First Amendment Claim of Official
        Retaliation for the Exercise of First Amendment Rights, Does Not
        Allege the Violation of a Clearly Established Right.................................... 32

B.      Count II, Plaintiffs' Claim for Denial of Equal Protection, Does
        Not Allege the Violation of a Clearly Established Right............................ 35

C.      Count III, Mrs. Wilson's Claim for the Denial of Her Right to
        Informational Privacy, Does Not Allege the Violation of a Clearly
        Established Right. ..................................................................................... 37

D.      Count IV, Mrs. Wilson's Claim for a Violation of Her Right to
        Due Process, Does Not Allege the Violation of a Clearly
        Established Right. ..................................................................................... 38

        1.      To the extent Plaintiff pleads a property interest in her alleged
                classified status, she does not plead the violation of a clearly
                established right because she has no such interest.................................... 39

        2.      To the extent Plaintiff pleads a deprivation of her liberty
                interest in future employment, she does not plead the violation
                of a clearly established right. .................................................................. 40

VI.     Plaintiffs' Count V for Public Disclosure of Private Facts Does Not State a
        Claim Upon Which Relief Can Be Granted................................................................ 42

VII.    Plaintiffs' Count V for Public Disclosure of Private Facts Must Be Dismissed
        Pursuant to the Westfall Act Because the Vice President Is Not a Proper
        Defendant. ................................................................................................................ 43

CONCLUSION................................................................................................................ 44

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Federation of Government Employees, AFL-CIO v. Dep't of Housing & Urban Development*, 118 F.3d 786 (D.C. Cir. 1997).....................38

*Anderson v. Creighton*, 483 U.S. 635 (1987) ..............31

*\*Baker v. Carr*, 369 U.S. 186 (1962)..................11, 12, 13, 14, 23

*Barr v. Matteo*, 360 U.S. 564 (1959) ..............43

*\*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)..................23

*\*Browning v. Clinton*, 2001 U.S. Dist. LEXIS 24537 (D.D.C. 2001), *aff'd, Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ..............8

*Bush v. Lucas*, 462 U.S. 367 (1983) ..............24, 28

*\*Butz v. Economou*, 438 U.S. 478 (1978)..............18, 19

*Carlson v. Green*, 446 U.S. 14 (1980) ..............24

*Chappell v. Wallace*, 462 U.S. 296 (1983) ..............24

*\*Cheney v. United States District Court*, 542 U.S. 367 (2004)..............18

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948) ..............22

*Chung v. U.S. Dep't of Justice*, 333 F.3d 273 (D.C. Cir. 2003) ..............26, 28

*\*Chung v. U.S. Dep't of Justice, No Civ. 00-1912 (TFH)*, 2001 WL. 34360430 (D.D.C. Sept. 20, 2001), *aff'd in part, rev'd in part*, 333 F.3d 273 (D.C. Cir. 2003) ..............26, 28

*Conley v. Gibson*, 355 U.S. 41 (1957) ..............4

*Conn v. Gabbert*, 526 U.S. 286 (1999) ..............31

*Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001) ..............23

*Ctr. for National Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918 (D.C. Cir. 2003)..............14

*Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001)..............32, 33

*Davis v. Passman*, 442 U.S. 228 (1979) ..............24

*Dep't of Navy v. Egan*, 484 U.S. 518 (1988) ................................................................9, 39

*Doe v. Cheney*, 885 F.2d 898 (1989) .................................................................................39

*\*Doe v. Gates*, 981 F.2d 1316 (D.C. Cir. 1993) ...............................................................39

*Doe v. Tenet*, 353 F.3d 1141 (9th Cir. 2004), *rev'd by* 544 U.S. 1 (2005)....................17

*Doe v. U.S. Dep't of Justice*, 753 F.2d 1092 (D.C. Cir. 1985) ....................................8, 40

*FDIC v. Meyer*, 510 U.S. 471 (1994) ................................................................................24

*Grossbaum v. Indianapolis-Marion County Building Authority*,
    100 F.3d 1287 (7th Cir. 1996) ....................................................................................35

*Grunseth v. Marriott*, 872 F. Supp. 1069 (D.D.C. 1995),
    *aff'd*, 79 F.3d 169 (D.C. Cir. 1996) ..........................................................................6, 7

*Guong v. United States*, 860 F.2d 1063 (Fed. Cir. 1988) .................................................17

*Halperin v. Kissinger*, 807 F.2d 180 (D.C. Cir. 1986) ..............................................13, 23

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ......................................................................31

*\*Hatfill v. Ashcroft*, 404 F. Supp. 2d 104 (D.D.C. 2005) ...................26, 28, 29, 32, 33

*Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C. Cir. 1987)............................................5

*Herbage v. Meese*, 747 F. Supp. 60 (D.D.C. 1990) .............................................................5

*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1084 (1985) ....................6

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ........................................................................18

*Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994) ..............................................41

*Kielczynski v. CIA*, 128 F. Supp. 2d 151 (E.D.N.Y. 2001),
    *aff'd sub nom.*, *Kielczynski v. John Does 1-2*, 56 F. App'x 540 (2d Cir. 2003) .................16

*Kounitz v. Slaatten*, 901 F. Supp. 650 (S.D.N.Y. 1995) ...................................................32

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*,
    507 U.S. 163 (1993)........................................................................................................4

*Loughlin v. U.S.*, 393 F.3d 155 (D.C. Cir. 2004)................................................................4

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................................32

*M.K. v. Tenet*, 196 F. Supp. 2d 8 (D.D.C. 2001) .............................................................40

*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987)............................................................5

*Maye v. Reno*, 231 F. Supp. 2d 332 (D.D.C. 2002) ........................................................29

*Mazaleski v. Truedell*, 562 F.2d 701 (D.C. Cir. 1977) .......................................39, 40, 41

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ......................................................................23

*McClam v. Barry*, 697 F.2d 366 (D.C. Cir. 1983) ...........................................................7

*Nix v. Hoke*, 139 F. Supp. 2d 125 (D.D.C. 2001) ........................................................6, 7

*Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) ...............................37

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982)........................................18, 19, 20, 21, 23, 31

*O'Donnell v. Barry*, 148 F.3d 1126 (D.C. Cir. 1998) ...................................................40

*Owens v. Okure*, 488 U.S. 235 (1989) .............................................................................8

*Penthouse International, Ltd. v. Meese*, 939 F.2d 1011 (D.C. Cir. 1991).................34, 35

*Pierson v. Ray*, 386 U.S. 547 (1967) .......................................................................18, 19

*Ratliff v. DeKalb County*, 62 F.3d 338 (11th Cir. 1995).............................................35, 36

*Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004),
    aff'd, 412 F.3d 190 (D.C. Cir. 2005).................................................................11, 12

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005).......................................10, 11, 14

*Schwarz v. U.S. Dep't of Treasury*, 131 F. Supp. 2d 142 (D.D.C. 2000),
    aff'd, 2001 WL 674636 (D.C. Cir. 2001)..................................................................27

*Schweiker v. Chilicky*, 487 U.S. 412 (1988) ......................................24, 25, 27, 30

*Snepp v. United States*, 444 U.S. 507 (1980).....................................................................9

*Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) ......................................................29

*Spalding v. Vilas*, 161 U.S. 483 (1896)..........................................................................43

*Suarez Corp. Industrial v. McGraw*, 202 F.3d 676 (4th Cir. 2000)...............................33

*Tenet v. Doe*, 544 U.S. 1 (2005) .............................................................................15, 17

*Thompson v. City of Starkville*, 901 F.2d 456 (5th Cir. 1990).......................................36

*Toolasprashad v. Bureau of Prisons*, 286 F.3d 576 (D.C. Cir. 2002)............................33

*Totten v. United States*, 92 U.S. 105 (1875) ........................................................40

*Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003) ...........................14

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) ..................................9

*Vukadinovich v. Bartels*, 853 F.2d 1387 (7th Cir. 1988) ...........................................36

*Weinberger v. Catholic Action*, 454 U.S. 139 (1981) .................................................15

*Whalen v. Roe*, 429 U.S. 589 (1977).................................................................37

*Wilson v. Garcia*, 471 U.S. 261 (1985).................................................................8

*Wilson v. Layne*, 526 U.S. 603 (1999) ................................................................31

*X-Men Sec., Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999)..............................................37

## STATE CASES

*Knight v. Furlow*, 553 A.2d 1232 (D.C. 1989) ..........................................................5

*In re Spikes*, 881 A.2d  1118 (D.C. 2005)..............................................................42

*Vassiliades v. Garfinckel's, Brooks Brothers*, 492 A.2d 580 (D.C. 1985)................................42

*Wolf v. Regardie*, 553 A.2d 1213 (D.C. 1989) .....................................................42, 43

## UNITED STATES CONSTITUTION

*U.S. Const. art. II ...................................................................................1

*U.S. Const. art. I, §3...............................................................................1

*U.S. Const. amend. XII..............................................................................1

*U.S. Const. amend. XXV............................................................................21

## FEDERAL STATUTES

3 U.S.C. § 106(a) (2000)............................................................................2, 21

*5 U.S.C. § 522a(b) (2006)..............................................................................25

50 U.S.C. § 402(a) (2000)..............................................................................2

50 U.S.C. §§ 421-426 ................................................................................29

50 U.S.C. 403g .......................................................................................17

42 U.S.C. §1983 ..................................................................................................8

28 U.S.C. § 2679 (2000) ...................................................................................44

*Fed. R. Civ. P. 12 ............................................................................................4

*Federal Employees Liability Reform and Tort Compensation Act of 1988
    (the "Westfall Act"), 28 U.S.C. § 2679 (2000) ........................................44

Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 ...............................44

Pub. L. No. 93-579, §2(b), 88 Stat. 1896 (1974) ............................................26

*The Intelligence Identities Protection Act of 1982, 50 U.S.C. §§ 421-426 ..........................29, 30

## STATE STATUTES

*D.C. Code § 12-301(4) ..................................................................................5, 6

## INTRODUCTION

Plaintiffs ask this Court to review the contents of a non-public conversation between Defendant Vice President of the United States Richard B. Cheney ("the Vice President") and one of his closest advisors. Next, they ask the Court to award them monetary damages on the basis of a single and allegedly truthful statement by the Vice President during that lone conversation. Along the way, Plaintiffs ask the Court to recognize for the first time four new constitutional rights under the *Bivens* doctrine. They ask the Court to do all this despite the fact that they filed their suit some *two years* after the statute of limitations expired on their claims.

The Vice President asks this Court to reject Plaintiffs' invitation, and to remain instead on the path dictated by established legal precedent. That path leads to dismissal of this suit for numerous, independently sufficient, grounds. *First*, all claims are time-barred by the applicable statute of limitations. *Second*, this Court lacks jurisdiction over Plaintiffs' claims because they raise nonjusticiable political questions and are barred by the *Totten* doctrine. *Third*, the Vice President is absolutely immune from suits for civil damages. *Fourth*, special factors counsel hesitation by the Court in recognizing for the first time Plaintiffs' *Bivens* claims. *Fifth*, the Vice President is entitled to qualified immunity. *Sixth*, Plaintiffs' state law claim must be dismissed because it does not state a claim upon which relief can be granted and because the United States—and not the Vice President—is the proper Defendant.

## STATEMENT OF FACTS

Defendant Richard B. Cheney is the Vice President of the United States. The Vice Presidency is a unique constitutional office. It performs both executive and legislative functions. *See* U.S. Const. art. II & amends. XII & XXV (executive) and U.S. Const. art. I, § 3 (legislative). Much of what the Vice President does consists of performing "functions specially

1

assigned to the Vice President by the President in the discharge of executive duties and responsibilities." 3 U.S.C. § 106(a) (2000). Among the Vice President's most important functions is his involvement in national security issues. *See, e.g.,* 50 U.S.C. § 402(a) (2000) (Vice President's membership on National Security Council). Defendant I. Lewis Libby, Jr. was Chief of Staff to the Vice President and Assistant to the Vice President for National Security Affairs until 2005.

Plaintiffs Valerie Plame Wilson ("Mrs. Wilson") and her husband Joseph C. Wilson, IV ("Mr. Wilson") (collectively "Plaintiffs") bring this suit seeking damages and asserting an organized effort "among current and former high-level officials in the White House . . . to violate [their] constitutional and other legal rights." Amended Complaint ("Am. Compl.") ¶ 2. Plaintiffs allege that these officials "sought to punish Mr. Wilson for his public statements regarding assertions by the President of the United States in the 2003 State of the Union address that he used to justify war against Iraq." *Id.* Plaintiffs claim that "as their chief method of punishment, the White House officials destroyed Mrs. Wilson's cover by revealing her classified employment with the CIA to reporters." *Id.* All of Plaintiffs' causes of action are premised on the allegation that Mrs. Wilson's CIA status had been classified or secret or covert.[1]

Although Plaintiffs' Amended Complaint makes passing allegation of a

---

[1] *See* Am. Compl. ¶ 7 ("Her employment status was classified . . . ."); *id.* ¶ 14 ("Mrs. Wilson's previously secret and classified CIA identity became public."); *id.* ¶ 21 ("In July 2003, the fact that Valerie Wilson was a CIA officer was classified. . . ."); *id.* ¶ 35 (referring to "the classified CIA identity of . . . Valerie Plame Wilson"); *id.* ¶ 61 ("[T]he exposure of the Plaintiff's covert status injured her ability to obtain other employment."); *id.* ¶ 63 ("Defendants acted intentionally or at least with deliberate indifference in acting to deprive Valerie Wilson of her employment with the federal government by eliminating the secrecy of her status that was essential to her continuing to perform her job.").

"conspiracy," *id.* ¶ 24, *Plaintiffs do not plead a count for conspiracy.*[2]  Instead, Plaintiffs raise

five other counts against the Vice President.  Plaintiffs allege (1) a violation of the First

Amendment Right to Freedom of Speech, *id.* ¶¶ 46-49; (2) a violation of the Fifth Amendment

Right to Equal Protection of the Laws, *id.* ¶¶ 50-54; (3) a violation of the Fifth Amendment right

to privacy, *id.* ¶¶ 55-58; (4) a violation of the Fifth Amendment right to property, *id.* ¶¶ 59-64;

and (5) a common law tort of public disclosure of private facts, *id.* ¶¶ 65-70.

      In support of these five causes of action, Plaintiffs include only four allegations

involving the Vice President—one of which is a wholly conclusory allegation of concerted

wrongdoing with other defendants.  They allege, first, that "[o]n or about June 12, 2003, Libby

was advised by the Vice President of the United States that Wilson's wife worked at the Central

Intelligence Agency in the Counterproliferation Division," Am. Compl. ¶ 19(h); second, that the

Vice President annotated a copy of Mr. Wilson's July 6, 2003, *New York Times* Op-Ed piece, *id.*

¶ 19(o); third, that "[o]n or before July 8, 2003, Vice President Cheney advised Libby that the

President of the United States specifically had authorized Libby to disclose to *New York Times*

reporter Judith Miller certain information from an October 2002 National Intelligence Estimate

concerning Iraq and weapons of mass destruction in order to rebut Mr. Wilson," *id.* ¶19(q);[3] and

fourth, that "[u]pon information and belief, Defendants Cheney, Rove, Libby, and John Does 1-

10 reached an agreement to discredit, punish, and seek revenge against the Plaintiffs that

included, among other things, disclosing to members of the press Valerie Plame Wilson's

classified CIA employment." *Id.* ¶ 24.

---

[2] *Compare* Amended Complaint *with* initial Complaint filed July 13, 2006 (alleging claim for civil conspiracy).

[3] Notably, as to the third allegation, Plaintiffs do not plead that this "certain information" concerned Mrs. Wilson's status or that it was made for any purpose other than to rebut public statements made by Mr. Wilson.

Plaintiffs also allege that on July 14, 2003, Robert Novak published a column in which he allegedly disclosed Mrs. Wilson's CIA employment status. *Id.* ¶ 19(h). To be clear, Plaintiffs do not allege that the Vice President ever himself spoke to either Novak or any other member of the media about Mrs. Wilson's status. Nor do Plaintiffs allege that the Vice President violated any laws when he allegedly discussed with Mr. Libby that Mrs. Wilson wife worked at the CIA. The essence of their suit against the Vice President is that in allegedly disclosing Mrs. Wilson's CIA employment status to his chief of staff and national security advisor, the Vice President participated in depriving Mr. and Mrs. Wilson of assorted constitutional and other common law rights.

## ARGUMENT

For purposes of a motion to dismiss, a court "must accept as true all the factual allegations [contained] in the complaint*." Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). Nonetheless, it is appropriate to dismiss a complaint for failure to state a claim where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (*citing* Fed. R. Civ. P. 12). *See also Loughlin v. U.S.*, 393 F.3d 155, 162-163 (D.C. Cir. 2004) (quoting and adopting *Conley*'s standard as the proper test for when "a complaint may be dismissed on jurisdictional grounds").

## I.    Plaintiffs' Suit Against the Vice President Must Be Dismissed as Time-Barred.

Plaintiffs' claims must be dismissed in their entirety because they are time-barred by the applicable District of Columbia statute of limitations. Plaintiffs filed this suit on July 13, 2006. The Amended Complaint alleges that the Vice President made Mr. Libby aware that Mrs. Wilson worked for the CIA on June 12, 2003, but it does not allege that the Vice President

himself ever spoke to the media. Nor do Plaintiffs plead a count for conspiracy or otherwise plead facts sufficient to impute the conduct of others to him. Plaintiffs' conclusory *references* to a conspiracy, which lack any specificity as to when and how the alleged agreement was reached, do not adequately plead a conspiracy and cannot be construed as having done so. *See Herbage v. Meese*, 747 F.Supp. 60, 65 (D.D.C. 1990) (dismissing a *Bivens* conspiracy suit against DOJ officials and explaining that "[s]omething stated as fact does not make it fact. 'A plaintiff's bare conclusions of law, or sweeping unwarranted averments of fact, will not be deemed admitted' for purposes of a motion to dismiss . . . .") (*citing Haynesworth v. Miller*, 820 F. 2d 1245, 1254 (D.C. Cir. 1987)). *See also Martin v. Malhoyt,* 830 F.2d 237, 257 (D.C. Cir. 1987) ("[C]onclusory allegations of unconstitutional or otherwise illegal conduct will not withstand a public official's dispositive pretrial motion.").

Although the Amended Complaint alleges no injury traceable to any concrete allegation made against the Vice President, the injuries Plaintiffs do identify were discovered no later than July 14, 2003, when Robert Novak published a column stating that Mrs. Wilson was a CIA employee, and the statute of limitations began running, at the latest, on that date. *See Knight v. Furlow,* 553 A.2d 1232, 1234 (D.C. 1989) (a cause of action accrues when plaintiff has knowledge, or by the exercise of reasonable diligence should have knowledge, of (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing). Despite learning of their alleged injury no later than July 14, 2003, Plaintiffs filed this suit on July 13, 2006.

Plaintiffs' claims are governed by the one-year statute of limitations set forth in D.C. Code §12-301(4) and are therefore barred.

A. **A One-Year Limitation Period Governs Plaintiffs' Fifth Count for Public Disclosure of Private Facts and Requires Its Dismissal.**

Plaintiffs' claim for public disclosure of private facts is governed by a one-year statute of limitations. In the District of Columbia, a one-year statute of limitations applies to torts of "libel, slander, assault, battery, mayhem, wounding, malicious prosecution, false arrest or false imprisonment." *See* D.C. Code § 12-301(4). Privacy torts, including the public disclosure of private facts, are treated as a species of defamation torts for statute of limitations purposes. *See Nix v. Hoke*, 139 F. Supp. 2d 125, 134 n.9 (D.D.C. 2001); *Grunseth v. Marriott*, 872 F. Supp. 1069, 1074-75 n.12 (D.D.C. 1995), *aff'd*, 79 F.3d 169 (D.C. Cir. 1996) ("This [one-year] limitation has been applied to invasion of privacy claims in the District of Columbia on the rationale that invasion of privacy is essentially a type of defamation."). Plaintiffs filed suit against the Vice President approximately three years after the statute of limitations began running. Their fifth cause of action is therefore barred by the one-year statute of limitations, and must be dismissed.

B. **Plaintiffs' Constitutional Torts Must Also Be Dismissed as Time-Barred.**

Plaintiffs' remaining four constitutional torts must also be dismissed as outside the governing one-year statute of limitations. "When no federal statute of limitations governs the period of repose for actions brought under the . . . rationale of *Bivens*, a federal court must look to the limitations period applicable to *the most nearly analogous state cause of action*." *Hobson v. Wilson*, 737 F.2d 1, 32 (D.C. Cir. 1984) (emphasis added) (citation omitted) (*citing Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 462 (1975)). In identifying the analogous state cause of action for Plaintiffs' constitutional torts, the Court need not look any further than Plaintiffs' fifth cause of action for public disclosure of private facts. The D.C. Circuit has held that a telling indicator for determining the analogous cause of action is whether it is "so alike that plaintiffs

can be expected to plead the common law claim as a pendent claim in constitutional suits."

*McClam v. Barry*, 697 F.2d 366, 375 (D.C. Cir. 1983) (alterations and quotation marks

omitted) (overruled on other grounds by *Brown v. United States*, 742 F. 2d 1498, 1509 (D.C. Cir.

1984)). In *McClam*, the court found that a one-year statute of limitation applied to a

constitutional assault claim which was pled concurrent with a state common law assault claim.

Assault was specifically listed in D.C.'s one-year statute of limitation, and so the court applied

the same limitation to the attached constitutional claim. Here, as in *McClam*, D.C.'s one-year

statute governs the tort of public disclosure of private facts. *See Nix*, 139 F. Supp. 2d at 134 n.9;

*Grunseth*, 872 F. Supp. at 1074-75 n.12. The constitutional torts are therefore likewise governed

by the one-year limitations period.

     In explaining the process for identifying the most closely analogous claim, the

*McClam* court further instructed that "[f]or such pairs of claims, the facts to be proved are

largely the same, and principally for that reason but also because the two claims grow out of the

same incident and seek to vindicate the same interests, settled expectations must be judged the

same." 697 F.2d at 375. Here, as to Plaintiffs' single count for public disclosure of private facts

and four counts of constitutional violations, "the facts to be proved are largely the same" and the

state and federal claims "grow out of the same incident and seek to vindicate the same interests."

*Id*. That observation applies literally to the Amended Complaint: each of Plaintiffs' five counts

begins by stating in identical language that "[t]he Plaintiffs restate as if fully set forth here each

and every claim, assertion, and allegation set forth in the foregoing Paragraphs 1 through 40 of

this Complaint." Am. Compl. ¶¶ 46, 50, 55, 59, 65. And as a practical matter, all of Plaintiffs'

counts rely on the same facts and seek redress for the same injuries that the Plaintiffs allegedly

suffered when the Vice President allegedly discussed Mrs. Wilson's CIA status with his chief of

staff.  There can be no doubt that in pleading the common law tort pendent to the constitutional

torts, Plaintiffs rely on the same facts and seek to vindicate the same interests.

      *McClam*'s holding that *Bivens* statutes of limitations are determined by analogous

claims compels dismissal here where the state law tort of public disclosure of private facts is

attached to, and is closely analogous to, the constitutional torts concurrently pled.  *See also Doe*

*v. U.S. Dept. of Justice*, 753 F.2d 1092, 1114 (D.C. Cir. 1985) (court "can discern no difference

in the practicalities of or the policies behind a *Bivens* action for the deprivation of a liberty

interest in reputation and an ordinary defamation claim"); *Browning v. Clinton*, 2001 U.S. Dist.

LEXIS 24537, *39 (D.D.C. 2001), *aff'd, Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002)

(noting that with respect to plaintiff's *Bivens* claims for threats to defame her, "it would seem

logical to apply the one year period to them").  The one-year statute of limitations therefore bars

all of Plaintiffs' claims.[4]

## II.    This Court Lacks Jurisdiction Over Plaintiffs' Claims Because They Raise Non-Justiciable Political Questions and Are Barred by the *Totten* Doctrine.

      Every one of Plaintiffs' causes of action derives from Plaintiffs' factual assertion

to the effect that Mrs. Wilson's employment status at the CIA had been "classified" or "secre[t]"

or "covert."  *See, e.g.,* Am. Compl. ¶ 7 ("Her employment status was classified . . . .") and ¶ 14

("Mrs. Wilson's previously secret and classified CIA identity became public.").[5]  Responsibility

---

[4] *McClam*'s statute of limitations holding remains good law and has been implicitly affirmed as recently as five years ago in *Browning*.  However, the Vice President brings to this Court's attention the decisions of the Supreme Court in *Wilson v. Garcia*, 471 U.S. 261 (1985), and *Owens v. Okure*, 488 U.S. 235 (1989).  These cases address the question of the applicable statute of limitations under 42 U.S.C. § 1983.  *Owens* held that, in the case of a § 1983 action, the proper statute of limitations is a state's residual provision rather than a more specific analogous state limitations period.  Neither the Supreme Court nor the D.C. Circuit has extended the *Wilson* and *Owens* rationale to *Bivens* cases.

[5] *See also supra* n.1.

for national security rests, of course, with the political branches of the federal government. That responsibility is of the utmost importance, and "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." *Snepp v. United States*, 444 U.S. 507, 509, 510 n.3 (1980) (per curiam).

Those protections are effectuated through Congressional enactments such as the Intelligence Identities Protection Act and through the President's constitutional power in the foreign policy field, which the Supreme Court has described as "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). Because the power to obtain, control and classify intelligence is a necessary concomitant of this Executive power, the Supreme Court has recognized that:

> [A]uthority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant.

*Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988).

The power to disclose classified information rests with the political branches of the federal government. Aggrieved individuals are not authorized to place their allegedly classified status in issue in judicial proceedings. Federal courts likewise lack jurisdiction to consider claims concerning private conversations among public officials addressed to national security issues.

**A.    Plaintiffs' Claims Against the Vice President Should Be Dismissed Because They Present Nonjusticiable Political Questions.**

Plaintiffs do not allege that the Vice President's communications with Mr. Libby,

9

his national security advisor and chief of staff, were random acts or otherwise inexplicable. To the contrary, Plaintiffs allege that the conduct of which they complain occurred as part of an administration response to Mr. Wilson's very public criticisms of administration foreign policy. *See*, *e.g.*, Am. Compl. ¶ 2 ("[O]fficials sought to punish Mr. Wilson for his public statements regarding assertions by the President of the United States in the 2003 State if the Union address. . . ."). According to the Amended Complaint, Mr. Wilson's July 6, 2003, Op-Ed piece "focused the attention of the Vice President . . . on Mr. Wilson, on the assertions made in his article, and on responding to those assertions." *Id.* ¶19(o). Also according to the Amended Complaint, in that article (and in print and television interviews), Mr. Wilson made a number of statements relating directly to the alleged factual basis of administration policy on Iraq: "that he had taken a trip to Niger at the request of the CIA to investigate allegations that Iraq had sought or obtained uranium yellowcake from Niger," *id.* ¶ 19(n); "that he doubted Iraq had obtained uranium from Niger recently, *id.*; and "that he believed, based on his understanding of government procedures, that the Office of the Vice President had been advised of the results of his trip," *id.*

In short, Plaintiffs allege that defendants committed constitutional and common law torts in direct reaction to Mr. Wilson's public statements on matters of national security and foreign policy. Claims arising from the kind of statements and conduct alleged against the Vice President here – performed in the exercise of his authority in the national security field – are nonjusticiable.

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), is directly on point. In *Schneider*, plaintiffs (family members of a deceased Chilean general) alleged a host of tort claims against former national security advisor Henry Kissinger relating to the conduct of U.S. foreign policy in the early 1970s. Specifically, plaintiffs alleged that Kissinger had assisted in

planning a military coup in Chile and, to advance that goal, had authorized summary execution, torture, cruel treatment and other torts. Defendants moved for dismissal based on the absence of subject matter jurisdiction. Plaintiffs countered that the political question doctrine did not apply to tort claims. The District Court granted that motion on the ground that the political question doctrine rendered plaintiffs' claims nonjusticiable. *Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005).

The Court of Appeals affirmed on the ground that the tort claims were indeed nonjusticiable. The court quoted the Supreme Court's six-factor test set out in *Baker v. Carr*, 369 U.S. 186 (1962), and rested its decision on the first four of those factors: that there existed [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; and [4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government. *Schneider*, 412 F.3d at 194. The Court of Appeals noted that in order to "find a political question, we need only conclude that one factor is present, not all." *Id.*

First, the *Schneider* court found that the essential nature of the action – a dispute about the conduct of U.S. foreign policy – was a subject "textually committed to the political branches of government." 412 F.3d at 194. The power to conduct foreign policy and assure national security resided with the legislative and executive branches. *Id.* at 194-95. That plaintiffs had alleged tortious conduct by executive branch officials in the course of exercising a foreign relations/national security function was of no moment. "[D]ecision-making in the areas of foreign policy and national security is textually committed to the political branches." *Id.* at

195. Administration decisions in those areas, whether wise or unwise, are "classically within the province of the political branches, not the courts." *Id.*

Second, the court concluded that it "lack[ed] judicially discoverable and manageable standards for resolving [the dispute]." *Id.* at 196 (*quoting Baker*, 369 U.S. at 217). The court noted that "it is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role." *Id.* (quotation marks omitted). Plaintiffs argued that there was no intrusion into executive functioning and that the court need only apply recognized tort law principles. The Court of Appeals, quoting the District Court, disagreed, stating that "[r]esolving the present lawsuit would compel the court, at a minimum, to determine whether actions or omissions by an Executive Branch officer in the area of foreign relations and national security were 'wrongful' under tort law." *Id.* at 196-97 (*quoting Schneider*, 310 F. Supp. at 262). The court noted that in order to determine the wrongfulness of the official's conduct, "the court would have to define the standard for the government's use of covert operations in conjunction with political turmoil in another country. There are no judicially discoverable and manageable standards for the resolution of such a claim."[6] *Id.* at 197.

The *Schneider* analysis applies here. First, the Amended Complaint's allegations establish that its subject is in substantial measure the conduct of U.S. foreign policy toward Iraq and national security issues relating to it. The Amended Complaint makes factual allegations relating to the Vice President's role in the conduct of national security policy. It makes allegations relating to Mrs. Wilson's alleged national-security-related roles. And it makes

---

[6] The *Schneider* court went on to find that an additional two of the *Baker v. Carr* factors were present: that judicial resolution would require an initial policy determination of a kind clearly for nonjudicial discretion; and, that the court could not proceed without expressing a lack of respect for coordinate branches of government.

allegations relating to Mr. Wilson's alleged role in the gathering of foreign intelligence and as

critic both of foreign policy and of conclusions drawn by the government relating to national

security. Indeed, the Amended Complaint's three concrete allegations of fact against the Vice

President are that he advised his national security advisor and chief of staff, Mr. Libby, "that

Wilson's wife worked at the Central Intelligence Agency in the Counterproliferation Division,"

Am. Compl. ¶ 19(h); that the Vice President annotated a copy of Mr. Wilson's July 6 Op-Ed

piece, *id.* ¶ 19(o) and that he authorized Mr. Libby to discuss certain information with *New York*

*Times* reporter Judith Miller. It is indisputable that Plaintiffs' allegations touch directly upon the

Vice President's functioning in the national security field.

Second, Plaintiffs would make the Vice President's internal communications on a

national security issue the subject of a civil (and very public) lawsuit. Plaintiffs invite the

judicial branch to permit intrusive discovery into those communications and to discern which

among them might be, as a matter of tort law, wrongful and which not. Such an inquiry cannot

be squared with basic separation of powers principles. "[S]eparation of powers concerns . . . are

especially prominent in the national security field." *Halperin v. Kissinger*, 807 F.2d 180, 187

(D.C. Cir. 1986). Resolution of Plaintiffs' claims would (i) necessitate judicial review of private

communications between the Vice President and his national security advisor on issues relating

to national security and foreign policy and (ii) require the court to distinguish which, if any, of

such communications are actionable by private persons and which are not subject to further

judicial scrutiny. There exist no "judicially discoverable or manageable standards for resolving"

such questions. *Baker*, 369 U.S. at 217. As the D.C. Circuit has written: "[I]t is within the role

of the executive to acquire and exercise the expertise of protecting national security. It is not

within the role of the courts to second-guess executive judgments made in furtherance of that

branch's proper role." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 932 (D.C. Cir. 2003).

A third reason for finding this type of dispute nonjusticiable was identified in *Baker v. Carr* and noted by the D.C. Circuit in *Schneider*: the concern that a "court could not proceed without expressing a lack of respect to coordinate branches of government." 412 F.3d at 198. Here, the specific allegations against the Vice President do not allege conduct that is in itself remotely wrongful. The allegations that the Vice President allegedly spoke to his national security advisor about Mrs. Wilson or made notes on Mr. Wilson's July 6 Op-Ed piece are no basis for judicial intrusion in the workings of the Office of the Vice President. Most charitably construed, these insubstantial allegations are an invitation to this Court to oversee a fishing expedition into the workings of the Office of the Vice President relating to communications about national security issues. For this Court to proceed on a complaint of this sort would indeed express a lack of respect for the Vice Presidency. For that reason too, the Amended Complaint should be dismissed as nonjusticiable.

**B.    Plaintiffs' Claims Are Barred Under the *Totten* Doctrine.**

Because Plaintiffs' causes of action necessarily rest on allegations concerning Mrs. Wilson's allegedly classified status, they are barred by the doctrine of *Totten v. United States*, 92 U.S. 105 (1875). In *Totten*, the representative of decedent, a former Union spy, brought a breach of contract action against the federal government for its failure to compensate him for "secret service" performed pursuant to the alleged contract. Affirming the lower court's outright dismissal, the Supreme Court stated, in sweeping terms, that "[t]he secrecy which such contracts impose precludes *any action* for their enforcement." 92 U.S. at 107 (emphasis added). The Court described the secret services at issue in the following terms: "The service . . . was a secret service . . . the employment and the service were to be equally concealed. *Both employer*

14

*and agent must have understood that the lips of the other were to be for ever sealed respecting the relation of either to the matter.*"  *Id.* at 106 (emphasis added).  The Court went on to state that "public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential." *Id.* at 107.  *See also Weinberger v. Catholic Action*, 454 U.S. 139, 146-47 (1981) (same) (dismissing action that would have required Navy to admit or deny national security purpose associated with project).

The *Totten* principle was reaffirmed as recently as a year ago in *Tenet v. Doe*, 544 U.S. 1 (2005).  In *Tenet*, two foreign nationals who claimed to have done espionage work for the United States brought Due Process and estoppel claims against the CIA director, alleging that the CIA had reneged on an agreement to provide them financial assistance in return for their espionage services.  In *Tenet*, the Government neither confirmed nor denied the plaintiffs' allegations as to the alleged services they provided.  544 U.S. at 3 n.1.  Faced with the Government's objection that the action was barred by the *Totten* rule, the Ninth Circuit had allowed the Does' action to go forward, reasoning that *Totten* precluded only breach-of-contract claims.  The Supreme Court unanimously reversed.  Chief Justice Rehnquist emphasized that the public policy upon which *Totten* rested forbade "the maintenance of *any suit* in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential.'"  544 U.S. at 8 (*quoting Totten*, 92 U.S. at 107).  The Court went on to pronounce a rule directly applicable to Plaintiffs' claims here: "No matter the clothing in which alleged spies dress their claims, *Totten precludes judicial review* in cases such as respondents' *where success depends upon the existence of their secret espionage relationship with the Government.*"  *Id.* (emphases added).

This Court need not look very far ahead in this case to see why *Totten*'s concern is directly implicated here and why this Court lacks jurisdiction over this case. For example, Mrs. Wilson alleges that she had a constitutionally protected property interest in her CIA status, *see* Am. Compl. ¶ 60, an interest allegedly violated by the Vice President's alleged discussion of that status with his national security advisor. What was that alleged property interest? What features of her allegedly classified employment relationship were damaged by the defendants' alleged conduct? Mrs. Wilson also alleges that she was "impaired in her ability to carry out her duties at the CIA." *Id.* ¶ 43. What were those duties? How was Mrs. Wilson's performance of those duties impaired? In order to succeed on her claims, Mrs. Wilson would appear to be required to prove not only that she worked at the CIA and that her status was classified, but also other factual details implicating her alleged injury and damages. These questions are only the most obvious concerns, visible on the face of the Amended Complaint. That Amended Complaint has placed Mrs. Wilson's relationship with the CIA (both before and after the alleged disclosure) and the duties she allegedly performed there at the center of this case. The *Totten* doctrine forbids judicial inquiry into such matters.

Although it seems certain that Plaintiffs' own allegations would require the disclosure of classified information, their claims are not saved even if they maintain otherwise. As the court pointed out in *Kielczynski v. CIA*, 128 F.Supp.2d 151 (E.D.N.Y. 2001), *aff'd sub nom.*, *Kielczynski v. John Does 1-2*, 56 F. App'x 540 (2d Cir. 2003), "the availability of the *Totten* doctrine is not affected by a plaintiff's allegation that adjudication of his claims would not force the United States to reveal additional information that might compromise national security." *Id.* at 163. The court noted that an individual's viewpoint on the character of allegedly secret or classified information, and the government's perception of that same

information, might be very different. The plaintiff's perspective does not control. "The decision of whether information that must be revealed is sensitive, including even an admission or denial of the existence of a secret espionage contract, is reserved under *Totten* to the United States." *Id.* at 164.

Nor does it make any difference that Mrs. Wilson now alleges that her classified status has been disclosed. "*Totten* is not limited to currently active spies." *Doe v. Tenet*, 353 F.3d 1141, 1145 (9th Cir. 2004) (opinion of five judges dissenting from denial of request for rehearing en banc), *rev'd by* 544 U.S. 1 (2005). As the government argued in *Guong v. United States*, 860 F.2d 1063, 1065-67 (Fed. Cir. 1988), "neither publications nor the passage of time obviate the Government's need to protect secret [or classified] information." *Id.* at 1066 (quotation marks omitted) (applying *Totten* to dismiss claim of alleged former spy who argued that published materials had eliminated risk that litigation would expose covert character of his employment).

In the language of *Tenet v. Doe*, there are no clothes in which Mrs. Wilson can "dress [her] claims" that would permit this court to intrude into "her duties at the CIA," Am. Compl. ¶ 43, *i.e.*, the protected details of her alleged relationship with the government. This is simply not a normal employment dispute, and the Court cannot treat it as such. The CIA is specifically exempted by statute from the presumption of disclosure applicable to other government employment relations. *See* 50 U.S.C. 403g ("[T]he Agency shall be exempted from the provisions... of any ... law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency."). For these reasons, Plaintiffs' claims, which rest upon the allegation that Mrs. Wilson's CIA employment status was classified or covert, must be dismissed.

**III.    The Amended Complaint Must Be Dismissed Because the Vice President Is Absolutely Immune from Civil Suits Seeking Damages.**

The Amended Complaint should be dismissed in its entirety because the Vice President of the United States is absolutely immune from civil suit when acting in an official capacity. The Supreme Court recognized absolute immunity for the President in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), and subsequently applied that case's "separation-of-powers considerations" to the Vice President in *Cheney v. United States District Court*, 542 U.S. 367, 382 (2004). A consideration of these separation-of-powers concerns and a recognition of the unique role of the Vice President compel the conclusion that the Vice President is absolutely immune from civil suit for his official actions.

The Supreme Court "consistently has recognized that government officials are entitled to some form of immunity from suits for civil damages." *Fitzgerald*, 457 U.S. at 744. *See also Butz v. Economou*, 438 U.S. 478, 508 (1978) ("[O]ur decisions recognize that there are some officials whose special functions require a full exemption from liability."). In deciding the scope of immunity for public officials, courts consider "the Constitution, federal statutes, and history," *Fitzgerald*, 457 U.S. at 747; "concerns of public policy, especially as illuminated by our history and the structure of our government," *id.* at 747-48; and "the immunity historically accorded the relevant official at common law and the interests behind it," *Butz*, 438 U.S. at 508. Applying these principles, the Supreme Court has recognized absolute immunity for officials such as state judges acting in their judicial capacity, *see Pierson v. Ray*, 386 U.S. 547 (1967), and state prosecutors exercising prosecutorial discretion, *see Imbler v. Pachtman*, 424 U.S. 409 (1976). With respect to executive officials in general, they have absolute immunity when acting in judicial or prosecutorial capacities, and potentially in other contexts if it is shown that "public policy requires an exemption of that scope." *Butz*, 438 U.S. at 506.

In *Fitzgerald*, the Supreme Court considered a claim of immunity by the President. The *Fitzgerald* plaintiff was a former Department of the Air Force employee who claimed that his discharge during the Nixon Administration was in retaliation for his public statements about cost overruns in the production of a government transport plane. The former President asserted absolute immunity from suit. In considering this claim, the Court observed that the President "must concern himself with matters likely to 'arouse the most intense feelings,'" 457 U.S. at 751-52 (*quoting Pierson*, 386 U.S. at 554); "has discretionary responsibilities in a broad variety of areas, many of them highly sensitive," *id.* at 756; and takes actions that have effect "on countless people," *id.* at 753. The scope and sensitivity of the President's duties make him "an easily identifiable target for suits for civil damages." *Id.* The Court was concerned that "[c]ognizance of this personal vulnerability" to civil suit "frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* The *Fitzgerald* Court pointed out that the prospect of civil suits targeting the President presented "unique risks to the effective functioning of government." *Id.* at 751. For those reasons, the Court recognized "absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Id.* at 756.

The Court revisited the *Fitzgerald* principles in the more recent *Cheney* case. In *Cheney*, public interest groups filed a civil action and sought discovery of an energy policy development group that the President established and of which the Vice President had been chairman. The Vice President filed a petition for writ of mandamus with the Court of Appeals, arguing immunity from suit. The Court of Appeals ruled that it was without authority to issue the writ, because the Vice President could assert privilege in the discovery process before the

District Court.  The Supreme Court held that the Court of Appeals erred by not considering the nature of the Vice President's office.  The Court began by reviewing the cases on *Presidential* immunity.  The Court observed that the "President's communications and activities encompass a vastly wider range of sensitive material than would be true of any 'ordinary individual,'" 542 U.S. at 381 (*quoting United States v. Nixon*, 418 U.S. 683, 715 (1974)); that the President's office occupies a "unique position in the constitutional scheme," *Cheney*, 542 U.S. at 382 (quoting *Fitzgerald*, 457 U.S. at 749); that the judiciary must "afford Presidential confidentiality the greatest protection consistent with the fair administration of justice," *id.* (*quoting Nixon*, 418 U.S. at 715); and that courts must "give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties," *id.* at 382.  The Court concluded that "[t]hese separation-of-powers considerations should inform a court of appeals' evaluation of a mandamus petition involving the President *or the Vice President*."  *Id.* at 382 (emphasis added).  The Court also noted that the need for information was not as compelling in a civil case as it is in a criminal context, and it concluded that institutional separation-of-powers concerns had a critical role to play in the analysis.

The *Cheney* Court's separation-of-powers analysis and the Vice President's unique constitutional status together justify a finding of absolute immunity from suit in the present case.  Among the more important considerations is the close link – both in the public eye and in the operations of the respective offices – between the President and the Vice President. The Vice President holds a unique office with both executive and legislative functions.  And of course, the Vice President becomes the President in the event of the President's death or incapacity.  U.S. Const. amend. XXV.

The Vice President occupies a distinctive and highly visible position as one of only two nationally elected officials. Although the original Constitution provided for the Vice President to be the second highest electoral vote-getter after the President, that procedure was changed by the Twelfth Amendment so that the candidates may seek one or the other office, but not both. In today's practice, where the candidate for President chooses his running-mate for Vice President and they run on the same ticket, the offices are inextricably linked in the public eye. The Supreme Court has observed that due to the "visibility of the Offices of the President and the Vice President and the effect of their actions on countless people," they are both "easily identifiable target[s] for suits for civil damages." *Cheney*, 542 U.S. at 386 (*quoting Fitzgerald*, 457 U.S. at 751) (internal quotation marks omitted).

The close link between the President and Vice President is not just a matter of public perception. The primary role of the Vice President today is to work with the President on matters that the President has entrusted to the Vice President. This role has been recognized by statute. Congress has authorized the Vice President to appoint certain employees and employ other experts and consultants, "[i]n order to enable the Vice President to provide assistance to the President in connection with the performance of functions specially assigned to the Vice President by the President in the discharge of executive duties and responsibilities." 3 U.S.C. § 106(a).

The close working relationship between the offices of the President and the Vice President and the nature of the Vice President's duties (not least the national security functions at issue here) counsel the extension of absolute immunity to the Vice President. The Vice President often performs tasks with scope and sensitivities similar to those that have supported a finding of absolute immunity for the President. The allegations of the present Amended

21

Complaint provide an example. Although the focus of the Amended Complaint is on the alleged disclosure of Mrs. Wilson's CIA employment status, it is not limited to this alone. The Amended Complaint sweeps more broadly to include other conduct that is alleged to have been done "to discredit, punish, and seek revenge against the Plaintiffs." Am. Compl. ¶ 24. Among the allegations in the Amended Complaint is that "[o]n or before July 8, 2003, Vice President Cheney advised Libby that the President of the United States specifically had authorized Libby to disclose to *New York Times* reporter Judith Miller certain information from an October 2002 National Intelligence Estimate concerning Iraq and weapons of mass destruction in order to rebut Mr. Wilson." *Id.* at 19(q).

   The Amended Complaint on its face raises issues relating to national security and foreign affairs. More specifically, it puts at issue the authorization by the President of the disclosure of information contained in a National Intelligence Estimate. If this case is permitted to go forward, Plaintiffs have signaled an intention to seek discovery with respect to not only the Vice President's conduct, but also to what *the President* did or did not say with respect to certain allegedly classified information. The Supreme Court has made abundantly clear that this sort of inquiry is not the proper function of the judiciary: "It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret." *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). *See also* discussion of nonjusticiability in Part II-A, *supra*.

   The Vice President, like the President, is a nationally elected official.[7] The two

---

[7] In this critical respect, the Vice President is fundamentally different from a Cabinet member such as the Attorney General, *see Mitchell v. Forsyth*, 472 U.S. 511 (1985), or the National Security Advisor, *see Halperin v. Kissinger*, 807 F.2d 180 (D.C. Cir. 1986). These officials are appointed and not elected. Unlike the President and Vice President, they are not subject to direct political check through the ballot box.

offices work closely together on sensitive issues affecting the lives of countless people. The Vice President, like the President, is highly visible and therefore a likely target for civil litigation. Such litigation runs the unacceptable risk of interfering with the function of the Vice President's office – and the President's office – and of implicating the judiciary in the review of core Executive functions such as national security policy and the conduct of foreign affairs. Subjecting the Vice President to civil suits would thus present "unique risks to the effective functioning of government." *Fitzgerald*, 457 U.S. at 751. Accordingly, given the functions of the Vice President's office and its unique position in the constitutional structure, this Court should hold that the Vice President is entitled to absolute immunity from civil suit with respect to actions taken in his official capacity.

## IV.    Special Factors Counsel Hesitation in the Recognition of the New *Bivens* Remedies Sought in the Amended Complaint.

### A.    Supreme Court Precedent Requires Courts to Be Reluctant to Recognize New *Bivens* Remedies.

Plaintiffs ask this Court to recognize four new constitutional remedies under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), despite the fact that the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001). The four constitutional violations that Plaintiffs plead have never been recognized under *Bivens*, and special factors counsel hesitation by this Court in recognizing them for the first time.

In *Bivens,* the Supreme Court held that the plaintiff could sue federal narcotics agents for damages he allegedly suffered as a result of their warrantless search of his home in violation of the Fourth Amendment of the Constitution. Even as the *Bivens* Court recognized an

implied right of action under the Fourth Amendment to the Constitution, it qualified its holding

by noting that under the facts presented to it, there were "no special factors counseling

hesitation." 403 U.S. at 396. Since *Bivens*, the Supreme Court has only twice recognized

additional implied rights of action for constitutional torts, most recently twenty-six years ago.

*See Carlson v. Green*, 446 U.S. 14 (1980) (recognizing implied right of action under the cruel

and unusual punishments clause of the Eighth Amendment against individual officers in suit

arising from treatment of federal prisoner); *see also Davis v. Passman*, 442 U.S. 228 (1979)

(recognizing implied right of action under the Due Process Clause of the Fifth Amendment

against individual officers).

By contrast, the Court has explicitly rejected the invitation to recognize new

*Bivens* remedies in each and every case it has considered in the past quarter-century. *See*

*Malesko*, 534 U.S. 61 (rejecting *Bivens* claim against private operator of halfway house); *FDIC*

*v. Meyer*, 510 U.S. 471 (1994) (unanimously declining to extend *Bivens* to permit suit against a

federal agency, even where Congress had waived its sovereign immunity); *Schweiker v. Chilicky*,

487 U.S. 412 (1988) (refusing to extend *Bivens* to damages action against individual

Government employees alleged to have violated Due Process in their handling of Social Security

applications); *Chappell v. Wallace*, 462 U.S. 296 (1983) (rejecting *Bivens* remedy for military

personnel against superior officers); *Bush v. Lucas*, 462 U.S. 367 (1983) (refusing to extend

*Bivens* to an alleged retaliatory violation of the First Amendment brought by federal employee).

Indeed, some members of the Court have characterized the recognition of *Bivens* remedies as "a

relic of the heady days in which this Court assumed common-law powers to create causes of

action—decreeing them to be 'implied' by the mere existence of a statutory or constitutional

prohibition." *Malesko*, 534 U.S. at 75 (Scalia, J., concurring and Thomas, J., joining in the concurrence).

### B.  Several Factors Counsel Hesitation in Recognizing New *Bivens* Remedies Here.

Where the Supreme Court has declined to recognize a new constitutional tort remedy, it has done so because it has found one or more of the "special factors counseling hesitation" first adumbrated in *Bivens* itself. *Bivens*, 403 U.S. at 396. Federal courts do not recognize new *Bivens* remedies "[w]hen the design of a Government program suggests that Congress has provided what it considers *adequate remedial mechanisms* for constitutional violations that may occur in the course of its administration." *Schweiker*, 487 U.S. at 423 (emphasis added).

#### 1.  Congress Has Established Remedial Mechanisms for the Types of Violations Alleged Here.

##### a.  The Privacy Act Is a Remedial Mechanism that Counsels Hesitation.

The Privacy Act of 1974, codified in part at 5 USC § 522a (2006), counsels against the recognition of a *Bivens* claim because it is precisely the sort of "adequate remedial mechanism" that courts find dispositive in declining to recognize new categories of *Bivens* claims. Congress's intent to provide a remedial mechanism for the sort of claims Plaintiffs allege is apparent from the statement of purpose of the Privacy Act, where Congress explained that:

> The purpose of this Act . . . is to provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies . . . [to be] subject to civil suit for any damages which occur as a result of willful or intentional action which violates any individual's rights under this Act.

Pub. L. No. 93-579, §2(b), 88 Stat. 1896 (1974) (implementing Privacy Act of 1974).

With certain exceptions, the Privacy Act instructs that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ." 5 U.S.C. § 552a(b). The statute defines records covered under the act broadly. They include "any item, collection, or grouping of information *about an individual* that is maintained by an agency." *Id.* § 552a (a)(4) (emphasis added).

The Privacy Act is a comprehensive remedial scheme for government disclosures of private information precluding redress under *Bivens*, and courts in the D.C. Circuit have expressly held so on more than one occasion. In *Chung v. U.S. Dep't of Justice*, No. Civ. 00-1912 (TFH), 2001 WL 34360430 (D.D.C. Sept. 20, 2001), *aff'd in part, rev'd in part,* 333 F.3d 273 (D.C. Cir. 2003), the District Court considered whether a Taiwanese citizen who had secretly cooperated with the federal government in its investigation of unlawful campaign donations could bring suit against the DOJ officials who had allegedly publicly disclosed his identity, endangering his life. The District Court held that the plaintiff could not seek a *Bivens* remedy because the Privacy Act was a broad remedial scheme for the type of harm the plaintiff alleged, and thus counseled hesitation. On appeal, the D.C. Circuit affirmed the lower court's holding without discussion, concluding simply that "the district court correctly held [that plaintiff's claims] are encompassed within the remedial scheme of the Privacy Act." *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003).

Similarly, in *Hatfill v. Ashcroft*, 404 F. Supp. 2d 104, 108 (D.D.C. 2005), the court found that the existence of the Privacy Act counseled hesitation in the recognition of a *Bivens* remedy in plaintiff's suit against government officials who had publicly identified him as

a "person of interest" in the anthrax investigations.  The court found that "the Privacy Act, being

a comprehensive legislative scheme that provides a meaningful remedy for the kinds of harm

[the plaintiff] alleges he has suffered, qualifies it as a special factor counseling hesitation against

the applicability of *Bivens*." *Id.* at 116.  The Privacy Act likewise counsels hesitation in

recognizing the *Bivens* remedy sought here.

        Plaintiffs may attempt to argue that the Privacy Act does not provide adequate

remedies for them because it does not create liability for individual officers who disobey its

terms, or because it does not cover the Vice President. *See, e.g., Schwarz v. U.S. Dept of*

*Treasury,* 131 F.Supp. 2d 142, 147 (D.D.C. 2000), *aff'd,* 2001 WL 674636 (D.C. Cir. 2001)

("Offices within the White House whose functions are limited to advising and assisting the

President do not come within the definition of an 'agency' within the meaning of FOIA or the

Privacy Act.  This includes the Office of the President (and by analogy the Office of the Vice

President) and undoubtedly the President and Vice President themselves.").  However, this is of

no consequence for purposes of the *Bivens* analysis.  Indeed, the mere fact that Congress has

enacted a comprehensive remedial scheme and has specifically *declined* to provide a remedy for

the category of claims Plaintiffs allege against the Vice President counsels hesitation by the

Court in recognizing new remedies under *Bivens*.  "The absence of statutory relief for a

constitutional violation, for example, does not by any means necessarily imply that courts should

award money damages against the officers responsible for the violation." *Schweiker*, 487 U.S. at

421-22.  Indeed, where "the design of the Government program suggests that Congress has

provided what it considers adequate remedial mechanisms for constitutional violations that may

occur in the course of its administration, [the Supreme Court has] not created additional *Bivens*

remedies." *Id.* at 423. *See also Bush*, 462 U.S. at 390 (holding that courts should hesitate to

intrude into decisions as to "whether or not it would be good policy to permit a federal employee to recover damages from a supervisor who has improperly disciplined him for exercising his First Amendment rights").

In *Chung*, the District Court considered and rejected the argument that the Privacy Act's failure to provide specific relief against officers who violated its terms permitted the recognition of a *Bivens* remedy. The court found that:

> [T]he fact that the remedies are not exhaustive neither mandates nor invites the creation of an alternative avenue of relief under the Constitution. Congress has crafted what it considers to be appropriate remedies for disclosure and record access violations. Given the extensiveness of this remedial scheme, its failure to include additional remedies, such as damages against individual officials or punitive damages, does not appear to be inadvertent. Therefore, it would be improper to permit [the plaintiff] to augment his claims under the Privacy Act with additional remedies under the Constitution.

*Id*. at *10.

The court in *Hatfill* reached the same conclusion. The plaintiff there alleged injuries similar to those alleged by Plaintiffs here: he claimed that the government had violated his First Amendment rights and destroyed his employment prospects by disclosing that he was a person of interest in an ongoing anthrax investigation. The plaintiff in *Hatfill* sought to avoid the application of *Chung*'s holding precluding *Bivens* remedies in light of the Privacy Act. He argued that the Privacy Act did not address the "retaliatory use of private information as a way to punish or chill protected speech" and that the Act did not foreclose his First and Fifth Amendment claims even if it "support[ed] a narrowing of those counts to preclude recovery for acts that are compensable under the Privacy Act." 404 F. Supp. 2d at 115 (*quoting* Hatfill Opposition). The court rejected the argument and found that all of the wrongs he alleged were sufficiently addressed by the Privacy Act so as entirely to preclude relief. *Id*. Here, as in *Chung* and *Hatfill*, Plaintiffs' claims are all precluded by the Privacy Act, regardless of whether the Act

provides the specific remedy Plaintiffs seek in this suit. "[T]he Supreme Court has made it clear beyond peradventure that the absence of statutory relief under existing laws is not a basis to imply a damages remedy against federal officials." *Maye v. Reno,* 231 F. Supp. 2d 332, 339 (D.D.C. 2002).

Where there is no evidence that Congress was "inadvertent" in its not affording redress under the remedial scheme it enacted, the Court must not create additional remedies for plaintiffs via *Bivens* actions. *See Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) (en banc) (per curiam) ("[I]t is quite clear that if Congress has not inadvertently omitted damages against officials in the statute at issue, then courts must abstain from supplementing Congress' otherwise comprehensive statutory relief scheme with *Bivens* remedies . . . .").

**b.      The Intelligence Identities Protection Act Counsels Hesitation.**

In addition to enacting the Privacy Act to address disclosures of private information, Congress has also specifically legislated against the disclosure of classified information identifying covert agents. The Intelligence Identities Protection Act of 1982, 50 U.S.C. §§ 421-426, broadly provides criminal penalties for three kinds of disclosures: (i) "Disclosure of information by persons having or having had access to classified information that identifies covert agent," *id.* §421(a); (ii) "Disclosure of information by persons who learn identity of covert agents as result of having access to classified information," *id.* §421(b); and (iii) "Disclosure of information by persons in course of pattern of activities intended to identify and expose covert agents," *id.* §421(c). The law carries penalties of up to ten years in prison for the disclosure of the names and identities of agents by those who have authorized access to classified information that identifies covert agents, and penalties of up to five years in prison for disclosure by those who learn agents' identities through authorized access to general classified information. *See id.* § 421(a), (b).

The injuries Plaintiffs claim all appear to flow from the alleged disclosure of Mrs. Wilson's alleged classified or covert status by federal officials with access to classified information. The Intelligence Identities Protection Act is itself an "adequate remedial mechanism" enacted by Congress and addressed to the conduct about which Plaintiffs complain. That Act addresses unlawful disclosure of information about covert agents in the strongest and clearest terms, yet it contains no private right of action for these or any individual civil plaintiffs. For that reason, it too forecloses recognition of new *Bivens* remedies for Plaintiffs. *See Schweiker*, 487 U.S. at 423.

### 2.    Additional Factors Counsel Hesitation.

In addition to the fact that Congress has enacted remedial legislation addressed to the types of claims Plaintiffs allege, there are additional reasons for this Court to hesitate to recognize new *Bivens* remedies. Plaintiffs' request that this Court oversee inquiry into non-public conversations between the Vice President and his national security advisor raises a serious question of a court's competence to intrude upon the political branches' functioning in the national security area. For the reasons given in Part II-A, *supra*, the novel action Plaintiffs seek to assert here raises a substantial separation-of-powers concern. If this Court does not dismiss the matter outright as nonjusticiable, then it should conclude that the threat posed by the action – that a court will intrude into core political branch functions – is itself a factor counseling hesitation in the creation of new *Bivens*-type remedy.

Furthermore, the sensitive nature of Mrs. Wilson's alleged status is another such factor. The matter at bar would require Plaintiffs to offer proof of, and ask the Court to make findings about, the underlying facts regarding Mrs. Wilson's alleged CIA status. The mere presence of this national security issue is alone cause for hesitation. And the risks to national security posed by Plaintiff's effort to prove that she was "impaired in her ability to carry out her

30

duties at the CIA," Am. Compl. ¶ 43, provide an additional ground for hesitation. For the reasons set forth above in Part II-B, *supra*, the concerns addressed by the *Totten* doctrine – even if not dispositive of this case on jurisdictional grounds – are a factor counseling hesitation in the creation of a new *Bivens* remedy.

## V.     Qualified Immunity Shields the Vice President from all of Plaintiffs' Claims.

Plaintiffs' claims against the Vice President must also be dismissed because, in addition to the absolute immunity the Vice President enjoys as argued above, the Vice President is protected by qualified immunity where, as here, Plaintiffs fail to allege violations of clearly established constitutional rights. It is settled that "government officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has made clear that this is a particularized standard which requires that "[t]he contours of the right . . . be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

A court evaluating a claim of qualified immunity undertakes a two-step analysis. The court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (*quoting Conn v. Gabbert,* 526 U.S. 286, 290 (1999)). In this case, all of Plaintiffs' claims fail one or both of the *Wilson v. Layne* criteria. The Vice President is therefore entitled to qualified immunity for them all.

A.    **Count I, Mr. Wilson's First Amendment Claim of Official Retaliation for the Exercise of First Amendment Rights, Does Not Allege the Violation of a Clearly Established Right.**

The first count, brought by Mr. Wilson only, alleges that the Vice President retaliated against him for the exercise of his First Amendment rights. A necessary element of a First Amendment retaliation claim is that "defendants' actions effectively chilled the exercise of [plaintiffs'] First Amendment right." *Hatfill v. Ashcroft*, 404 F. Supp. 2d 104, 118 (D.D.C. 2005) (*quoting Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)). Neither in Count I nor anywhere else in the Amended Complaint does Mr. Wilson plead that his exercise of First Amendment rights was ever chilled.

In the absence of the necessary element of chill, there is no First Amendment violation. *Hatfill*, 404 F. Supp. 2d at 118. In *Hatfill*, a doctor brought suit claiming First Amendment retaliation for his criticisms of the government, which had identified him as a "person of interest" in the anthrax investigations. The court dismissed the claim, finding that "[w]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Id.* at 119 (quotation marks omitted). The court held that the plaintiff had not stated a claim for First Amendment retaliation because he had continued to speak out against the Government and thus his speech was not chilled.[8] *Id.* Here, Mr. Wilson's claim must be dismissed simply because he does not plead this necessary element of a First Amendment retaliation claim, and thus does not state the violation of a constitutional right.[9]

---

[8] This motion does not rely upon evidence of Mr. Wilson's book, talk show appearances, magazine interviews, and other speech.

[9] For similar reasons, Mr. Wilson lacks constitutional standing to bring this claim. Having failed to plead that his speech was chilled, Mr. Wilson has not pled a "concrete and particularized" injury to *himself*, and cannot raise a claim merely on the basis of an alleged injury to his wife. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). *See also, e.g., Kounitz v. Slaatten*, 901

Indeed, even if Mr. Wilson had pled that his speech was chilled, he still has not alleged the violation of a constitutional right because courts have made clear that a claim for retaliation for the exercise of First Amendment rights is only actionable where it is "likely to deter a person of ordinary firmness from that exercise." *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (quotation marks omitted).[10] This test is an objective test: "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Hatfill*, 404 F. Supp. 2d at 118 (*quoting Curley*, 268 F.3d at 73). Having failed to allege any chill at all, Mr. Wilson has also failed to allege *actionable harm* under the First Amendment. He therefore does not allege a violation of a clearly established right.

Moreover, courts reject claims of retaliation when the alleged retaliation takes the form of more speech. For example in, *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000), direct mail marketers under investigation for possible criminal and ethical violations claimed that the government had retaliated against them for their exercise of free speech in criticizing the investigation itself. In particular, the plaintiffs alleged that officials in the state Attorney General's office threatened and pressured the Better Business Bureau to exclude the plaintiff company, and that the officials further defamed the company in the press. *Id.* at 682. The court rejected their claims, finding that "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely

---

F. Supp. 650 (S.D.N.Y. 1995) (husband lacked standing to bring First Amendment retaliation claim after his wife was fired due to his criticism of her supervisor because he had no concrete injury).

[10] Mr. Wilson's own self-description suggests that he regards himself as a person of, at least, "ordinary firmness." *See* Am. Compl. ¶ 8 (Wilson "truly inspiring" and "courageous").

affect a citizen's First Amendment rights, even if defamatory." *Id*. at 687.  Further, the *Suarez* court noted that courts have declined to find an adverse affect from retaliation "where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." *Id*. at 686.  *See also id*. at 687-88 (collecting cases where courts have declined to find actionable harm).

Here, Mr. Wilson's allegation against the Vice President does not even rise to the level of "criticism" or "false accusation" or "verbal reprimand." *See id*. at 687.  Plaintiff alleges only that the Vice President told his national security advisor that Mrs. Wilson was a CIA employee.  Plaintiff cannot state a claim for a violation of the First Amendment where the core of the allegedly retaliatory conduct was merely disclosure of an allegedly true fact as part of a non-public conversation between two individuals.

Further, even if Plaintiff had pled that the Vice President in some way criticized him, that alone would not constitute a violation of the First Amendment.  Courts have clearly held that the government is entitled itself to some level of speech which criticizes others.  In *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1016 (D.C. Cir. 1991), the court held that no First Amendment violation existed where the Attorney General and members of his Commission on Pornography sent letters to distributors of adult magazines indicating that, if they failed to respond to allegations they were selling pornography, the allegations would be included in the Commission's final report.  The court noted that "[i]f the First Amendment were thought to be violated any time a private citizen's speech or writings were criticized by a government official, those officials might be virtually immobilized." *Id*. at 1016.  The court explained that "corporations and other institutions are criticized by government officials for all sorts of conduct that might well be perfectly legal, including speech protected by the First Amendment.  At least

where the government threatens no sanction—criminal or otherwise—we very much doubt that the government's criticism or effort to embarrass the [corporation] threatens anyone's First Amendment rights." *Id.* This is because "[a]s part of the duties of their office, these officials surely must be expected to be free to speak out to criticize practices, even in a condemnatory fashion, that they might not have the statutory or even constitutional authority to regulate." *Id.* at 1015. The *Penthouse* decision also noted that the "the Supreme Court has never found a government abridgement of First Amendment rights in the absence of some actual or threatened imposition of governmental power or sanction." *Id.* Again, even had the Plaintiff alleged blistering public criticism by the Vice President, such criticism would not constitute a violation of the First Amendment.

B.     **Count II, Plaintiffs' Claim for Denial of Equal Protection, Does Not Allege the Violation of a Clearly Established Right.**

The second cause of action (in which both Plaintiffs join) asserts a denial of Equal Protection. This second count fails to allege violation of a constitutional right. Plaintiffs' Equal Protection claim is merely a repackaging of the First Amendment claim for retaliation. Plaintiffs allege that "the Defendants' actions in subjecting the Plaintiffs to differential treatment were motivated by vindictiveness and an illegitimate animus." Am. Compl. ¶ 52. Plaintiffs essentially say that the Vice President selectively retaliated against them for Mr. Wilson's speech. However, "no clearly established right exists under the *equal protection* clause to be free from retaliation." *Ratliff v. DeKalb County,* 62 F.3d 338, 340-41 (11th Cir. 1995). *See also Grossbaum v. Indianapolis-Marion County Bldg. Authority,* 100 F.3d 1287, 1296 n.8 (7th Cir. 1996) ("We do not imply, however, that retaliation claims arise under the Equal Protection Clause. That clause does not establish a general right to be free from retaliation.").

Courts have universally rejected analogous attempts to dress up First Amendment claims as Equal Protection claims. For example, in *Vukadinovich v. Bartels*, 853 F.2d 1387 (7th Cir. 1988), the plaintiff brought a claim alleging he was dismissed from his job as a teacher for speaking to the local paper. In rejecting his Equal Protection claim, the court found that the "plaintiff is not claiming that he was classified on the basis of some forbidden characteristic, only that he was treated differently because he exercised his right to free speech. We believe this is best characterized as a mere rewording of plaintiff's First Amendment-retaliation claim, which was properly disposed of." *Id.* at 1391-92. Similarly, in *Ratliff*, the Eleventh Circuit overturned a district court's denial of qualified immunity, instructing that "a constitutional claim for retaliation may be brought . . . pursuant to the *first amendment,* not the equal protection clause." 62 F.3d at 341.

The Fifth Circuit reached the same conclusion in *Thompson v. City of Starkville,* 901 F.2d 456 (5th Cir. 1990). In *Thompson*, a police officer who had been openly critical of his unit's promotion practices brought suit claiming he had been discharged in retaliation for his speech in violation of his First Amendment rights and the Equal Protection Clause. Thompson was fired for "conduct unbecoming a police officer" for having an extramarital affair, but claimed that other officers engaging in the same conduct were not fired. He alleged that it was only because he had filed grievances and been outspoken about promotion practices that he alone was fired. The court found that his Equal Protection claim was a "restatement of his first amendment claim." *Id.* at 468. The court observed that "Thompson attempts to create a classification for equal protection purposes based solely on his exercise of his first amendment right to free speech . . . . Thompson's right to free speech under the first amendment is essentially an individual right and [] Thompson makes no claim that anyone other than he was

similarly treated." The court held that the plaintiff "fails to state an equal protection claim" and that "[h]is recourse is solely under the first amendment." *Id.*

Plaintiffs cannot go forward on their Equal Protection claim because it does not state a claim for a violation of the Equal Protection Clause. The Vice President is entitled to qualified immunity on this claim for the reasons above and because "there simply is no equal protection right not to be singled out for criticism." *X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 72 (2d Cir. 1999).

### C.      Count III, Mrs. Wilson's Claim for the Denial of Her Right to Informational Privacy, Does Not Allege the Violation of a Clearly Established Right.

The Vice President is entitled to qualified immunity for Mrs. Wilson's claim for a violation of her right to informational privacy because neither the Supreme Court nor the D.C. Circuit has ever held that such a right exists. At least twice the Supreme Court has had the opportunity to recognize such a right, and on both occasions it stopped short of doing so. In *Whalen v. Roe*, 429 U.S. 589, 605-06 (1977), the Supreme Court considered a challenge to New York's statute creating a state database of all prescriptions for certain drugs. Characterizing the duty to avoid unwarranted disclosures of private information, the Court noted that the duty "*arguably* has its roots in the Constitution." *Id.* (emphasis added). However, the Court declined to address the contours of the *arguable* right because in the case before it, the record "[did] not establish an invasion of any right or liberty protected by the Fourteenth Amendment." *Id.* at 605-06. Similarly, in *Nixon v. Administrator of General Services*, 433 U.S. 425, 457 (1977), President Nixon asked the Court to find that the Presidential Recordings and Materials Preservation Act violated his right to informational privacy. The Court rejected his claim and noted that "[w]e *may* agree with appellant that, at least when Government intervention is at stake, public officials, including the President, are not wholly without constitutionally protected

privacy rights in matters of personal life unrelated to any acts done by them in their public capacity." *Id.* (emphasis added).

The D.C. Circuit has expressly declined to recognize the right to informational privacy.   In *American Federation of Government Employees, AFL-CIO v. Dep't of Housing & Urban Development*, 118 F.3d 786, 791 (D.C. Cir. 1997), the D.C. Circuit considered the constitutionality of employee questionnaires used by HUD.  The employees claimed that the forms violated their rights by requiring disclosure of private facts such as illegal drug use and financial history.  The court noted its "grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information."  *Id.* at 791.  Surveying other circuits finding such a right, the D.C. Circuit noted that:

> [O]f the cases cited holding that there is a constitutional right to nondisclosure of private information, none cites a constitutional provision in support of its holding. It is understandable, though rare, to fail to cite a supporting provision of the Constitution when one is dealing with such well-established rights as those in the first or fourth amendments.  It is quite a telling failure when the constitutional right at issue is not well-established.

*Id.* at 793.  The court also specifically noted that the D.C. Circuit "has not purported to resolve the issue."  *Id.* at 792.  Where both the Supreme Court and the D.C. Circuit have yet to "resolve the issue" of the existence and scope of a right to informational privacy, it follows automatically that such a right cannot be "clearly established."  The Vice President is therefore entitled to qualified immunity with respect to Count III.

### D.    Count IV, Mrs. Wilson's Claim for a Violation of Her Right to Due Process, Does Not Allege the Violation of a Clearly Established Right.

The Vice President is also entitled to qualified immunity from Mrs. Wilson's fourth cause of action – claiming a Due Process violation – because the allegations do not state a violation of a clearly established right.  Indeed, it is not at all clear precisely which Due Process right Plaintiff is pleading.  Although Count IV is captioned as a "Violation of Fifth Amendment

Right to Property," Plaintiff also pleads that "the exposure of Plaintiff's covert status injured her ability to obtain other employment." Am. Compl. ¶ 61. To the extent Plaintiff pleads an impairment of her future employment prospects, such a claim is not cognizable at all as a property right; it would more properly be pled as a violation of her right to liberty under the Due Process Clause. As the D.C. Circuit explained in *Mazaleski v. Truedell*, 562 F.2d 701, 709 (D.C. Cir. 1977), "as a threshold requirement the plaintiff in a public employee dismissal case must show that he has either a legitimate entitlement with respect to his job, which would be protected as property under the fifth or fourteenth amendments, or that his dismissal deprives him of a liberty interest protected by those constitutional provisions." *Id.*

1. **To the extent Plaintiff pleads a property interest in her alleged classified status, she does not plead the violation of a clearly established right because she has no such interest.**

Mrs. Wilson notably does not plead that she was fired, demoted, or transferred by the CIA. She appears to plead only that she had a property interest in her allegedly *classified status*. However, the courts have expressly found that there is no such property interest. The D.C. Circuit has held, for example, that CIA employees do not even have a property interest in their *jobs* at all, much less a specific type of CIA job. *See Doe v. Gates*, 981 F.2d 1316, 1320-21 (D.C. Cir. 1993). Courts have also held that there is no property interest in a security clearance. *See Dep't of Navy v. Egan*, 484 U.S. 518, 528 (1988) ("It should be obvious that no one has a 'right' to a security clearance."); *Doe v. Cheney*, 885 F.2d 898 (1989) (employee of National Security Agency had no entitlement to sensitive compartmented information and, therefore, was not deprived of Due Process property interest when he was denied access to classified information and was discharged). Plaintiff lacks any property interest in her allegedly classified status, and thus even if she had been deprived of her allegedly covert status, this deprivation would not constitute a violation of a clearly established right.

39

**2.**    **To the extent Plaintiff pleads a deprivation of her liberty interest in future employment, she does not plead the violation of a clearly established right.**

To the extent Mrs. Wilson has pled impairment of future employment interests, the claim is properly analyzed as one addressing a liberty interest under the Due Process Clause. *See generally Mazaleski*, 562 F.2d 701; *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1111 (D.C. Cir. 1985) (addressing interest in obtaining future employment as a liberty interest). Courts within the Circuit recognize two distinct causes of action under the liberty component of the Due Process Clause of the Fifth Amendment. The first is the so-called "reputation-plus" action, which clearly does not apply here because it requires the making of defamatory governmental statements in the course of the termination of employment. *O'Donnell v. Barry*, 148 F.3d 1126 (D.C. Cir. 1998). The second cause of action is the so-called stigmatization action. *See Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003). However, in order to properly plead a violation of such an interest, Plaintiff must plead that she was *broadly precluded* from pursuing her chosen profession. *See id.* For example, in *M.K. v. Tenet*, 196 F. Supp. 2d 8, 15-16 (D.D.C. 2001), a CIA employee who had been internally designated as not qualified for her position brought suit against the CIA alleging a deprivation of her liberty interest. The court dismissed her claim, finding that:

> Plaintiff C.T. neither alleges that the CIA automatically excluded her from a definite range of employment opportunities with the government nor broadly precluded her from continuing in her chosen career. *While it appears that plaintiff C.T. has been denied employment in the specific position she previously held, there is nothing to suggest that she would be unable to gain employment in another government job, or in the private sector within her career field.*

*Id.* at 16 (emphasis added). This *Tenet* decision indicates that even if Mrs. Wilson had pled that she left the CIA and was forced to pursue similar work in the private sector, she would have failed to allege a violation of her liberty interest. But Plaintiff alleges nothing even close to that.

She pleads rather that she was "impaired in her ability to carry out her duties at the CIA," Am. Compl. ¶ 43, and that she has been "impaired in pursuing professional opportunities." *Id.* ¶ 44. Indeed, according to Plaintiffs' Amended Complaint, despite the Novak column on July 14, 2003, "[u]ntil January 2006, she was an employee of the CIA." *Id.* ¶ 7.

As to the breadth of the stigmatization that Plaintiff must plead, *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528-29, 1530 (D.C. Cir. 1994), is also instructive. In *Kartseva*, a translator who was fired from a government contractor after her security clearance was revoked by the State Department brought suit alleging a violation of her liberty interest in future employment. The D.C. Circuit explained that her claims could not survive a motion to dismiss if she showed that she "has merely lost one position in her profession but is not foreclosed from reentering the field." *Id.* at 1529. The court further explained that a Plaintiff must be broadly precluded from pursuing her career in order to state a valid claim. *See id.* at 1528 ("[I]f . . . State's action . . . has the *broad* effect of largely precluding [plaintiff] from pursuing her chosen career as a Russian translator, that, too, would constitute a 'status change' adequate to implicate a liberty interest.").

Plaintiff has not pled the sort of broad preclusion from her profession which is required to state a claim for a violation of her liberty interests. Plaintiff pleads rather that "[a]s a result of the Defendant's actions, Mrs. Wilson was impaired in her ability to carry out her duties at the CIA, and to pursue her career there serving her country, as she had planned," *id.* ¶ 43, and that she has been "impaired in pursuing professional opportunities as a result of the Defendant's actions." *Id.* ¶ 44. However, her claim must be dismissed because "[t]he barrier of which [she] complains is a practical, not legal one." *Mazaleski*, 562 F.2d at 713.

**VI.    Plaintiffs' Count V for Public Disclosure of Private Facts Does Not State a Claim Upon Which Relief Can Be Granted.**

Plaintiffs' fifth count for public disclosure of private facts must be dismissed for failure to state a claim. District of Columbia courts have held that this tort has five elements: "(1) publicity, (2) absent any waiver or privilege, (3) given to private facts (4) in which the public has no legitimate concern (5) and which would be highly offensive to a reasonable person of ordinary sensibilities." *Wolf v. Regardie*, 553 A.2d 1213, 1220 (D.C. 1989). "Failure to establish *any one of these elements* will defeat a plaintiff's cause of action." *Id.* (emphasis added).

Plaintiffs have not pled that the Vice President ever made any public disclosure of Mrs. Wilson's alleged CIA employment status. The sole pertinent factual allegation is that the Vice President communicated the fact of her CIA employment to his national security advisor and chief of staff. Am. Compl. ¶ 19(h). However, to satisfy the publicity element of the tort, "[t]he determinative factor is whether the communication is public as opposed to private." *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 587 (D.C. 1985) (*quoting* the Restatement (Second) of Torts § 652D, cmt. a, for the explanation that "any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity" to the private life of a person). Against the Vice President, Plaintiffs allege a non-public conversation.

Plaintiffs have additionally failed to state a claim because the disclosures they allege are subject to a privilege. *See Wolf*, 553 A.2d at 220. District of Columbia courts have defined privilege in the context of libel and analogous torts as encompassing "a special legal right, exemption, or immunity granted to a person or class of persons." *In re Spikes*, 881 A.2d 1118, 1124 (D.C. 2005) (*quoting* Black's Law Dictionary 1234 (8th ed. 2004)). The Supreme Court long ago established that federal government officials are absolutely immune from suits

alleging violations of state law defamation-type torts when acting in the scope of their official duties. *See Spalding v. Vilas*, 161 U.S. 483, 498-99 (1896) (rejecting libel suit against Postmaster General) ("In exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he were subjected to any such restraint."); *Barr v. Matteo*, 360 U.S. 564, 570-71 (1959) (extending this absolute immunity to lower level officials such as Director of Office of Rent Stabilization) ("It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.") Plaintiffs have therefore failed to plead a claim for public disclosure of private facts because, if the Vice President's conduct were as alleged, it would be subject to a privilege of immunity from this state law claim.

Because "[f]ailure to establish any one of [the tort's] elements will defeat a plaintiff's cause of action," *Wolf*, 553 A.2d at 1220, Count V against the Vice President must be dismissed.

**VII.    Plaintiffs' Count V for Public Disclosure of Private Facts Must Be Dismissed Pursuant to the Westfall Act Because the Vice President Is Not a Proper Defendant.**

Concurrent with this submission, the Department of Justice is filing a Certification of Scope of Employment asserting that the conduct alleged against the Vice President here is the type of conduct falling within the scope of his official duties. For the

reasons stated in the Government's Memorandum of Points and Authorities in Support of the

United States' Motion to Dismiss, Plaintiffs' state law claim for public disclosure of private facts

must be dismissed under the Federal Employees Liability Reform and Tort Compensation Act of

1988 (the "Westfall Act"), 28 U.S.C. § 2679 (2000).  The Westfall Act instructs that common

law tort claims against federal officers or employees must be brought against the United States—

and cannot be asserted against individual employees themselves—when the alleged conduct

giving rise to the claim was performed within the scope of their federal employment.  The United

States, and not the Vice President, is the proper defendant as to Count V.  Because Plaintiffs

have not exhausted required administrative remedies under the Federal Tort Claims Act, 28

U.S.C. §§ 1346(b), 2671-80, their state law claim must be dismissed.

## CONCLUSION

For the reasons set forth above, which present adequate and independent bases for

action, Plaintiffs' Amended Complaint should be dismissed in its entirety.

Respectfully submitted,

/s/
_____
Terrence O'Donnell (D.C. Bar # 26849)
Emmet T. Flood (D.C. Bar # 448110)

Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Phone:  (202) 434-5000
Fax:  (202) 434-5029
todonnell@wc.com
eflood@wc.com

*Attorneys for Vice President of the United States*
*Richard B. Cheney in his individual capacity*

Dated: November 14, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of November, 2006, a copy of the foregoing

Defendant Vice President of the United States Richard B. Cheney's Motion to Dismiss Plaintiffs'

Amended Complaint and Memorandum of Points and Authorities in Support of Defendant Vice

President of the United States Richard B. Cheney's Motion to Dismiss was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

/s/
_____
Emmet T. Flood (D.C. Bar # 448110)