**EXHIBIT A**

Copyright 2005 Time Inc.
Time Magazine

July 25, 2005

**SECTION:** U.S. EDITION; NATION; Pg. 38

**LENGTH:** 2119 words

**HEADLINE:** "What I Told the Grand Jury";
EXCLUSIVE Matthew Cooper reveals exactly what Karl Rove told him--and what the special counsel zeroed in on

**BYLINE:** Matthew Cooper

**BODY:**

It was my first interview with the President, and I expected a simple "Hello" when I walked into the Oval Office last December. Instead, George W. Bush joked, "Cooper! I thought you'd be in jail by now." The leader of the free world, it seems, had been following my fight against a federal subpoena seeking my testimony in the case of the leaking of the name of a CIA officer. I thought it was funny and good-natured of the President, but the line reminded me that I was, very weirdly, in the Oval Office, out on bond from a prison sentence, awaiting appeal--in large part, for protecting the confidence of someone in the West Wing. "What can I say, Mr. President," I replied, smiling. "The wheels of justice grind slowly."

After a fight that went all the way to the Supreme Court, the wheels of justice have stopped grinding--for me, anyway. Last week I testified before the federal grand jury investigating the leak. I did so after I received a specific last-minute waiver from one of my sources, Karl Rove, the President's top political adviser, releasing me from any claim of confidentiality he might have about our conversations in July 2003. Under federal law grand jurors and prosecutors are sworn to secrecy but those who testify, like me, are under no such obligation, which is why I'm able to tell you what happened in the grand jury room. Patrick Fitzgerald, the special counsel, told me that he would prefer that I not discuss the matter, and I suspect he said the same thing to White House officials who are now treating his request as a command and refusing to comment on the case. I don't know if I can illuminate this confounding investigation, but I can at least explain my small part in it. Like the blindfolded man and the elephant, all I know is what seems to be in front of me.

So here's what happened last Wednesday.

Before going into the grand jury room at 9:30 a.m., my lawyers and I met briefly with Fitzgerald, a couple of his attorneys and the lead FBI agent in the case. It was, to say the least, unsettling sitting there in the federal courthouse in Washington with the man who, for months, had tried to get me to testify or he would put me in jail. Fitzgerald counseled me that he wanted me to answer completely but didn't want to force any answers on me or have me act as if I remembered things more clearly than I did. "If I show you a picture of your kindergarten teacher and it really refreshes your memory, say so," he said. "If it doesn't, don't say yes just because I show you a photo of you and her sitting together."

Grand juries are in the business of handing out indictments, and their docility is infamous. A grand jury, the old maxim goes, will indict a ham sandwich if a prosecutor asks it of them. But I didn't get that sense from this group of grand jurors. They somewhat reflected the demographics of the District of Columbia. The majority were African American and were disproportionately women. Most sat in black vinyl chairs with little desks in rows that were slightly elevated, as if it were a shabby classroom at a rundown college. A kindly African-American forewoman swore me in, and when I had to leave the room to consult with my attorneys, I asked her permission to be excused, not the prosecutor's, as is the custom. These grand jurors did not seem the types to passively indict a ham sandwich. I would say one-third of my 2 1/2 hours of testimony was spent answering their questions, not the prosecutor's, although he posed them on their behalf. I began to take notes but then was told I had to stop, so I'm reliant on memory.

For my part, I sat at the end of an L-shaped table next to one of the prosecutor's lawyers, who handed me various documents to review while an overhead projector displayed the documents on a screen near me. Virtually all the questions centered on the week of July 6, 2003. I was new to covering the Bush White House, having been the deputy Washington bureau chief for TIME. As it happens, that week was a big one at the White House. On that Sunday, the

New York Times had published former Ambassador Joseph Wilson's now infamous Op-Ed describing his mission to Niger to investigate whether Saddam Hussein was seeking uranium to make nuclear weapons. Wilson said he had found no evidence of that and was confounded as to why the President would claim otherwise in his 2003 State of the Union address. As a freshly minted White House correspondent, I told the grand jury, I was all over that story by midweek, especially because it emerged as a likely candidate for TIME's cover the following Monday.

The grand jurors wanted to know what was on my mind, and I told them. The White House had done something it hardly ever does: it admitted a mistake. Shortly after Wilson's piece appeared, the White House said that the African uranium claim, while probably still true, should not have been in the President's State of the Union address because it hadn't been proved well enough. That was big news as the media flocked to find out who had vetted the President's speech. But at the same time, I was interested in an ancillary question about why government officials, publicly and privately, seemed to be disparaging Wilson. It struck me, as I told the grand jury, as odd and unnecessary, especially after their saying the President's address should not have included the 16-word claim about Saddam and African uranium.

I told the grand jurors that I was curious about Wilson when I called Karl Rove on Friday, July 11. Rove was an obvious call for any White House correspondent, let alone someone trying to prove himself at a new beat. As I told the grand jury--which seemed very interested in my prior dealings with Rove--I don't think we had spoken more than a handful of times before that. I recalled that when I got the White House job a couple of weeks earlier, I left a message for him trying to introduce myself and announce my new posting.

As I told the grand jury--and we went over this in microscopic, excruciating detail, which may someday prove relevant--I recall calling Rove from my office at TIME magazine through the White House switchboard and being transferred to his office. I believe a woman answered the phone and said words to the effect that Rove wasn't there or was busy before going on vacation. But then, I recall, she said something like, "Hang on," and I was transferred to him. I recall saying something like, "I'm writing about Wilson," before he interjected. "Don't get too far out on Wilson," he told me. I started taking notes on my computer, and while an e-mail I sent moments after the call has been leaked, my notes have not been.

The grand jury asked about one of the more interesting lines in that e-mail, in which I refer to my conversation with Rove as being on "double super secret background," a line that's raised a few eyebrows ever since it leaked into the public domain. I told the grand jury that the phrase is not a journalistic term of art but a reference to the film Animal House, in which John Belushi's wild Delta House fraternity is placed on "double secret probation." ("Super" was my own addition.) In fact, I told the grand jury, Rove told me the conversation was on "deep background." I explained to the grand jury that I take the term to mean that I can use the material but not quote it, and that I must keep the identity of my source confidential.

Rove went on to say that Wilson had not been sent to Niger by the director of the CIA and, I believe from my subsequent e-mails--although it's not in my notes--that Rove added that Dick Cheney didn't send him either. Indeed, the next day the Vice President's chief of staff, I. Lewis (Scooter) Libby, told me Cheney had not been responsible for Wilson's mission.

Much of my grand jury session revolved around my notes and my e-mails. (Those e-mails and notes were given to the special counsel when Time Inc., over my objections, complied with a court order.) Owing to my typing, some words were a jumble. For instance, I wrote "don't get too war out on Wilson," when I clearly meant "far out." There were some words in my notes that I could not account for--at one point they read, "...notable..." I didn't know if that was Rove's word or mine, and one grand juror asked if it might mean "not able," as in "Wilson was not an able person." I said that was possible, but I just didn't recall that. The notes, and my subsequent e-mails, go on to indicate that Rove told me material was going to be declassified in the coming days that would cast doubt on Wilson's mission and his findings.

As for Wilson's wife, I told the grand jury I was certain that Rove never used her name and that, indeed, I did not learn her name until the following week, when I either saw it in Robert Novak's column or Googled her, I can't recall which. Rove did, however, clearly indicate that she worked at the "agency"--by that, I told the grand jury, I inferred that he obviously meant the CIA and not, say, the Environmental Protection Agency. Rove added that she worked on "WMD" (the abbreviation for weapons of mass destruction) issues and that she was responsible for sending Wilson. This was the first time I had heard anything about Wilson's wife.

Rove never once indicated to me that she had any kind of covert status. I told the grand jury something else about my conversation with Rove. Although it's not reflected in my notes or subsequent e-mails, I have a distinct memory of

Rove ending the call by saying, "I've already said too much." This could have meant he was worried about being indiscreet, or it could have meant he was late for a meeting or something else. I don't know, but that sign-off has been in my memory for two years.

This was actually my second testimony for the special prosecutor. In August 2004, I gave limited testimony about my conversations with Scooter Libby. Libby had also given me a specific waiver, and I gave a deposition in the office of my attorney. I have never discussed that conversation until now. In that testimony, I recounted an on-the-record conversation with Libby that moved to background. On the record, he denied that Cheney knew about or played any role in the Wilson trip to Niger. On background, I asked Libby if he had heard anything about Wilson's wife sending her husband to Niger. Libby replied, "Yeah, I've heard that too," or words to that effect. Like Rove, Libby never used Valerie Plame's name or indicated that her status was covert, and he never told me that he had heard about Plame from other reporters, as some press accounts have indicated.

Did Fitzgerald's questions give me a sense of where the investigation is heading? Perhaps. He asked me several different ways if Rove indicated how he had heard that Plame worked at the CIA. (He did not, I told the grand jury.) Maybe Fitzgerald is interested in whether Rove knew her CIA ties through a person or through a document.

A surprising line of questioning had to do with, of all things, welfare reform. The prosecutor asked if I had ever called Mr. Rove about the topic of welfare reform. Just the day before my grand jury testimony Rove's lawyer, Robert Luskin, had told journalists that when I telephoned Rove that July, it was about welfare reform and that I suddenly switched topics to the Wilson matter. After my grand jury appearance, I did go back and review my e-mails from that week, and it seems as if I was, at the beginning of the week, hoping to publish an article in TIME on lessons of the 1996 welfare-reform law, but the article got put aside, as often happens when news overtakes story plans. My welfare-reform story ran as a short item two months later, and I was asked about it extensively. To me this suggested that Rove may have testified that we had talked about welfare reform, and indeed earlier in the week, I may have left a message with his office asking if I could talk to him about welfare reform. But I can't find any record of talking about it with him on July 11, and I don't recall doing so.

So did Rove leak Plame's name to me, or tell me she was covert? No. Was it through my conversation with Rove that I learned for the first time that Wilson's wife worked at the CIA and may have been responsible for sending him? Yes. Did Rove say that she worked at the "agency" on "WMD"? Yes. When he said things would be declassified soon, was that itself impermissible? I don't know. Is any of this a crime? Beats me. At this point, I'm as curious as anyone else to see what Patrick Fitzgerald has.

**GRAPHIC:** COLOR PHOTO: BRENDAN SMIALOWSKI--POLARIS, COURTSIDE, Flanked by his lawyer Richard Sauber, Cooper meets the press following his testimony before a federal grand jury; B/W PHOTO, MEMO TO BOSS, Cooper wrote this e-mail moments after speaking to Rove. The double-secret line is from Animal House; COLOR PHOTO: STEPHEN CROWLEY--THE NEW YORK TIMES, BUSHMEN, Cooper spoke to Karl Rove and Scooter Libby, second and third from left, in July 2003. Neither used Valerie Plame's name or indicated she had covert status

**LOAD-DATE:** July 17, 2005