UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VALERIE PLAME WILSON, and<br>JOSEPH C. WILSON, IV,<br><br>         Plaintiffs,<br><br>   v.<br><br>I. LEWIS LIBBY, *et al.*,<br><br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civ. A. No. 06-1258 (JDB)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney for the
District of Columbia

JEFFREY S. BUCHOLTZ
Principal Deputy Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

TIMOTHY P. GARREN
Director, Torts Branch

RICHARD MONTAGUE
Senior Trial Attorney

GLENN S. GREENE, #450348
Trial Attorney
Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Washington, D.C. 20044-7146
Tel: (202) 616-4143
Fax: (202) 616-4314
Attorneys for the United States of America

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PLAINTIFFS' ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.      THE UNITED STATES MUST BE SUBSTITUTED UNDER THE WESTFALL ACT FOR THE CURRENT DEFENDANTS ON PLAINTIFFS' INVASION OF PRIVACY CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          A.     Defendants' Alleged Conduct Giving Rise To The Invasion Of Privacy Claim Is The "Kind" Of Conduct They Were Employed To Perform Under District of Columbia Scope Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          B.     Defendants' Alleged Conduct Giving Rise To The Invasion Of Privacy Claim Was Undertaken At Least Partly To Serve The United States Under The Controlling Scope Analysis Principles Of This Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    II.     PLAINTIFFS' FTCA CLAIM MUST BE DISMISSED FOR FAILURE TO EXHAUST THE REQUIRED ADMINISTRATIVE REMEDIES . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

## CASES

*Aversa v. United States*,
  99 F.3d 1200 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bancoult v. McNamara*,
  370 F. Supp. 2d 1 (D.D.Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Brown v. Argenbright Sec., Inc.*,
  782 A.2d 752 (D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Brown v. Armstrong*,
  949 F.2d 1007 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Council on American Islamic Relations v. Ballenger*,
  444 F.3d 659 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 12

*Daisley v. Riggs Bank, N.A.*,
  372 F.Supp.2d 61 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Evans v. District of Columbia*,
  391 F.Supp.2d 160 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12

*Forrest City Machine Works, Inc. v. United States*,
  953 F.2d 1086 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Garber v. United States*,
  578 F.2d 414 (C.A.D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Gonzalez-Vera v. Kissinger*,
  Civ. No. 02-2240 (HHK) (D.D.C. Sept. 17, 2004), *aff'd on other grounds*, 449 F.3d 1260
  (D.C.Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Greene v. Nguyen, No. Civ. A. 05-0407*,
  2005 WL 3275897 (D.D.C. Sept. 7, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Gutierrez de Martinez v. Lamagno*,
  515 U.S. 417 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Haddon v. United States*,
  68 F.3d 1420 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Harbury v. Hayden*,
  2006 WL 2212696 (D.D.C. Aug. 1, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hutchins v. Andrews, No. Civ.A. 05-938,*
    2005 WL 1902842 (D.D.C. July 13, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Jackson v. United States,*
    730 F.2d 808 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Johnson v. Weinberg,*
    434 A.2d 404 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11

*Krieger v. Department of Justice, No. Civ. A. 98-1703,*
    2005 WL 555418 (D.D.C. March 8, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lyon v. Carey,*
    533 F.2d 649 (D.C. Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11

*Majano v. Kim, No. Civ. A. 04-201,*
    2005 WL 839546 (D.D.C. Apr. 11, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Maron v. United States,*
    126 F.3d 317 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*McNeil v. United States,*
    508 U.S. 106 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rasul v. Rumsfeld,*
    414 F.Supp.2d 26 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17

*Rodriguez v. Sarabyn,*
    129 F.3d 760 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Schecter v. Merchants Home Delivery, Inc.,*
    892 A.2d 415 (D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Schneider v. Kissinger,*
    310 F.Supp.2d 251 (D.D.C. 2004), *aff'd on other grounds,* 412 F.3d
    190 (D.C. Cir. 2005), *cert. denied,* 126 S.Ct. 1768 (2006) . . . . . . . . . . . . . . . . . . . . 11

*Schrob v. Catterson,*
    967 F.2d 929 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

*Stokes v. Cross,*
    327 F.3d 1210 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Tarpeh-Doe v. United States,*
    28 F.3d 120 (C.A.D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Smith,*
    499 U.S. 160 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Westfall v. Erwin,*
    484 U.S. 292 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## STATUTES

28 C.F.R. § 15.4(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80 . . . . . . . . . . . . . . . . passim

28 U.S.C. § 2674 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

28 U.S.C. § 2675(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

Federal Employees Liability Reform and Tort Compensation Act of 1988 (the "Westfall
    Act"), 28 U.S.C. § 2679 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## MISCELLANEOUS

Restatement (Second) of Agency § 228 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15

Restatement (Second) of Agency § 229 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Restatement (Second) of Agency § 245 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Am. Jur. 2d *Employment Relationship* § 374 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

## INTRODUCTION

Valerie Plame Wilson ("Plame") and Joseph C. Wilson, IV ("Wilson") (collectively, "plaintiffs") filed this lawsuit on various legal theories against Richard B. Cheney, Vice President of the United States; Richard L. Armitage, former Deputy Secretary of State; Karl C. Rove, White House Senior Advisor; and I. Lewis Libby Jr., former Assistant to the President of the United States and Chief of Staff to the Vice President (collectively, "the individual federal defendants"). One of plaintiffs' legal theories for recovery against those defendants is a common-law tort claim for invasion of privacy based upon the defendants' alleged actions in disclosing classified information to the press that Plame was employed at the Central Intelligence Agency ("CIA"). Compl. ¶¶ 65-70 (Fifth Cause of Action).

That claim should be dismissed under the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the "Westfall Act"), 28 U.S.C. § 2679. Common law tort claims against federal officials or employees – such as the claim alleged by plaintiffs – cannot be asserted against a federal official personally where the alleged conduct giving rise to the claim was performed within the scope of federal employment under state *respondeat superior* law. Under the Westfall Act, such claims can only be maintained against the United States.

Here, even accepting plaintiffs' allegations as true for purposes of this motion, under the law of the District of Columbia the alleged disclosures giving rise to the invasion of privacy cause of action were made within the scope of the defendants' federal offices. *See* Ex. 1 (28 U.S.C. § 2679 scope certification of Director Timothy P. Garren). Consequently, plaintiffs' exclusive remedy on the claim is a lawsuit against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80. Plaintiffs, however, cannot pursue relief under the FTCA because they have not satisfied the jurisdictional prerequisites of that statute.

## PLAINTIFFS' ALLEGATIONS

As noted, the central issue with respect to this motion is whether the alleged actions that form the basis for plaintiffs' common law invasion of privacy claim against the individual federal defendants fall within the scope of their official positions based on the *respondeat superior* law of the District of Columbia.  Thus, the United States begins by reviewing the allegations of the Amended Complaint that are relevant to application of the law of *respondeat superior* in these circumstances.

This lawsuit arises generally out of a highly publicized controversy regarding statements made by President George W. Bush in his State of the Union address in 2003.  As alleged in the Amended Complaint, President Bush stated in that address that "[t]he British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa."  Compl. ¶ 19(a).  Months later the *New York Times* published a column by Nicholas Kristof that questioned the accuracy of those "sixteen words."  *Id.* ¶ 19(b).  Kristof reported that an unnamed former ambassador [now known to be Wilson] was sent to Niger in 2002 following a request of the Vice President's office to investigate the allegation that Saddam Hussein had attempted to obtain uranium from an African country.  *Id.*  Kristof claimed that the ambassador eventually reported back to the CIA and the State Department that the allegations were wrong and based upon forged documents.  *Id.*

After several more newspaper articles were published that raised questions about alleged Iraqi efforts to buy uranium and that referred to Wilson's Niger trip, *id.* ¶¶ 19(i), (k), Wilson publicly injected himself into the controversy.  He wrote an article published in the *New York Times* entitled "What I Didn't Find in Africa," and he submitted to an interview by the *Washington Post*, which published an article about his trip to Niger.  *Id.* ¶ 19(n).  Wilson also appeared on the television program "Meet the Press" to discuss the controversy.  *Id.*  He claimed

2

in his various public announcements that he had taken the trip to Niger at the request of the CIA in February 2002 to investigate the allegations that Iraq had sought or obtained uranium. *Id.* He expressed doubts about the claim that Iraq had obtained uranium from Niger and stated that he believed that the Vice President's office had been advised of the results of his trip. *Id.*

Plaintiffs claim that Wilson's public statements focused the attention of the Vice President and Libby on responding to Wilson's assertions. *Id.* ¶ 19(o). Plaintiffs allege that Libby had previously asked the State Department for information about Wilson's Niger trip, *id.* ¶ 19c, and that he and the Vice President were informed or otherwise eventually came to believe that Plame worked at the CIA and was involved in planning Wilson's trip, *id.* ¶¶ 19(d)-(f), (h). They contend that the Vice President, Rove and Libby reached an agreement to "discredit, punish and seek revenge" against Wilson partly by disclosing Plame's classified CIA employment to the press. *Id.* ¶ 24. Pursuant to this supposed plan, plaintiffs claim that Libby discussed Plame's CIA employment with reporter Judith Miller on several occasions and once informed reporter Matthew Cooper. *Id.* ¶¶ 19(m), (r), (w), (x). They contend that Rove also spoke with Cooper, informing him that Plame worked for "the agency" and was responsible for sending Wilson to Niger. *Id.* ¶ 28.

Plaintiffs do not contend that Miller or Cooper initially published anything about Plame's position at the CIA or engaged in any other public disclosure of her identity. Plaintiffs allege instead that columnist Robert Novak was the first to publicly disclose Plame's identity, which he discussed in his syndicated column on July 14, 2003. *Id.* ¶ 14. Novak wrote that "[Joseph] Wilson never worked for the CIA, but his wife, Valerie Plame, is an Agency operative on weapons of mass destruction." *Id.* Novak also stated in his column that "[t]wo senior

3

administration officials" told him that Plame suggested sending Wilson to Niger. *Id.*

According to plaintiffs, Armitage had previously met with Novak in his State Department office and told him that Plame worked for the CIA on weapons of mass destruction. *Id.* ¶ 39. Plaintiffs claim that Armitage had also informed reporter Bob Woodward of the same information weeks earlier. *Id.* ¶ 37. Armitage allegedly learned about Plame's position at the CIA from a State Department memorandum, *id.* ¶ 36, and he disclosed the information to Novak and Woodward independently from the alleged efforts by the Vice President, Rove and Libby to retaliate against or discredit Wilson, *id.* ¶¶ 24, 46-54.

## SUMMARY OF ARGUMENT

Plaintiffs' invasion of privacy claim should be dismissed under the Westfall Act,[1] which provides that the exclusive remedy for a claim for damages arising from any "negligent or wrongful act or omission" of a federal employee acting within the scope of employment is a suit against the United States under the FTCA. 28 U.S.C. § 2679(b)(1). Pursuant to the terms of that Act, the Department of Justice has properly certified that the invasion of privacy claim asserted in this case against the individual federal defendants is based on conduct they performed within the scope of their federal offices. *See* Ex. 1. As a result of that certification, the United States should be substituted in place of those defendants on that claim, which must then be adjudicated under the provisions of the FTCA. That requires dismissal of the claim because plaintiffs have not exhausted the required administrative remedies under the FTCA, *see* 28 U.S.C. § 2675(a), which is a jurisdictional requirement for proceeding on an FTCA claim.

Although plaintiffs include an assertion in their Amended Complaint that defendants' conduct giving rise to the invasion of privacy claim occurred "outside the scope of their

---

[1] The statute was adopted to reverse the effect of the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292 (1988).

employment," Compl. ¶ 69, such bare legal assertions should be given no weight by the court,

*see Maron v. United States*, 126 F.3d 317, 323 (4th Cir. 1997) (finding burden is on the plaintiff

to present "persuasive evidence refuting the certification"); *Schrob v. Catterson*, 967 F.2d 929,

936 (3d Cir. 1992) (the plaintiff must come forward with "specific facts rebutting" the

certification); *Forrest City Machine Works, Inc. v. United States*, 953 F.2d 1086, 1088 (8th Cir.

1992) (the plaintiff is required to present "evidence contradicting the government's scope-of-

employment certification").  Here, the allegations in the Amended Complaint establish that the

challenged conduct was undertaken within the scope of office or employment of the individual

federal defendants under the law of the District of Columbia.  Scope analysis under traditional

*respondeat superior* principles focuses generally on a public policy determination of when

employers should be held responsible for torts committed by their employees.  Most jurisdictions

construe scope of employment very broadly in this context to provide victims with a source of

compensation for tort injuries committed by employees at work if the conduct at issue was even

incidentally related to their employment.   *See* 27 Am. Jur. 2d *Employment Relationship* § 374

(2004) (explaining that "[t]he policy objectives underlying the imposition of *respondeat superior*

liability are to prevent the recurrence of tortious conduct, to give the assurance of compensation

for the victim and to ensure the victim's losses will be equitably borne by those who benefit from

the enterprise that gave rise to the injury"); Prosser & Keeton,  The Law of Torts § 69 (5th ed.

1984 ) ("What has emerged as the modern justification for vicarious liability is a rule of policy, a

deliberate allocation of risk.").  In light of these principles, a scope finding does not suggest that

the conduct giving rise to the tort claim was authorized or condoned by the employer or that it

served some legitimate interest of the employer.  Grossly misguided and even egregiously

criminal misconduct by employees is often determined to have been committed within the scope

of employment when connected to employment activity.

Consistent with that approach, District of Columbia law recognizes an especially broad definition of scope of employment. That approach is clearly reflected in a line of cases in which courts have found in various contexts that even deadly physical assaults committed in anger and without justification by employees on the job against customers were within the scope of employment, including sexual assault. *See Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976) (finding that a rape and stabbing of a business customer occurred within the scope of employment); *Johnson v. Weinberg,* 434 A.2d 404 (D.C. 1981) (finding an unprovoked shooting of a customer to be within scope); *Majano v. Kim*, No. Civ. A. 04-201, 2005 WL 839546, at *8 (D.D.C. Apr. 11, 2005) (recognizing that "a broad range of intentional tortious conduct has been found to be within the scope of employment despite the violence by which injury was inflicted."). Directly relevant to the present case, courts applying D.C. law have repeatedly concluded that wrongful and even defamatory press statements made by employees on the job were within the scope of their employment. *See Council on American Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006) (recognizing Westfall Act immunity for statements to reporters); *Evans v. District of Columbia*, 391 F.Supp.2d 160, 169-70 (D.D.C. 2005) (recognizing that press statements allegedly disclosing protected information about the plaintiff were made within the scope of government employment). Those cases leave no doubt that plaintiffs' invasion of privacy claim is covered by the Westfall Act and that the United States must be substituted on the claim in place of the current defendants.

That result is not altered by the fact that Libby, one of the defendants covered by the Westfall Act certification here, is currently under federal indictment for obstruction of justice and perjury related to the federal grand jury investigation into the disclosure of Plame's position with the CIA. It is important to recognize that the allegations in plaintiffs' Amended Complaint are distinguishable from the outstanding federal indictment against Libby in that he is not criminally

charged with having intentionally disclosed any classified information about Plame. Further, even if Mr. Libby had been so charged, under D.C. *respondeat superior* law the fact that an employee may be guilty of criminal wrongdoing does not preclude a finding that the employee was acting within the "scope of employment" under the Westfall Act.

As discussed, a finding that an employee is acting within the "scope" of employment under the Westfall Act does not exonerate or even reduce the employee's culpability for any criminal acts committed at work. Nor does it imply that the employer was somehow complicit in the alleged misconduct or derived benefit from it. *See* 27 Am. Jur. 2d § 374 ("'Respondeat [S]uperior' is a form of *strict liability* and represents the sentiment that it is unjust to permit an employer to gain from the intelligent cooperation of others without being responsible for the mistakes, the errors of judgment, and the frailties of those working for it.") (emphasis added.); Prosser & Keeton, The Law of Torts § 69 ("An employer who is held *strictly liable* [on a *respondeat superior* theory] is under the greatest incentive to be careful in the selection, instruction and supervision of his servants....") (emphasis added). To the contrary, the scope certification simply reflects two facts. First, Congress in enacting the Westfall Act, chose to make federal employees absolutely immune from suit for common law torts challenging conduct within the scope of federal employment as determined under relevant state law; and second, that the District of Columbia adheres to a broad understanding of the scope of employment under which Libby's alleged conduct must be deemed as a matter of law to have been performed within the scope of his official duties.

### ARGUMENT

I.    **THE UNITED STATES MUST BE SUBSTITUTED UNDER THE WESTFALL ACT FOR THE CURRENT DEFENDANTS ON PLAINTIFFS' INVASION OF PRIVACY CLAIM.**

The attached certification of Director Timothy P. Garren, *see* Ex. 1, constitutes "*prima*

*facie* evidence" that the requirements of the Westfall Act are satisfied for each of the individual federal defendants as to the invasion of privacy claim.[2]  *Council on American Islamic Relations*, 444 F.3d at 662 (citing *Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994)).  The effect of the certification is twofold: (1) the United States is substituted in place of the current defendants on the claim; and (2) the claim is then adjudicated against the United States under the FTCA.  *See* 28 U.S.C. § 2679(d)(1); *see also United States v. Smith*, 499 U.S. 160, 161-62 (1991).[3]  Although a plaintiff may challenge a Westfall Act scope certification, the burden would be on the plaintiffs to first set forth facts "that, if true, would demonstrate that. . .[defendants acted] outside the scope of ... [their] employment." *Stokes v. Cross*, 327 F.3d 1210, 1214-16 (D.C. Cir. 2003). Because the Westfall Act confers a form of absolute immunity intended to protect federal officials not merely from liability, but also from the burdens and distractions of litigation, discovery is disfavored.  *See Schrob v. Catterson*, 967 F.2d at 935;  *Brown v. Armstrong*, 949 F.2d 1007, 1011-12 (8th Cir. 1991).  Here, plaintiffs cannot defeat Westfall Act certification because the alleged actions of the individual federal defendants giving rise to plaintiffs' invasion of privacy claim present no legitimate issue of fact on the scope question.  To the contrary, the

---

[2]  The Attorney General has delegated his authority under the Westfall Act to certify scope of employment to any Director of the Torts Branch, Civil Division.  *See* 28 C.F.R. § 15.4(a).  The attached certification specifying that the Vice President, Armitage, Rove and Libby were acting within the scope of their federal employment as to their alleged conduct giving rise to the invasion of privacy claim is signed by Timothy P. Garren, who is the director of the Constitutional and Specialized Tort Litigation Section in the Torts Branch, Civil Division.

[3]  There are only two exceptions to the Westfall Act's rule specifying the FTCA as the exclusive remedy for claims based upon a "negligent or wrongful act or omission" of a federal employee acting within the scope of employment.  These exceptions are: (1) claims brought "for a violation of the Constitution of the United States" – such as the *Bivens* claims asserted by the plaintiffs in their first four causes of action; or (2) claims brought "for a violation of a statute of the United States" 28 U.S.C. § 2679(b)(2); *see also Smith*, 499 U.S. at 166-67 (refusing to infer another exception beyond the two expressly stated in the *Westfall* Act).  Plaintiffs' common law invasion of privacy claim does not fall within either exception.

allegations set forth in the Amended Complaint establish that the requirements for substitution

under the Westfall Act are amply satisfied.[4]

The substantive law to be satisfied in analyzing the scope question is supplied by the

District of Columbia because the alleged conduct giving rise to plaintiffs' invasion of privacy

claim occurred here.  Under the FTCA, courts must apply the law of the state where the alleged

tortious acts occurred.  *See* 28 U.S.C. § 2674; *Tarpeh-Doe v. United States*, 28 F.3d at 123;

*Garber v. United States,* 578 F.2d at 415.  The District of Columbia law of *respondeat superior*

is drawn from the Restatement (Second) of Agency, which provides:

> [c]onduct of a servant is within the scope of employment if, but only if: (1) it is of
> the kind he is employed to perform; (2) it occurs substantially within the
> authorized time and space limits; (3) it is actuated, at least in part, by a purpose to
> serve the master; and (4) if force is intentionally used by the servant against
> another, the use of force is not unexpected by the master.

Restatement (Second) of Agency § 228 (1958); *Schecter v. Merchants Home Delivery, Inc.*, 892

A.2d 415, 427-28 (D.C. 2006) (citing *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 n. 8

(D.C. 2001)).  Those requirements are satisfied in this case.

Scope requirements two and four under District of Columbia law do not appear to be at

issue in this case.  Requirement four is irrelevant because there was no alleged use of force

related to plaintiffs' invasion of privacy claim.  As to requirement two concerning "authorized

time and space limits," those are not disputed in the Amended Complaint.  To the contrary,

plaintiffs specifically pled that Armitage's disclosure to Novak concerning Plame's position at

---

[4] Certification of scope of employment under the Westfall Act is not a discretionary
action by the Department of Justice.  Federal employees who are sued for their actions have a
right to receive a scope of employment certification whenever their alleged conduct satisfies the
requirements of the Act.  If a scope certification is not provided, federal employees may petition
the court to compel certification.  28 U.S.C. § 2679(d)(3); *see also Gutierrez de Martinez v.
Lamagno*, 515 U.S. 417, 431 (1995) (finding that "the Act specifically allows employees whose
certification requests have been denied by the Attorney General, to contest the denial in court").

the CIA – which directly resulted in the first publication about her involvement in the matter and is the source of all plaintiffs' alleged injuries – occurred at a meeting in Armitage's office at the State Department. Compl. ¶ 39. Although the Amended Complaint is vague regarding where and when other alleged disclosures supposedly occurred, there is no claim that anything was done at some unauthorized time or space. Indeed, it is difficult to imagine how such a requirement could ever be applied to preclude scope of employment for officials at the highest levels of the federal government, such as the Vice President, Armitage, Rove and Libby. Unlike ordinary employees who may have very defined hours and places of employment, officials at their levels do not function under narrow time and space parameters. And applying requirements one and three as they have consistently been interpreted by the courts of the District of Columbia, there is no question that defendants' alleged actions occurred within the scope of their federal offices or employment.

A.    **Defendants' Alleged Conduct Giving Rise To The Invasion Of Privacy Claim Is The "Kind" Of Conduct They Were Employed To Perform Under District of Columbia Scope Analysis.**

Conduct is considered to be the kind an employee is employed to perform if it is "'of the same general nature as th[e] [conduct] authorized' or 'incidental to the conduct authorized.'" *Harbury*, 2006 WL 2212696, at *10 (D.D.C. Aug. 1, 2006) (quoting Restatement (Second) of Agency § 229 (1958)). The conduct need not be explicitly sanctioned by the employer. *Daisley v. Riggs Bank, N.A.*, 372 F.Supp.2d 61, 75 (D.D.C. 2005). Conduct is "incidental" to an employee's legitimate duties if it is "foreseeable." *Haddon v. United States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995). Although that requires more than a mere "opportunity" to commit an intentional tort on the job, it is enough that the tort was "a 'direct outgrowth' of an employee's instructions or job assignment." *Id.* Applying that approach, Judge Urbina of this Court recently noted that "[t]he courts in the District of Columbia categorize practically any conduct as

10

falling within the scope of, or incidental to, that authorized by their employer so long as the

action has *some nexus* to the action authorized." *Rasul v. Rumsfeld*, 414 F.Supp.2d 26, 33

(D.D.C. 2006) (emphasis added), appeal docketed, No. 06-5222 (D.C. Cir. July 31, 2006);[5] *see*

*also Greene v. Nguyen*, No. Civ. A. 05-0407, 2005 WL 3275897, at *4 (D.D.C. Sept. 7, 2005)

(recognizing that District of Columbia courts apply an especially "expansive" scope analysis).

Judge Urbina's observation is amply supported by numerous decisions by the courts holding

employers liable under D.C. *respondeat superior* law even for wanton and egregious acts of

violence committed by their employees at work.[6]

Courts applying D.C. law have repeatedly found for *respondeat superior* purposes that

allegedly improper disclosures by federal employees to the media of government related

---

[5] In *Rasul*, the court approved the substitution of the United States for military officials
who were sued for allegedly torturing the plaintiffs during their detentions at Guantanamo Bay
and for senior federal officials who allegedly authorized those actions. *See also Schneider v.
Kissinger,* 310 F.Supp.2d 251, 264-66 (D.D.C. 2004) (upholding certification and substitution of
the United States for individual defendant Henry Kissinger on allegations that he conspired in
violation of government policy to kidnap the Commander-in-Chief of the Chilean army, which
led to his death), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005), *cert. denied*, 126 S.Ct.
1768 (2006); *Gonzalez-Vera v. Kissinger,* Civ. No. 02-2240, at 10-14 (HHK) (D.D.C. Sept. 17,
2004) (finding that United States was correctly substituted for individual defendant Henry
Kissinger despite allegations that Kissinger assisted and condoned torture undertaken by the
regime of General Augusto Pinochet), *aff'd on other grounds*, 449 F.3d 1260 (D.C.Cir. 2006),
*reh'g en banc denied* (Aug. 17, 2006).

[6] In *Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976), the D.C. Circuit affirmed a finding
that a mattress deliveryman acted within the scope of his employment when he assaulted and
raped the plaintiff immediately following a dispute over whether he should carry the mattress
into the apartment for her inspection and whether a check was an acceptable means of payment.
The court noted that "[t]he dispute arose out of the very transaction which had brought [the
deliveryman] to the premises" and the assault "arose naturally and immediately ... about two
items of great significance in connection with his job." *Id.* at 652.  In *Johnson v. Weinberg,* 434
A.2d 404 (D.C. 1981), the D.C. Court of Appeals found an employer liable for injuries inflicted
when an employee responsible for removing clothes from washing machines shot a customer
during a dispute involving missing shirts.  The Court found that "[t]he assault arose out of the
transaction which initially brought [the customer] to the premises ... and was triggered by a
dispute over the conduct of the employer's business." *Id.* at 409.

information is the kind of conduct the employees were hired to perform. The D.C. Circuit's

recent decision in *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir.

2006), is particularly instructive in that regard. In that case Congressman Ballenger was sued by

a non-profit organization for defamation. The defamation claim was based on Congressman

Ballenger's statement to a reporter in an interview initiated to discuss his marital status. The

interview eventually strayed into matters concerning the non-profit organization. In referencing

the organization, Congressman Ballenger characterized it as the "fund-raising arm" for

Hezbollah, which the State Department has designated to be a foreign terrorist organization. *Id.*

at 662. Those comments were republished in newspapers and electronically throughout the

United States. *Id.*

      The D.C. Circuit upheld the district court's determination that Congressman Ballenger

was acting within the scope of his federal employment when he made the allegedly defamatory

statement. In response to the organization's argument that the defamatory statement *itself* was

not conduct of the kind the congressman was employed to perform, the court noted that

> [t]he proper inquiry in this case focuses on the underlying dispute or controversy,
> not on the nature of the tort, and is broad enough to embrace any intentional tort
> arising out of a dispute undertaken on the employer's behalf. Here, the underlying
> dispute or controversy was the phone call between Ballenger and ... [the reporter]
> discussing the marital separation. The appropriate question, then, is whether that
> telephone conversation – not the allegedly defamatory sentence – was the kind of
> conduct Ballenger was employed to perform .... We hold that it was. Speaking to
> the press during work hours in response to a reporter's inquiry falls within the
> scope of a congressman's authorized duties.

*Id.* at 664 (internal citations and quotations omitted). *See also Evans v. District of Columbia*,

391 F.Supp.2d 160, 169-70 (D.D.C. 2005) (finding that District of Columbia Councilman's

alleged defamatory statements at council meetings and to media outlets impugning plaintiff's

ethics and judgment, accusing plaintiff of impeding a government investigation, and disclosing

information contained in plaintiff's personnel file were shielded by doctrine of official immunity

because Councilman acted within the scope of his employment); *Krieger v. Department of Justice*, No. Civ. A. 98-1703, 2005 WL 555418, at *6 (D.D.C. March 8, 2005) (finding allegation that supervisor took part in issuance of a press release which improperly disclosed inaccurate information about plaintiff did not establish that supervisor exceeded the scope of his federal employment); *Greene*, 2005 WL 3275897, at *3-5 (finding alleged defamatory remarks concerning plaintiff's sexual conduct to be within defendant federal employees' scope of employment); *Hutchins v. Andrews*, No. Civ.A. 05-938, 2005 WL 1902842, at *4 (D.D.C. July 13, 2005) (upholding certification and substitution of United States as defendant for employees of Veterans Administration who allegedly published a statement defaming plaintiff and injuring his professional reputation).[7]

Consistent with that reasoning, defendants' alleged conduct in disclosing information about Plame to members of the press broadly constitutes under *respondeat superior* analysis the kind of conduct they were employed to perform. Defendants all occupied senior leadership positions in the federal government at the time of their alleged conduct. Officials at their levels commonly interact with reporters to address inquiries concerning the policies and practices of the government, which serves obvious and essential public policy interests. That is especially true in regard to highly publicized challenges to governmental determinations on matters as fundamental as national security, such as gave rise to this case. Senior officials are expected to respond to

---

[7] Courts in other jurisdictions have also found allegedly tortious disclosures of information by federal employees to be within the scope of federal employment. *See Aversa v. United States*, 99 F.3d 1200, 1210-13 (1st Cir. 1996) (upholding certification and substitution of the United States as defendant for Assistant United States Attorney and Internal Revenue Service official who allegedly falsely stated to local and national news media that the plaintiff was involved in criminal activities); *Rodriguez v. Sarabyn*, 129 F.3d 760 (5th Cir. 1997) (upholding certification and substitution of the United States as defendant for Bureau of Alcohol, Tobacco and Firearms officials for allegedly tortious statements related to raid on Branch Davidian compound in Waco, Texas).

criticisms of government policy on such important matters in order to correct inaccuracies in the

press and provide an explanation of the government's position.  In this instance, there was much

information reported in the press suggesting that the Vice President's office had prior awareness

of and may have been involved in the decision to arrange Wilson's trip to Niger.  *See* Compl.

¶¶ 19(b), (l), (k), (n).  Addressing press reports regarding government business and providing the

government's perspective on matters of public controversy is well within the scope of

employment of those government officials whose duties entail speaking with reporters.

The fact that plaintiffs allege that defendants "intentionally" disclosed classified

information about Plame does not alter the scope analysis.  Although the improper disclosure of

classified information by a federal official would not be approved or condoned by the United

States, courts applying D.C. law have repeatedly found that even the most egregious criminal

acts, unapproved and unauthorized by the employer, may occur within the scope of employment.

*See supra* at pp. 11-13.  As the D.C. Circuit emphasized in *Ballenger*, the focus of the scope

inquiry is not on the substance of the disclosure; the focus is on the circumstances in which the

disclosure was made.  444 F.3d at 664.  Here, the individual defendants were authorized in their

leadership positions to communicate with the press and their allegedly improper disclosures

related directly to governmental matters of central concern to their offices and served the interest

of the government as opposed to their private interests.  Even if those actions were improper, as

the plaintiffs allege, the individual defendants nevertheless acted within the scope of their office

or employment.

**B.**  **Defendants' Alleged Conduct Giving Rise To The Invasion Of Privacy Claim Was Undertaken At Least Partly To Serve The United States Under The Controlling Scope Analysis Principles Of This Jurisdiction.**

The final factor to be considered in determining whether an employee's conduct occurred

within the scope of employment is whether the alleged actions were undertaken, at least in part,

14

for the purpose of serving the employer. *See* Restatement (Second) of Agency § 228. The D.C.

Court of Appeals has recognized that this requirement also

> focuses on the underlying dispute or controversy, not on the nature of the tort, and is
> broad enough to embrace *any intentional tort* arising out of a dispute that "was originally
> undertaken on the employer's behalf."

*Johnson*, 518 A.2d at 992 (emphasis added). Moreover,

> [while t]he employer . . . is not to be held liable for "willful acts, intended by the agent
> *only* to further his own interest, not done for the [employer] at all." . . . [t]he employer
> does not avoid liability for the employee's intentional torts . . . if the tort is committed
> *partially* because of a personal motive, such as revenge, as long as "the employee [is]
> actuated, *at least in part*, by a desire to serve his principal's interest."

*Id.* at 988 (emphasis added) (internal citations omitted); *see also* Restatement (Second) of

Agency § 245 cmt. f (1958). When an employee's actions occur in the course of performing job

duties, "the employee is *presumed* to be intending, at least in part, to further the employer's

interests." *Johnson*, 518 A.2d at 989 (emphasis added).

Plaintiffs allege nothing that remotely rebuts the presumption under District of Columbia

law that defendants acted in this case at least in part to serve the interests of their employer.

There is no claim that defendants acted out of any purely personal interests, let alone that

personal interests were the *sole* reason for their actions. As to Armitage, plaintiffs do not even

suggest that he harbored any malice against them. *See* Compl. ¶¶ 36-39. Although plaintiffs

alleged that the Vice President, Rove and Libby "reached an agreement to discredit, punish and

seek revenge against the plaintiffs," Armitage is not included as a party to the alleged plan. *Id.*

¶ 24. Nor did plaintiffs name Armitage as a defendant on their First Amendment retaliation

claim or their Fifth Amendment equal protection claim for "vindictiveness and an illegitimate

animus." *Id.* ¶¶ 46-54. The gist of the matter is that the disclosure in this case from Armitage to

Novak at the State Department on July 8, 2004, which allegedly led to the first publication of

Plame's identity, was due to nothing more than a claimed inadvertent error or misjudgment. It

cannot logically be argued that such conduct occurred outside the scope of federal employment under the law of the District of Columbia.

Although plaintiffs claim that the Vice President, Rove and Libby acted out of malice in making their alleged disclosures, plaintiffs' central contention boils down to an accusation that those defendants engaged in a misguided and unlawful effort to advance their conception of the United States' interests by undermining Wilson's criticisms of government policy. The alleged conduct cannot fairly be characterized as personally motivated, let alone *entirely* personally motivated. Plaintiffs specifically claim in their Amended Complaint that the Vice President, Rove and Libby acted in response to Wilson's published criticisms of government policies and that at least part of their motive was to "discredit" Wilson. *See id.* ¶¶ 3, 24. The natural result of a successful campaign to discredit Wilson would have been to call his criticisms of government policies into doubt. *See id.* ¶ 23 (quoting Washington Post article stating that "two top White House officials" disclosed the identity of Valerie Wilson to journalists "as part of their *broader* case against Wilson") (emphasis added); ¶ 19(o) ("publication of the Wilson Op-Ed acutely focused the attention of the Vice President and [Libby] – his chief of staff – on Mr. Wilson, on the assertions made in his article, and on responding to those assertions"). That is enough to establish scope, even reading plaintiffs' allegations as suggesting that the Vice President, Rove and Libby also acted out of some personal desire to punish and retaliate against them. Considering that at least part of the motive behind the alleged disclosures was to defend the policies of the federal government, District of Columbia law dictates that the actions must be considered to have occurred within the scope of defendants' offices or employment with the government.

**II.    PLAINTIFFS' FTCA CLAIM MUST BE DISMISSED FOR FAILURE TO EXHAUST THE REQUIRED ADMINISTRATIVE REMEDIES.**

Upon the substitution of the United States under the Westfall Act as the proper defendant on plaintiffs' Fifth Cause of Action, the resulting FTCA claim must be dismissed. The Westfall Act provides that when the United States is substituted for an individual defendant, the resulting claim is "subject to the limitations and exceptions applicable to" FTCA claims. 28 U.S.C. § 2679(d)(4). In this case, plaintiffs have not satisfied the jurisdictional requirements for proceeding on an FTCA claim. An essential prerequisite to the pursuit of an FTCA claim is the exhaustion of all administrative remedies. "An action shall not be instituted upon a claim against the United States for money damages ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claims shall have been finally denied by the agency in writing." 28 U.S.C. § 2675(a); *see also McNeil v. United States*, 508 U.S. 106, 112 (1993); *Bancoult*, 370 F. Supp. 2d at 10-11; *Schneider*, 310 F. Supp. 2d at 266-67. This requirement is jurisdictional. *See* 28 U.S.C. § 2675(a); *Jackson v. United States*, 730 F.2d 808, 809 (D.C. Cir. 1984); *Schneider*, 310 F. Supp. 2d at 269. Because plaintiffs have not exhausted their administrative remedies, this Court lacks subject matter jurisdiction over their FTCA claims. *See* 28 U.S.C. § 2675(a); *McNeil*, 508 U.S. at 112; *Rasul*, No. 04-1864, 2006 WL 266570, at *11 (D.D.C. Feb. 6, 2006).

## CONCLUSION

For the foregoing reasons, the United States should be substituted for the individual federal defendants on plaintiffs' Fifth Cause of Action asserting a common law tort claim of invasion of privacy, and that claim should then be dismissed for failure to exhaust the required administrative remedies to proceed on the claim under the FTCA.

Dated: November 14, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney for the
District of Columbia
JEFFREY S. BUCHOLTZ
Principal Deputy Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

TIMOTHY P. GARREN
Director, Torts Branch

RICHARD MONTAGUE
Senior Trial Attorney

GLENN S. GREENE, #450348
Trial Attorney
Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Washington, D.C. 20044-7146
Tel: (202) 616-4143
Fax: (202) 616-4314
Attorneys for the United States of America

CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2006, I served a true copy of the foregoing upon

counsel listed below:

Alex Bourelly, Esq.
Baker Botts LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400

Melanie Sloan
Anne L. Weismann
Citizens for Responsibility and Ethics
In Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005

Emmet T. Flood, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

Erwin Chemerinsky
Duke University School of Law
Science Drive and Towerview Road
Durham, NC 277708-0360

Robert D. Luskin, Esq.
Patton Boggs LLP
2550 M Street, N.W.
Washington, D.C. 20037

Joseph Cotchett
Cotchett Pitre, Simon & McCarthy
840 Malcolm Road
Suite 200
Burlingame, CA 94010

Michael Waldman
Fried, Frank, Harris, Shriver
 & Jacobson LLP
1001 Pennsylvannia Ave, NW
Washington, DC 20004-2505

By: _____
    Richard Montague
    Department of Justice
    Torts Branch, Civil Division
    Box 7146 Washington, D.C. 20044
    Phone (202) 616-4158
    Fax (202) 616-4314
    Attorney for the United States of America