UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| VALERIE PLAME WILSON, and<br>JOSEPH C. WILSON, IV, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. A. No. 06-1258 (JDB) |
| | ) | |
| I. LEWIS LIBBY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' STATEMENT OF INTEREST
## AND POINTS AND AUTHORITIES

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

JEFFREY S. BUCHOLTZ
Principal Deputy Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

TIMOTHY P. GARREN
Director Torts Branch, Civil Division

RICHARD MONTAGUE
Senior Trial Attorney

GLENN S. GREENE, #450348
Trial Attorney
Department of Justice
Torts Branch, Civil Division
Box 7146 Washington, D.C. 20044
Phone (202) 616-4158
Fax (202) 616-4314
Attorneys for the United States of America

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INTRODUCTION AND STATEMENT OF THE UNITED STATES' INTEREST . . . . . . . . . . 1

I.     SPECIAL FACTORS COUNSELING HESITATION FORECLOSE
       EXTENSION OF THE *BIVENS* REMEDY IN THIS CONTEXT . . . . . . . . . . . 7

       A.     Courts Should Not Create A Cause of Action Under *Bivens* Where, As
              Here, There Are "Special Factors Counseling Hesitation." . . . . . . . . . . . 7

       B.     The Privacy Act Is A "Special Factor" That Counsels Against Extending
              *Bivens* To Allow A First Or Fifth Amendment Claim Based On Alleged
              Disclosures Of Information About Plame For Punitive And Retaliatory
              Reasons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.    THE VICE PRESIDENT IS ENTITLED TO ABSOLUTE IMMUNITY FROM
       CIVIL LIABILITY ARISING FROM HIS PERFORMANCE OF OFFICIAL
       DUTIES.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.   QUALIFIED IMMUNITY ALSO SHIELDS THE INDIVIDUAL FEDERAL
       DEFENDANTS FROM PERSONAL LIABILITY. . . . . . . . . . . . . . . . . . . . . . 22

       A.     The First Amendment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

       B.     Equal Protection Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       C.     Right To Privacy Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       D.     Due Process Property Deprivation Claim . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Federal Bureau of Investigation,*
    971 F. Supp. 603 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Alexander v. Peffer,*
    993 F.3d 1348 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*American Federation of Government Employees, AFL-CIO v. Department of Housing &*
    *Urban Development,*
    118 F.3d 786 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Anderson v. Creighton,*
    483 U.S. 635 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 23

*Bartel v. Federal Aviation Admin.,*
    725 F.2d 1403 (D.C. Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,*
    403 U.S. 388 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Blazy v. Tenet,*
    194 F.3d 90 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Blazy v. Tenet,*
    979 F. Supp. 10 (D.D.C.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Briscoe v. Lahue,*
    460 U.S. 325 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bush v. Lucas,*
    462 U.S. 367 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14

*Butz v. Economou,*
    438 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

*Cardamone v. Cohen,*
    241 F.3d 520 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Carlson v. Green,*
    446 U.S. 14 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cheney v. United States District Court,*
    542 U.S. 367 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16, 19, 20

*Chung v. Department of Justice*,
    333 F.3d 273 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 11, 12

*Clinton v. Jones*,
    520 U.S. 681 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Coalition for Economic Equity v. Wilson*,
    122 F.3d 692 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Collins v. City of Harker Heights*,
    503 U.S. 115 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Colson v. Grohman*,
    174 F.3d 498 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Correctional Services Corp. v. Malesko*,
    534 U.S. 61 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*In re Crawford*,
    194 F.3d 954 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Crawford-El v. Britton*,
    523 U.S. 574 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 27

*Davis v. Passman*,
    442 U.S. 228 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Doe v. Delie*,
    257 F.3d 309 (3rd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Doe v. Gates*,
    981 F.2d 1316 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Doe v. U.S. Postal Serv.*,
    317 F.3d 339 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Doe v. United States Department of Justice*,
    753 F.2d 1092 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Downie v. City of Middleburg Heights*,
    301 F.3d 688 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

*Eagle v. Morgan*,
    88 F.3d 620 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Federal Labor Relations Auth. v. U.S. Department of Treasury, Financial Management Serv.*,
    884 F.2d 1446 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ferri v. Ackerman,*
    444 U.S. 193 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Forrester v. White,*
    484 U.S. 219 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Gonzales-Vera v. Kissinger,*
    449 F.3d 1260 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Gray v. Poole,*
    275 F.3d 1113 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gregoire v. Biddle,*
    177 F.2d 579 (2nd Cir. 1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Griffin v. Ashcroft,*
    No. 02-5399, 2003 WL 22097940 (D.C. Cir. Sept. 3, 2003) . . . . . . . . . . . . . . . . . 11

*Gutierrez de Martinez v. Lamagno,*
    515 U.S. 417 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22, 23

*Hartman v. Moore,*
    126 S. Ct. 1695 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Hatfill v. Ashcroft,*
    404 F. Supp.2d 104 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Idaho v. Coeur d'Alene Tribe,*
    521 U.S. 261 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Imbler v. Pachtman,*
    424 U.S. 409 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jones v. Executive Office of President,*
    167 F.Supp.2d 10 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*Kalka v. Hawk,*
    215 F.3d 90 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Kallstrom v. Columbus,*
    136 F.3d 1055 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*Kartseva v. Department of State,*
    37 F.3d 1529 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*M.K. v. Tenet,*
196 F. Supp.2d 8 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Mazaleski v. Truesdell,*
562 F.2d 701 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Mittleman v. United States Treasury,*
773 F. Supp. 442 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Moore v. United States,*
213 F.3d 705 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*National Archives and Records Admin. v. Favish,*
541 U.S. 157 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Nebraska Beef, Ltd. v. Greening,*
398 F.3d 1080 (8th Cir.), *cert. denied,* 126 S. Ct. 1908 (2006) . . . . . . . . . . . . . . . . . . . 8

*Nixon v. Administrator of General Servs.,*
433 U.S. 425 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16

*Penthouse Int'l Ltd. v. Meese,*
939 F.2d 1011 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Pierson v. Ray,*
386 U.S. 547 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*Saucier v. Katz,*
533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Scheetz v. The Morning Call, Inc.,*
946 F.2d 202 (3rd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Schwartz v. U.S. Department of Treasury,*
131 F.Supp.2d 142 (D.D.C. 2001), *aff'd,* 2001 WL 674636 (D.C. Cir. 2001) . . . . . . . 13

*Schweiker v. Chilicky,*
487 U.S. 412 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Sheets v. Salt Lake County,*
45 F.3d 1383 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Shmueli v. City of New York,*
424 F.3d 231 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Smith v. Aldrich,*
    235 F.3d 1058 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Smith v. Power,*
    346 F.3d 740 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Spagnola v. Mathis,*
    859 F.2d 223 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Spalding v. Vilas,*
    161 U.S. 483 (1896) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Stewart v. Evans,*
    351 F.3d 1239 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Suarez Corp. Indus. v. McGraw,*
    202 F.3d 676 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26

*Toolasprashad v. Bureau of Prisons,*
    286 F.3d 576 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Trifax Corp. v. District of Columbia,*
    314 F.3d 641 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Tripp v. Executive Office of the President,*
    200 F.R.D. 140 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*United States Department of Defense v. Federal Labor Relations Auth.,*
    510 U.S. 487 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Whalen v. Roe,*
    429 U.S. 589 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Wilson v. Layne,*
    526 U.S. 603 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Woodrum v. Woodward County, Okl.,*
    866 F.2d 1121 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*X-Men Sec., Inc. v. Pataki,*
    196 F.3d 56 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

**STATUTES**

Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No.
   100-694 § 2(a)(6), 102 Stat. 4563 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5 U.S.C. § 552a (a)(3), (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 517 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1) . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 2679(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## INTRODUCTION AND STATEMENT OF THE UNITED STATES' INTEREST

This memorandum is submitted on behalf of the United States under the authority of 28 U.S.C. § 517, which expressly authorizes the Attorney General to send any officer of the Department of Justice "to attend to the interests of the United States" in any action pending in a state or federal court.

Valerie Plame Wilson ("Plame") and Joseph C. Wilson, IV ("Wilson") (collectively, "plaintiffs") filed this action alleging constitutional and common law torts against Richard B. Cheney, Vice President of the United States; Richard L. Armitage, former Deputy Secretary of State; Karl C. Rove, White House Senior Advisor; and I. Lewis Libby. Jr., former Assistant to the President of the United States and Chief of Staff to the Vice President (collectively, "the individual federal defendants"). Plaintiffs seek to have the Vice President, Libby and Rove held personally liable for what they style a "conspiracy" to "punish" Wilson "for his public statements regarding assertions by the President of the United States in the 2003 State of the Union address that he used to justify war against Iraq." Compl. ¶ 2.

As alleged in the Amended Complaint, President Bush stated in that address that "[t]he British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa." Compl. ¶ 19(a). Months later the *New York Times* published a column by Nicholas Kristof that questioned the accuracy of those "sixteen words." *Id.* ¶ 19(b). Kristof reported that an unnamed former ambassador (now known to be Wilson) was sent to Niger in 2002 following a request by the Vice President's office to investigate the allegation that Saddam Hussein had attempted to obtain uranium from an African country. *Id.* Kristof claimed that the ambassador eventually reported back to the Central Intelligence Agency ("CIA") and the State Department that the allegations were wrong and based upon forged documents. *Id.*

After several more newspaper articles were published that raised questions about alleged

1

Iraqi efforts to buy uranium and that referred to Wilson's Niger trip, *id.* ¶¶ 19(i), (k), Wilson publicly injected himself into the controversy. He wrote an article published in the *New York Times* entitled "What I Didn't Find in Africa," and he submitted to an interview by the *Washington Post*, which published an article about his trip to Niger. *Id.* ¶ 19(n). Wilson also appeared on the television program "Meet the Press" to discuss the controversy. *Id.* He claimed in his various public announcements that he had taken the trip to Niger at the request of the CIA in February 2002 to investigate the allegations that Iraq had sought or obtained uranium. *Id.* He expressed doubts about the claim that Iraq had obtained uranium from Niger and stated that he believed that the Vice President's office had been advised of the results of his trip. *Id.*

Plaintiffs claim that Wilson's public statements focused the attention of the Vice President and Libby on responding to Wilson's assertions. *Id.* ¶ 19(o). Specifically, plaintiffs assert that Libby had previously asked the State Department for information about Wilson's Niger trip, *id.* ¶ 19(c), and he and the Vice President were informed or otherwise eventually came to believe that Plame worked at the CIA and was involved in planning Wilson's trip, *id.* ¶¶ 19(d)-(f), (h). Plaintiffs contend that the Vice President, Libby and Rove reached an agreement to "discredit, punish and seek revenge" against Wilson partly by disclosing Plame's classified CIA employment to the press. *Id.* ¶ 24. Pursuant to this supposed plan, Rove and Libby allegedly revealed Plame's CIA employment to two different reporters. Libby discussed Plame's CIA employment with reporter Judith Miller on several occasions and once informed reporter Matthew Cooper. *Id.* ¶¶ 19(m), (r), (w), (x). Plaintiffs also contend that Rove spoke with Cooper, informing him that Plame worked for "the agency" and was responsible for sending Wilson to Niger. *Id.* ¶ 28. Plaintiffs do not claim, however, that either Miller or Cooper initially published anything about Plame's position at the CIA or engaged in any other public disclosure of her identity.

Plaintiffs allege that columnist Robert Novak was the first to publicly disclose Plame's CIA employment, which he discussed in his syndicated column on July 14, 2003. *Id.* ¶ 14. Novak wrote that "[Joseph] Wilson never worked for the CIA, but his wife, Valerie Plame, is an agency operative on weapons of mass destruction." *Id.* Novak also stated in his column that "[t]wo senior administration officials" told him that Plame suggested sending Wilson to Niger. *Id.* According to plaintiffs, Armitage previously had met with Novak in his State Department office and told him that Plame worked for the CIA on weapons of mass destruction. *Id.* ¶ 39. They also claim that Armitage had informed reporter Bob Woodward of the same information weeks earlier. *Id.* ¶ 37. Armitage allegedly learned about Plame's position at the CIA from a State Department memorandum, *id.* ¶ 36, and he disclosed the information to Novak and Woodward independently from the alleged efforts by the Vice President, Libby and Rove to retaliate against or discredit Wilson, *id.* ¶¶ 24, 46-54.[1]

The United States has a strong interest in ensuring that federal officials are appropriately protected from personal liability in lawsuits arising as a result of their official positions. In *Spalding v. Vilas*, 161 U.S. 483, 498 (1896), the Supreme Court noted that an executive officer "should not be under an apprehension that the motives that control his official conduct may at any time become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as intrusted to the executive branch of the government, if he were subjected to any such restraint." Although personal liability – including liability for so-called "constitutional torts," *see Bivens v. Six Unknown Named Agents of the Fed.*

---

[1] Plaintiffs' apparent distinction in that regard is reflected by their exclusion of Armitage on their first and second causes of action (based on the alleged scheme to punish Wilson). They allege in those two claims that the Vice President, Libby and Rove violated Wilson's First Amendment rights by "retaliatory action in reprisal for * * * exercise of the right to speech," *id.* ¶ 47, and violated plaintiffs' Fifth Amendment rights by subjecting them "to differential treatment * * * motivated by vindictiveness and * * * illegitimate animus * * * ." *Id.* ¶ 52.

*Bureau of Narcotics*, 403 U.S. 388 (1971) – is possible in some limited circumstances, the

Supreme Court consistently has recognized that the mere prospect of liability carries with it

substantial costs:

> it cannot be disputed seriously that claims frequently run against the innocent as
> well as the guilty – at a cost, not only to the defendant officials, but to society as a
> whole. These social costs include the expenses of litigation, the diversion of
> official energy from pressing public issues, and the deterrence of able citizens
> from acceptance of public office. Finally, there is the danger that fear of being
> sued will "dampen the ardor of all but the most resolute, or the most irresponsible
> [public officials], in the unflinching discharge of their duties."

*Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581

(2nd Cir. 1949) (L. Hand, J.)) (alteration in original). Congress similarly has recognized that

"[t]he prospect of such liability will seriously undermine the morale and well being of Federal

employees, [and] impede the ability of agencies to carry out their missions * * * ." Federal

Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694,

§ 2(a)(6), 102 Stat. 4563 (1988).

Fear of litigation may make officials act "with an excess of caution" or "skew their

decisions in ways that result in less than full fidelity to the objective and independent criteria that

ought to guide their conduct." *Forrester v. White*, 484 U.S. 219, 223 (1988). "In this way,

exposing government officials to the same legal hazards faced by other citizens may detract from

the rule of law instead of contributing to it." *Id.* Nowhere is that more true than when high-level

officials are sued in a controversy growing out of such sensitive matters as the conduct of foreign

and national security policy. *Cf. Gonzales-Vera v. Kissinger*, 449 F.3d 1260, 1264 (D.C. Cir.

2006) (holding that political question doctrine barred damages suit against former national

security advisor and Secretary of State, explaining "[a]lthough the plaintiffs attempt to

characterize Kissinger's acts as ultra vires, * * * "[w]hatever Kissinger did as National Security

Advisor or Secretary of State 'can hardly be called anything other than foreign policy'") (citation

omitted).

The United States thus has a compelling interest in ensuring that the limits on the implied *Bivens* remedy are enforced. One of those limits inheres in the nature of the *Bivens* remedy as a non-statutory cause of action. Judicial creation of a non-statutory cause of action is unusual, to say the least, under our system of separated powers, *see Correctional Services Corp. v. Malesko*, 534 U.S. 61, 66-67 & n.3 (2001); *id.* at 75 (Scalia, J., joined by Thomas, J., concurring), and the Supreme Court has admonished courts to tread with great care in deciding whether to recognize a *Bivens* remedy in a particular context. *See id.* at 74 (emphasizing the Court's "'caution consistently and repeatedly recognized for three decades' concerning 'extending *Bivens* remedies into any new context'"). Even if it is proper for courts to recognize a cause of action that Congress has omitted to create, where Congress has given "careful attention" to an area, courts should not add to the remedies that Congress saw fit to create. *See Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988). Congress gave careful attention to the subject of disclosures of government information and, in enacting the Privacy Act of 1974, created a comprehensive remedial scheme governing such disclosures. Part I below explains the United States' view that it would be inappropriate for this Court to imply a cause of action under *Bivens* when Congress has already spoken on the remedies that should exist to redress the type of injury alleged by plaintiffs in this case. Indeed, the D.C. Circuit has squarely held that no *Bivens* cause of action should be recognized for the type of claim asserted by plaintiffs because such claims are encompassed within the Privacy Act. *See Chung v. Department of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003).

In addition, because of the costs of permitting individual-capacity litigation to proceed against public officials, the United States believes that it is critical for courts to apply fully and fairly the immunity doctrines that protect public officials. *Cf. Anderson v. Creighton*, 483 U.S.

635, 646 n.6 (1987) ("[W]e have emphasized that qualified immunity questions should be

resolved at the earliest possible stage of a litigation."). Here, the United States believes that –

apart from the question whether a *Bivens* claim should be recognized in this context – the

individual federal defendants have valid claims of immunity.  First, as explained in Part II below,

under the Supreme Court's decisions in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), and *Cheney v.*

*United States District Court*, 542 U.S. 367 (2004), the Vice President possesses absolute

immunity from civil damages claims in connection with acts taken within the scope of his office,

such as those challenged by plaintiffs.  Second, as explained in Part III below, plaintiffs have

failed to allege that any of the individual federal defendants has violated a constitutional right, let

alone one that was clearly established in the circumstances, and qualified immunity thus bars

plaintiffs' claims.  *See Anderson*, 483 U.S. at 639-41.

For these reasons, the United States respectfully urges this Court to dismiss the Amended

Complaint.[2]

---

[2] This Statement of Interest addresses only the constitutional tort claims brought against
the individual federal defendants.  As noted, the Amended Complaint also includes a common
law tort claim for invasion of privacy.  The individual federal defendants are not the appropriate
defendants on that claim.  Rather, under 28 U.S.C. § 2679(d)(1), the United States is the only
appropriate defendant because the individual federal defendants are sued for acts taken within the
scope of federal office or employment.  *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417,
420 (1995).  Accordingly, the United States is also filing with this Court a certification under 28
U.S.C. § 2679(d)(1) that substitutes the United States as the defendant on that claim.  In addition,
the United States is simultaneously filing a Motion to Dismiss the common law tort claim.  As
explained in the Motion to Dismiss, plaintiffs have failed to comply with the applicable
requirements under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680,
that govern tort actions against the United States.

## DISCUSSION

I.    **SPECIAL FACTORS COUNSELING HESITATION FORECLOSE EXTENSION OF THE *BIVENS* REMEDY IN THIS CONTEXT.**

    A.    **Courts Should Not Create A Cause of Action Under *Bivens* Where, As Here, There Are "Special Factors Counseling Hesitation."**

In *Bivens*, the Supreme Court held that the victim of an alleged Fourth Amendment violation could bring suit to recover damages under 28 U.S.C. § 1331 where there were no apparent alternative remedies and "no special factors counseling hesitation" in the judicial recognition of such a cause of action "in the absence of affirmative action by Congress" to create that remedy. 403 U.S. at 396. Subsequently, the Court held in *Davis v. Passman*, 442 U.S. 228 (1979), that a congressional employee could maintain a *Bivens*-type suit under the Fifth Amendment arising from termination of her employment, while in *Carlson v. Green*, 446 U.S. 14 (1980), the Court permitted a *Bivens* action for alleged violations of the Eighth Amendment. In all three of these cases the Court found that there were no "special factors counselling hesitation" in the judicial creation of a remedy that Congress had not recognized.

In the three decades since *Carlson*, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001). Instead, "more recent decisions have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts." *Schweiker v. Chilicky*, 487 U.S. 412, 422 (1988). Indeed, the Supreme Court's most recent decision addressing the creation of a *Bivens* remedy pointedly noted the remedy's questionable doctrinal basis: in *Bivens*, the Court "rel[ied] largely on earlier decisions implying private damages actions into federal statutes," decisions from which the Court has since "retreated" and that reflect an understanding of private rights of action that the Court has since "abandoned." *Malesko*, 534 U.S. at 67 & n.3. The concurrence in *Malesko* went even farther, condemning *Bivens* as "a relic of the heady days

7

in which this Court assumed common-law powers to create causes of action." *Id*. at 75 (Scalia, J., joined by Thomas, J., concurring). The Eighth Circuit has described the Supreme Court's recent decisions in this area as erecting a "presumption against judicial recognition of direct actions for violations of the Constitution by federal officials or employees." *Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir.), *cert. denied*, 126 S. Ct. 1908 (2006).

In *Chilicky*, the Supreme Court declined to recognize a *Bivens* remedy for the denial of social security disability benefits, allegedly in violation of the Fifth Amendment's Due Process Clause. The Court explained that "[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies." 487 U.S. at 423. The Social Security system fit that description, and although the statutory remedies merely restored benefits the plaintiffs were entitled to all along and did not include damages, Congress' failure to provide more in the way of relief was not an invitation to the Court to fashion such remedies as the Court might believe appropriate, but rather a reason for the Court to refrain, out of deference to Congress, from creating a *Bivens* remedy. *See id.* Congress had struck the balance between government efficiency and individual rights, and the Court would not alter that balance by creating a further remedy of its own. *See id.*

*Chilicky* relied heavily on *Bush v. Lucas*, 462 U.S. 367 (1983), in which the Court unanimously refused to create a *Bivens* remedy to supplement the remedies available under the Civil Service Reform Act to an employee allegedly demoted in retaliation for First Amendment-protected speech. The *Bush* Court emphasized that the federal employment relationship was "governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States." *See id.* at 368. Congress had given careful attention to policy questions involved in balancing the rights and interests of the government and its employees, so

8

it was not for the courts to decide "whether or not it would be good policy to permit a federal employee to recover damages from a supervisor who has improperly disciplined him for exercising his First Amendment rights." *Id.* at 390.

The "*Bivens* lines of cases reflect[s] a sensitivity to varying contexts, and courts should consider whether there are 'special factors counselling hesitation,' before allowing a suit to proceed under [that] theory. The range of concerns to be considered in answering this inquiry is broad." *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 280 (1997) (Kennedy, J. concurring) (citing *Bivens*, 403 U.S. at 407 (Harlan, J., concurring)). That is especially so where there exist statutory remedies to which the plaintiff might turn. As the Court summarized in *Chilicky*:

> the concept of "special factors counselling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

487 U.S. at 423.

**B.    The Privacy Act Is A "Special Factor" That Counsels Against Extending *Bivens* To Allow A First Or Fifth Amendment Claim Based On Alleged Disclosures Of Information About Plame For Punitive And Retaliatory Reasons.**

The gist of plaintiffs' proposed *Bivens* claims is that the senior federal officials named in this action improperly disclosed the fact of Plame's employment with the CIA and did so in order to ruin her career and punish both her and her husband. *See, e.g.*, Compl. ¶¶ 34, 38, 39, 40; *see also id.* ¶¶ 42, 44; 46, 49; 51, 53; 55, 56, 58. Essential to plaintiffs' theory, in other words, was the disclosure of the Wilsons' marriage and Plame's identity as a CIA employee. Even assuming these allegations describe constitutional violations, the United States believes that it is not appropriate to extend *Bivens* to the context of this case. Congress considered the problem of improper disclosures of information contained in government records, and it enacted the Privacy

9

Act of 1974 to deal with it.  The Privacy Act and its remedies amount in this case to a "special factor counselling hesitation in the absence of affirmative action by Congress."

    **1.**  "The Privacy Act of 1974 regulates the collection, maintenance, use, and dissemination of information concerning individuals."  *Downie v. City of Middleburg Heights*, 301 F.3d 688, 696 (6th Cir. 2002) (quoting *Cardamone v. Cohen*, 241 F.3d 520, 524 (6th Cir. 2001)).  "The Act attempts to strike a balance between the government's need to collect and maintain information and the privacy interests of the persons to whom such information pertains."  *Cardamone*, 241 F.3d at 524 (citation and internal quotations omitted); *see also Blazy v. Tenet*, 194 F.3d 90, 96 (D.C. Cir. 1999).  Subject to certain exceptions, the Privacy Act provides in very broad terms that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains * * * ."  5 U.S.C. § 552a (b).  The Act also provides that an individual may bring a civil action against an agency where that agency fails to comply with any provision of the Act. *Id.* § 552a(g)(1)(D).  For purposes of the Privacy Act, to "maintain" a record means to "maintain, collect, use, or disseminate."  5 U.S.C. § 552a(a)(3).  The term "record" includes "any item, collection, or grouping of information *about an individual* that is maintained by an agency." *Id.* § 552a(a)(4) (emphasis added).

    The D.C. Circuit has authoritatively held that the Privacy Act is a comprehensive remedial scheme that precludes *Bivens* claims based on leaks of government information.  In *Chung v. Department of Justice*, 333 F.3d 273 (D.C. Cir. 2003), a businessman who pled guilty to making illegal campaign contributions brought suit under both *Bivens* and the Privacy Act alleging that leaks by high-ranking Justice Department officials stymied his efforts to cooperate with prosecutors and endangered his life by revealing his cooperation in an investigation.  The

D.C. Circuit affirmed this Court's dismissal of the *Bivens* claims "because, as the district court correctly held, they are encompassed within the remedial scheme of the Privacy Act." *Id.* at 274 (citation omitted). *See also Griffin v. Ashcroft*, No. 02-5399, 2003 WL 22097940 at * 2 (D.C. Cir. Sept. 3, 2003) (*per curiam*).

Although the United States believes that the D.C. Circuit's holding in *Chung* is dispositive here, the United States notes that other courts have reached the same conclusion. For example, in *Downie*, the Sixth Circuit held that "because the Privacy Act is a comprehensive legislative scheme that provides a meaningful remedy," the court would not "imply a *Bivens* remedy * * * directly under the First Amendment of the United States Constitution." 301 F.3d at 696. The plaintiffs in *Downie* alleged that the defendant federal agents engaged in a campaign to discredit them by, among other things, causing entry of false records in local police files regarding an arrest for carrying a concealed weapon. *See id.* at 690-91. The plaintiffs sought damages asserting that "[p]laintiffs are entitled to seek employment in their chosen profession, but have been and continue to be precluded from such employment as a direct result of the actions of the defendants and in retaliation for plaintiff Downie exercising his constitutional rights of free speech." *Id.* at 696. The Sixth Circuit affirmed the dismissal of the *Bivens* claims, explaining that "because the Privacy Act is a comprehensive legislative scheme that provides a meaningful remedy for the kind of wrong Downie alleges that he suffered, we should not imply a *Bivens* remedy * * * directly under the First Amendment of the United States Constitution." *Id.* at 696.

In addition, "a number of district courts have addressed the question, and they have all held that the Privacy Act does prevent persons * * * from bringing *Bivens* actions against individual federal officials." *Downie*, 301 F.3d at 698 (collecting cases). Most recently, in *Hatfill v. Ashcroft*, 404 F. Supp.2d 104 (D.D.C. 2005), this Court held that the Privacy Act was a

11

special factor barring a *Bivens* claim based on alleged leaks regarding the government's

investigation of the 2001 anthrax attacks.  Like the Wilsons, the plaintiff in *Hatfill* alleged that

the leaks were retaliatory and denied him due process by destroying his employment prospects.

*See id.* at 113.  To the extent the claims were grounded on the alleged leaks, the court held that

the Privacy Act precluded the creation of a *Bivens* remedy.  *See id.* at 115-17.[3]

2.  "Enacted to 'safeguard [ ] the public from unwarranted * * * dissemination of personal

information contained in agency records,' the Privacy Act generally prohibits 'nonconsensual

disclosure of any information that has been retrieved from a protected record,' unless that

information falls into one of a number of statutory exceptions * * * ."  *Doe v. U.S. Postal Serv.*,

317 F.3d 339, 342 (D.C. Cir. 2003) (quoting *Bartel v. Federal Aviation Admin.*, 725 F.2d 1403,

1407, 1408 (D.C. Cir.1984) (alteration in original)).  The Act obviously covers information

contained in personnel files.  *See Federal Labor Relations Auth. v. U.S. Department of Treasury,*

*Financial Management Serv.*, 884 F.2d 1446, 1451 (D.C. Cir. 1989); *see also United States*

*Department of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487, 493-94 (1994).

Here, plaintiffs attribute the alleged violations of the their First and Fifth Amendment

rights to the "disclosure of Mrs. Wilson's identity," Compl. ¶ 40, and allege that "[b]oth Mr. and

Mrs. Wilson have suffered gross invasions of privacy as a result of Defendants' conduct," *id.*

¶ 41.  Plame's identity (including her marriage to Wilson) clearly is the kind of personal

information located in agency records and that falls within the Privacy Act.  Accordingly, the

Privacy Act operates here as a "comprehensive legislative scheme that provides a meaningful

remedy for the kind of wrong" plaintiffs allege.  *Downie*, 301 F.3d at 696.  As in *Chung, Downie*

---

[3] *See also Mittleman v. United States Treasury*, 773 F. Supp. 442, 445-48, 454 (D.D.C. 1991); *Blazy v. Tenet*, 979 F. Supp. 10, 27 (D.D.C.1997); *Alexander v. Federal Bureau of Investigation*, 971 F. Supp. 603, 610 (D.D.C. 1997).

and *Hatfill*, therefore, the Privacy Act is a "special factor counseling hesitation" requiring dismissal of plaintiffs' *Bivens* claims.

According to the Amended Complaint, the broad public disclosure of Plame's identity resulted from Armitage telling columnist Robert Novak about it a few weeks after reading it in a State Department memorandum. *See* Compl. ¶¶ 36, 39; *see also id.* ¶ 37 (alleging Armitage also told reporter Bob Woodward, who apparently did not publish it). In light of the circumstances, the disclosures attributed to the other defendants also appear traceable to information presumably within agency records covered by the Privacy Act. *Compare Doe v. United States Postal Service*, 317 F.3d at 343 *with* Compl. ¶ 18(e) ("On or about June 11 or 12, 2003, the Under Secretary of State orally advised Libby that, in sum and substance, Wilson's wife worked at the CIA and that State Department personnel were saying that Wilson's wife was involved in the planning of his trip."); *id.* ¶ 18(f) ("On or about June 11, 2003, Libby spoke with a senior officer of the CIA to ask about the origin and circumstances of Wilson's trip and was advised by the CIA officer that Wilson's wife worked at the CIA and was believed [erroneously] to be responsible for sending Wilson on the trip."); *id.* ¶ 18(h) ("On or about June 12, 2003, Libby was advised by the Vice President of the United States that Wilson's wife worked at the Central Intelligence Agency in the Counterproliferation Division. Libby understood that the Vice President had learned this information from the CIA.").

**3.** Although the Privacy Act does not cover the offices of the President and Vice President because those offices are not "agencies" within the meaning of the Act,[4] that has no

---

[4] The judges of this district, with one exception, have repeatedly agreed with the United States on this point in regard to the Office of the President. *See Tripp v. Executive Office of the President*, 200 F.R.D. 140, 144 (D.D.C. 2001) (collecting cases); *but see Alexander v. Federal Bureau of Investigation*, 971 F. Supp. 603, 606 (D.D.C. 1997). *See also Schwartz v. U.S. Department of Treasury*, 131 F.Supp.2d 142, 147 (D.D.C. 2001) ("Offices within the White (continued...)

bearing on whether the Act is a "special factor" precluding plaintiffs' proposed *Bivens* claims. As the Amended Complaint shows, plaintiffs' alleged injuries are traceable to disclosures of information apparently located within records of the CIA and perhaps also the State Department. Congress has enacted a comprehensive statutory scheme that addresses the kind of injury alleged here. Even assuming that the Privacy Act does not remedy every disclosure plaintiffs allege – or even any of them – there is no indication that is the result of congressional inadvertence. The controlling point is that the Privacy Act broadly provides meaningful remedies against the United States for the type of harm plaintiffs claim to have suffered, which precludes the extension of *Bivens* into this context. *See Chilicky*, 487 U.S. at 427-29.

In both *Chilicky* and *Bush*, the remedial schemes at issue were held to preclude *Bivens* actions even though neither afforded any type of damages remedy. The fact that Congress had chosen not to include such a remedy in the legislation at issue made it inappropriate for the Court to create one. *See Chilicky*, 487 U.S. at 423; *Bush v. Lucas*, 462 U.S. at 390. Indeed, in *Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) (en banc) (*per curiam*), the D.C. Circuit refused to recognize a *Bivens* claim for a federal employee who allegedly suffered constitutional violations in the federal personnel context even though the Civil Service Reform Act afforded no remedy to the employee. As explained in *Spagnola*:

> *Bush* extends even to those claimants within the system for whom the CSRA provides "no remedy whatsoever."

*          *          *

---

[4](...continued)
House whose functions are limited to advising and assisting the President do not come within the definition of an "agency" within the meaning of FOIA or the Privacy Act. This includes the Office of the President (and by analogy the Offices of the Vice President) and undoubtedly the President and Vice President themselves."), *aff'd*, 2001 WL 674636 (D.C. Cir. 2001).

> After *Chilicky*, it is quite clear that if Congress has "not inadvertently" omitted damages against officials in the statute at issue, then courts must abstain from supplementing Congress' otherwise comprehensive statutory relief scheme with *Bivens* remedies – unless, of course, Congress has clearly expressed a preference that the judiciary preserve *Bivens* remedies.

*Id.* at 228, 229 (citations omitted).

Plaintiffs' *Bivens* claims in this case are precluded by the Privacy Act for the same reasons, regardless of whether the Privacy Act is determined to afford them with a remedy. One important reason why courts have concluded that the Privacy Act does not apply to the offices of the President or the Vice President is because that would raise significant separation of powers concerns, and the courts are unwilling to presume lightly that Congress would intend to extend such statutes to those constitutionally unique offices. *See Tripp v. Executive Office of President*, 200 F.R.D. at 144 ("Congress's exercise of this type of control over the President ... [under the Privacy Act would raise] separation of powers and other constitutional concerns."); *Jones v. Executive Office of President*, 167 F.Supp.2d 10, 15 (D.D.C. 2001) ("To subject the White House Office to the terms of the Privacy Act 'raises constitutional concerns, including separation of powers and Article II confidentiality.....'") (*quoting Barr v. Executive Office of President*, No. 99-1695, 2000 WL 33539396, *2 (D.D.C. August 9, 2000)). Such considerations – far from providing a foundation for implying a constitutional tort remedy in this context – are additional and compelling reasons to preclude such a claim under traditional *Bivens* analysis. Indeed, it would be doubly perverse for a court to use Congress' reluctance to raise constitutional concerns by subjecting the Executive Office of the President and the Office of the Vice President to the Privacy Act's statutory cause of action as a justification to create a non-statutory constitutional tort cause of action against senior officials like the defendants here. *Cf. Chilicky*, 487 U.S. at 421-22 ("The absence of statutory relief for a constitutional violation, for example, does not by any means necessarily imply that courts should award money damages against the officers

responsible for the violation.").

## II.    THE VICE PRESIDENT IS ENTITLED TO ABSOLUTE IMMUNITY FROM CIVIL LIABILITY ARISING FROM HIS PERFORMANCE OF OFFICIAL DUTIES.

Although most government officials are entitled only to qualified immunity from suits for damages, *see Butz v. Economou*, 438 U.S. 478 (1978), the Supreme Court has consistently recognized that the unique and important functions performed by certain officials require greater protection. As the Court has explained, "[t]he point of immunity for such officials is to forestall an atmosphere of intimidation that would conflict with their resolve to perform their designated functions in a principled fashion." *Ferri v. Ackerman*, 444 U.S. 193, 204 (1979). Applying these well-established common law principles, courts have recognized that judges, legislators, and prosecutors, among others, enjoy some form of absolute immunity. In *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982), the Court concluded that these basic principles compelled even broader protection for the President and held that the President is entitled to absolute immunity from civil damages suits for all conduct within at least the "outer perimeter" of his official duties. Applying *Fitzgerald* in *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367, 382 (2004), the Supreme Court emphasized that separation of powers concerns arise in civil litigation against the Vice President just as they arise with respect to the President. Application of *Fitzgerald*, *Cheney*, and traditional common-law immunity principles confirms that the Vice President possesses absolute immunity from civil suits seeking money damages arising out of conduct within his office.

As noted, the Supreme Court authoritatively addressed the scope of the President's immunity in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). There, the Court concluded that the question of whether the President enjoyed absolute immunity required it to balance the threat of interference with the President's exercise of his responsibilities against the public interest in

allowing civil suits. The Court concluded that this balance tilted sharply in favor of the

conclusion that the President was absolutely immune from civil suits for his official conduct.

Specifically, the Court noted that, like "prosecutors and judges – for whom absolute

immunity now is established – a President must concern himself with matters likely to 'arouse

the most intense feelings.'" *Id.* at 751-52 (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)).

The Court explained that "it is in precisely such cases that there exists the greatest public interest

in providing an official 'the maximum ability to deal fearlessly and impartially with' the duties of

his office." *Id.* at 752 (quoting *Ferri*, 444 U.S. at 203). Because the "visibility" of the

President's office would make him "an easily identifiable target for suits for civil damages," the

Court concluded that "[c]ognizance of this personal vulnerability frequently could distract a

President from his public duties, to the detriment of not only the President and his office but also

the Nation that the Presidency was designed to serve." *Id.* at 753.[5]

The Court found that the "dangers of intrusion on the authority and function" of

government outweighed any public interest served by allowing a civil suit for damages to

proceed against the President. *Id.* at 754. The Court emphasized that "there is a lesser public

interest in actions for civil damages than, for example, in criminal prosecutions." *Id.* at 754 n.37.

Although recognizing "that the sphere of protected action must be related closely to the

immunity's justifying purposes," the Court refused to limit the President's immunity to the

performance of specific duties. *Id.* at 755. Given "the special nature of the President's

constitutional office and functions," the Court believed it was "appropriate to recognize absolute

Presidential immunity from damages liability for acts within the 'outer perimeter' of his official

---

[5] The Court acknowledged that there was "no historical record of numerous suits against
the President," observing that the Court had not implied a constitutional cause of action against
federal officials for damages until *Bivens* in 1971. 457 U.S. at 753 n.33.

responsibility." *Id.* at 756. The Court broadly defined the contours of that immunity, rejecting arguments that the President had acted outside the scope of his official duties by ordering plaintiff Fitzgerald's discharge from the Air Force because such conduct clearly "lay well within the outer perimeter of [the President's] authority." *Id.* at 757.

The Supreme Court noted in *Fitzgerald* that recognition of absolute Presidential immunity from civil suits "will not leave the Nation without sufficient protection against misconduct," because "there are formal and informal checks on Presidential action that do not apply with equal force to other" officials, including "constant scrutiny by the press," and "the threat of impeachment." *Id.* at 757. Given the existence of these alternate remedies for Presidential misconduct, absolute immunity would not place the President "above the law," but would "merely preclude[] a particular private remedy for alleged misconduct in order to advance compelling public ends." *Id.* at 758.

The reasoning in *Fitzgerald* supports affording absolute immunity to the Vice President. Like the President, the Vice President is a constitutional officer. The Constitution specifies that the Vice President shall replace the President upon his removal from office, death, resignation, or inability to serve, Art. II, § 2, and it authorizes the Vice President and a majority of the heads of the executive departments to determine that the President is unable to discharge his office, Amend. XXV, § 4. It further provides that the Vice President "shall be President of the Senate," with the controlling vote when the Senate is "equally divided." Art. I, § 3. Like the President, the Vice President must be elected every four years, Art. II, § 1, and he is subject to impeachment in the same manner as the President, Art. II, § 4.

As the only government official other than the President who is elected by the entire country, the Vice President can be emblematic of government policy in a way that is different in kind from that of any official other than the President himself. That status and visibility, and his

association with Presidential acts and policies, render his office a target for litigation, second, perhaps, only to the President. *Compare Fitzgerald*, 457 U.S. at 753. And like the President, the Vice President also holds an office with a unique role under the Constitution. *Compare id.* at 754.

Indeed, the Supreme Court emphasized in *Cheney* that separation of powers concerns arise in civil litigation against the Vice President just as they arise with respect to the President. *See Cheney*, 542 U.S. at 382. Citing the *Fitzgerald* holding that the President has absolute immunity from claims for damages for conduct performed within the outer perimeter of his authority, the Court explained: "In view of the visibility of the Offices of the President *and the Vice President* and the effect of their actions on countless people," both the President *and the Vice President* "are easily identifiable target[s] for suits for civil damages." *Cheney*, 542 U.S. at 386 (quoting *Fitzgerald*, 457 U.S. at 751) (internal quotations omitted; emphasis added). *See also Clinton v. Jones*, 520 U.S. 681, 702 n.36 (1997) (comparing the significant risks of litigation arising from acts taken while President with the relatively minor risks arising from acts taken before assuming that office, where "the class of potential plaintiffs is considerably smaller and the risks of litigation less intense").

*Cheney*'s linking of the Offices of the President and the Vice President and its specific reliance on *Fitzgerald* are compelling indications that the Vice President should be afforded the same immunity as the President with regard to private civil damages claims. The public interest in allowing damages suits to go forward against the Vice President is diminished by the same "formal and informal checks on Presidential action" that undermine the rationale for allowing civil suits for damages against the President. *See Fitzgerald*, 457 U.S. at 757.[6]

---

[6] As with the President, the absence of a historic or common-law tradition of damages suits against the Vice President or of absolute immunity from such suits can be explained by the relatively recent innovation of *Bivens* claims against federal officials.

Although the Court's analysis in *Fitzgerald* rested primarily on functional considerations, it also observed that separation of powers concerns confirmed that analysis. *See Fitzgerald*, 457 U.S. at 749, 752. And the Court's decision in *Cheney* indicates that *Fitzgerald*'s reasoning applies to the Vice President as well. In vacating the denial of mandamus in a Federal Advisory Committee Act ("FACA") lawsuit against the Vice President, the Supreme Court in *Cheney* expressly observed that "separation-of-powers considerations should inform a court of appeals' evaluation of a mandamus petition involving the President or the Vice President." *See Cheney*, 542 U.S. at 382. A tort lawsuit brought against the Vice President in the context of a policy dispute raises similar "separation-of-powers considerations" to those arising in a suit seeking documents from the Vice President under FACA.[7]

In short, considerations that led the Supreme Court to confirm that the President was entitled to absolute immunity from civil suits for damages apply to the Vice President. Indeed, this case illustrates the concerns that warrant the protections of absolute immunity. The sole allegation in this case concerning conduct by the Vice President is that "Defendants Cheney, Rove, Libby and John Does 1-10 reached an agreement to discredit, punish, and seek revenge

---

[7] In all events, it is well-established that official immunity is not confined to cases where the Constitution mandates it. *See, e.g., Butz*, 438 U.S. at 497 ("the doctrine of official immunity from § 1983 liability * * * [is] not constitutionally grounded"). That principle applies with particular force in the *Bivens* context, where there is no statutory right of action or common-law tradition of constitutional tort claims against federal officials. In the *Bivens* context it is not a question of judicially creating an immunity to defeat a cause of action that Congress has created; to the contrary, *recognizing* such a non-statutory claim is a departure from the ordinary separation of powers between the Legislative and Judicial Branches. In the several cases where the Supreme Court has declined to extend the availability of a *Bivens* remedy, the Court has never suggested that such a remedy is required unless the Constitution bars it. *See Malesko*, 534 U.S. at 66-74. To borrow a phrase, the separation of powers "does not require what it barely permits." *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 709 (9th Cir. 1997). Just as this Court need not hold that the Constitution prohibits creating plaintiffs' *Bivens* claims in order to decline to recognize those claims here, the Court need not hold that the Constitution requires absolute immunity for the Vice President in order to recognize absolute immunity for the reasons set forth in the text.

against the Plaintiffs that included, among other things, disclosing to members of the press Plaintiff Valerie Plame Wilson's classified CIA employment." Compl. ¶ 24.  As the Supreme Court recognized with respect to the President, the nature of the Vice President's office makes it extraordinarily susceptible to damages claims, each of which, under principles of qualified immunity, must be parsed and analyzed with reference to controlling principles of law.  As we show below, those principles would require dismissal.  But, of more general importance, the Vice President should not be subjected to the considerable burdens and costs often imposed to establish even a defense of qualified immunity, much less the demands of discovery or trial.[8]

Although plaintiffs have made conclusory allegations that each of the defendants acted outside the scope of his official duties, *see* Compl. ¶ 69, such allegations do not strip officials of absolute immunity.  In *Fitzgerald*, the Supreme Court rejected precisely this same type of argument – that "no federal official could, within the outer perimeter of his duties of office, cause Fitzgerald to be dismissed without satisfying" the applicable statutory standard – because "[t]his construction would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose."  457 U.S. at 756.  The relevant question thus is not whether the conduct that the complaint alleges the Vice President undertook would have been

---

[8] It bears emphasis that the analytical framework applied by the Supreme Court in *Fitzgerald* is not unique to the office of the President but has been used to confirm that absolute immunity from civil suits exists for a wide variety of federal officers.  Employing the same functional analysis and balancing test used in *Fitzgerald*, the courts have held that absolute immunity in the judicial sphere extends not only to judges, but also that prosecutors, witnesses, and other persons are similarly entitled to absolute immunity for acts intimately associated with the judicial process. *See, e.g., Imbler v. Pachtman*, 424 U.S. 409 (1976) (prosecutors); *Briscoe v. Lahue*, 460 U.S. 325 (1983) (witnesses); *Gray v. Poole*, 275 F.3d 1113, 1117 (D.C. Cir. 2002) (social worker functioning in capacity as a witness); *Moore v. United States*, 213 F.3d 705, 709-10 (D.C. Cir. 2000) (prosecutor initiating criminal proceedings).  As Chief Justice Burger observed in his concurring opinion in *Fitzgerald*, there is a greater "potential danger" from the "thousands of prosecutors and judges" who enjoy absolute immunity and who are "less open to constant, public scrutiny" than the President – an observation equally applicable to the Vice President.  457 U.S. at 759 n.2.

lawful, because "[a]doption of this construction would deprive absolute immunity of its intended effect." *Id.* at 756-57; *see also Smith v. Power*, 346 F.3d 740, 743 (7th Cir. 2003) (holding that city attorney was entitled to absolute immunity despite allegations that he exceeded his authority). Nor are allegations of improper motive relevant. *See, e.g., Shmueli v. City of New York*, 424 F.3d 231, 237-38 (2d Cir. 2005) (holding that prosecutor was entitled to absolute immunity despite allegations of improper motive). Rather, what matters is whether the conduct alleged to have caused the harm was within at least the "outer perimeter" of the official's duties. Here, accordingly, any argument that the Vice President could not lawfully disclose plaintiff's identity would miss the point, because there can be no doubt that discussions with the press responding to allegations that intelligence supporting the invasion of Iraq was flawed are generally functions within the Vice President's duties.

Because the sole allegation against the Vice President in this case challenges conduct that falls within a broad conception of his duties, the Vice President is entitled to absolute immunity. As the Supreme Court stressed in *Fitzgerald*, recognizing absolute immunity from civil damages suits does not elevate the Vice President "above the law," but instead "merely precludes a particular private remedy for alleged misconduct in order to advance compelling public ends." 457 U.S. at 758.

## III.    QUALIFIED IMMUNITY ALSO SHIELDS THE INDIVIDUAL FEDERAL DEFENDANTS FROM PERSONAL LIABILITY.

All of the individual federal defendants are entitled to qualified immunity. The affirmative defense of qualified immunity recognizes that "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)).

Accordingly, the Supreme Court has held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. *Harlow* establishes an "objective legal reasonableness" standard that abjures abstractions and looks instead to the state of the law applicable to the circumstances in which an official acted. To overcome the qualified immunity defense in a personal damages action against a federal official, the plaintiff must demonstrate that "the right the official is alleged to have violated ... [was] clearly established in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Consequently, "[e]ven when the general rule has long been clearly established (for instance, the First Amendment bars retaliation for protected speech), the substantive legal doctrine on which the plaintiff relies" may facilitate dismissal or summary judgment because "there may be doubt as to the illegality of the defendant's particular conduct * * * ." *Crawford-El v. Britton*, 523 U.S. 574, 591 (1998).

The United States, and not private actors, is responsible for enforcing the legal prohibition on unauthorized disclosure of classified information. The United States enforces those prohibitions through the criminal justice system, through civil actions such as enforcement of non-disclosure agreements, and through administrative discipline. Indeed, a Special Counsel investigated whether any disclosure of the relationship between Plame and the CIA was in violation of federal criminal law. However, in this case the issue before the Court is quite narrow: whether the factual allegations in the Amended Complaint, taken as true, state a violation of a clearly established constitutional right. They do not. Plaintiffs have failed to allege a violation of a constitutional right, let alone a constitutional right that was clearly established in the

circumstances at the time of the alleged conduct at issue.

### A.    The First Amendment Claim.

To establish a cognizable claim of official retaliation for the exercise of First Amendment

rights, it is not enough to allege retaliatory intent.  There also must be some harm-causing official

action, a requirement sometimes described as subjecting the plaintiff to treatment that would chill

a person of ordinary firmness from speaking out.  *See, e.g., Toolasprashad v. Bureau of Prisons*,

286 F.3d 576, 586 (D.C. Cir. 2002); *see also Hatfill*, 404 F. Supp.2d at 118.  Retaliatory motive is

"easy to allege and hard to disprove," *Crawford-El*, 523 U.S. at 584-85; *see also National*

*Archives and Records Admin. v. Favish*, 541 U.S. 157, 174 (2004), and hence it is important as an

initial matter to focus on precisely what plaintiffs allege was done to retaliate for Wilson's

exercise of First Amendment rights, *see Colson v. Grohman*, 174 F.3d 498, 500 (5th Cir. 1999)

("the precise nature of the harms suffered by a plaintiff claiming First Amendment retaliation is

crucial to our determination of whether she has alleged a constitutional deprivation").  The

determination of whether a plaintiff's First Amendment rights were "adversely affected by

retaliatory conduct" turns on "the status of the speaker, the status of the retaliator, the relationship

between the speaker and the retaliator, and the nature of the retaliatory acts."  *Suarez Corp. Indus.*

*v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).  This case is quite unlike others in which courts

have found government "retaliation" to violate First Amendment rights.

"[W]here a public official's alleged retaliation is in the nature of speech, in the absence of

threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action

will imminently follow, such speech does not adversely affect a citizen's First Amendment rights,

even if defamatory." *Suarez*, 202 F.3d at 687 (collecting cases).  Accordingly, a claim that

government officials retaliated for speech through speech of their own (without coercion or threat)

does not violate any clearly established First Amendment right.  That is true, moreover, even if the

official's own "retaliatory" speech is not constitutionally protected. *See id.* For example, so long

as they are unaccompanied by any threat of actual prosecution, false accusations of criminal

conduct by a federal official do not implicate the First Amendment, even if made with retaliatory

intent. *See, e.g., Suarez*, 202 F.3d at 688-89; *Colson*, 174 F.3d at 511-12; *cf. Hatfill*, 404 F.

Supp.2d at 118-19 (holding that official statements and leaks allegedly falsely linking plaintiff to

anthrax attacks did not create sufficient chill to violate First Amendment rights). As the D.C.

Circuit has recognized, "corporations and other institutions are criticized by government officials

for all sorts of conduct that might well be perfectly legal, including speech protected by the First

Amendment. At least when the government threatens no sanction – criminal or otherwise – we

very much doubt that the government's criticism or effort to embarrass the [corporation] threatens

anyone's First Amendment rights." *Penthouse Int'l Ltd. v. Meese*, 939 F.2d 1011, 1016 (D.C. Cir.

1991). That is true because the ability of government officials to speak out is no less vital to the

public interest than is the right of private citizens. "As part of the duties of their office, these

officials surely must be expected to be free to speak out to criticize practices, even in a

condemnatory fashion, that they might not have the statutory or even constitutional authority to

regulate." *Id.* at 1015.

Read in light of these principles, plaintiffs' Amended Complaint has not alleged a valid

First Amendment claim. To begin, the Vice President is not alleged to have made any disclosure

outside the government regarding Plame. Armitage is alleged to have disclosed "that Mrs. Wilson

worked at the CIA as an analyst on weapons of mass destruction," Compl. ¶¶ 37, 39, but Armitage

is not alleged to have violated plaintiffs' First Amendment rights, *see supra* at pp. 1-3 & n.1.

Libby and Rove are sued for First Amendment retaliation, and are alleged to have disclosed

Plame's identity, *see* Compl. ¶¶ 19(r), 19(w), 19(x), 27, 28, but the Amended Complaint does not

allege that Libby or Rove actually knew that Plame's government employment was an official

secret.

These omissions from the Amended Complaint are critical in assessing the context in which the alleged "retaliation" occurred. The First Amendment is not violated when government officials answer their critics, especially when they too go to the press. *See Suarez*, 202 F.3d at 686. Even read in the light most favorable to plaintiffs, it appears that the Complaint alleges only that Rove and Libby acted in the context of a broader official effort to address criticisms of government policy made in the press.[9] As the Amended Complaint puts it, for example, "officials brought up Plame [to reporters] as part of their broader case against Wilson." Compl. ¶ 23. That also is apparent from Rove's alleged statement to MSNBC host Chris Matthews that "Wilson's wife was 'fair game,'" a term the Amended Complaint explains "is used colloquially to describe a person who may *legitimately* be attacked." *Id.* ¶ 30 (emphasis added). The point, of course, is not that the alleged disclosure of Plame's CIA employment was "legitimate;" it is that the Amended Complaint shows the alleged "retaliation" for Wilson's speech to have occurred in the context of a debate in the media over a critic's charges and to have involved efforts to "push[ ] back" in that same public forum. *E.g., id.* ¶ 23. Such alleged conduct, even if defamatory or in other ways unlawful, does not implicate the First Amendment rights of government critics.[10]

Even if plaintiffs' allegations met the legal requirements for showing official conduct sufficient to chill the exercise of First Amendment rights, their claim would fail on a different

---

[9] Not only are plaintiffs challenging mere speech by government officials, they are challenging speech that they assert was true. There can be no claim that truthful speech by a government official, unaccompanied by any threat or coercion violates the First Amendment, let alone that such a proposition has been "clearly established" in the law.

[10] This is not to suggest the alleged disclosure of Plame's covert CIA employment is affirmatively protected by the First Amendment any more that the alleged defamatory speech in *Suarez* was protected by the First Amendment. *See Suarez*, 202 F.3d at 687. The point is merely that such alleged speech by the individual federal defendants did not violate plaintiffs' First Amendment rights under any "clearly established" theory.

ground. "[A]t least with respect to certain types of claims, proof of an improper motive is not sufficient to establish a constitutional violation – there must also be evidence of *causation*." *Crawford-El*, 523 U.S. at 593 (emphasis added); *see also Hartman v. Moore*, 126 S. Ct. 1695, 1703-04 (2006). The Amended Complaint asserts that the Vice President, Libby and Rove violated plaintiffs' First Amendment rights through Rove's and Libby's disclosure of Plame's identity to the press. Compl. ¶ 24. Specifically, Libby allegedly discussed Plame's CIA employment with reporter Judith Miller on several occasions, and Rove allegedly told reporter Matthew Cooper about it. *Id.* ¶¶ 19(m), (r), (w), (x); *see also id.* ¶ 28. But plaintiffs do not allege that Miller or Cooper originally published that information. Instead, the information was first published by columnist Robert Novak, who learned it from Armitage, but Armitage is *not* alleged to have violated the First Amendment. *Id.* Hence, plaintiffs have alleged no conduct by the Vice President, Libby or Rove that could fairly be held to have caused the injuries they claim in the Amended Complaint.[11]

---

[11] The First Amendment claim is not saved by plaintiffs' bare allegation of conspiracy. *See, e.g.,* Compl. ¶ 2. Conclusory allegations of conspiracy are not sufficient to state a constitutional tort claim; it is the complaint's specific allegations that must be evaluated in order to assess whether official conduct violated a constitutional right. *See Smith v. Aldrich*, 235 F.3d 1058, 1063 (8th Cir. 2000) (recognizing that conspiracy claims require "allegations of specific fact showing a 'meeting of minds' among alleged conspirators"); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999) ("The complaint contains several charges of 'participation' in a 'conspiracy' that are conclusory, and are for that reason insufficient to state a claim...."); *Woodrum v. Woodward County, Okl.*, 866 F.2d 1121, 1126 (9th Cir. 1989) (finding that "conclusory allegations" are inadequate to allege a conspiracy claim for the violation of constitutional rights). Although plaintiffs seek recovery against the Vice President, they allege no facts indicating that he made or authorized any of the disclosures that supposedly caused plaintiffs' alleged injuries. Libby and Rove are alleged to have made disclosures, but are not alleged to have done so with knowledge that they were disclosing a classified fact that allegedly would ruin Plame's career. Armitage is alleged to have disclosed to reporters the fact of Plame's CIA employment, but is not alleged to have violated the First Amendment. Nor do plaintiffs allege that Armitage acted at the direction of or in cooperation with the Vice President, Rove or Libby. In substance, plaintiffs have merely alleged disparate actions by the individual federal defendants related to the disclosure of Plame's identity but have offered no facts demonstrating a

(continued...)

**B.    Equal Protection Claim.**

Plaintiffs have also failed to allege a cognizable Fifth Amendment equal protection claim for much the same reasons that their First Amendment claim should be dismissed.  Even assuming that official action that is allegedly arbitrary and irrational may sometimes trigger equal protection scrutiny even without claims of class-based animus, there is no support for such a theory in regard to mere speech by government officials such as is alleged in this case.  As the Second Circuit explained in *X-Men Sec., Inc. v. Pataki*, 196 F.3d at 72: "[T]here simply is no equal protection right not to be singled out for criticism."

Nor were plaintiffs' injuries actually caused by the alleged "vindictiveness and ... illegitimate animus" underlying plaintiffs' equal protection claim against the Vice President, Libby and Rove.  Compl. ¶ 52.  As with plaintiffs' First Amendment claim and according to plaintiffs' own Amended Complaint, their injuries allegedly originated from Armitage's disclosure to Novak, which disclosure is not alleged to have been motivated by any ill-will toward plaintiffs.  Accordingly, there is no logical foundation for plaintiffs' equal protection claim.

**C.    Right To Privacy Claim.**

For their third cause of action, plaintiffs allege that the individual federal defendants infringed the Fifth Amendment, which plaintiffs say "prohibits government officials from violating any individual's right to privacy by publicly disclosing personal information."  Compl. ¶ 56.  This essentially is a "substantive" due process claim, and warrants caution "because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citation omitted).

Although some circuits have recognized a limited substantive due process right of

---

[11](...continued)
meeting of minds between them on a common plan.

"informational privacy," neither the Supreme Court nor the D.C. Circuit ever has done so.  In *Whalen v. Roe*, 429 U.S. 589 (1977), the Supreme Court only assumed the existence of such a right, *see, e.g., id.* at 605 (noting that right "*arguably* has its roots in the Constitution") (emphasis added), while "hold[ing] that this record does not establish an invasion of any right or liberty protected by the Fourteenth Amendment." *Id.* at 605-06.  Similarly, the Court in *Nixon v. Administrator of General Servs.*, 433 U.S. 425 (1977), stated that "[w]e *may* agree with appellant that, at least when Government intervention is at stake, public officials, including the President, are not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity." *Id.* at 457 (emphasis added).  As in *Whalen*, however, the Court held that, even assuming a privacy right, there was no infringement because the public interest in preserving presidential records justified the Presidential Recordings and Materials Preservation Act. *See id.* at 459-66.

In light of *Whalen* and *Nixon*, and in spite of cases recognizing a limited right in other circuits,[12] the D.C. Circuit has expressed "grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information." *American Federation of Government Employees, AFL-CIO v. Department of Housing & Urban Development*, 118 F.3d 786, 791 (D.C. Cir. 1997).  And although the Court of Appeals has "suggested in dicta the existence of a constitutional right to privacy in personal information," the court "has not purported to resolve the issue." *Id.* (citations omitted).

In the absence of a Supreme Court or D.C. Circuit decision resolving the question, it follows that plaintiffs have not alleged a violation of a clearly established "informational privacy

---

[12] *See, e.g., In re Crawford*, 194 F.3d 954, 958-59 (9th Cir. 1999); *Kallstrom v. Columbus*, 136 F.3d 1055, 1061-62 (6th Cir. 1998); *Eagle v. Morgan*, 88 F.3d 620, 625 (8th Cir. 1996); *Sheets v. Salt Lake County*, 45 F.3d 1383, 1387 (10th Cir. 1995).

right." *See Wilson v. Layne*, 526 U.S. 603, 617 (1999) ("Petitioners have not brought to our

attention any cases of controlling authority in their jurisdiction at the time of the incident which

clearly established the rule on which they seek to rely * * * "). And although the law also may

become clearly established by "a consensus of cases of persuasive authority such that a reasonable

officer could not have believed that his actions were lawful," *id.*, that condition assuredly is not

met in a circuit that has "expressed grave doubts as to the existence" of the purported right at

issue. *American Federation of Government Employees*, 118 F.3d at 791. Indeed, even among

those circuits to recognize the "informational" privacy right, it appears that "the exact boundaries

of such a right have yet to be established," *Doe v. Delie*, 257 F.3d 309, 323 (3rd Cir. 2001); *see*

*also Scheetz v. The Morning Call, Inc.*, 946 F.2d 202, 207 (3rd Cir. 1991) ("the outlines of the

confidentiality right are not definite"), and no court has "clearly established" a privacy right under

the Constitution in the fact of employment. This too establishes that the individual federal

defendants enjoy qualified immunity, for qualified immunity can only be overcome where the

asserted right that has been allegedly violated has been "clearly established" in the

"particularized" context at issue. *Anderson*, 483 U.S. at 640.[13]

---

[13] A court addressing a qualified immunity defense generally is required to determine first whether the plaintiff's allegations make out the violation of any constitutional right at all and then decide if that right was "clearly established." *See, e.g., Wilson*, 526 U.S. at 609; *Stewart v. Evans*, 351 F.3d 1239, 1243 (D.C. Cir. 2003); *but see Kalka v. Hawk*, 215 F.3d 90, 96-98 (D.C. Cir. 2000) (sustaining a qualified immunity defense and declining to decide whether the plaintiff's allegations established a violation where the law was not clear and the constitutional question would require extensive discovery to resolve). Even assuming the truth of plaintiffs' allegations, their substantive due process privacy claim would fail. Unlike in cases that recognize a right of informational privacy in things such as medical or financial information, *see Alexander v. Peffer*, 993 F.3d 1348, 1350 (8th Cir. 1993), the fact of employment by a government agency is not the sort of "personal" information any court has previously regarded as private in a constitutional sense. Although at least one case, *Kallstrom v. Columbus*, 136 F.3d 1055 (6th Cir. 1998), recognized a constitutional privacy violation in the release of undercover police officers' personnel *files*, moreover, that does not give vitality to plaintiffs' claim based on improper disclosure of the fact of government *employment*. The potential harm in *Kallstrom*

(continued...)

**D.    Due Process Property Deprivation Claim.**

Plaintiffs' fourth cause of action based on Plame's alleged loss of CIA employment is unclear. On the one hand, the Amended Complaint charges that the alleged disclosures "deprive[d] Valerie Wilson of her employment with the federal government by eliminating the secrecy of her status that was essential to continuing to perform in her job." Compl. ¶ 63. On the other hand, it asserts "[i]n addition, the Defendants' actions violate the Due Process Clause of the Fifth Amendment ... because the exposure of the Plaintiff's covert status injured her ability to obtain other employment." *Id.* ¶ 61. Viewed from either perspective, the Amended Complaint fails to allege a clearly established due process violation.

Plame appears to rest her claim on the premise that she had a due process-protected property interest in her CIA job. But she does not squarely allege that she had such a property interest, and there is no basis to conclude that she did. *See Doe v. Gates*, 981 F.2d 1316, 1320-21 (D.C. Cir. 1993) (concluding that undercover CIA employee had no property interest in continued employment); *see also Mazaleski v. Truesdell*, 562 F.2d 701, 709 (D.C. Cir. 1977) ("Only if the court first finds that a 'liberty' or 'property' interest is affected will it go on to a balancing of interests analysis to determine what level of procedural protection is appropriate").

The reference in the Amended Complaint to "other" employment, Compl. ¶ 61, is vague, but if by that Plame contends that the individual federal defendants injured her future employment prospects, she is invoking a liberty, not property, interest. *See generally Doe v. United States Department of Justice*, 753 F.2d 1092, 1111 (D.C. Cir. 1985) (describing the interest in obtaining future employment as a liberty interest). But the cases finding harm to a liberty interest in future

---

[13](...continued)
flowed from the release of detailed personal information, including the officers' "addresses, phone numbers, and drivers licenses," *id.* at 1063, to defense counsel in a drug trafficking prosecution. Plaintiffs' allegations here are not comparable to those in *Kallstrom*.

employment have done so only when the impairment resulted from some government stigma, which obviously is not present here. As the D.C. Circuit has explained, the "key inquiry" in such cases is: "Has the government, by attacking personal or corporate reputation, achieved in substance an alteration of status that, if accomplished through formal means, would constitute a deprivation of liberty?" *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003); *see also Kartseva v. Department of State*, 37 F.3d 1529, 1530 (D.C. Cir. 1994) (holding that plaintiff must demonstrate a stigma that broadly disqualifies plaintiff from pursuing jobs across the entire range of a chosen profession); *M.K. v. Tenet*, 196 F. Supp.2d 8, 15 (D.D.C. 2001).

Here, the answer to that question is clearly "no." Plame had no property interest in her CIA job, and she suffered no alleged stigma at the hands of the individual federal defendants that broadly disqualified her from all future employment in the field of counterintelligence. Notably, Plame does not allege that she was fired from the CIA and does not claim that the revelation of her identity precludes her from other counterintelligence jobs at the CIA (or other employers). Accordingly, "there is no necessity for broader inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

# CONCLUSION

For the foregoing reasons, the United States respectfully submits that plaintiffs'

constitutional tort claims against the individual federal defendants should be dismissed.


Dated: November 14, 2006


                                    Respectfully submitted,

                                    PETER D. KEISLER
                                    Assistant Attorney General

                                    JEFFREY A. TAYLOR
                                    United States Attorney

                                    JEFFREY S. BUCHOLTZ
                                    Principal Deputy Assistant Attorney General

                                    C. FREDERICK BECKNER III
                                    Deputy Assistant Attorney General

                                    TIMOTHY P. GARREN
                                    Director, Torts Branch, Civil Division


                                    _____
                                    RICHARD MONTAGUE
                                    Senior Trial Attorney

                                    GLENN S. GREENE, #450348
                                    Trial Attorney
                                    Department of Justice
                                    Torts Branch, Civil Division
                                    P.O. Box 7146
                                    Washington, D.C. 20530
                                    Tel: (202) 616-4171
                                    Fax: (202) 616-4314
                                    Attorneys for the United States of America

CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2006, I served a true copy of the foregoing upon

counsel listed below:

Alex Bourelly, Esq.
Baker Botts LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400

Melanie Sloan
Anne L. Weismann
Citizens for Responsibility and Ethics
In Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005

Emmet T. Flood, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005

Erwin Chemerinsky
Duke University School of Law
Science Drive and Towerview Road
Durham, NC 277708-0360

Robert D. Luskin, Esq.
Patton Boggs LLP
2550 M Street, N.W.
Washington, D.C. 20037

Joseph Cotchett
Cotchett Pitre, Simon & McCarthy
840 Malcolm Road
Suite 200
Burlingame, CA 94010

Michael Waldman
Fried, Frank, Harris, Shriver
 & Jacobson LLP
1001 Pennsylvannia Ave, NW
Washington, DC 20004-2505

By: _____
    Richard Montague
    Department of Justice
    Torts Branch, Civil Division
    Box 7146 Washington, D.C. 20044
    Phone (202) 616-4158
    Fax (202) 616-4314
    Attorney for the United States of America