FRIENDS OF THE PANAMINT VALLEY, *et al.,*
Plaintiffs,
v.
Dirk Kempthorne, *et al.,*
Defendants,
and
National Parks Conservation Association, *et al.*
Proposed Defendant-Intervenors

Civ. No. 1:06CV1560 (JBD)

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Friends of the Panamint Valley, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Dirk Kempthorne *et al.*, | ) |
| | ) |
| Defendants, and | ) |
| | ) |
| National Parks Conservation Association, *et al* | ) |
| | ) |
| Proposed Defendant-Intervenors | ) |

**Civ. No. 1:06cv1560 (JDB)**

## DECLARATION OF JEFFREY B. AARDAHL

County of Mendocino )
             )
State of California  )

I, Jeffrey B. Aardahl, declare as follows,

1. I am a member of the Public Employees for Environmental Responsibility (PEER). I was an employee of the Department of the Interior from approximately 1974 to 2005. I began as a wildlife biologist in the Bureau of Land Management's (BLM's) Inyokern Resource Area in California. I then worked a wildlife biologist and environmental coordinator in the Ridgecrest Resource Area of California from approximately 1980 to 1989. From 1989 to 1995, I worked at Death Valley National Park as the Resources Management Division Chief. From 1995 to 1997, I worked at the Barstow Field Office of BLM as the Resources Management Branch Chief. From 1997 to 2000 I worked in the BLM Washington, D.C. Headquarters Office as a Wildlife Biologist in the Special Status Species Management Program. From 2000 to 2005 I worked at

1

the BLM Ridgecrest Field Office as the Resources Management Branch Chief. I retired from that position in 2005. I am currently an independent environmental consultant and volunteer my time and services in a variety of environmental protection initiatives in the California Desert Conservation Area. I have a BS degree in Wildlife Biology from Humboldt State University in California, and have completed graduate courses in biology at California State University, Long Beach, California. I served in the U.S. Army from 1971 through 1972. I make this Declaration on the basis of personal knowledge, and I am competent to testify to the matter stated herein. This Declaration is submitted in support of the National Parks Conservation Association *et al.*'s Motion to Intervene in the above captioned matter.

## Public Employees for Environmental Responsibility

2. As a member of PEER and long-time public employee concerned with environmental protection, I am familiar with PEER's efforts to preserve Surprise Canyon and the previous litigation regarding Surprise Canyon.

3. PEER is a national, non-profit corporation based in Washington, D.C. with chapters throughout the United States, including California. PEER represents current and former federal and state employees of land management, wildlife protection, and pollution control agencies who are frustrated by the failure of governmental agencies to enforce or faithfully implement the environmental laws entrusted to them by Congress. The ability of PEER's members to independently critique agency decisions frequently is compromised by conflicts between their duties as employees of a federal agency to uphold the law and the risk of disciplinary action for insubordination. Consequently, PEER's members, such as myself, rely on PEER to criticize agency action, including the use of litigation, on their behalf. The importance of PEER's work has become particularly relevant in this regard during the past six years due to the apparent

2

political influence of special interest groups favoring expanded use of off-road vehicles in federal agency management of public lands and resources, especially by the BLM.  PEER has had a long-standing interest in protecting public lands in the California Desert.  In March, 2000, PEER, along with the Center for Biological Diversity, and the Sierra Club, filed suit against BLM seeking to the protect many areas of the California desert and the species that depend on them.

4.  I was the Resources Management Branch Chief at the BLM Ridgecrest office at the time PEER commenced its litigation.  I interacted with representatives of both the plaintiff environmental groups and representatives from off-road vehicle advocacy groups such as the California Association of 4-Wheel Drive Clubs, and the High Desert Multiple Use Coalition concerning BLM's ongoing management of Surprise Canyon and other areas in the California Desert.  I had previously helped to author the 1982 Management Plan for the Surprise Canyon Area of Critical Environmental Concern, and was the most well-informed member of the BLM staff at that time with respect to the ecology of Surprise Canyon and the status of the species that depend on Surprise Canyon Creek.  An excellent example of the kind of competing interests that BLM and Interior are subject to is the conflict here in Surprise Canyon between off-road vehicle users who want access to the area for extreme off-roading and the larger environmental community that considers protection of wildlife and riparian values of Surprise Canyon to be most appropriate.  I do not believe that BLM and Interior will adequately represent the interests of PEER and other environmental groups in the present litigation.

5.  Through my position as a BLM employee, I am aware that despite BLM and public concerns in the 1990s about the impact of motor vehicle use on the riparian habitat in Surprise Canyon, BLM permitted such motor vehicle use.  As a condition of that use, I recall that in the early 1990s, BLM had committed to monitor numerous resources in the Canyon to ensure that

use of the route was not damaging wildlife habitat, water quality, and other values there. However, to the best of my knowledge, BLM failed to undertake the full range of monitoring to which it committed and which was necessary to complete to assist the agency in understanding the impacts of vehicle use in the Canyon.

6.  As part of the settlement of the litigation filed by PEER and others in 2000, BLM agreed to prepare an evaluation report of the Surprise Canyon Area of Critical Environmental Concern ("ACEC"), to review implementation of the ACEC management plan, describe current and on-going conflicts between biological resources and the then-allowed uses of Surprise Canyon, and to propose corrective action by BLM. I was involved in preparing and editing that report with the assistance of staff in the Ridgecrest Field Office. In addition, BLM agreed to pursue closure of Surprise Canyon to motorized vehicles until BLM complied with the National Environmental Policy Act ("NEPA"). I was involved in preparing the motorized vehicle closure order and assisted in preparing the environmental assessment (EA) and decision record that supported the closure. In that EA, BLM found that off-road or motorized vehicle use was causing substantial damage to riparian vegetation, wetlands, and the stream channel. Motorized vehicles were using much of the streambed as a route of travel, resulting in capture of the stream flow in tire ruts and accelerated soil erosion. In many areas this erosion resulted in the lowering of the water table, channeling the stream flow, and thus prevented natural meandering of the stream and regeneration of riparian vegetation such as willow and cottonwood trees. Furthermore, there was evidence that water quality was being impacted by accelerated soil erosion, and occasional spillage of motorized vehicle fluids (gasoline, power steering fluid, lubricating oil) when vehicles were winched up and down a series of steep waterfalls in the middle portion of the Canyon. Off-road vehicle users of the Canyon routinely removed riparian

4

vegetation to facilitate the passage of vehicles. BLM decided to close the Canyon based on the substantial impacts to riparian vegetation, wetlands, soils and water quality that were revealed in the environmental assessment, and especially to comply with the rules governing the use of off-road vehicles on public land as found in 43 C.F.R. Part 8340.

7. Under the terms of the same consent decree, BLM is also required to complete NEPA review that will evaluate a full range of options for management of human access to Surprise Canyon and to evaluate the nature or conditions under which such access, if any, will be allowed in future. I was involved in assisting with preparation of the Draft EIS from approximately 2002 until 2004. During that time I was the lead BLM employee overseeing a contractor hired to conduct public scoping meetings on Surprise Canyon management and prepare a Draft EIS. I also accompanied the contractor in scoping meetings held with cooperators in the EIS effort that included: the National Park Service; County of Inyo; California Department of Fish and Game; California Water Quality Control Board, Lahontan Region; and the Timbisha Shoshone Tribe.

8. In order to implement the closure, BLM published a notice in the Federal Register on May 29, 2001, 66 Federal Register 29163-29164, Closure Order for Motorized Vehicle Use, Surprise Canyon Area of Critical Environmental Concern BLM Route P71, Panamint Mountains, Inyo County, CA. I assisted in preparing the Closure Order for Hector Villalobos, the BLM Manager of the Ridgecrest Field Office.

9. As the first step in preparing the NEPA review, in May, 2002, BLM issued a Notice of Preparation for an Environmental Impact Statement for Surprise Canyon. I helped prepare that Notice and was the Surprise Canyon EIS project manager from 2002 to 2003. PEER submitted comments on that Notice.

10. Since 2000, PEER has continued to advocate for protection of Surprise Canyon

5

including outreach to the public through media stories, the website at www.PEER.org, and by members participating in trips to Surprise Canyon.

## My Involvement and Injury

10. Beginning in approximately 1980, I have made more than a dozen trips to Surprise Canyon, Panamint City, and other areas in the Panamint Mountain Range. As a BLM employee I frequently went to Surprise Canyon from approximately 1980 to 1982 to monitor the activities and effects of a mining operation at Panamint City. From 2001 to 2005 I made many trips to the Canyon to monitor and assess the environmental resources of the area relative to off-road vehicle use and natural recovery processes that began with the vehicle closure in May of 2001. In 2000 and 2001, I was responsible for documenting the impacts to the Canyon from off-road vehicle use and I observed that such use was causing considerable damage to riparian vegetation, stream channel morphology, and water quality. As stated above, off-road vehicles were using the floodplain and streambed in the Canyon as a route of travel, which caused accelerated soil erosion, channeling of the perennial stream, removal of protective riparian vegetation from stream banks, lowering of the water table, and retarding the germination of willow and cottonwood trees, and other riparian plants. I noted that motorized vehicle fluids were occasionally released into the stream environment during vehicle winching operations in the series of steep waterfalls in the middle portion of the Canyon. These fluids included gasoline, power steering fluid, lubricating oil and antifreeze. Such occurrences were either observed by me, others including contractors conducting bird surveys, or described in off-road vehicle organization newsletters.

11. I have also traveled to Surprise Canyon for my own enjoyment to experience a unique stream environment, lush riparian vegetation, bighorn sheep and other wildlife, scenic beauty,

6

and solitude. These attributes are especially important here since the area is located in a region of the Mojave Desert known for its harsh climate and high summer temperatures. My most recent trip was in 2005, when I assisted in acquainting members of the conservation community and media reporters with the Canyon and its valuable natural resources. I intend to return to Surprise Canyon within the next eight months.

12. I have looked for, observed, photographed, documented, and studied many of the sensitive and rare and endangered plants and animals of Surprise Canyon, in addition to the extensive wetland riparian vegetation, and the water quantity and quality of the Creek. I intend to return to the area many times in the future. I closely followed and documented the natural restoration of the Creek and the Canyon after the closure was put in place in 2001. I have observed that the old mining road in the Canyon between Chris Wicht Camp and Limekiln Spring is essentially gone due to a major flood in 1984, later periodic flooding of the Canyon due to summer and fall rain events, and recovery of riparian vegetation following the vehicle closure in 2001. I have also noticed that natural processes have begun to stabilize the streambed through natural meandering of the stream in the floodplain and regeneration of willow and cottonwood trees and other riparian plant species. The latter are extremely important natural features that stabilize soil and stream banks from the naturally erosive forces of water flow. Since the closure of the Canyon to off-road vehicles I have noted that desert bighorn sheep use of the Canyon bottom is frequent especially in the middle and lower portion of the Canyon. Also, the Inyo California Towhee, a native bird associated with riparian willow thickets in the adjacent Argus Mountains west of Surprise Canyon, has been sighted several times in the middle portions of the Canyon in dense riparian woodland vegetation. This federal and state listed species was not observed in the Canyon until 2004, approximately three years after the off-road vehicle closure

7

became effective.

13. I continue to use and enjoy the natural resources on many BLM and NPS lands for recreational, scientific, spiritual, educational, aesthetic, artistic, and professional purposes and continue to use and enjoy the lands within Surprise Canyon and Death Valley National Park that are at issue in this case. I have personally seen and documented the destruction caused by off-road vehicles in Surprise Canyon Creek and the permanent scars that were left on the landscape.

14. As a wildlife biologist who is intimately familiar with Surprise Canyon, it is my professional opinion that re-opening Surprise Canyon to motorized vehicles would adversely impact this area including directly damaging the wetland and riparian vegetation of the Canyon, the species that depend on the Creek and riparian vegetation, and the water quality of the perennial stream. Because the Canyon is extremely narrow, any motorized vehicle use in the Canyon would necessitate driving directly in the Creek and floodplain, and such use in the past has adversely impacted the streambed and stream banks, the soil structure. Such impacts include erosion of wetland soil and stream banks, channelization or capture of stream flow in tire ruts, and loss of riparian vegetation. I personally witnessed and documented the purposeful cutting down of riparian trees and vegetation after off-road vehicle group "outings" to Surprise Canyon. I have also read various off-road vehicle group newsletters describing the removal of riparian vegetation and willow trees using hand tools and power saws that was required to facilitate the operation of vehicles in the Canyon. Due to the protection provided by the closure order, Surprise Canyon is in the process of naturally recovering and extensive new growth of willow and cottonwood trees, and other riparian plant species, is occurring. These cottonwood and willow trees are habitat for wildlife including three state and federally listed species; the Southwestern Willow Flycatcher, Least Bell's Vireo and the Inyo California Towhee. If

motorized vehicles are again allowed into the Canyon, the inevitable destruction they would cause would severely harm my professional, recreational, scientific and aesthetic interests, as well as those of other PEER members, in Surprise Canyon and the listed, rare, and sensitive species that live there.

15. It is critical that PEER be permitted to intervene in this lawsuit to defend their previous efforts to protect Surprise Canyon, and the species that depend on it, and to ensure that the Consent Decree is adequately defended. If the current litigation is successful in re-opening Surprise Canyon and Surprise Canyon Creek to motorized vehicle use, the ecosystem of Surprise Canyon, and my and the PEER's interests will be irrevocably harmed.

Pursuant to 28 U.S.C. Sec. 1746, I DECLARE, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _31 st of October_, 2006 in Gualala, Mendocino County, California

_Jeffrey B. Aardahl_

Jeffrey B. Aardahl

9