FRIENDS OF THE PANAMINT VALLEY, *et al.*,
Plaintiffs,
v.
Dirk Kempthorne, *et al.*,
Defendants,
and
National Parks Conservation Association, *et al.*
Proposed Defendant-Intervenors

Civ. No. 1:06CV1560 (JBD)

# EXHIBIT 12

FILED

2001 MAR 20 AM 10:30

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation; SIERRA CLUB, a non-profit corporation; and PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, a non-profit corporation,

    Plaintiffs,

v.

BUREAU OF LAND MANAGEMENT,

    Defendant.

No. C 00-00927 WHA

JUDGMENT

Final judgment is entered in favor of plaintiffs and against defendants pursuant to the stipulated consent decrees, each previously approved by the Court, dated August 25, 2000, November 6, 2000, January 29, 2001, and March 20, 2001. The Court will retain jurisdiction to enforce said consent decrees.

The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: March 20, 2001.

                                              WILLIAM ALSUP
                                              UNITED STATES DISTRICT JUDGE

FILED
2001 MAR 20 AM 10: 30
RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation; SIERRA CLUB, a non-profit corporation; and PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>BUREAU OF LAND MANAGEMENT,<br><br>Defendant. | No. C 00-00927 WHA<br><br>**ORDER APPROVING FINAL CONSENT DECREES RE BIGHORN SHEEP AND RE ALL FURTHER INJUNCTIVE RELIEF** |

**INTRODUCTION**

In this action brought by environmental groups against the Bureau of Land Management for violation of the Endangered Species Act, 16 U.S.C. 1531, et seq., plaintiffs, the BLM and third-party intervenors propose to settle all remaining claims through two consent decrees that will provide temporary relief until the BLM finishes consulting with the Fish and Wildlife Service and ensures that its land management plan for the California desert does not threaten the continued existence of any endangered species. This order **APPROVES** the two proposed consent decrees.

## STATEMENT

In 1976, Congress found that "the California desert environment and its resources, including certain rare and endangered species of wildlife, plants, and fishes, and numerous archeological and historic sites, are serious threatened by air pollution, inadequate Federal management authority, and the pressures of increased use, particularly recreational use, which are certain to intensify because of the rapidly growing population of Southern California." 43 U.S.C. 1781(3). As a result, Congress designated 25 million acres as the California Desert Conservation Area ("CDCA") and charged the Bureau of Land Management with creating a long-range plan for the management, use, development, and protection of the public lands within it.

On March 16, 2000, plaintiffs Center for Biological Diversity, Sierra Club, and Public Employees for Environmental Responsibility brought this action, seeking to force the BLM to consult with the Fish and Wildlife Service ("FWS") with respect to the BLM's CDCA plan as required by Section 7 of the Endangered Species Act and to enjoin the BLM from "authorizing, allowing, carrying out, or continuing any livestock grazing, road building, off-road-vehicle use, recreational use, water diversions, energy production, utility corridors, special use permits, land exchanges, mining, and other projects in the CDCA" until consultation was completed (Compl. at 13). On June 20, 2000, the High Desert Multiple-Use Coalition, the Desert Vipers, the San Diego Off-Road Coalition, the Association of California 4-Wheel Drive Clubs, and the Blue-Ribbon Coalition sought to intervene. Their motion was granted on August 7, 2000.

Plaintiffs moved for partial summary judgment on July 21, 2000. Shortly before the hearing, the parties submitted a stipulation for a consent order to resolve the issue of "duty to consult," which was approved. It required the BLM to consult with the FWS with regard to the entire CDCA plan by January 31, 2001. In exchange, plaintiffs withdrew the motion for summary judgment. All that remained of the litigation was plaintiffs' claims for interim injunctive relief before the FWS consultation was complete. Shortly thereafter, the parties attended their first settlement conference in front of United States Magistrate Judge Joseph Spero. Trial was set for April 9, 2001.

At a hearing on September 21, 2000, almost one month after the first consent decree was entered, Rick Fisher, Robert Arnold, Bill Howell, and Dave Fisher were denied leave to intervene. After a hearing on November 16, 2000, the California Mining Association was denied leave to intervene. Public Lands for the People, Inc., Sports Committee District 37, AMA, Inc., and the California Off-Road Vehicle Association, Inc. were denied leave to intervene after a hearing on January 4, 2001. Unlike the earlier motion to intervene, all these motions for intervention were denied as untimely and prejudicial to the parties, given the substantial proceedings that had already occurred. The Court, however, invited all of these intervenor-applicants to file amicus briefs and to appear at the hearings and ordered that they be served with all papers filed in this action.

On October 12, 2000, plaintiffs moved to enjoin the BLM from allowing livestock grazing within the critical habitat of the desert tortoise. The hearing, set for November 16, was continued until December 21. The parties held further settlement conferences. On November 6, 2000, the Court approved a stipulated consent decree, which required the BLM to restrict vehicle use at the Algodones Dunes area in order to protect the Peirson's Milk-Vetch (an endangered plant), until the BLM finished consulting with the FWS on the CDCA plan. As settlement negotiations continued, on December 19, 2000, plaintiffs withdrew their motion to enjoin interim livestock grazing in the habitat of the desert tortoise.

On December 26, 2000, the parties filed a stipulation for a further consent decree regarding interim livestock grazing. The proposed consent decree required the BLM to prohibit cattle and sheep grazing within certain areas of the habitat of the desert tortoise until the BLM had completed consultation with the FWS or by January 31, 2002 for certain provisions involving implementation of the current biological opinions for sheep and cattle grazing. It also required the BLM to exclude cattle from the Rattlesnake Canyon Allotment until the BLM had finalized its amendment to the West Mojave bio-regional plan. A hearing on approval of the stipulation was set for January 25, 2001. Pursuant to the Court's order, the parties served notice of the hearing on the intervenor-applicants, and Dave Fisher and Public Lands for the People, et. al., participated as amici at the hearing. The stipulation was approved on January 29.

3

Finally, the parties (including the original intervenors) filed two proposed consent decrees, the two now pending: a bighorn sheep stipulated consent decree and a stipulated consent decree for residual relief. The majority of the provisions in both proposed consent decrees require the BLM to initiate studies or to disseminate information on the effects of various activities within the CDCA. In addition, the bighorn sheep stipulated consent decree requires the BLM to reduce human access to areas used by the Peninsular bighorn sheep during the lambing and water stress seasons, until the BLM has consulted with the FWS and made any changes required by the FWS beyond the interim relief (Bighorn Stip. ¶ 25). The stipulated consent decree for residual relief covers interim relief that was not addressed in either of the previous consent decrees or the bighorn sheep stipulated consent decree. It terminates after the BLM finishes its consultation with the FWS, except for a few provisions which will remain in place until June of 2003, when the BLM issues a record of decision on the West Mojave bio-regional plan amendment (Residual Stip. ¶¶ 51(F), 32).

## Amici

Throughout this litigation leave to be heard as an amicus was freely granted to any interested person, and any interested person was invited to make his or her views known. In addition, the parties were required to serve their papers on those who were denied intervenor status, and the amendments to the proposed decrees now at issue were served on participants at the hearing on February 14. Fifty people or so attended the February 14 hearing on the approval of the proposed consent decrees now at issue, and anyone who wished was given the opportunity to address his or her concerns to the Court. Nine did.[1] Additionally, numerous amicus briefs and letters were received and considered. In response to concerns raised by non-parties, the parties were given the opportunity to amend their stipulations. Their amendments were received on March 1, 2001.

---

[1] The Counties of Imperial, San Bernadino and Riverside, the Cities of Palm Springs and La Quinta, the Coachella Valley Mountain Conservancy, the Coachella Valley Collection Services, the Coachella Valley Association of Governments, Chuparosa, Inc., Mount Pinyon Pines, LLC, the California Mining Association, Robert Penry (a sheriff in San Bernadino County), and the city attorneys for Kern County and the City of Ridgecrest appeared and made objections on record.

4

Even after the hearing, and after the submission of the revised stipulations, objections were submitted. Those, too, have been considered. Additionally, Dave Fisher, who did not appear at the hearing on February 14, filed a request for a separate briefing schedule and a hearing on the revised proposed consent decrees. This request is hereby denied, because all objectors have been given ample opportunity to be heard, and their objections have been considered.

### The Bighorn Sheep Stipulated Consent Decree

The bighorn sheep stipulated consent decree requires the BLM to take various actions to protect the Peninsular bighorn sheep. It terminates when the BLM has completed consultation with the FWS. If the FWS determines that measures beyond the relief provided in the proposed consent decree are necessary, the interim provisions will remain in place until the BLM complies with the opinion. Most of the interim relief revolves around Dunn Road, a road on BLM land that traverses the northern Santa Rosa Mountains. As amended after the hearing, this proposed consent decree requires the BLM to enforce the closure of Dunn Road, not to authorize any significant maintenance of Dunn Road, to restrict the use of Dunn Road by nearby landowners, to implement voluntary closures of certain trails, to provide five "sheep ambassadors" to monitor frequently-used trails and to educate the public on the necessity of not disturbing the sheep, to institute a water stress trail signing and education program from July to September, and with limited exceptions, not to approve any mining permits within the habitat of the bighorn sheep. It contains a clause that ensures that BLM cannot violate the law, including observation of third-person's rights vis-a-vis the agency (Bighorn Stip. ¶ 24):

> In complying with the terms of this agreement, BLM shall be subject to all applicable federal statutes or regulations, and nothing in this agreement shall be construed to require BLM to take any actions in contravention of any such applicable statutes or regulations.

Most of the objections to this proposed consent decree concern Dunn Road. This controversy has a long history. According to the BLM, Dunn Road has always been an illegal road across BLM land, bulldozed by Michael Dunn in 1966. The BLM sued Mr. Dunn in 1968 and obtained title to the road in 1976. Nonetheless, nearby landowners and even some state

entities used the road to access their lands. Off-road-vehicle enthusiasts freely used the road as well. Although the BLM installed locked gates in 1998, bootleg keys were circulated, and prohibited use continued. On August 28, 2000, the BLM officially closed the road. 65 Fed. Reg. 52126 (Aug. 28, 2000).

While the BLM has already closed the road to the public, the parties' initial proposed consent decree prohibited all maintenance of the road and could be read to prevent access by state government entities for police and fire activities and environmental monitoring. In response to these concerns, the amended proposed consent decree clarifies that all the state agencies that objected at the February 14 hearing (the Palm Springs Police and Fire Departments, Cathedral City Police and Fire Departments, Coachella Valley Mountains Conservancy, and Riverside Flood Control and Water Conservation District) will be given keys to the road to carry out their statutory duties (Bighorn Stip. ¶ 16g). As a result, the Coachella Valley Mountains Conservancy and Riverside Flood Control and Water Conservation District withdrew their objections to the settlement (Cummings Decl., Exh. A).

### The Stipulated Consent Decree for Residual Relief

As amended, the stipulated consent decree for residual relief requires the BLM to prepare evaluation reports for seventeen areas, to implement vehicle closure of Windy Point, not to authorize competitive off-road-vehicle events outside of designated areas, to fence off the riparian area of the Mojave River in Afton Canyon from cattle, to build an east boundary fence on the Rattlesnake Canyon grazing allotment, to limit expansion of mining in areas that may affect the critical habitat of any endangered species, to stop unauthorized off-road-vehicle entry into twenty different areas, and to close vehicle access to Surprise Canyon except to property owners. It has a provision preserving the rights of third-persons, which is identical to the one in the bighorn sheep stipulated consent decree (Residual Stip. ¶ 56):

> In complying with the terms of this agreement, BLM shall be subject to all applicable federal statutes or regulations, and nothing in this agreement shall be construed to require BLM to take any actions in contravention of any such applicable statutes or regulations.

6

The proposed consent decree terminates when the BLM has completed consultation with the FWS, but if the FWS determines that measures beyond the relief provided in the proposed consent decree are necessary, the interim provisions will remain in place until the BLM complies with the opinion. A few provisions will remain in place until June of 2003, when the BLM issues a record of decision on the West Mojave bio-regional plan amendment (Residual Stip. ¶¶ 51(F), 32).[2] Most of the objections to this proposed consent decree focus on the restrictions on off-road-vehicle use, the limitations on new mining activities, and the restrictions on grazing.

## ANALYSIS

As a general matter, "a district court should enter a proposed consent judgment if the court decides that it is fair, reasonable, and equitable and does not violate the law or public policy." *Sierra Club, Inc. v. Electronic Controls Design, Inc.*, 909 F.2d 1350 1355 (9th Cir. 1990). Additionally, the court must "be satisfied that the decree represents a reasonable factual and legal determination." *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990). When a government agency is a target of a consent decree, however, an additional concern is raised. Because federal agencies are charged by Congress to carry out statutory missions, consent decrees that restrict their discretion, especially over long periods of time, could undermine the ability of agencies to exercise the judgment and expertise as envisioned by Congress. Although the Ninth Circuit has not addressed such circumstances, *Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117 (D.C. Cir. 1983), did so. There, environmental groups sought to enforce a consent decree that required the EPA to promulgate effluent discharge standards under the Clean Water Act ("CWA") by certain deadlines. After a change in administrations following the 1980 presidential election, the deadlines were not met. The EPA then sought to vacate the consent decree on the grounds that it exceeded the district court's authority, and that it impermissibly infringed on the EPA's discretion.

---

[2] These provisions require the BLM to maintain existing route designations in the Ord Mountain area, until it decides what the final routes will be, fence off the riparian area of the Mojave River and provide alternate livestock watering areas, retain lands populated by the Lane Mountain Milk-Vetch, restrict vehicle access in five different areas, make a list of natural springs that have unresolved off-road-vehicle or burro conflicts, fence at least a half mile area to protect the riparian habitat of the southwestern willow flycatcher, create a proposal for the closure, subject to public review, of roads in five different areas, make a wild-and-scenic-river-eligibility determination for the Mojave River, and implement emergency route designation in two different areas (Residual Stip. ¶¶ 5, 7, 12, 17, 18(A), (B) and (E), 26, 36, 38, 40–41).

Over a strenuous dissent, the court of appeals upheld the validity of the consent decree because the district court found that it "was consistent with the purpose of the CWA and that it fairly resolved the controversy." *Id.* at 1126. The axis of contention between the majority and dissent was to what extent a court must defer to an agency's decision to be bound when the decision has far-reaching effects on future administrations. The balance struck by the majority was that a court must determine "that the settlement is consistent with the statute the consent judgment is to enforce and fairly and reasonably resolves the controversy in a manner consistent with the public interest." *Id.* at 1128.

While *Gorsuch* is not binding in the Ninth Circuit, it resonates with the present case, concluded as it was through an agreement made with an outgoing administration. So the Court must be sensitive to the public interest in not unduly tying the hands of the agency for too long. Part of an agency's discretion, of course, is how it manages its litigation; the decision to fight or surrender involves the agency's expertise as to how it wants to marshal its resources. *See Heckler v. Chaney*, 470 U.S. 821 (1985). Nonetheless, in deciding whether and how long to require the government to be bound into the future on pain of contempt, a court should not blindly accept an agency's view of the public interest. Too, the objections made by the public, whether the agency is acting within its powers, within the law, and within the public interest should be considered. All that having been said, a court should still give due weight to the agency's balancing of the competing considerations in deciding whether to approve a consent decree. Accordingly, this order will consider the extent and duration of the proposed consent decrees' effect on agency discretion, in addition to examining whether there is a reasonable basis in law and fact, whether the decrees are fair, reasonable and equitable, and whether the decrees are within the public interest.

### Effect on Agency Discretion

The proposed consent decrees do not unduly constrain agency discretion. They are finite. They only remain in effect until the BLM has finished its consultation with the FWS, except if the FWS determines that measures beyond the relief provided by the proposed consent decrees are necessary. Then, the interim provisions will remain in effect until the BLM implements the

8

additional changes (Bighorn Stip. ¶ 25; Residual Stip. ¶ 51). A few provisions in the stipulated consent decree for residual relief will last until June of 2003, when the BLM issues a record of decision on the West Mojave bio-regional plan amendment (Residual Stip. ¶¶ 51(F), 32). Unlike the consent order in *Gorsuch*, the two proposed consent decrees will not bind the BLM for many years into the future.

At the hearing on February 14, moreover, the Court raised some concern about whether after the recent and intervening change in administrations, new officials of the Department of the Interior would seek to dissolve or modify any resulting consent decrees. At oral argument, the Court raised the question whether officials in the newly elected administration of President Bush had approved the settlement. Counsel for the government replied that they had. Nonetheless, the BLM was given the opportunity to check again to verify this. The Court notes that the amended proposed consent decrees incorporate the concerns expressed by the new administration and are both signed by Henri Bisson, Assistant Director Renewable Resources & Planning Bureau of Land Management in Washington.

And, both consent decrees have provisions that require the BLM to obey the law (Bighorn Stip. ¶ 24; Residual Stip. ¶ 56). This provision requires compliance with NEPA and other procedural mechanisms subject to judicial review, which guarantee that the BLM will make decisions in a manner compliant with its statutory duties and use its discretion in a manner consistent with its congressional mandate.

### Reasonable Legal Basis

Without speculating on what the outcome of this litigation might have been, the Court finds that there is a reasonable legal basis for the two proposed consent decrees. After an agency has begun consultation with the FWS as required by the Endangered Species Act, but before the consultation is complete, it is still obligated to refrain from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. 1536(d). Plaintiffs contend that the activities that they seek to enjoin will cause irreversible harm to at

9

least 24 listed endangered and threatened species, which will foreclose reasonable and prudent alternatives to the existing plan. At trial, if they had proven all the violations of Endangered Species Act Section 7(d) that they have alleged, they would have been entitled to significant injunctive relief. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 194–95 (1978).

### Reasonable Factual Basis

The parties have presented a reasonable factual basis for the two proposed consent decrees. In determining whether there is a reasonable factual basis, a court need not make a detailed inquiry, because this would convert a settlement into a trial on the merits, which is exactly what a consent decree seeks to avoid. *Oregon*, 913 F.2d at 582. Nonetheless, a court still must have enough facts to make "an informed, just and reasoned decision." *Ibid.* (quotation omitted).

The provisions regarding Dunn Road are supported. In 1998, the FWS listed the bighorn sheep as an endangered species. It found that there are less than 400 bighorn sheep left in existence. 63 Fed. Reg. 13143 (Mar. 18, 1998). Factors that contribute to the destruction of the species, according to the FWS study, include: degradation and fragmentation of the habitat, non-adaptive behavioral responses to residential and commercial development, including development in Coachella Valley, Imperial County and Palm Springs, and disease spread by livestock. *Id.* at 13143–45. Disturbances at the lambing and watering areas are a significant factor in the destruction of the species, according to the FWS. *Id.* at 13146. Additionally, the FWS found that illegal roads on BLM land and outdoor recreational activities such as "jeep nature tours, mountain biking, horseback riding, dog walking, camping, sight-seeing, and other ecotourist forms of recreation" occur during the lambing and summer water-stress season for the sheep, making these activities a threat to the species. *Id.* at 13147. As part of its rulemaking process, the FWS addressed on the record 34 different objections to the listing. The FWS is an uninterested party in this action, and it is the agency with which the BLM is consulting pursuant to the Endangered Species Act.

Plaintiffs have submitted the declaration of Mark Jorgensen, who has studied the bighorn sheep for 33 years (Jorgensen Decl. ¶ 2). Mr. Jorgensen stated that "a network of trails within

sheep habitat has been woven all along the ranges above the Coachella Valley, reaching most lambing and watering area[s]" (*id.* ¶ 7). "One of the most significant negative impacts to the Peninsular Ranges bighorn sheep in the northern portion of the range," according to Mr. Jorgensen, "is the continued use of Dunn Road" (*id.* ¶ 9). In Mr. Jorgensen's opinion, Dunn Road is "placed in just about the worst possible location in terms of impacts to bighorn sheep. The lower elevation portion of this dirt road bisects prime bighorn habitat, including lambing areas. . . . In my opinion, continued use of the Dunn Road at current levels is incompatible with the recovery of the Peninsular Ranges bighorn sheep. The best future for Dunn Road would be obliteration and revegetation" (*ibid.*). The BLM has also studied the issue of the bighorn sheep and Dunn Road. During the closure of Dunn Road, the BLM recognized that numerous studies link vehicle use with harm to the bighorn sheep. 65 Fed. Reg. 52126-27 (Aug. 28, 2000).

The foregoing evidence constitutes a reasonable basis in fact for the most controversial part of the two proposed consent decrees. Similarly, other endangered and threatened species listed in the stipulated consent decree for residual relief have been studied and listed by a similar public notice and comment rulemaking procedure. During the listing process, the activities that plaintiffs seek to enjoin and the geographic areas where they seek relief were implicated. *E.g.*, 63 Fed. Reg. 53596-02 (Oct. 6, 1998) (listing five species of milk-vetch, stating locations of species, and indicating off-road-vehicle use threatens their continued existence); 62 Fed. Reg. 51125-01 (Sept. 30, 1997) (noting that the Cushenbury buckwheat, Cushenbury milk-vetch and Cushenbury oxytheca are all endangered, that Parish's daisy is threatened, and that the "primary threat to the [four] species is limestone mining"); 50 Fed. Reg. 20777-01 (May 20, 1985) (listing Ash Meadows gumplant, stating location of species and noting "local mining activities threaten the integrity of the species' habitat"). The foregoing studies constitute a reasonable factual predicate for the two proposed consent decrees.

### Fair, Reasonable and Equitable

Given the reasonable prospect that plaintiffs could have obtained an injunction that prohibited all mining, off-road-vehicle use and other activities within at least large tracts of the CDCA, the narrower relief embodied in the two proposed consent decrees is reasonable. In

11

exchange for the agreements at issue, all plaintiffs have agreed to limit relief to the stipulations. The provisions in the decrees are similar to the type of relief that plaintiffs would have obtained had they prevailed, but many of them reflect compromise and ongoing negotiation. For instance (Residual Stip. ¶ 4):

> BLM will not authorize OHV [off-highway vehicle] competitive motorized events outside of designated OHV open areas except for events passing through the Navy Parachute Range between the Paster City and Superstition Hills OHV Open Areas that comply with the Flat-tailed horned lizard conservation strategy. The parties acknowledge that the provisions of this paragraph provide temporary management direction and that all parties may continue to support more permissive or more restrictive competitive event opportunities in ongoing BLM management processes. ...

Compromises were also made to allow the limited expansion of mining (Residual Stip. ¶ 33):

> BLM will not authorize any new mining plans of operations or expansions of existing mining plans of operations in excess of two acres per operation, not to exceed 20 acres cumulatively for all operations, in the critical habitat of threatened or endangered species or in occupied habitat for those species where critical habitat has not been designated. Nothing in this provision precludes BLM from processing any such application.

Additional compromises were made so that the two proposed consent decrees do not prevent state entities from performing their duties under state law. The County of Riverside and State of California Department of Justice (on behalf of the Coachella Valley Mountains Conservancy) withdrew their objections in response to the amendments made after the hearing on February 14 (Cummings Decl., Exh. A). These compromises reflect the reasonable and careful negotiation that has been ongoing in this case since at least July of 2000.

### Public Interest

The Court finds that approval of the two consent decrees at issue is within the public interest. Whether a consent decree is within the public interest in part depends on whether it is "consistent with the statute that the judgment was meant to enforce." *Gorsuch*, 718 F.2d at 1128. The protective provisions of the two proposed consent decrees fall within the purpose of the Endangered Species Act. "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *TVA*, 437 U.S. at 184. Likewise, the proposed consent decrees are consistent with the Federal Land Policy and

12

Management Act, which created the CDCA. This Act requires the BLM to balance the numerous and competing considerations that went into the proposed consent decrees, e.g., preservation of desert wildlife, recreational use of the land, and mining. 43 U.S.C. 1781.

### (i) Third-Party Rights

The public interest necessarily involves consideration of the public's comments and objections. The most serious objection to both proposed consent decrees is that they will alter existing mining, ranching or off-road-vehicle permits. Contrary to the fears that have been expressed, neither consent decree will reduce any rights to administrative notice and/or hearings prior to making such modifications. Both proposed consent decrees contain identical clauses that ensure that BLM cannot violate the law (Bighorn Stip. ¶ 24; Residual Stip. ¶ 56):

> In complying with the terms of this agreement, BLM shall be subject to all applicable federal statutes or regulations, and nothing in this agreement shall be construed to require BLM to take any actions in contravention of any such applicable statutes or regulations.

Any permit-holder is free to try to prove at administrative hearings, or in court, that any specific modification will be unlawful. The consent decrees will not and may not be asserted as a legal authority for any agency action over and above the BLM's existing statutory authority or to avoid any duties under NEPA. Similarly, the resulting consent decrees in no way suspend or supercede any requirement for public notice or opportunity for public comment to which the BLM is subject. The Court makes no finding that any "emergency" does (or does not) exist. Consequently, the BLM shall not under any circumstances cite this order as authority to take any emergency actions or otherwise circumvent the requirements of the law.

### (ii) Dunn Road

With regard to Dunn Road, at the Court's suggestion, many of the concerns expressed during the hearing were alleviated by the amendments to the proposed consent decrees. As already discussed, this order in no way precludes any party with legal rights to the road from asserting them in a proper forum.

#### (iii) Voluntary Trail Closure

At the hearing on February 14, the City of La Quinta argued that the signs implementing voluntary trail closures were misleading. According to it, the signs suggested that the trails were closed. In response, these signs were changed to state: "Please do not use this trail January 1 to June 30" (Cummings Decl., Exh. C). This is not misleading and suggests the voluntary nature of compliance.

#### (iv) Statute of Limitations

Public Lands for the People, et. al., at the hearing on February 14, raised a statute of limitations argument that was identical to the one that they raised regarding the livestock grazing stipulation. For the same reasons stated in the order approving the stipulation, dated January 29, 2001, this argument is rejected.

#### (v) Extent of Relief

Public Lands for the People, et. al., has also argued that some of the relief in the consent decree exceeds the relief that plaintiffs could have obtained after a trial. Even if this were true, "as long as a consent decree comes within the general scope of the case made by the pleadings [and] furthers the objectives upon which the law is based," a court may enter a consent decree that "provides broader relief than the court could have awarded after a trial." *Sierra Club*, 909 F.2d at 1355 (quoting *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO v. City of Cleveland*, 478 U.S. 501, 525–26 (1986)) (quotations omitted). As already discussed, the two proposed consent decrees achieve the purpose of the Endangered Species Act, contain provisions that ensure that the BLM follows all applicable laws, and provide considerably less relief than plaintiffs sought in their complaint.

#### (vi) All Plaintiffs Are Bound

The way the two proposed consent decrees were originally drafted, it was unclear whether all three plaintiffs would be bound by the decrees such that all litigation issues comprehended by this lawsuit over the CDCA would end and could not be reasserted in yet a different lawsuit. This concern has also been addressed. At oral argument, plaintiffs clarified that the Sierra Club, Center for Biological Diversity and Public Employees for Public

14

Responsibility would all be bound by the consent decrees, and the amended proposed consent decrees state that all three plaintiffs are bound.

## CONCLUSION

For the foregoing reasons, both proposed consent decrees are **APPROVED**. The Court finds that there is a reasonable basis in law and fact, that it is within the public interest, and that the two consent decrees are fair, equitable and reasonable and do not overly infringe on agency discretion.

**IT IS SO ORDERED.**

Dated: March 20, 2001.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE