# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VALERIE PLAME WILSON and ) <br> JOSEPH C. WILSON IV, ) <br>               Plaintiffs ) <br> ) <br>       v. ) <br> ) <br> I. LEWIS LIBBY JR., ) <br> KARL C. ROVE, ) <br> RICHARD B. CHENEY, ) <br> RICHARD L. ARMITAGE, and ) <br> JOHN DOES 1-9, ) <br>          Defendants ) <br> ) | Case No. 06-1258 (JDB) |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' AND THE UNITED STATES' <u>MOTIONS TO DISMISS</u>

Anne Weismann (D.C. Bar No. 298190)
Melanie Sloan (D.C. Bar No. 434584)
Citizens for Responsibility
and Ethics in Washington
1400 Eye Street, N.W.
Suite 450
Washington, D.C. 20005
Phone:  (202) 408-5565
Fax:  (202) 588-5020

Erwin Chemerinsky (D.C. Bar No. 289330)
Duke University School of Law
Science Drive and Towerview Road
Durham, NC 27708-0360
Phone: (919) 613-7173
Fax:  (919) 613-7231

Joseph Cotchett (D.C. Bar No. 325498)
Cotchett, Pitre, Simon & McCarthy
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Phone:  (650) 6979-6000
Fax: (650) 697-9577

Attorneys for Plaintiffs

# CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION...............................................................................................................1

FACTUAL ALLEGATIONS................................................................................................2

    I.      The Initial Revelations of Mr. Wilson's Report........................................3

    II.     Mr. Wilson's Op-Ed................................................................................6

    III.    The Retaliation........................................................................................7

    IV.   Mr. And Mrs. Wilson Were Seriously Injured........................................11

ARGUMENT....................................................................................................................12

    I.      Plaintiffs Have Stated Claims Upon Which Relief Can Be Granted.....................12

          A.     Plaintiff Joseph Wilson States a Claim Under the First Amendment for Violation of His First Amendment Rights............................12

          B.     Plaintiffs Valerie and Joseph Wilson State a Claim Under the Fifth Amendment for Violation of Their Right to Equal Protection of the Law............................................16

          C.     Plaintiff Valerie Wilson States a Claim Under the Fifth Amendment for Violation of Her Right to Privacy....................20

          D.     Plaintiff Valerie Wilson States a Claim Under the Fifth Amendment for Deprivation of Property Without Due Process...............28

          E.     The Tort Claim of Plaintiffs Valerie Wilson and Joseph Wilson for Invasion of Privacy by Public Disclosure of Private Facts Is Not Subject to Dismissal Under the Westfall Act....................30

    II.     Plaintiffs Claims Are Not Time-Barred................................................38

          A.     The Constitutional Claims Are Not Time-Barred......................39

      B.      The Claim for Public Disclosure of Private Facts Is Not Time-Barred.....42

III.      Plaintiffs' Claims Are Not Barred by the State Secrets Doctrine...........................48

IV.      There Are No Factors That Counsel Against Recognizing Plaintiffs'
      Constitutional Claims Under *Bivens*......................................................................51

      A.      The Privacy Act Is Not a Reason to Deny a *Bivens* Remedy in
      This Case.......................................................................................................52

      B.      The Intelligence Identities Protection Act Is Not a Reason to Deny
      a *Bivens* Claim in This Case......................................................................55

      C.      Civil Service Remedies Are Not a Reason to Deny a *Bivens* Claim
      in This Case...................................................................................................56

V.      Defendants Are Not Protected by Absolute or Qualified Immunity......................57

      A.      Defendant Cheney Is Not Protected by Absolute Immunity......................57

      B.      Defendants' Actions Are Not Protected by Qualified Immunity...............59

CONCLUSION...................................................................................................................60

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

*3883 Connecticut, LLC v. District of Columbia.*, 336 F.3d 1068 (D.C. Cir. 2003) ......................17

*American Federation of Government Employees v. Dep't of Housing
    and Urban Development*, 118 F.3d 786 (D.C. Cir. 1997) ............................................21, 22

*Am. Towers v. Williams*, 50 Fed. Appx. 448 (D.C. Cir. 2002), *reh'g denied*,
    No. 01-7141, 2002 U.S. App. LEXIS 26828 (D.C. Cir. Dec. 23, 2002) ........................17

*Ashton v. Civiletti*, 613 F.2d 923 (D.C. Cir. 1979) ........................................................29

*Baker v. Carr*, 369 U.S. 186 (1962) ...................................................................16, 50

*Barry v. New York*, 712 F.2d 1554 (2d Cir. 1983), *cert. denied sub nom.
    Slevin v. New York*, 464 U.S. 1017 (1983) ..............................................................21

*Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982) ...............................................................14

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ........................................................14

*Bieneman v. City of Chicago*, 864 F.2d 463 (7th Cir. 1988) ............................................41

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
    403 U.S. 388 (1971) ....................................................................................12, 16, 51

*Briscoe v. Potter*, 355 F.Supp.2d 30 (D.D.C. 2004) .......................................................25

*Broudy v. Mather*, 460 F.3d 106 (D.C. Cir. 2006) ...........................................................2

*Burns v. Reed*, 500 U.S. 478 (1991) .............................................................................57

*Bush v. Lucas*, 462 U.S. 367 (1983) ............................................................................56

*Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) ........................22, 24, 25

*Butz v. Economou*, 438 U.S. 478 (1978) ............................................................40, 58, 59

*Cain v. Tigard-Tualatin Sch. Dist.*, 262 F.Supp.2d (D. Or. 2003) ..........................15, 16

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990) ....................................43

*Carney v. American Univ.*, 151 F.3d 1090 (D.C. Cir. 1998) ........................................42

*Chin v. Bowen*, 833 F.2d 21 (2d Cir. 1987) ...............................................................41

*Chung v. U.S. Dep't of Justice*, 333 F.3d 273 (D.C. Cir. 2003) ....................................53

*Chung v. U.S. Dep't of Justice*, No. 00-1912 (D.D.C. Sept. 21, 2001) ..........................54

*CIA v. Sims*, 471 U.S. 159 (1985) .............................................................................28

*Cobb v. Pozzi*, 363 F.3d 89 (2d Cir. 2003) .................................................................19

*Colm v. Vance*, 567 F.2d 1125 (D.C. Cir. 1977)...........................................................29

*Council on Am-Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006) .........32

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ..............................................................13

*Danai v. Canal Square Associates*, 862 A.2d 395 (D.C. Ct. App. 2004) .....................30

*Dangler ex rel. Dangler v. Yorktown Cent. Schs.*, 777 F.Supp.1175 (S.D.N.Y. 1991) ...............15

*Davis v. Passman*, 442 U.S. 228 (1979) ......................................................................51

*Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977) ................................................16, 51

*DeMuria v. Hawkes*, 328 F.3d 704 (2d Cir. 2003) ......................................................18

*Diamond v. Davis*, 680 A.2d 364 (D.C. Ct. App. 1996) ...............................................42

*Doe v. Gates*, 981 F.2d 1316 (D.C. Cir. 1993) ...........................................................29

*Doe v. Medlantic Health Care*, 814 A.2d 939 (D.C. Ct. App. 2003) ......................42, 43

*Doe v. U.S. Postal Service*, 317 F.3d 339 (D.C. Cir. 2003) .........................................52

*Downie v. City of Middleburg Heights*, 301 F.3d 688 (6th Cir. 2002) .........................53

*Ellsberg v. Mitchell,* 709 F.2d 51 (D.C. Cir. 1983) .....................................................48

*Fitzgerald v. Seamans*, 553 F.2d 220 (D.C. Cir. 1977) ...............................................44

*Fraternal Order of Police v. Williams*, 263 F.Supp.2d 45 (D.D.C. 2003) ....................25

*Gutierrez v. Lamagno*, 515 U.S. 417 (1995) ........................................................32

*Halkin v. Helms*, 690 F.2d 977 (D.C. Cir. 1982) ..............................................48

*Halperin v. CIA*, 629 F.2d 144 (D.C. Cir. 1980) ..........................................27, 28

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................16, 58, 59

*Hatfill v. Ashcroft*, 404 F.Supp.2d 104 (D.D.C. 2005) ......................................54

*Haynesworth v. Miller*, 820 F.2d 1245 (D.C. Cir. 1987), *rev'd in part*
    *on other grounds by Hartman v. Moore*, 126 S. Ct. 1695 (2006) ..............16, 51

*Henke v. U.S. Dep't of Commerce*, 83 F.3d 1453 (D.C. Cir. 1996) ......................53

*Hobson v. Brennan*, 625 F.Supp.459 (D.D.C. 1985) ..........................................42

*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984) ..............................39, 40, 42, 44-46

*Hope v. Pelzer*, 536 U.S. 730 (2002) ................................................................59

*In re Crawford*, 194 F.3d 954 (9th Cir. 1999) ....................................................21

*Jane Does v. District of Columbia*, 232 F.R.D. 18 (D.D.C. 2005) ......................41

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998) ....................25, 26, 27

*Kimbro v. Velten*, 30 F.3d 1501 (D.C. Cir. 1994) ..............................................32

*Keenan v. Tejada*, 290 F.3d 252 (5th Cir. 2002) ..............................................12

*Kounitz v. Slaatten*, 901 F.Supp.650 (S.D.N.Y. 1995) ......................................15

*Lederman v. United States*, 131 F.Supp.2d 46 (D.D.C. 2001) ..........................41

*Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002) ................................41

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ....................................................58, 59

*Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346
    (D.C. Ct. App. 1987) ..............................................................................32

*McSurely v. Hutchison*, 823 F.2d 1002 (6th Cir. 1987), *cert. denied*,
    485 U.S. 934 (1988) .................................................................................41

*Nix v. Hoke*, 139 F.Supp.2d 125 (D.D.C. 2001).............................................................39

*Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) ..............................21

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ....................................................................58

*Noble v. United States Parole Comm'n*, 194 F.3d 152 (D.C. Cir. 1999) .....................17

*Owens v. Okure*, 488 U.S. 235 (1989) ..........................................................................40

*Plante v. Gonzalez*, 575 F.2d 1119 (5th Cir. 1978) ......................................................21

*Rasul v. Rumsfeld*, 433 F.Supp.2d 58 (D.D.C. 2006) ...................................................27

*Rasul v. Rumsfeld*, 414 F.Supp.2d 26 (D.D.C. 2006) ...................................................32

*Roth v. Board of Regents*, 408 U.S. 564 (1972) ............................................................29

*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990) ..........................................14

*Scarbrough v. Morgan County Bd. of Educ.*, No. 04-6302 (6th Cir. Nov. 22, 2006) ...18

*Schecter v. Merchants Home Delivery*, 892 A.2d 415 (D.C. Ct. App. 2006) ...............33

*Scheuer v. Rhodes*, 416 U.S. 232 (1974), *overruled in part on other*
    *grounds by* Davis v. Scherer, 468 U.S. 183 (1984) ...................................57, 58

*Schneider v. Kissinger*, 310 F.Supp.2d 251 (D.D.C. 2004) ..........................................32

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) ..........................................49, 50

*Schweiker v. Chilicky*, 487 U.S. 412 (1988) ............................................................55, 56

*Snepp v. United States*, 444 U.S. 507 (1980) ................................................................27

*Stokes v. Cross*, 327 F.3d 1210 (D.C. Cir. 2003) .....................................................36, 37

*Tenet v. Doe*, 544 U.S. 1 (2005) ....................................................................................49

*Toolasprashad v. Bureau of Prisons*, 286 F.3d 576 (D.C. Cir. 2002) ....................13, 14

*Totten v. United States*, 92 U.S. 105 (1875) .................................................................48

*Trudeau v. Federal Trade Commission*, 456 F.3d 178 (D.C. Cir. 2006) .......................2

*United States v. Reynolds*, 345 U.S. 1 (1953) .........................................................20, 48

*United States v. Westinghouse Elec. Corp.*, 638 F.2d 570 (3d Cir. 1980) .....................21

*Van Strum v. Lawn*, 940 F.2d 406 (9th Cir. 1991) ................................................40, 41

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ........................................17, 19

*Walls v. City of Petersburg*, 895 F.2d 188 (4th Cir. 1990) ..........................................21

*Wardlaw v. Pickett*, 1 F.3d 1297 (D.C. Cir. 1993) ......................................................40

*Washington Teachers' Union Local No. 6 v. Board of Education
    of the District of Columbia*, 109 F.3d 774 (D.C. Cir. 1997) ............................29

*Whalen v. Roe*, 429 U.S. 589 (1977) ...........................................................................21

*Wolf v. Regardie*, 553 A.2d 1213 (D.C. Ct. App. 1989) ..............................................30

## Constitution

United States Constitution,

   Art. I, §3 ........................................................................................................59

   Art. II, §1 .......................................................................................................59

   Amend. I ...........................................................12-16, 19, 24, 39, 41, 42, 51, 53
   Amend. V ...........................................................12, 16, 20, 30, 39, 51, 54
   Amend. XIV .................................................................................17, 25
   Amend. XXV, §3 ............................................................................59
   Amend. XXV, §4 ............................................................................59

## Statutes

Privacy Act, 5 U.S.C. §552a ..........................................................................................51
   5 U.S.C. §552a(a)(4) .....................................................................................52
   5 U.S.C. §552a(a)(5) .....................................................................................52

18 U.S.C. §793 ................................................................................................35, 60

Westfall Act, 28 U.S.C. §1346(b), §§2671-2680.................................................31
    28 U.S.C. §2679 ...............................................................................................31
    28 U.S.C. §2679(d)(1) ...............................................................................31, 32

28 U.S.C. §1367 ................................................................................................30

42 U.S.C. §1983 ............................................................................25, 26, 40, 41

Intelligence Identities Protection Act, 50 U.S.C. §421 ............23, 26, 34, 51, 55, 56, 60
    50 U.S.C. §§421(a) ...........................................................................................55
    50 U.S.C. §§421(b) ...........................................................................................55
    50 U.S.C. §§421(c) ...........................................................................................55
    50 U.S.C. §§421(d) ...........................................................................................55

D.C. Code Ann. §12-301(4) (2006) .............................................................39, 42
D.C. Code Ann. §12-301(8) (2006) .............................................................39, 40

**Legislative Materials**

S. Rep. 97-201 .............................................................................................34, 55

Privacy Act of 1974, Pub. L. No. 93-579, §2, 88 Stat. 1896 (Dec. 31, 1974) ..............53

**Executive Materials**

Executive Order 12958 ..................................................................................35, 60

Executive Order 13292 ..................................................................................35, 60

**Indictment**

*United States v. Libby*, Indictment .....................................................................46

**Restatement**

Restatement (Second) of Agency (1957) .......................................................32, 35, 36

**Other Authorities**

At the President's Side: The Vice Presidency in the Twentieth Century
    (Timothy Walch ed., Univ. Of Missouri Press 1997) .......................................59

Elizabeth Bazan, <u>CRS Report for Congress: Intelligence Identities Protection Act</u>,
    (Congressional Research Service Oct. 3, 2003) ..................................................23, 34, 55

George H. W. Bush, 41st President of the United States,
    Remarks at the Dedication Ceremony for the George Bush
    Center for Intelligence (Apr. 26, 1999) ...........................................24, 33, 34, 60

Joel K. Goldstein, <u>The New Constitutional Vice Presidency</u>,
    30 Wake Forest L. Rev. 505 (1995) ................................................................59


Matthew Cooper, Massimo Calabresi, and John F. Dickerson,
    <u>A War on Wilson?</u>, *Time*, July 17, 2003 ........................................................46

Michael Isikoff, <u>Richard Armitage's Role in Plame Case</u>,
    *Newsweek*, September 4, 2006 ......................................................................46

President Ronald Reagan, Remarks on Signing the Intelligence
    Identities Protection Act of 1982 (June 23, 1982) ................................23, 24, 56

Robert D. Novak, <u>Mission to Niger</u>, *The Washington Post*, July 14, 2003 ...........38, 45

Transcript, *Meet the Press* (NBC television broadcast Sept. 14, 2003) ........................33

Transcript, President Bush and Prime Minister Allawi
    Press Conference (Sept. 23, 2004) .................................................................33

Transcript, President, Prime Minister of India Discuss
    Freedom and Democracy (July 18, 2005) .......................................................34

Walter Pincus and Mike Allen, <u>Probe Focuses on Month Before</u>
    <u>Leak to Reporters</u>, *The Washington Post*, October 12, 2003 ...........................46

Washingtonpost.com, Transcript: Bush Holds Post-G-8 Summit (June 10, 2004) .....................34

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————  )
                                         )
VALERIE PLAME WILSON and                 )
JOSEPH C. WILSON IV,                     )
                          Plaintiffs     )
                                         )
                                         )
            v.                           )     Case No. 06-1258 (JDB)
                                         )
I. LEWIS LIBBY JR.,                      )
KARL C. ROVE,                            )
RICHARD B. CHENEY,                       )
RICHARD L. ARMITAGE, and                 )
JOHN DOES 1-9,                           )
                          Defendants     )
                                         )
———————————————  )

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' AND THE UNITED STATES'
<u>MOTIONS TO DISMISS</u>**

## INTRODUCTION

This is a case about abuse of power at the highest level of American government.
Plaintiffs Valerie and Joseph Wilson have alleged that the defendants, among the most senior
officials in the administration, intentionally revealed Valerie Wilson's status as a secret operative
for the Central Intelligence Agency ("CIA") in retaliation for Joseph Wilson exposing false
statements in the President's State of the Union Address.  The plaintiffs seek money damages as
compensation for the substantial harms they have suffered from the violation of their
constitutional and common law rights.

Each of the defendants has moved to dismiss the plaintiffs' suit on various grounds.  In
addition, the United States has filed a statement of interest with its view on the merits of
plaintiffs' claims and a motion to dismiss plaintiffs' common-law tort claim.  For the sake of

efficiency, given the substantial overlap in the arguments presented by the defendants, plaintiffs

file this consolidated Memorandum of Points and Authorities in response to all of the

defendants' and the United States' motions to dismiss.

## FACTUAL ALLEGATIONS

In considering a motion to dismiss a court must accept as true all of the allegations of the

complaint and the plaintiff must be given every reasonable inference from the facts. *See, e.g.,*

*Broudy v. Mather*, 460 F.3d 106, 108 (D.C. Cir. 2006); *Trudeau v. Federal Trade Commission*,

456 F.3d 178, 193 (D.C. Cir. 2006).

Valerie Wilson was an employee of the CIA until January 2006. Her employment status

was classified and was not publicly known until July 14, 2003, when a press report precipitated

by leaks by the defendants exposed her status. Amended Complaint ("Am. Complaint") ¶7.

Joseph C. Wilson IV is married to Valerie Wilson. *Id.* From 1976 through 1998, Mr.

Wilson was a member of the United States Diplomatic Service. From 1988 to 1991, he was the

Deputy Chief of Mission at the United States Embassy in Baghdad, Iraq. In that position, he was

recognized as "truly inspiring" and "courageous" by President George H. W. Bush after he

shielded more than 50 Americans at the Embassy in the face of threats from Saddam Hussein to

execute anyone who refused to turn over foreigners. Mr. Wilson later served as United States

Ambassador to Gabon and Sao Tome and Principe under President George H. W. Bush and as

Senior Director for Africa at the National Security Council under President Clinton. *Id.* ¶8.

The defendants to this lawsuit include I. Lewis (a/k/a "Scooter") Libby, former Assistant

to the President, former Chief of Staff to the Vice President, and former Assistant to the Vice

President for National Security Affairs; Karl C. Rove, a political consultant who has served as

2

Deputy Chief of Staff to the President, head of the Office of Political Affairs, head of the Office

of Public Liaison, and head of the Office of Strategic Initiatives at the White House; Vice

President Richard B. Cheney; and Richard L. Armitage, former Deputy Secretary of the

Department of State. *Id*. ¶¶9-12. Included as defendants are John Does No. 1-9, individuals

whose identities are not known, but who are believed to be either senior level government

officials or political operatives with ties to senior level officials at all times relevant to the

Complaint. *Id*. ¶13.

Each of these defendants acted in retaliation for Mr. Wilson's public statements, in an

Op-Ed article in *The New York Times* and in comments to the media, exposing inaccuracies in

President George W. Bush's January 28, 2003 State of the Union Address. *Id*. ¶2. In that

speech, President Bush stated that "[t]he British government has learned that Saddam Hussein

recently sought significant quantities of uranium from Africa." (the "sixteen words"). *Id.* ¶19a.

### *The initial revelations of Mr. Wilson's report*

On May 6, 2003, *The New York Times* published a column by Nicholas Kristof which

disputed the accuracy of the "sixteen words." The column reported that as a result of a request

from the Vice President's office an unnamed former ambassador -- now known to be Plaintiff

Joseph Wilson -- was sent to Niger in 2002 to look into allegations that Iraq sought to buy

uranium from Niger. According to the column, the former ambassador reported back to the CIA

and State Department in early 2002 that the allegations were unequivocally wrong and based on

forged documents. Am. Complaint ¶19b.

On or about May 29, 2003, in the White House, Mr. Libby asked an Under Secretary of

State for information concerning the unnamed former ambassador's travel to Niger to investigate

claims about Iraqi efforts to acquire uranium yellowcake.  The Under Secretary thereafter directed the State Department's Bureau of Intelligence and Research to prepare a report concerning the former ambassador and his trip.  The Under Secretary provided Mr. Libby with interim oral reports in late May and early June 2003, and told Mr. Libby that Mr. Wilson was the former ambassador who took the trip.  *Id.* ¶19c.

On or about June 9, 2003, a number of classified documents from the CIA were faxed to the Office of the Vice President to the personal attention of Mr. Libby and another person in that office.  The faxed documents, which were marked as classified, discussed Mr. Wilson and his trip to Niger, among other things, but did not mention Mr. Wilson by name.  After receiving these documents, Mr. Libby and one or more other persons in the Office of the Vice President handwrote the names "Wilson" and "Joe Wilson" on the documents.  *Id.* ¶19d.

On or about June 11 or 12, 2003, the Under Secretary of State orally advised Mr. Libby that Mr. Wilson's wife worked at the CIA and that State Department personnel were saying that his wife was involved in the planning of his trip.  *Id.* ¶19e.  Around the same time, Mr. Libby asked a senior CIA officer about the origin and circumstances of Mr. Wilson's trip.  The officer told Mr. Libby that Mr. Wilson's wife worked at the CIA and was believed [erroneously] to be responsible for sending Mr. Wilson on the Niger trip.  *Id.* ¶19f.

Prior to June 12, 2003, *Washington Post* reporter Walter Pincus contacted the Office of the Vice President in connection with a story he was writing about Mr. Wilson's trip.  Mr. Libby participated in discussions in the Office of the Vice President concerning how to respond to Mr. Pincus.  *Id.* ¶19g.

4

On or about June 12, 2003, Vice President Cheney advised Mr. Libby that Mr. Wilson's wife worked at the CIA in the Counterproliferation Division. Mr. Libby understood that the Vice President had learned this information from the CIA. *Id.* ¶19h.

On June 12, 2003, *The Washington Post* published an article by Walter Pincus about Mr. Wilson's trip to Niger. The article described Mr. Wilson not by name, but as a retired ambassador, and reported that the CIA had sent him to Niger after an aide to the Vice President raised questions about purported Iraqi efforts to acquire uranium. Mr. Pincus's article questioned the accuracy of the "sixteen words" in President Bush's State of the Union address and stated that the retired ambassador had reported to the CIA that the uranium purchase story was false. *Id.* ¶19i.

On or about June 14, 2003, Mr. Libby met with a CIA briefer. During their conversation, Mr. Libby expressed displeasure that CIA officials were making comments critical of the Vice President's office to reporters, and discussed with the briefer, among other things, "Joe Wilson" and his wife "Valerie Wilson," in the context of Mr. Wilson's trip to Niger. *Id.* ¶19j.

On or about June 19, 2003, an article entitled "The First Casualty: The Selling of the Iraq War" that was highly critical of Vice President Cheney appeared in *The New Republic* magazine online. Among other things, the article questioned the "sixteen words" and stated that following a request for information from the Vice President, the CIA had asked an unnamed ambassador to travel to Niger to investigate allegations that Iraq had sought uranium from Niger. The article included a quotation attributed to the unnamed ambassador alleging that the administration officials "knew the Niger story was a flat-out lie." The article also was critical of how the administration, including the Office of the Vice President, portrayed intelligence concerning Iraqi

5

capabilities with regard to weapons of mass destruction and accused the administration of suppressing dissent from the intelligence agencies on this topic. *Id.* ¶19k.

Shortly after publication of *The New Republic* article, Mr. Libby spoke by telephone with his then-Principal Deputy and discussed the article. The Principal Deputy asked him whether information about Mr. Wilson's trip to Niger could be shared with the press to rebut reports that the Vice President had sent Mr. Wilson. Mr. Libby responded that there would be complications at the CIA in disclosing that information publicly, and that he could not discuss the matter on a non-secure line. *Id.* ¶19l.

On or about June 23, 2003, Mr. Libby met with *New York Times* reporter Judith Miller. During this meeting, Mr. Libby criticized the CIA, and disparaged what he termed "selective leaking" by the CIA concerning intelligence matters. In discussing the CIA's handling of Mr. Wilson's trip to Niger, he informed Ms. Miller that Mr. Wilson's wife might work at a bureau of the CIA. *Id.* ¶19m.

### Mr. Wilson's Op-Ed

On July 6, 2003, *The New York Times* published an Op-Ed article by Mr. Wilson entitled "What I Didn't Find in Africa." On that same day, *The Washington Post* published an article about Mr. Wilson's 2002 trip to Niger, which was based in part upon an interview of him. Mr. Wilson also appeared as a guest on the July 6 television interview show "Meet the Press." In his Op-Ed article, and in interviews with print reporters and on television, Mr. Wilson explained that in February 2002, he had taken a trip to Niger at the request of the CIA to investigate claims that Iraq had sought or obtained uranium yellowcake from Niger and that he found no evidence to support these allegations. Mr. Wilson stated that he believed, based on his understanding of

government procedures, that the Office of the Vice President had been informed of the results of his trip.  Am. Complaint ¶19n.

In a May 12, 2006 court filing in *United States v. Libby*, the government proffered a copy of the July 6 Op-Ed annotated shortly after its publication in the handwriting of Vice President Cheney.  According to the government, those notes of the Vice President "support the proposition that publication of the Wilson Op-Ed acutely focused the attention of the Vice President and [Libby] – his chief of staff – on Mr. Wilson, on the assertions made in his article, and on responding to those assertions."  *Id.* ¶19o.

### *The retaliation*

Following the publication of Mr. Wilson's Op-Ed piece and statements in the national media, the defendants engaged in a concerted effort to retaliate against him by exposing his wife's employment as an operative for the CIA.  On or about July 7, 2003, Mr. Libby had lunch with the then-White House Press Secretary and advised the Press Secretary that Mr. Wilson's wife worked at the CIA and noted that such information was not widely known.  Am. Complaint ¶19p.

On or before July 8, 2003, Vice President Cheney advised Mr. Libby that the President of the United States specifically had authorized Mr. Libby to disclose to *New York Times* reporter Judith Miller certain information from an October 2002 National Intelligence Estimate concerning Iraq and weapons of mass destruction in order to rebut Mr. Wilson.  Just three days later, on July 11, 2003, CIA Director George Tenet conceded that claims about Iraqi attempts to buy uranium from Africa in the January 2003 State of the Union address were a mistake and that the "16 words should never have been included in the text written for the President," an

acknowledgment that the substance of Mr. Wilson's criticism was legitimate and correct.  *Id.* ¶19q.

Rather than admit the validity of Mr. Wilson's criticisms, on or about the morning of July 8, 2003, Mr. Libby met with Judith Miller.  When the conversation turned to the subject of Joseph Wilson, Mr. Libby asked that  the information he provided on the topic be attributed to a "former Hill staffer" rather than to a "senior administration official," as had been the understanding with respect to other information that he provided Ms. Miller during this meeting. Mr. Libby discussed Mr. Wilson's trip with Ms. Miller and criticized the CIA reporting concerning it.  During this discussion, Mr. Libby told Ms. Miller that he believed that Mr. Wilson's wife worked at the CIA.  *Id.* ¶19r.

Also on or about July 8, 2003, Mr. Libby met with the Counsel to the Vice President in an anteroom outside the Vice President's Office.  During their brief conversation, Mr. Libby asked the Counsel, in sum and substance, what paperwork there would be at the CIA if an employee's spouse undertook an overseas trip.  *Id.* ¶19s.

Not earlier than June 2003, but on or before July 8, 2003, the Assistant to the Vice President for Public Affairs learned from another government official that Mr. Wilson's wife worked at the CIA and so informed Mr. Libby.  *Id.* ¶19t.

On or about July 10 or July 11, 2003, Mr. Libby spoke to a senior official in the White House, believed to be Karl Rove or one or more of John Does No. 1 - 9, who advised him of a conversation earlier that week with columnist Robert Novak in which Mr. Wilson's wife was discussed as a CIA employee involved in Mr. Wilson's trip.  Mr. Libby was advised that Mr. Novak would be writing a story about Mr. Wilson's wife.  *Id.* ¶19u.

On or about July 12, 2003, Mr. Libby flew on Air Force Two with the Vice President and others to and from Norfolk, Virginia. On his return trip, Mr. Libby discussed with other officials aboard the plane what he should say in response to certain pending media inquiries, including questions from *Time* reporter Matthew Cooper. *Id*. ¶19v.

On or about the afternoon of July 12, 2003, Mr. Libby spoke by telephone to Mr. Cooper, who asked whether Mr. Libby had heard that Mr. Wilson's wife was involved in sending Mr. Wilson on the trip to Niger. Mr. Libby confirmed to Mr. Cooper, without elaboration or qualification, that he had heard this information too. *Id*. ¶19w. On the same day, Mr. Libby spoke by telephone with Judith Miller of *The New York Times* and discussed Mr. Wilson's wife, and that she worked at the CIA. *Id*. ¶19x.

Around the same time, other defendants similarly revealed Mrs. Wilson's employment at the CIA in an attempt to punish the Wilsons. For example, on Friday, July 11, 2003, *Time* report Matthew Cooper telephoned Defendant Rove at the White House. In the ensuing conversation, Mr. Rove instructed Mr. Cooper that the conversation was to be on "deep background," which Mr. Cooper has stated he understood to mean that he could use the information Mr. Rove was giving to him but not quote it, and that he must keep the identity of the source confidential. *Id*. ¶27.

In the same telephone conversation, Mr. Rove clearly indicated to Mr. Cooper that Mrs. Wilson worked "at the agency," which Mr. Cooper understood obviously to mean the CIA. Mr. Rove also told Mr. Cooper that Mrs. Wilson "worked on 'WMD' [weapons of mass destruction]" issues and that she was responsible for sending Mr. Wilson to Niger. This was the first time that Mr. Cooper had heard anything about Joseph Wilson's wife. *Id*. ¶28. Mr. Cooper has said he

9

has a distinct memory of Mr. Rove ending the call by saying, "I've already said too much." *Id.* ¶29.

In July 2003, shortly after Mr. Novak's column appeared, Mr. Rove called Chris Matthews, host of the MSNBC network program "Hardball," and told him that Mr. Wilson's wife was "fair game." "Fair game" is a hunting term used to describe prey (an animal that is killed and eaten) and is used colloquially to describe a person who may legitimately be attacked. Again, Mr. Rove attempted to make this statement targeting Mrs. Wilson off the record and on the condition that he not be identified as its source, so as to avoid detection for the wrongdoing. *Id.* ¶30.

Similarly, Defendant Armitage participated in exposing Mrs. Wilson in an attempt to punish Mr. Wilson. On or about June 10, 2003, Mr. Armitage received a memorandum prepared by an analyst in the State Department's Bureau of Intelligence and Research which referred to Valerie Wilson as a CIA WMD manager. The memorandum was stamped "Secret" and the paragraph that mentioned Mrs. Wilson was prefaced with the letters "S/NF," meaning Secret/No Foreigners. *Id.* ¶36.

On or about June 13, 2003, Mr. Armitage had a meeting with reporter Bob Woodward. During the course of that meeting, Mr. Armitage told Mr. Woodward that Mrs. Wilson worked at the CIA as an analyst on weapons of mass destruction. *Id.* ¶37. On July 8, 2003, Mr. Armitage met with reporter Robert Novak and revealed to him that Mrs. Wilson worked for the CIA on weapons of mass destruction. *Id.* ¶39.

Defendants committed these acts as part of a concerted effort to punish Mr. Wilson for embarrassing the Bush Administration when he revealed a crucial misstatement in the President's

10

State of the Union Address. On October 28, 2005, Special Counsel Patrick J. Fitzgerald explained at a press conference announcing the indictment against Defendant Libby:

> In July 2003, the fact that Valerie Wilson was a CIA officer was classified. Not only was it classified, but it was not widely known outside the intelligence community. Valerie Wilson's friends, neighbors, college classmates had no idea she had another life. The fact that she was a CIA officer was not well known for her protection and for the benefit of all of us. It is important that a CIA officer's identity be protected, that it be protected not just for the officer, but for the nation's security.

*Id.* ¶21.

At the same press conference, Special Counsel Fitzgerald stated: "Valerie Wilson's cover was blown in July 2003. The first sign of that cover being blown was when Mr. Novak published a column on July 14th, 2003. But Mr. Novak was not the first reporter to be told that Wilson's wife, Valerie Wilson, Ambassador Wilson's wife Valerie, worked at the CIA. Several other reporters were told [by Libby]." *Id.* ¶22.

### Mr. and Mrs. Wilson were seriously injured

Plaintiffs were seriously injured by the defendants' retaliatory revelation of Mrs. Wilson's status as a CIA operative. As a result of the defendants' conduct, Valerie and Joseph Wilson fear for their safety and for the safety of their children. The disclosure of Mrs. Wilson's covert identity makes her and her family a target for those persons and groups who bear hostility to the United States and/or its intelligence officers. Am. Complaint ¶42.

Also as a result of the defendants' actions, Mrs. Wilson was impaired in her ability to carry out her duties at the CIA, and to pursue the career she had planned there serving her country. *Id.* ¶43. Clearly she could no longer serve as a covert operative. Both Mr. and Mrs.

Wilson have suffered gross invasions of privacy as a result of the defendants' conduct. *Id.* ¶41.

**ARGUMENT**

Plaintiffs' Amended Complaint asserts claims under the First Amendment for violation of freedom of speech, the Fifth Amendment for denial of equal protection, violation of privacy, and for a deprivation of property without due process, and under the tort law of the District of Columbia for public disclosure of private facts. Am. Complaint ¶¶18-70. Below plaintiffs discuss each of these claims as well as the defenses asserted by the defendants, including the statute of limitations, the "state secrets" doctrine, the existence of a cause of action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), and claims of absolute and qualified immunity.

## I. PLAINTIFFS HAVE STATED CLAIMS UPON WHICH RELIEF CAN BE GRANTED.

### A. PLAINTIFF JOSEPH WILSON STATES A CLAIM UNDER THE FIRST AMENDMENT FOR VIOLATION OF HIS FIRST AMENDMENT RIGHTS.

In Count I of the Complaint, Joseph Wilson seeks recovery for violation of his First Amendment rights by Defendants Libby, Cheney and Rove. The First Amendment, of course, protects individuals from being punished by the government for their expression. "[I]f government officials were permitted to impose serious penalties in retaliation for an individual's speech, the government would be able to stymie or inhibit his exercise of rights in the future and thus obtain indirectly a result that it could not command directly." *Keenan v. Tejada*, 290 F.3d 252, 258 (5th Cir. 2002) (*citing Perry v. Sinderman*, 408 U.S. 593, 597 (1972)). To prevail on a First Amendment retaliation claim, a plaintiff must show (1) that he was engaged in

12

constitutionally protected activity and (2) that the defendant's response was actionable retaliation, sufficiently severe to chill a person of ordinary firmness. *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 584–85 (D.C. Cir. 2002). *See also Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).

Both of these requirements are met here. First, Mr. Wilson unquestionably was engaged in constitutionally protected activity when he wrote his Op-Ed in *The New York Times* and appeared in the media. Second, the defendants' response to punish him for his speech by destroying his wife's career is certainly sufficiently severe to chill a person of ordinary fitness in the future. This is all that is required to state a claim under the First Amendment.

The defendants make three arguments in response to this claim. First, Defendants Rove and Cheney argue that because Mr. Wilson did not allege that he personally was chilled from speaking, he has not stated a First Amendment claim. Memorandum of Points and Authorities in Support of Defendant Karl C. Rove's Motion to Dismiss Plaintiff's Amended Complaint ("Rove Mem.") at 22-23; Memorandum of Points and Authorities in Support of Defendant Vice President of the United States Richard B. Cheney's Motion to Dismiss ("Cheney Mem.") at 32-33. Defendants, however, misstate the requirements for a First Amendment claim. A First Amendment claim exists if a person is punished for his or her speech and the punishment is severe enough to cause a reasonable person to be chilled from speaking in the future. No case cited by the defendants, and for that matter no case of which plaintiffs are aware, has held that an individual who has been punished for his or her speech can establish a First Amendment violation only by proving that he or she was actually chilled in speaking.

13

The D.C. Circuit explicitly rejected such a requirement in *Toolasprashad*: "[t]he relevant question is not whether [the government action] actually interferes with a [plaintiff's] ability to exercise his rights," but whether the defendants' actions are "likely to deter a person of ordinary firmness." *Toolasprashad v. Bureau of Prisons*, 286 F.3d at 585. A defendant cannot evade liability by targeting particularly hardy or strong-willed plaintiffs. "It would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity . . ." *Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005) (*quoting Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999)).

To assert a chilling effect, a plaintiff need claim only something more than *de minimis* harm. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (Posner, J.). In *Bart*, a city employee was subjected to a campaign of "petty harassment" after her unsuccessful campaign for mayor. *Id.* at 623–24. The actions taken against the plaintiff included "baseless reprimands" and ridicule for bringing a birthday cake to work to celebrate another employee's birthday. *Id.* Though an "air of ridiculousness" surrounded these allegations, the court denied the motion to dismiss, reasoning that the cumulative impact of the employer's campaign may amount to something sufficient to chill the First Amendment rights of "a person of ordinary firmness." *Id.* at 625. "The effect on freedom of speech may be small, but . . . it need not be great in order to be actionable." *Id.*; *see also Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76 (1990) (The First Amendment protects against "even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights.").

14

The First Amendment also prohibits punishing a person's speech by retaliating against a family member, which is what occurred here. For example, in *Cain v. Tigard-Tualatin Sch. Dist.*, 262 F.Supp.2d 1120 (D. Or. 2003), a student was subjected to retaliatory physical and emotional abuse by his high school football coach after his parents filed two complaints against the coach for inappropriate conduct. *Id.* at 1123. The court ruled that the parents had a First Amendment claim for damages under §1983 based on the chilling effect to their free speech rights from the coach's retaliatory harassment of their son. According to the court, the coach's harassment of their son would lead "ordinary people in [their] position to refrain from engaging in future criticism [of the coach] in order to protect their son from further harm. In fact, [the coach] could not have chosen a more effective method for stifling the parents' speech than to retaliate against [their son]." *Id.* at 1130. *See also Dangler ex rel. Dangler v. Yorktown Cent. Schs.*, 777 F. Supp. 1175, 1177 (S.D.N.Y. 1991) (motion to dismiss First Amendment claim denied where school alleged to have retaliated against son for father's complaints). Likewise, in *Kounitz v. Slaatten*, 901 F. Supp. 650 (S.D.N.Y. 1995), the court allowed the plaintiff's First Amendment claim to proceed where she was allegedly fired in retaliation for her husband's speech. "[I]t would be anomalous to conclude that the Defendants could avoid Kounitz's allegations on the ground that the actual injury in this case was inflicted on her rather than on her husband directly." *Id.* at 654–55.

Second, defendants argue that plaintiffs' First Amendment claim is precluded by qualified immunity. *See, e.g.* Cheney Mem. at 32-33. Defendant Cheney cannot avail himself of the protections of qualified immunity, however, because, as the cases described above indicate, individuals clearly have a First Amendment right to avoid being punished by government

15

officials for their speech and any reasonable officer surely knows this. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (officers are liable if they violate clearly established law that a reasonable officer should know). Moreover, it is well established that a cause of action for money damages exists under the First Amendment pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See, e.g., Haynesworth v. Miller*, 820 F.2d 1245, 1255 (D.C. Cir. 1987); *Dellums v. Powell*, 566 F.2d 167, 194 (D.C. Cir. 1977).

Finally, Defendant Libby argues that the First Amendment claim should be dismissed because Mr. Wilson lacks standing. Defendant I. Lewis Libby's Memorandum of Points and Authorities in Support of His Motion to Dismiss the Complaint ("Libby Mem.") at 20-21. As the case law makes clear, however, a plaintiff has a right to sue based on allegations of retaliation for the plaintiff's exercise of his or her First Amendment rights. *See, e.g., Cain, supra.* Here, the injury to Mr. Wilson was the plaintiff's intentional acts of retaliation for his speech, which destroyed his wife's career and placed the plaintiffs and their family in jeopardy. As the person whose speech has been punished, the core requirement for standing has been met; the plaintiff has alleged "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962).

## B. PLAINTIFFS VALERIE AND JOSEPH WILSON STATE A CLAIM UNDER THE FIFTH AMENDMENT FOR VIOLATION OF THEIR RIGHT TO EQUAL PROTECTION OF THE LAWS.

Plaintiffs contend that they were denied equal protection by Defendants Libby, Rove and Cheney when they discriminated against Mrs. Wilson and treated her differently from all others

employed by the CIA in retaliation for her husband's speech.   The law is clearly established that a plaintiff constitutes a "class of one" and states a claim under the equal protection clause when she alleges (1) treatment intentionally different from others similarly situated and (2) the lack of a rational basis for the different treatment.  *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000); *3883 Connecticut, LLC v. District of Columbia.*, 336 F.3d 1068, 1075 (D.C. Cir. 2003); *Am. Towers v. Williams*, 50 Fed. Appx. 448 (D.C. Cir. 2002), *reh'g denied*, No. 01-7141, 2002 U.S. App. LEXIS 26828 (D.C. Cir. Dec. 23, 2002); *Noble v. United States Parole Comm'n*, 194 F.3d 152, 154 (D.C. Cir. 1999).

At issue in *Olech* was the Fourteenth Amendment equal protection claim of a property owner who was challenging a village's easement requirement to connect her to the municipal water supply. According to the owner, the village had imposed the easement requirement, which she alleged to be "irrational and wholly arbitrary," because of her prior lawsuit against the village. 528 U.S. at 563. Based on a line of Supreme Court cases dating back to 1923 that recognized "class-of-one" equal protection claims, the *Olech* Court held that the owner had stated an equal protection claim "under traditional equal protection analysis." *Id.* at 564.  It was sufficient that she had alleged intentionally different treatment from others similarly situated, without a rational basis for the difference.  *Id.*

Plaintiffs' complaint here makes the same allegations.  Mrs. Wilson was treated differently from all others similarly situated and there was no legitimate basis for this difference; it was just retaliation for Mr. Wilson's speech.  In response, Defendant Cheney argues that qualified immunity precludes this claim.  Cheney Mem. at 35-37.  Defendant Rove argues that there is no cause of action under equal protection.  Rove Mem. at 24-25.  Strikingly, *every* case cited by both Defendants Cheney and Rove was decided before the Supreme Court's *Olech* decision in 2000.

17

Since 2000, courts across the country repeatedly have recognized an equal protection claim for a person who alleges that he or she has arbitrarily been treated differently from others who are similarly situated. For example, in a very recent Sixth Circuit case involving both First Amendment and equal protection claims, *Scarbrough v. Morgan County Bd. of Educ.*, No. 04-6302, 2006 U.S. App. LEXIS 28941 (6th Cir. Nov. 22, 2006), the court followed *Olech* in denying a motion to dismiss. Plaintiff Scarbrough was formerly the elected superintendent of the Morgan County Schools. He was challenging his failure to be appointed to the newly established position of Director of Schools after a newspaper reported that he would be speaking at a church with a large homosexual congregation. *Scarbrough*, No. 04-6302 at *1–2. Among other claims, Mr. Scarbrough alleged a violation of the Equal Protection Clause, based on a claim that he had been treated differently than the job recipient because of an animus against homosexuals. *Id.* at *23–26. Accepting that the two men were similarly situated, the court noted that in the Sixth Circuit, animus against homosexuals can never be a legitimate governmental purpose. *Id.* at *26. If Mr. Scarbrough could prove this animus, he could prove the equal protection violation. *Id.*

The Second Circuit also denied a motion to dismiss, permitting plaintiffs to proceed on a "class of one" equal protection claim, in *DeMuria v. Hawkes*, 328 F.3d 704 (2d Cir. 2003). Plaintiff DeMurias were engaged in a feud with their neighbors who they claimed were harassing them with threats and attempts to have their trash removal stopped, their water supply turned off and their backyard excavated. *Id.* at 705. Defendant Hawkes was a city police officer to whom the DeMurias had complained repeatedly about their neighbors' misconduct. According to the DeMurias, Hawkes was a friend of their neighbors who had "aided and abetted" their conduct, and maliciously and arbitrarily subjected the DeMurias to a different standard of police protection than any other resident.

18

*Id.*

The Second Circuit denied the defendants' motion to dismiss, noting that the DeMurias'

claims fit within the *Olech* framework. *Id.* at 706–08. Although the DeMurias had failed to "name

names" of others who were similarly situated, their claim that they were afforded a different standard

of police protection was sufficient "to meet the minimal level established by *Olech* for 'class of one'

equal protection claims at the pleading stage." *Id.* at 707. Moreover, although the complaint failed to

use the word "irrational" to describe the challenged conduct, the DeMurias had alleged an

"impermissible motive and . . . animus" on behalf of Hawkes, sufficient to satisfy the irrationality

requirement of *Olech*. *Id.* *See also Cobb v. Pozzi*, 363 F.3d 89 (2d Cir. 2003) (denying motion for

judgment as matter of law following jury verdict in favor of plaintiff's "class of one" First

Amendment and equal protection claims arising from claimed irrational treatment in punishing

plaintiff for a purportedly unlawful job action).[1]

In sum, as reaffirmed by the Supreme Court in *Olech* and recognized subsequently by a litany

of courts, equal protection claims may proceed for a "class of one." Every case cited by the

defendants to refute plaintiffs' equal protection claim was decided before *Olech*. Accordingly, given

the well settled state of the law, defendants are not entitled to qualified immunity from the equal

protection claim.

Defendant Rove also argues that the equal protection claim should be dismissed because

"[r]esolving the allegation that the Wilsons were treated differently than other CIA employees or

spouses would require the review of information that the CIA is legally allowed to keep secret."

---

[1] In *Cobb*, the Second Circuit rejected the defendants' qualified immunity claims finding that even before *Olech*, the Supreme Court had recognized class-of-one equal protection claims based on intentional and irrational different treatment. 363 F.3d at 111.

Rove Mem. at 26.  This argument deserves consideration only if defendants wish to assert that there are other employees in Mrs. Wilson's situation who were treated in the same manner.  Defendants make no such claim and cannot defeat an equal protection claim merely by asserting the possibility of a defense that they have not asserted.  More importantly, Mr. Rove cannot make a secrecy claim on behalf of the United States.[2]  The United States has not asserted any such secrecy interest, even though it has filed a brief in this court on the merits of plaintiffs' constitutional claims.

### C.  PLAINTIFF VALERIE WILSON STATES A CLAIM UNDER THE FIFTH AMENDMENT FOR VIOLATION OF HER RIGHT TO PRIVACY.

The Amended Complaint asserts that all of the defendants' disclosures of Mrs. Wilson's status as a covert CIA operative violated her right to privacy as guaranteed under the Due Process Clause of the Fifth Amendment.  Am. Complaint ¶¶55-58.  Mrs. Wilson's status as a secret operative was deeply personal and, as Special Prosecutor Fitzgerald noted in July 2003, was classified and unknown even to her friends, neighbors, and college classmates.  *Id.* ¶21.  That secrecy was essential to Mrs. Wilson's enjoyment of the peace and quiet of her home and family life, free from undue worry for the safety of herself and her family.

Defendants move to dismiss this claim based on qualified immunity, contending that Mrs. Wilson did not have a clearly established right to privacy.  *See* Cheney Mem. at 37-38; Libby Mem. at 24-26; Rove Mem. at 36; Memorandum of Points and Authorities in Support of Defendant Richard L. Armitage's Motion to Dismiss ("Armitage Mem.") at 17-21.  Although the Supreme Court has not defined the precise contours of the right to privacy, it clearly has recognized the existence of such a

---

[2] As explained below (section III of this brief) in discussing the "state secrets" issue raised by the defendants, only the United States government may invoke the secrecy interests of the United States.  *United States v. Reynolds*, 345 U.S. 1, 7 (1953).

20

right.  In *Nixon v. Administrator of General Services*, 433 U.S. 425, 457 (1977) (citations omitted), the Court declared that "[o]ne element of privacy has been characterized as the individual interest in avoiding disclosure of personal matters."  In *Whalen v. Roe*, 429 U.S. 589 (1977), the Supreme Court addressed the constitutionality of a state controlled substances statute requiring doctors to send forms to the state department of health that included personal information about patients for whom the doctors had prescribed potentially harmful drugs.  The Court concluded that the statute was constitutional because the state had put into place measures to protect the information from improper disclosure.  The Court also recognized that when states collect and use personal information they have a duty to avoid unwarranted disclosures, and that this duty "arguably has its roots in the Constitution." *Id.* at 605.

Moreover, the majority of Circuits have recognized a right to informational privacy, making it a clearly established right that a reasonable officer should know.  *See, e.g.*, *In re Crawford*, 194 F.3d 954, 958-59 (9th Cir. 1999) (Constitution affords conditional right to informational privacy); *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990) (informational privacy constitutionally protected where there is reasonable expectation of confidentiality); *Barry v. New York*, 712 F.2d 1554, 1559 (2d Cir.), *cert. denied sub nom. Slevin v. New York*, 464 U.S. 1017 (1983) (Constitution protects individual's interest in avoiding disclosure of personal matters); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577-580 (3d Cir. 1980) (constitutional right to privacy of medical records kept by employer); *Plante v. Gonzalez*, 575 F.2d 1119, 1134 (5th Cir. 1978), *cert. denied*, 439 U.S. 1129 (1979) (Supreme Court has recognized constitutional protection for privacy of personal affairs).

Defendants rely heavily on the D.C. Circuit's decision in *American Federation of*

21

*Government Employees v. Dep't of Housing and Urban Development*, 118 F.3d 786 (D.C. Cir. 1997). But in that case, the court expressly declined to rule on whether there is a constitutional right to informational privacy protected by the due process clause. *Id.* at 791-92.

Even if there is not a clearly established right to informational privacy in general, the law is clear that such a right exists under due process where the defendants' disclosure of personal information places an individual in danger. The law is clearly established that there is a basis for constitutional liability "where the state creates a dangerous situation or renders citizens more vulnerable to danger." *Butera v. District of Columbia*, 235 F.3d 637, 649 (D.C. Cir. 2001) (citation omitted). The "key requirement" for liability under a state endangerment theory, according to the D.C. Circuit, "is affirmative conduct by the State to increase or create the danger that results in harm to the individual." *Id.* at 650. In *Butera*, the District of Columbia was found liable under the due process clause for failing to protect a police informant who was sent undercover into a dangerous situation where he was beaten to death. Even though the informant was killed by third parties, the District of Columbia was nevertheless found liable for his death because its officials had "affirmatively act[ed] to increase or create the danger." *Id.* at 651.

Assertion of a substantive due process violation based on the state endangerment theory also requires a plaintiff to show conduct that is "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id.* at 651, *quoting County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1992). Courts have imposed this requirement to distinguish arbitrary government action protected under the due process clause from conduct that violates state tort law. *Id.*

As applied here, the state endangerment doctrine would require Mr. and Mrs. Wilson to allege (1) that the defendants, individual government actors, affirmatively acted to place the Wilsons in

22

danger; (2) that the defendants' conduct shocks the conscience; and (3) that the unlawfulness of the defendants' conduct was clearly established at the time of the disclosures. Each of these requirements is met here.

First, each of the defendants took affirmative actions that resulted in increased danger to the Wilsons. Defendants Libby, Rove and Armitage are each alleged to have intentionally disclosed to the press for publication Mrs. Wilson's status as a covert CIA operative. Defendant Cheney participated directly in a conspiracy to make public the fact that Mrs. Wilson was a CIA covert operative in direct retaliation for Mr. Wilson's speech.

The actions of each defendant placed Valerie and Joseph Wilson and their family in danger. As set forth in the complaint, "[t]he disclosure of Mrs. Wilson's covert identity makes her and her family a target for those persons and groups who bear hostility to the United States and/or its intelligence officers." Am. Complaint ¶42. As a result of the defendants' disclosures, "[b]oth Mr. and Mr. Wilson fear for their safety and for the safety of their children." *Id.*

The legitimacy of the Wilsons' fears and the reality of their increased danger are reflected in the Intelligence Identities Protection Act (IIPA), 50 U.S.C. §421, which was enacted in response to the dangers from unauthorized disclosures of the very kind of information disclosed here. Those disclosures led to the deaths and attempted assassinations of some CIA officers. Elizabeth Bazan, CRS Report for Congress: Intelligence Identities Protection Act, (Congressional Research Service Oct. 3, 2003) ("CRS Rept. on IIPA") at 2. President Reagan, upon signing the IIPA into law, recognized expressly the need behind the bill to "protect our own security and that of the brave men and women who serve us in difficult and dangerous intelligence assignments." President Ronald Reagan, Remarks on Signing the Intelligence Identities Protection Act of 1982 (June 23, 1982)

*available at* http://foi.missouri.edu/iipa/remarks.html. Surely the defendants do not deny that

disclosing the names of covert CIA operatives places those individuals and their families in danger.

Second, this case presents conduct that shocks the conscience. The first President Bush

labeled those who expose the names of sources as nothing less than "the most insidious of traitors."

George H. W. Bush, 41st President of the United States, Remarks at the Dedication Ceremony for the

George Bush Center for Intelligence (Apr. 26, 1999) *available at*

https://www.odci.gov/cia/public_affairs/speeches/1999/bush_speech_042699.html. This lawsuit is

premised on "the intentional and malicious exposure" of Mrs. Wilson's status as a covert CIA

operative by individuals who had full knowledge of the potential consequences of their actions. Am.

Complaint ¶1. They acted not on the spur of the moment, but after careful reflection and planning

and as part of an overall conspiracy to retaliate against Mr. Wilson for the exercise of his First

Amendment rights. Their self-serving purpose was political, not public. Where, as here, "'actual

deliberation is practical,'" the unlawful conduct that results from that deliberation is all the more

shocking. *Butera*, 235 F.3d at 652, *quoting Sacramento County v. Lewis*, 523 U.S. at 851. Moreover,

because the defendants owed an even greater duty to protect Valerie Wilson given the nature of her

federal employment, which required her to assume grave responsibilities and risks, it would be

enough if the defendants had acted simply with "deliberate indifference." *Id.* (quotation omitted).

The treacherous acts committed by the defendants for private, not public, gain placed the Wilsons,

their family, and the nation's security at risk and are both conscience shocking and reflect deliberate

indifference.

Third, the Wilsons' right to be free from government conduct that placed them in danger was

clearly established at the time of the disclosures in question. *Butera* was decided on January 9, 2001,

more than two years earlier. Of note, in *Butera* the state officials were granted qualified immunity specifically because the D.C. Circuit had not previously adopted the state endangerment doctrine. *Id.* at 652-53. From that point forward, however, the applicability of the state endangerment doctrine was clear, and the District of Columbia courts have ruled accordingly. *See, e.g., Fraternal Order of Police v. Williams*, 263 F.Supp.2d 45, 47 (D.D.C. 2003), *aff'd*, 375 F.3d 1141 (D.C. Cir. 2004) (recognizing that under state endangerment doctrine an individual can assert substantive due process right to protection by District of Columbia from third-party violence where city officials act affirmatively to increase or create danger); *Briscoe v. Potter*, 355 F.Supp.2d 30, 43 (D.D.C. 2004) (applying state endangerment doctrine to hold that postal workers harmed in anthrax attacks stated due process liberty claims against U.S. Postal Service officials who had misled workers about safety of postal facility).

Moreover, at least one case on which the *Butera* court relied, *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), presents closely analogous facts to those presented here. The plaintiffs in *Kallstrom* were undercover narcotics officers employed by the City who sued when the City provided copies of their personnel and pre-employment files to attorneys for defendants who were arrested on drug charges as a result of the plaintiffs' investigative efforts. The information, which included the officers' names and addresses, was provided in turn to some of the defendants, who were known members of a violent gang. The officers sued under 42 U.S.C. §1983, claiming that the dissemination of personal information violated their right to privacy under the due process clause of the Fourteenth Amendment.

The Sixth Circuit agreed, concluding that the plaintiffs' privacy interests implicated "a fundamental liberty interest, specifically their interest in preserving their lives and the lives of their