family members, as well as preserving their personal security and bodily integrity." *Kallstrom*, 136 F.3d at 1062. The court was careful to say that not every release of private information rises to constitutional dimensions. "But where the release of private information places an individual at substantial risk of serious bodily harm, possibly even death, from a perceived likely threat, the magnitude of the liberty deprivation . . . strips the very essence of personhood." *Id.* at 1064 (citation omitted). Applying the state endangerment doctrine, the *Kallstrom* court held that the City's disclosures placed the officers in "special danger," particularly because undercover officers (like CIA covert operatives) depend on anonymity for their safety. *Id.* at 1067. Because the City either knew, or should have known, that releasing the personal information would increase the threats of violence to the plaintiffs and their families, the City was liable under section 1983. *Id.*

Like the *Kallstrom* plaintiffs, Mrs. Wilson depended on the secrecy of her status as a CIA covert operative not only to function effectively in her job, but also to protect her safety and the safety of her family. The principal distinction between *Kallstrom* and this case is the scope and magnitude of the harm; defendants' egregious conduct in exposing Mrs. Wilson's covert operative status to the world at large has forever compromised Mrs. Wilson's safety anywhere on the globe. The defendants knew, or should have known, that disclosing that status would increase the likelihood of violence directed at her and her family. Because it was clearly established at the time of the defendants' actions under the *Kallstrom* precedent, as adopted by the D.C. Circuit, that disclosing this information would violate the Wilsons' fundamental liberty interest, the defendants are liable for the resulting damages.

Moreover, the unlawful disclosures at issue here were made more than two decades after the passage of IIPA, a statute that criminalizes the unauthorized disclosure of intelligence sources. Based

on this statute alone, a reasonable person should have understood the unlawfulness of disclosing Mrs. Wilson's status as a covert CIA operative. *Cf. Rasul v. Rumsfeld*, 433 F.Supp.2d 58, 71 (D.D.C. 2006) (defendants not entitled to qualified immunity in detainee abuse case because Religious Freedom Restoration Act put defendants on notice that their conduct was prohibited). These high-level government officials can claim neither ignorance of, nor immunity from, the laws they are sworn to uphold.

Finally, Defendant Libby argues that the information disclosed about Mrs. Wilson is not the kind of "personal fact" the privacy of which is protected under the Constitution. Libby Mem. at 26 n.7. This argument rests on the characterization of the information as inherently benign because it involves merely "employment status." *Id.*

The information here is hardly benign and its disclosure risks a direct and personal effect on the plaintiffs by exposing them and their family to heightened danger. This case does not involve an effort to gain access to information that is properly controlled by the government, but to hold defendants accountable for their unauthorized and illegal disclosures of classified information. The personal danger to the plaintiffs that resulted from the defendants' disclosures makes those disclosures rise to the level of a due process violation. *See Kallstrom*, 136 F.3d at 1064.

In other words, plaintiffs are not challenging the power of the CIA to control information relating to its sources and methods. Rather, Mrs. Wilson is challenging the defendants' failure to honor the reasons for classifying that information, which include protecting her personal safety. *See, e.g., Snepp v. United States,* 444 U.S. 507, 512 (1980) ("The continued availability of . . . [foreign] sources depends upon the CIA's ability to guarantee the security of information that might compromise them and even endanger the personal safety of foreign agents."); *Halperin v. CIA*, 629

27

F.2d 144, 148 (D.C. Cir. 1980) (public disclosure of agents could endanger their personal safety); *see also CIA v. Sims*, 471 U.S. 159, 171 (1985) (citing to testimony on "the grim consequences facing intelligence sources whose identities bec[o]me known"). As the courts have recognized, separate and apart from the institutional reasons that the government has for maintaining the privacy of Mrs. Wilson's status as a covert CIA operative, the plaintiffs have personal privacy grounds for maintaining the secrecy of this information that are rooted in their liberty interest to be free from bodily harm.

In sum, based on the classified nature of the information at issue, the reasons for its classification, and the consequences that flow from the unauthorized disclosure of this classified information, the plaintiffs had a legitimate expectation of privacy that was violated when the defendants, acting without any authorization or legitimate governmental reason, leaked the information to the press for purely personal reasons.

### D. PLAINTIFF VALERIE WILSON STATES A CLAIM UNDER THE FIFTH AMENDMENT FOR DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS.

Valerie Wilson seeks recovery for the actions of all of the defendants in effectively denying her continued employment as a covert CIA operative. Once the defendants revealed her status, she no longer could operate as a secret operative. Am. Complaint ¶¶59-64. As a result, she was denied a property interest in her job without due process.

Defendants move to dismiss based on qualified immunity, contending that she has no property interest in employment in the CIA and also arguing that the defendants' actions did not deprive her of her job. Cheney Mem. at 38-41; Libby Mem. at 26-28; Rove Mem. at 31-32; Armitage Mem. at 21-25.

It is clearly established that government employees have a property interest if they have a reasonable expectation to continued employment. As the Supreme Court explained *Roth v. Board of Regents*, 408 U.S. 564, 577 (1972), "[p]roperty interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." The D.C. Circuit has recognized that government employees have a property interest when they have a reasonable expectation of continued employment. *See, e.g., Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C. Cir. 1979); *see also Washington Teachers' Union Local No. 6 v. Bd. of Education*, 109 F.3d 774, 779-80 (D.C. Cir. 1997); *Colm v. Vance*, 567 F.2d 1125 (D.C. Cir. 1977).

Defendants argue nevertheless that CIA employees do not have a reasonable expectation of continued employment, relying on *Doe v. Gates*, 981 F.2d 1316 (D.C. Cir. 1993). *See* Libby Mem. at 26; Armitage Mem. at 23. But *Doe v. Gates* establishes that the *CIA Director* may terminate an employee at any time. The court stated: "Indeed, the [National Security] Act expressly confers upon the Director the discretion [to] terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States." *Doe*, 981 F.2d at 1320 (citation omitted). Mrs. Wilson concedes that the CIA Director could have terminated her employment. But that does not mean that she did not have a reasonable expectation of continued employment relative to the actions of others outside of the CIA. Mrs. Wilson had every reason to expect that top level government officials outside of the CIA would not ruin her career for their own private gain and for reasons having nothing to do with furthering the legitimate interests of the United States.

29

The defendants also argue that Mrs. Wilson was not deprived of property because she was still employed by the CIA even after her status as a secret operative was disclosed. *See* Armitage Mem. at 24; Rove Mem. at 31-32. This argument ignores reality. Mrs. Wilson could no longer function as a secret operative once that status was revealed by the defendants. A career which she thoroughly enjoyed and planned to pursue for years to come was taken away by the defendants' action without due process. Under these facts, the complaint states a due process claim under the Fifth Amendment.

### E. THE TORT CLAIM OF PLAINTIFFS VALERIE AND JOSEPH WILSON FOR INVASION OF PRIVACY BY PUBLIC DISCLOSURE OF PRIVATE FACTS IS NOT SUBJECT TO DISMISSAL UNDER THE WESTFALL ACT.

The law of the District of Columbia recognizes the tort of invasion of privacy by public disclosure of private facts. *See, e.g., Danai v. Canal Square Associates*, 862 A.2d 395, 400 n.3 (D.C. Ct. App. 2004). This court has supplemental jurisdiction over this claim pursuant to 28 U.S.C. §1367. A cause of action for the tort of public disclosure of private facts requires "(1) publicity, (2) absent any waiver or privilege, (3) given to private facts (4) in which the public has no legitimate concern (5) and which would be highly offensive to a reasonable person of ordinary sensibilities." *Wolf v. Regardie*, 553 A.2d 1213, 1220 (D.C. Ct. App. 1989).

Each of these elements has been alleged here. The defendants, individually and collectively, publicized that Valerie Wilson was a secret operative for the CIA. Am. Complaint ¶¶14-35. There is no privilege that protected the disclosure. Moreover, Mrs. Wilson contends that her status as a secret operative was a private fact that the public had no legitimate interest in knowing and that the disclosure would "be deemed outrageous and highly offensive to a reasonable person of ordinary

30

sensibilities." Am. Complaint ¶66. In other words, all of the elements of the tort of public disclosure of private facts have been alleged.

Each of the defendants moves to dismiss this claim based on the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the "Westfall Act"), 28 U.S.C. §2679. *See* Cheney Mem. at 43-44; Libby Mem. at 28-30; Rove Mem. at 37 n.18; Armitage Mem. at 25-30.[3] Additionally, the United States government filed a brief urging dismissal of the tort claim based on the Westfall Act. Memorandum of Points and Authorities in Support of the United States' Motion to Dismiss ("U.S. Mem.") at 7-18.

The Westfall Act establishes the Federal Tort Claims Act, ("FTCA"), 28 U.S.C. §1346(b), §§ 2671-2680, as the exclusive remedy for any tort claim resulting from the act or omission of a government employee acting within the scope of his or her employment, with the exception of *Bivens* remedies for constitutional tort claims. If the Attorney General or his designee certifies that a federal employee was acting within the scope of employment "at the time of the incident out of which the claim arose," it is presumed that the individual employee is granted immunity from suit, the United States is substituted for the employee and the action proceeds as one against the United States. *Id.* at

---

[3] Defendant Cheney also argues that there is no cause of action against him for this tort because his communications were private, not public. Cheney Mem. at 42. As plaintiffs have alleged, however, Defendant Cheney participated in the public disclosure of this information by taking part in an intentional, concerted effort to reveal publicly Mrs. Wilson's status as a secret operative for the CIA and that this "caused widespread publication of a private fact." Am. Complaint ¶66. In addition, Defendant Cheney argues that the information is privileged because there is absolute immunity for defamation claims against government officials acting in the scope of their employment. Cheney Mem. at 42-43. But plaintiffs assert no claim for defamation. None of the cases cited by Defendant Cheney deals with the tort of public disclosure of private facts. Nor do they speak of a privilege to disclose private facts about an individual.

31

§2679(d)(1).

The United States has made such a substitution here, based on the certification of the Attorney General's designee that "at the time of the conduct alleged in the amended complaint the individual defendants . . . were acting within the scope of their employment as employees of the United States." Certification of Scope of Employment by Timothy P. Garren, Director, Torts Branch.

Scope-of-employment determinations are governed by the law of *respondeat superior* in the state where the tortious act occurred. *Council on Am-Islamic Relations v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006). The test is an objective one "based on all the facts and circumstances." *Id.* Although the scope-of-employment certification has a *prima facie* effect, it is not conclusive and is subject to judicial review. *Gutierrez v. Lamagno*, 515 U.S. 417, 436-37 (1995); *Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994). Certification shifts the burden to the plaintiffs to initially allege facts that, if true, would place the defendants' actions outside the scope of their employment. *Rasul v. Rumsfeld*, 414 F.Supp.2d 26, 32 (D.D.C. 2006); *Schneider v. Kissinger*, 310 F.Supp.2d 251, 264 (D.D.C. 2004). What is crucial and overlooked by the defendants is that plaintiffs are entitled to discovery and an evidentiary hearing to resolve any issues of material fact. *Id.*

Here the United States has based its substitution on an application of District of Columbia law because of its assumption that "the alleged conduct giving rise to plaintiffs' invasion of privacy occurred here [in D.C.]." U.S. Mem. at 9. Putting aside whether this is a correct assumption as a matter of fact, the District of Columbia's law of *respondeat superior* follows the Restatement (Second) of Agency (1957) ("Restatement"), §228. *See Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 n.4 (D.C. Ct. App. 1987). Importantly for this case, where the tort was committed solely for the benefit of the employee, the District of Columbia courts typically find that it

32

is outside the scope of employment. *See, e.g., Schecter v. Merchants Home Delivery*, 892 A.2d 415, 431 (D.C. Ct. App. 2006).

There are two reasons why dismissal under the Westfall Act is inappropriate. First, the unauthorized disclosure of classified information was committed solely for the benefit of the employees; revealing the identity of a secret operative in these circumstances was not and never could be in service of the master, here the United States. Second, there are factual issues that underlie the certification that are in dispute and as a result, at a minimum, discovery is needed to resolve any such dispute. Each course is discussed below.

As the former President Bush and his administration have stressed over and over again, protecting national security in this post-9/11 era is of such importance and presents such a challenge that many of the bedrock principles of our society must yield to this greater good. In current American political discourse, it is common to suggest that September 11 "changed everything." The President and Vice President have each expressed this view publicly.[4]

Even prior to 9/11, the unauthorized disclosure of covert agents was viewed as posing a significant threat to our national security. President George H.W. Bush stated publicly that those who expose the names of our human sources of intelligence are "the most insidious of traitors." George H. W. Bush, Remarks at the Dedication Ceremony for the George Bush Center for Intelligence (Apr. 26,

---

[4] For example, on September 14, 2003, Vice President Cheney stated on Meet the Press that "9/11 changed everything . . . It changed in terms of the kind of national security strategy we need to pursue, in terms of guaranteeing the safety and security of the American people." Transcript, *Meet the Press* (NBC television broadcast Sept. 14, 2003), *available at* www.msnbc.msn.com/id/3080244/). Nine days later at a press conference with Iraq Prime Minister Allawi, President Bush echoed this sentiment, "[s]ee, 9/11 changed everything." Transcript, President Bush and Prime Minister Allawi Press Conference (Sept. 23, 2004), *available at* www.whitehouse.gov/news/releases/2004/09/20040923-8.html.

1999) *supra*. The Intelligence Identities Protection Act, enacted more than a decade earlier in 1982, criminalized the unauthorized disclosure of the identities of covert agents and was passed in response to a concerted effort by a small group of Americans to disclose the names of covert intelligence agents. *See* S. Rep. 97-201, at 1, *reprinted in* 1982 U.S.C.C.A.N. 145. Those disclosures may have caused the deaths or attempted assassinations of some CIA officers, the expulsion of others from foreign countries, and impaired U.S. relations with foreign intelligence sources. *See* CRS Rept. on IIPA.

When Valerie Wilson's identity as a covert agent was revealed, President Bush pledged to fire anyone in his administration responsible for the leak. He reaffirmed that pledge on several occasions. *See, e.g.*, Washingtonpost.com, Transcript: Bush Holds Post-G-8 Summit, www.washingtonpost.com/wp-dyn/articles/A32143-2004Jun10.html (last visited Jan. 11, 2007), (on June 10, 2004, President Bush answered in the affirmative in response to the question of whether he stood by his pledge to fire anyone who had leaked); Transcript, President, Prime Minister of India Discuss Freedom and Democracy (July 18, 2005), *available at* http://www.whitehouse.gov/news/releases/2005/07/20050718-1.html (on July 18, 2005, president said "if someone committed a crime, they will no longer work in my administration."). Although he never honored that pledge, the president's initial reaction to news of the leak reflects the seriousness of the misconduct and the potentially grave threat it poses to national security. Most importantly, it demonstrates that revealing Mrs. Wilson's status as a secret operative was not within any defendant's duties as a government employee. It clearly shows that the defendants were not acting for the interests of their employer, as is required under *respondeat superior* liability, but for their own personal interests.

The paramount importance of protecting our national security means that the master/employer (the United States) would never be served in any way by the unauthorized disclosure of Mrs. Wilson's covert agent status, because to do so would pose a grave and direct threat to national security. *See, e.g.*, *United States v. Libby*, Indictment ¶1d ("Disclosure of the fact that such individuals [covert agents] were employed by the CIA had the potential to damage the national security in ways that ranged from preventing the future use of those individuals in a covert capacity, to compromising intelligence-gathering methods and operations, and endangering the safety of CIA employees and those who dealt with them."). Thus, it is not just a question of the legality or illegality of the conduct in question, but that it placed our national security at risk. This is simply an unacceptable outcome that cannot reasonably be construed as in furtherance of the employee's service to the master/United States. Moreover, the willful and vengeful disclosure of a covert CIA operative's identity is patently "different in kind from that authorized." Restatement, §228(2).

Each of the defendants, as high level officials with cleared access to classified information, was well aware of the unacceptable risks to national security that their conduct posed. As the federal indictment notes, Mr. Libby was obligated by applicable laws and regulations, including 18 U.S.C. §793 and Executive Order 12958, as modified by Executive Order 13292, not to disclose classified information to persons not authorized to receive such information. *United States v. Libby*, Indictment ¶1b. For example, Mr. Libby executed a "Classified Information Nondisclosure Agreement" acknowledging that he understood that the unauthorized disclosure of classified information could result in irreparable injury to the United States. *Id.*

Notwithstanding these facts, the United States has based its certification on the assertion that the positions of each defendant included the authority to speak to members of the press within the

35

course and scope of their employment. The conduct at issue, however, is not merely talking to the press, but is the defendants' participation in a deliberate campaign to discredit and punish Mr. Wilson for his constitutionally protected public statements by intentionally disclosing classified information. It was not employment-related and any authority the defendants had to talk to the press did not include the authority to reveal the classified status of a covert CIA operative solely for political gain. The defendants knew, or should have known, that not only was their conduct illegal, but it placed the national security at risk. Accordingly, it was "different in kind from that authorized" and "too little actuated by a purpose to serve the master." Restatement, §288(2).

Second, the determination by the United States that the defendants were acting within the scope of their employment rests on a number of assumptions for which there is no factual support and which are in dispute. Under the process employed in this Circuit to resolve such disputes, plaintiffs are entitled to discovery and an evidentiary hearing provided that they allege "sufficient facts that, taken as true, would establish that the defendants' actions exceeded the scope of their employment." *Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003).

The United States claims that the requirement in the Restatement that the conduct occur within authorized time and space limits is "not disputed in the Amended Complaint." U.S. Mem. at 9. With respect to Defendants Cheney, Libby and Rove this is very much in dispute. Although the Amended Complaint identifies a number of conversations that Mr. Libby had with reporters in which he conveyed information concerning Ms. Wilson's status as a covert CIA operative, it does not identify where and when those conversations took place. That is because this information is still unknown to the plaintiffs, which is not surprising given the lengths to which the defendants went to conceal their activities. At least one of the dates -- July 12, 2003 -- was a Sunday, and that is also the

36

date on which Vice President Cheney advised Mr. Libby about Ms. Wilson's status. What is not yet known is whether these conversations took place off hours, away from the White House, and outside the authorized time and space limits of the defendants' jobs. Indeed, it is unknown whether these meetings took place in Washington, Virginia, or Maryland -- critical information in determining which state law applies. Similarly with respect to Mr. Rove, the complaint identifies a conversation he had with Chris Matthews, but the exact date, time and place of the conversation are not yet know. Accordingly, plaintiffs should be accorded discovery so as to be able to rebut the claims of the defendants and the United States that the actions were within the scope of the defendants' employment.

Also, the government's certification appears to be based on the premise that the defendants were speaking to the press "to address inquiries concerning the policies and practices of the government," U.S. Mem. at 13, and to "correct inaccuracies in the press and provide an explanation of the government's position." *Id.* at 14. The Amended Complaint makes very different allegations as to why this occurred and that is the controlling document for these purposes. *See, e.g., Stokes v. Cross*, 327 F.3d at 1215.

As alleged in the Amended Complaint, the defendants were not simply answering press inquiries and correcting inaccuracies. Rather, the defendants planned and carried out a deliberative and affirmative plan to publicly discredit and retaliate against Mr. Wilson by depriving Mrs. Wilson of her job as a covert CIA agent. Rather than addressing publicly, directly, and on the merits why Mr. Wilson was wrong or unfair, they embarked on an anonymous whispering campaign designed to discredit and injure the plaintiffs. Am. Complaint ¶3. The defendants carried out their campaign by affirmatively reaching out to the press, "pushing back" and "us[ing] everything they had." *Id.* at 23.

37

As Special Counsel Fitzgerald remarked, "'it is hard to conceive of what evidence there could be that would disprove the existence of White House efforts to 'punish' Wilson.'" *Id.* at 34, *quoting* Government's Resp. to Def.'s Third Mot. to Compel Disc. at 30 n. 10 (April 5, 2006) (Dkt. #80).[5]

Given that the defendants' conduct is a far cry from the routine press communications on which the certification is based, the basis for that certification is genuinely in dispute. This dispute can only be resolved through discovery and an evidentiary hearing.

Plaintiffs' need for discovery is heightened here, where the complaint is based on an anonymous campaign designed purposely to conceal the identifies and roles of the actors/defendants. These defendants hid behind reporters' claims of privilege, even allowing a reporter to go to jail rather than reveal her sources. Their goal was not to publicly correct inaccuracies about the policies and practices of this administration. Rather, they plotted and acted maliciously and in secret to destroy the Wilsons. Because the government's certification is not premised on the conduct as pled, but instead on a fiction that is unsupported by the current record, it cannot stand.

## II. PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED.

All of the defendants argue that the Wilsons' constitutional and common-law tort claims are time-barred because they were filed more than one year after Robert Novak first disclosed, in a July 14, 2003 article, that Mrs. Wilson was "an agency operative on weapons of mass destruction." Robert D. Novak, Mission to Niger, *The Washington Post*, July 14, 2003. *See* Armitage Mem. at 30;

---

[5] Moreover, as the record makes clear, it was Mr. Wilson, not President Bush, who was telling the American public the truth about his fact-finding trip to Niger. Defendants were not responding to inaccuracies in a news story, but fabricating an entirely new one. And in doing so, they went well beyond the scope of Mr. Wilson's prior statements to the press and media reports about his Niger trip when they revealed Mrs. Wilson's covert status as a CIA operative -- a fact unconnected to the press reports of what Mr. Wilson's trip uncovered.

38

Cheney Mem. at 4; Libby Mem. at 15; Rove Mem. at 37. According to the defendants, all claims are governed by the one-year statute of limitations for defamation torts, D.C. Code Ann. §12-301(4) (2006), which has been interpreted as including the tort of public disclosure of private facts. Because the Complaint was filed on July 13, 2006, defendants argue that it is barred in its entirety by the one-year statute of limitations.

### A. THE CONSTITUTIONAL CLAIMS ARE NOT TIME-BARRED.

Where, as here, there is no federal statute of limitations governing constitutional claims brought under *Bivens*, courts look to the limitations period for the most closely analogous state cause of action. *Hobson v. Wilson*, 737 F.2d 1, 32 (D.C. Cir. 1984). As explained above, plaintiffs have pled four causes of action under the Constitution: (1) a violation of Joseph Wilson's First Amendment right to freedom of speech; (2) a violation of the Wilsons' Fifth Amendment right to equal protection of the laws; (3) a violation of Valerie Wilson's Fifth Amendment right to privacy; and (4) a violation of Valerie Wilson's Fifth Amendment right to property.

The Fifth Amendment right to privacy claim is arguably analogous to the D.C. common law tort of public disclosure of private facts, which is subject to the one-year statute of limitations for libel and slander, D.C. Code Ann. §12-301(4) (2006). *Nix v. Hoke*, 139 F.Supp.2d 125, 133-134 (D.D.C. 2001). Like the common law tort, it is premised on the publicity of private facts in which the public has no legitimate concern and which would be "highly offensive to a reasonable person of ordinary sensibilities." *Nix*, 139 F.Supp.2d at 134 n.8. Standing alone it would arguably be subject to a one-year statute of limitations.

The other constitutional tort claims, however, have no direct corollary in state law and thus are subject to the catch-all three-year limitations period provided in D.C. Code Ann. §12-301(8)

39

(2006). Section 301(8) establishes a three-year limitations period for claims "for which a limitation is not otherwise specially prescribed." *See Hobson v. Wilson*, 737 F.2d at 32 n.99.

Supreme Court precedent provides that where a case of this nature presents multiple claims with differing statutes of limitations, the "residual" statute of limitations applies to all claims. *See Owens v. Okure*, 488 U.S. 235 (1989). In deciding between multiple state intentional tort statutes of limitations and the state's general or residual statute of limitations, the Court chose the later, reasoning that this would result in greater uniformity and clarity. *Id.* at 245-250.

Although *Owens* involved an action for damages under §1983 stemming from an allegedly unlawful arrest and beating by police officers, it is nevertheless directly relevant here. *Bivens* remedies are the judicially crafted federal counterpart to §1983 claims. *See, e.g., Butz v. Economou*, 438 U.S. 478, 500 (1978); *Wardlaw v. Pickett*, 1 F.3d 1297, 1301 (D.C. Cir. 1993). As with *Bivens* claims, §1983 does not provide a specific statute of limitations, requiring courts to borrow state-law limitations provisions. As a result, a number of appellate courts have applied the reasoning of *Owens* to *Bivens* claims to hold that courts should borrow the statute of limitations for personal injury claims (or "residual" statute of limitations).

For example, in *Van Strum v. Lawn*, 940 F.2d 406 (9th Cir. 1991), the Ninth Circuit concluded that all of the concerns that animated the Supreme Court to apply the residual statute of limitations in *Owens* applied equally to *Bivens* claims. Specifically,

> the purposes of *Bivens* actions are best served through a uniform, easily applicable limitations period that is unlikely to discriminate against interests protected by the Constitution. . . .[T]he rationale for applying the statute of limitations for personal injury applies with even greater force to *Bivens* actions, which come solely from the provisions of the Constitution protecting personal rights.

40

*Van Strum*, 940 F.2d at 409-410. With this ruling the Ninth Circuit joined the Seventh (*Bieneman v. City of Chicago*, 864 F.2d 463 (7th Cir. 1988)), Second (*Chin v. Bowen*, 833 F.2d 21 (2d Cir. 1987)), and Sixth Circuits (*McSurely v. Hutchison*, 823 F.2d 1002 (6th Cir. 1987)), *cert. denied*, 485 U.S. 934 (1988)).

Although the D.C. Circuit does not appear to have expressly incorporated the *Owens* approach for *Bivens* claims with multiple statutes of limitations, it left standing with no discussion a district court ruling that the District of Columbia's three-year general limitations period applied to *Bivens* claims brought under the First and Fourth Amendments. *Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002). The district court determination in *Lederman* on the applicable statute of limitations relied expressly on the Supreme Court's decision in *Owens*, as well as prior Circuit precedent that "the same principles of uniformity and finality apply to *Bivens* actions" as to §1983 claims. *Lederman v. United States*, 131 F.Supp. 2d 46, 51 (D.D.C. 2001). As the district court noted, "'*Bivens* actions [are] the judicially crafted counterpart to section 1983 . . . Thus, the *Owens* Court's rationale and decision to apply the state's general limitations provision is relevant and applicable here." *Id.* at 51-52 (citation omitted).

As these cases recognize, the thrust of claims under either section 1983 or *Bivens* is that the state (in the case of §1983) or the federal actors (for *Bivens* claims) violated the plaintiffs' constitutional rights -- violations for which there is no direct corollary in state tort law. *See, e.g., Jane Does v. District of Columbia*, 232 F.R.D. 18, 30-31 (D.D.C. 2005) (applying D.C.'s three-year catch-all statute of limitations to §1983 claim alleging forced abortion violated plaintiffs' due process rights, rather than one-year statute of limitations for battery, because "the thrust of the complaint in this action is not that the District inflicted an unlawful touching on each of the named plaintiffs . . . but

rather that the District violated their constitutional due process rights.").

Under this approach, all of the Wilsons' constitutional claims would be subject to the three-year statute of limitations found in the District of Columbia Code, which applies to claims for which "a limitation is not otherwise prescribed." *Id.* at 31 (quotation omitted); *see also Hobson v. Wilson*, 737 F.2d at 32 (applying D.C.'s three-year statute of limitations to Bivens claims under First Amendment); *Carney v. American Univ.*, 151 F.3d 1090, 1096 (D.C. Cir. 1998); *Hobson v. Brennan*, 625 F.Supp. 459, 467-68 (D.D.C. 1985).[6]

### B. THE CLAIM FOR PUBLIC DISCLOSURE OF PRIVATE FACTS IS NOT TIME-BARRED.

The Wilson's common law tort claim for public disclosure of private facts, is, however, subject to a one-year statute of limitations, D.C. Code Ann. §12-301(4) (2006). This raises the question of when that claim accrued. The defendants argue that the one-year statute of limitations began to run on July 14, 2003, when Robert Novak first published his article identifying Ms. Wilson's covert agent status.

A cause of action normally accrues for statute of limitations purposes when the plaintiff "has either actual notice of her cause of action or is deemed to be on inquiry notice because if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such an investigation, if conducted, would have led to actual notice." *Diamond v. Davis*, 680 A.2d 364, 1996 D.C. App. LEXIS 310, *24-25 (D.C. Ct. App. 1996). *See also Doe v. Medlantic Health Care*, 814 A.2d 939 (D.C. Ct. App. 2003). Once a plaintiff has actual knowledge or, with the exercise of

---

[6] Of course, even if the court were to find a one-year statute of limitations for the constitutional claims, there still would be the question of when they began to run. As argued below, even under a one-year statute of limitations, this lawsuit was initiated in a timely manner.

reasonable diligence would have known of some injury, its cause-in-fact, and some evidence of wrongdoing, the plaintiff is required to file its action within the applicable statute of limitations, which is measured from the date that the plaintiff acquired actual or imputed knowledge. *Id.*

The discovery rule, recognized under federal common law, postpones the beginning of the limitations period from the date that the plaintiff actually suffers harm to the date that the plaintiff discovers the injury. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). Determining the date of discovery is a question of fact that requires the court to evaluate all of the plaintiff's circumstances, including the conduct of the defendants and any misrepresentations they have made as well as "the reasonableness of the plaintiff's reliance on the defendant's conduct and misrepresentations." *Doe v. Medlantic*, 814 A.2d at 946 (citations omitted).

Courts have recognized two other tolling doctrines -- equitable tolling and equitable estoppel -- both of which are "just like the discovery rule, grafted on to federal statutes of limitations." *Cada*, 920 F.2d at 451 (citations omitted). Under equitable tolling, although the plaintiff is assumed to know that it has been injured, the plaintiff "cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant." *Id.* Unlike the discovery rule, which gives the plaintiff the entire limitations period starting from the date of discovery, the statute of limitations under equitable tolling begins to run from the date of injury but is tolled to give the plaintiff the extra time it needs. *Id.* at 452. To invoke equitable tolling a plaintiff need show only that the plaintiff could not "by the exercise of reasonable diligence have discovered essential information bearing on his claim." *Id.*

Equitable estoppel, on the other hand, focuses on the conduct of the defendant and comes into play "if the defendant takes active steps to prevent the plaintiff from suing in time." *Id.* at 450. Also

43

known as fraudulent concealment, equitable estoppel operates to give the plaintiff the full extent of the limitations period starting from when the plaintiff discovers the cause of action. *See Fitzgerald v. Seamans*, 553 F.2d 220, 228 (D.C. Cir. 1977) ("time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit.").

The D.C. Circuit has seemingly blended the notice requirement with the discovery rule in a discussion of what it termed "constructive discovery." *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C. Cir. 1984). Pointing out that fraudulent concealment (or equitable estoppel) does not even come into play if a plaintiff is on notice of a potential claim, the court went on to explain that "notice" refers to "an awareness of sufficient facts to identify a particular cause of action, be it a tort, a constitutional violation or a claim of fraud." *Id*. But notice, according to the D.C. Circuit, does not mean "the kind of notice -- based on hints, suspicions, hunches or rumors -- that requires a plaintiff to make inquiries in the exercise of due diligence, but not to file suit." *Id*. Moreover, such notice must include "an awareness of the persons responsible for plaintiff's injury. . . . [S]imply because a person knows he has been injured by one person cannot reasonably mean he should be held to know of every other participant." *Id*. at 36.

The D.C. Circuit applied these principles in a prior case remarkably similar to that of the Wilsons, *Fitzgerald v. Seamans*, *supra*. There, the plaintiff alleged that the defendants had engaged in a conspiracy to terminate his government service in retaliation for his congressional testimony, and had concealed the conspiracy by making false accusations besmirching his reputation and characterizing the termination as a reduction in force. The court found that although the plaintiff had sufficient facts to be on notice of the conspiracy by the Air Force defendants, 553 F.2d at 228, he had no knowledge of the involvement of defendant Butterfield, a White House advisor and "person of

44

influence in a different center of power." *Id.* at 229. Because Butterfield's involvement in the conspiracy emerged only by "happenstance during the Watergate hearings," the court reversed the district court's entry of summary judgment for Butterfield on statute of limitations grounds. *Id.* The lesson the *Hobson* court took from this decision was that it must "probe a plaintiff's knowledge to determine whether he was on notice of all possible defendants, and not just a subgroup, as well as the particular cause of action." *Hobson v. Wilson*, 737 F.2d at 36.

Applying these principles here compels the same conclusion. First, the plaintiffs did not have knowledge of their claims until October 28, 2005, when Special Counsel Fitzgerald filed an indictment against Mr. Libby and disclosed publicly for the first time the facts that underlie that indictment. Under that analysis, the statute of limitations began to run from that date based on the "constructive discovery" theory discussed on *Hobson*. Alternatively, under the principle of equitable estoppel, the statute of limitations did not begin to run until October 28, 2005, because of the affirmative actions of the defendants to conceal their role in the conspiracy to deprive the Wilsons of their constitutional rights.

The Novak article published in July 2003 referred only to "two senior administration officials" who had told Mr. Novak "that Wilson's wife suggested sending him to Niger." Novak, *The Washington Post*, July 14, 2003. From this general description of Mr. Novak's source there was no way to reasonable discern the identities of those officials or, indeed, whether they were located at the White House or in an agency. Moreover, Mr. Novak did not report that Valerie Wilson was a CIA operative. Three days later *Time* published an article by Matthew Cooper that suggested the Bush administration was feuding with Joseph Wilson because of his *New York Times* Op Ed., and revealed that "some government officials have noted to *Time* in interviews, (as well as to syndicated columnist

45