Robert Novak) that Wilson's wife, Valerie Plame, is a CIA official who monitors the proliferation of weapons of mass destruction." Matthew Cooper, Massimo Calabresi, & John F. Dickerson, A War on Wilson?, *Time*, July 17, 2003. Again, the very general description of these sources as "government officials" did not provide sufficient detail to allow a reasonable person to determine defendants' identities. Subsequently, on October 12, 2003, *The Washington Post* reported that "an administration official" had told the newspaper that "two top White House officials disclosed Plame's identity to at least six Washington journalists." Walter Pincus and Mike Allen, Probe Focuses on Month Before Leak to Reporters, *The Washington Post*, October 12, 2003. But the identities of those officials had yet to be revealed and the plaintiffs had nothing more than "hints, suspicions, hunches or rumors" to go on, *Hobson v. Wilson*, 737 F.2d at 35, which is not enough from which to impute knowledge.

That knowledge was not forthcoming until October 28, 2005, when, as a result of the investigation headed by Special Counsel Patrick Fitzgerald, the United States filed criminal charges against Defendant Libby, *United States v. I. Lewis Libby*, Cr. No. 05-394 (RBW) (D.D.C.). *See* Am. Complaint ¶18. Indeed, with the exception of Defendant Armitage, the facts that form the basis for the claims against the defendants are derived almost exclusively from that indictment, as it was the first public exposition of who was involved in the leak of Mrs. Wilson's covert agent status and precisely what each of the defendants, except Mr. Armitage, did. As for Mr. Armitage, his role in this scheme was not revealed publicly until September 4, 2006 (nine days before the amended complaint was filed adding him as a defendant), when Michael Isikoff disclosed that his new book identified Mr. Armitage as the initial source for Robert Novak's July 2003 article. Michael Isikoff, Richard Armitage's Role in Plame Case, *Newsweek*, September 4, 2006.

As these facts make clear, knowledge of who was responsible for the disclosure of Mrs. Wilson's covert agent status cannot be imputed to the plaintiffs until October 28, 2005. Prior to that date the plaintiffs, like the rest of the country, could only speculate about who was behind the leaks, but that speculation could not properly form the basis for a complaint.

Moreover, the defendants fraudulently concealed their involvement in this matter, thereby tolling the statute of limitations. They made clear to each of the journalists with whom they spoke that the information they were disclosing was not to be attributed publicly to them. They hid behind the reporters' claims of privilege and even allowed Judith Miller to go to jail for contempt of court when she refused to disclose her source -- a source she and Mr. Libby had agreed she would describe as a "former Hill staffer." Indeed, it was their "anonymous 'whispering campaign' designed to discredit and injure the plaintiffs and to deter other critics from publicly speaking out," rather than "address[ing] publicly, directly, and on the merits why they may have thought Mr. Wilson was wrong or unfair in his statements" that enhanced the "audacity and malevolence" of their campaign. Am. Complaint ¶3.

In sum, under either the discovery rule or equitable estoppel, the one-year statute of limitations for the Wilsons' common-law tort claim did not begin to run until October 28, 2005, for all defendants except Mr. Armitage and until September 4, 2006, for Mr. Armitage. Because the complaint was filed on July 13, 2006, against Defendants Libby, Rove and Cheney, and an amended complaint on September 13, 2006, adding Defendant Armitage, the tort claim of public disclosure of private facts is not time-barred.

### III.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATE SECRETS DOCTRINE.

Each of the defendants argues that the case should be dismissed because of the sensitive

nature of the information involved.  Defendant Cheney argues that this case should be dismissed

under the state secrets doctrine based on *Totten v. United States*, 92 U.S. 105 (1875).  Cheney Mem.

at 14-17.  Defendants Rove Armitage, and Libby make a similar argument that no cause of action

should be allowed under *Bivens* because sensitive information is involved.  Rove Mem. at 19-20;

Armitage Mem. at 16-17; Libby Mem. at 14-15.  The defendants also argue that the sensitive nature

of the information makes the case a non-justiciable political question.  Cheney Mem. at 9; Rove

Mem. at 19-20.

The law is clear, however, that only the United States government may invoke the state

secrets doctrine and here the United States has not done so.  As the D.C. Circuit noted, "[t]he starting

point for any analysis of a claim of the state secrets privilege is *United States v. Reynolds*, 345 U.S. 1

(1953)."  *Halkin v. Helms*, 690 F.2d 977, 990 (D.C. Cir. 1982).  In *Reynolds*, the Supreme Court

declared:

> The privilege belongs to the Government and must be asserted by
> it; it can neither be claimed nor waived by a private party.  It is not
> to be lightly invoked.  There must be a formal claim of privilege,
> lodged by the head of the department which has control over the
> matter, after actual personal consideration by that officer.

345 U.S. at 7-8 (footnotes omitted).  Thus, the D.C. Circuit has been emphatic that "[t]he privilege

may be asserted only by the government itself; neither a private party *nor an individual official* may

seek its aid."  *Ellsberg v. Mitchell,* 709 F.2d 51, 56 (D.C. Cir. 1983) (emphasis added).  This, of

course, makes sense because it is the interests of the United States, not the individual, that are at stake

if sensitive governmental information is released.

The United States government has not invoked the state secrets doctrine in this case or made any argument that the case should be dismissed because of the possible relevance of sensitive information. There can be no question that the United States is well aware of what is at issue here. As discussed above, the United States has filed a brief with this court seeking dismissal of the tort law claim based on the Westfall Act and a separate statement of interest on the merits of plaintiffs' constitutional claims. Totally absent from the government's briefs is any invocation of the state secrets doctrine or any argument that there is sensitive information that requires dismissal of the Wilsons' complaint.

The irony in the defendants invoking the sensitive nature of the information cannot escape notice. This case arises from the defendants' disclosure of the classified, highly secret and sensitive information that Mrs. Wilson was an operative for the CIA. For the defendants to now say that they cannot be held liable because the information is secret and sensitive is much like the child who kills his parents and begs for mercy on the ground that he is an orphan. In *Tenet v. Doe*, 544 U.S. 1, 11 (2005), the Supreme Court said that the state secrets privilege applies if there is a possibility that an "espionage relationship may be revealed." But in this case, the espionage relationship already has been revealed by the defendants. That revelation, of course, is the entire basis for this lawsuit; there is no state secret to be protected,[7] only ruined lives to be reclaimed.

Nor does the political question doctrine provide a basis for dismissing this case. Defendant Cheney claims that *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005), "is directly on point."

---

[7] Indeed, the only "sensitive" fact necessary to resolve the plaintiffs' claims is Mrs. Wilson's employment as a CIA covert operative, a fact that today is no secret.

49

Cheney Mem. at 10. As Defendant Cheney explains, that case involved family members of a deceased Chilean general asserting tort claims "against former national security advisor Henry Kissinger relating to the conduct of U.S. foreign policy in the early 1970s." *Id.* The court stressed that challenges to the conduct of foreign policy were a non-justiciable political question because the matters were committed to the elected branches of government. *Schneider*, 412 F.3d at 194-95.

But this case involves no foreign policy decisions made by the United States government. The defendants do not assert that they revealed Mrs. Wilson's status as a secret operative for the CIA as part of foreign policy decision-making. Nor could they; they did so in retaliation for her husband unmasking the inaccuracies in the President's State of the Union Address. The defendants' self-serving action had nothing to do with foreign policy, only domestic deception. Besides, as the Supreme Court has explained, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211 (1962).

Defendant Armitage argues that to calculate damages, the court will need to know facts regarding Ms. Wilson's employment that implicate "national security activities." Armitage Mem. at 16. At this point it is mere speculation that damages cannot be determined without access to classified information. Even if classified information were needed at the damages phase, the court would have a variety of options at its disposal, including the use of a procedure whereby classified information on damages is submitted in camera, with counsel being cleared for access. The possible need for such information at a damages phase, however, is not a reason for granting a motion to dismiss at this stage of the proceedings.

## IV.  THERE ARE NO FACTORS THAT COUNSEL AGAINST RECOGNIZING PLAINTIFFS' CONSTITUTIONAL CLAIMS UNDER *BIVENS*.

In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971), the Supreme Court held that federal government officials could be sued for money damages for violating an individual's constitutional rights.   As Justice Harlan explained, "[f]or people in Bivens' shoes, it is damages or nothing." *Id.* at 410 (Harlan, J., concurring).  That is certainly true for the plaintiffs in this case.  For Valerie and Joseph Wilson the only possible remedy is damages; it truly is damages or nothing.

Defendants nevertheless urge this court to not create a "new" *Bivens* remedy.  For example, Defendant Cheney argues that "[s]pecial factors counsel hesitation in the recognition of the new *Bivens* remedies sought in the Amended Complaint."  Cheney Mem. at 23.   Defendant Rove similarly argues that the court should not allow "new remedies" under *Bivens.*  Rove Mem. at 17.  But plaintiffs are not asking for recognition of any new *Bivens* remedies.   Plaintiffs' constitutional claims arise under the First and Fifth Amendments.   It already is clearly established that *Bivens* remedies exist for violation of these provisions.  *See, e.g., Davis v. Passman*, 442 U.S. 228 (1979) (*Bivens* action exists for violation of due process); *Haynesworth v. Miller*, 820 F.2d 1245, 1255 (D.C. Cir. 1987), *rev'd in part on other grounds by Hartman v. Moore*, 126 S. Ct. 1695 (2006); *Dellums v. Powell*, 566 F.2d 167, 194 (D.C. Cir. 1977) (*Bivens* action exists for violation of First Amendment rights).

Each of the defendants argues that there are special factors counseling hesitation in allowing a *Bivens* claim here.  Specifically, they point to the Privacy Act, 5 U.S.C. §552a, the Intelligence Identities Protection Act of 1982, 50 U.S.C. §421, and agency grievance procedures as reasons to not

51

allow a *Bivens* action.  *See* Armitage Mem. at 9-14; Cheney Mem. at 23-30; Libby Mem. at 9-13;

Rove Mem. at 9-17.[8]  These statutes are not a reason to preclude a *Bivens* remedy because none

provides a basis for relief to the plaintiffs and none reflects a judgment by Congress to preclude

*Bivens* suits in circumstances such as these.

### A.   THE PRIVACY ACT IS NOT A REASON TO DENY A *BIVENS* REMEDY IN THIS CASE.

Most simply, the Privacy Act is irrelevant in this case because the White House Office, which

includes the Office of the Vice President, is not an agency and therefore not subject to the Privacy

Act.  Since the Act does not apply, it obviously cannot be a basis for denying a *Bivens* cause of action.

Moreover, the Privacy Act cannot properly be characterized as a comprehensive remedial

scheme that precludes all *Bivens* actions.  By its very terms, the Privacy Act covers the collection,

maintenance, use and dissemination only of information stored in executive branch agencies.  *See,*

*e.g.*, *Doe v. U.S. Postal Service*, 317 F.3d 339, 342 (D.C. Cir. 2003) ("the Privacy Act generally

prohibits 'nonconsensual disclosure of any information that has been retrieved from a *protected*

*record*,'" *quoting Bartel v. FAA*, 725 F.2d 1403, 1408 (D.C. Cir. 1984) (emphasis added).  More

specifically, the Privacy Act applies only to information that is "about an individual," 5 U.S.C.

§552a(a)(4), and that is stored in a system of records "under the control of any agency from which

information is retrieved by the name of the individual or by some identifying number, symbol, or

other identifying particular assigned to the individual."  *Id.* at §552a(a)(5).  Courts have interpreted

this provision as requiring that the agency's actual practice be to retrieve the information by name or

other personal identifier; it is not enough that the information is merely capable of being retrieved in

---

[8] The defendants also argue that the sensitive nature of the information is a reason to not allow a *Bivens* remedy.  That argument is addressed above.

that fashion. *Henke v. U.S. Dep't of Commerce*, 83 F.3d 1453, 1460 n. 12 (D.C. Cir. 1996). As the legislative history of the Privacy Act confirms, the statute was focused on protecting "the privacy of individuals identified in information systems *maintained by federal agencies*." Privacy Act of 1974, Pub. L. No. 93-579, §2, 88 Stat. 1896 (Dec. 31, 1974) (emphasis added). In short, the Privacy Act is a very precise and highly technical statute that applies only to federal agency records and only when certain preconditions are met.

Although several courts, including the D.C. Circuit, have described the Privacy Act as "comprehensive" in the context of considering a *Bivens* claim, the rulings have arisen in clearly distinguishable cases. *Bivens* claims have been precluded in instances where the Privacy Act was available and provided a possible remedy for the plaintiff. For example, in *Downie v. City of Middleburg Heights*, 301 F.3d 688 (6th Cir. 2002), the Sixth Circuit upheld the district court's refusal to imply a *Bivens* remedy under the First Amendment "because the Privacy Act is a comprehensive legislative scheme that provides a meaningful remedy *for the kind of wrong Downie alleges that he suffered*." *Id.* at 696 (emphasis added). The court's conclusion was based on its finding that the plaintiff's claims stemmed from the creation, maintenance, or dissemination of allegedly false records and that, accordingly, alleged "wrongs that could be addressed under the Privacy Act." *Id.* In other words, because the *Downie* plaintiff had a Privacy Act claim (whether or not he could prevail on it), the court declined to also imply a *Bivens* remedy. Here, though, the plaintiffs have no possible claims under the Privacy Act.

Similarly, in *Chung v. U.S. Dep't of Justice*, 333 F.3d 273 (D.C. Cir. 2003), the D.C. Circuit affirmed without discussion the district court's dismissal of a *Bivens* claim based on an unauthorized leak, noting that the dismissal was based on the fact that "the Privacy Act provides a comprehensive

remedial scheme for harm caused by governmental disclosure of personal information." *Id.* at 275. The district court's dismissal in *Chung* of the *Bivens* claims under the First and Fifth Amendments was based on the fact that the Privacy Act "comprehensively cover[ed]" the plaintiff's claims stemming from the "allegedly wrongful disclosure of government records." *Chung v. U.S. Dep't of Justice*, No. 00-1912, 2001 U.S. Dist. LEXIS 25302 *47 (D.D.C. Sept. 21, 2001). As in *Downie*, the *Chung* plaintiff had pled a Privacy Act claim and, based on the fact that the Privacy Act covered such claim, the court, not surprisingly, was not willing to also infer a *Bivens* remedy.[9] This was also true in *Hatfill v. Ashcroft*, 404 F.Supp.2d 104, 116-17 (D.D.C. 2005), where the court refused to imply a *Bivens* remedy for a Fifth Amendment due process claim which was redressable under the Privacy Act and where the plaintiff had pled a Privacy Act claim.

In arguing that the Privacy Act precludes a *Bivens* remedy here, the United States also relies on the presumption that "the disclosures attributed to the other defendants [than Armitage] also appear traceable to information presumably within agency records covered by the Privacy Act." Statement of Interest at 13. There is simply no factual predicate for this presumption; the court is confined to the face of the complaint and, for purposes of ruling on the defendants' motions to dismiss, must accept all facts pled therein as true.

In sum, the technically narrow scope of the Privacy Act coupled with its legislative history do not suggest "that Congress has provided what it considers adequate remedial mechanisms for [all]

---

[9] In Chung's case, he was complaining about information that had been leaked from an agency's investigative files and there was no claim by the government that the files were not subject to the Privacy Act. Here, by contrast, the Wilsons' privacy claims stem from leaked information that was not from an "information system" as defined by the Privacy Act. As noted above, the legislative history confirms that Congress's concern with harm to individual privacy was no wider than that caused by disclosures of information in agency systems of records.

constitutional violations," *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988), but only those violations

that would otherwise be redressable through the Privacy Act. In the absence of affirmative evidence

that Congress deliberately excluded claims such as those of the Wilsons, the mere existence of the

Privacy Act is not properly considered a "special factor" counseling against implying a *Bivens*

remedy here.

### B. THE INTELLIGENCE IDENTITIES PROTECTION ACT IS NOT A REASON TO DENY A *BIVENS* CLAIM IN THIS CASE.

The Intelligence Identities Protection Act is a criminal statute that was enacted in 1982.

Under its terms, it is a crime to intentionally disclose the identity of a covert agent to someone not

authorized to receive classified information if the disclosure is done with knowledge that the

information disclosed identifies the agent and that the United States is taking affirmative steps to

conceal the agent's intelligence relationship with the United States. 50 U.S.C. §§421(a), (b), and (c).

Violations of the act are felonies punishable by a fine or imprisonment of no more than three years, or

both. *Id.* at §§(c) and (d).

Congress enacted the IIPA in response to a systematic effort by a small number of

individuals, including former intelligence agency employees, to disclose the names of covert

intelligence operatives. S. Rep. 97-201 at 1, *reprinted in* 1982 U.S.C.C.A.N. 145. It was believed

that such disclosures may have contributed to the deaths or attempted assassinations of some CIA

officers. CRS Rept. on IIPA at 2. The President, in signing the act, remarked that the IIPA was a

recognition "that the revelation of the names of secret agents adds nothing to legitimate public debate

over intelligence policy. It is also a signal to the world that while we in this democratic nation remain

tolerant and flexible, we also retain our good sense and our resolve to protect our own security and

that of the brave men and women who serve us in difficult and dangerous intelligence assignments." Ronald Reagan, Remarks on Signing the Intelligence Identities Protection Act of 1982 (June 23, 1982) *supra*.

Crucially, the IIPA is purely a criminal statute, and there is no precedent for relying on a criminal statute as a "special factor" that would preclude a *Bivens* civil remedy. The Supreme Court has found that the existence of federal statutes providing alternative remedies to injured individuals are a "special factor" precluding *Bivens* remedies. *See, e.g., Schweiker v. Chilicky*, 487 U.S. 412 (1988) (administrative remedies foreclose *Bivens* remedy against Social Security administration); *Bush v. Lucas*, 462 U.S. 367 (1983) (administrative remedies under civil service statute foreclose *Bivens* remedy by a government employee). A criminal statute, however, offers no possible remedy to an injured individual and thus is not a basis for precluding a remedy under *Bivens*. Criminal statutes, by their very nature, are intended to redress societal, not individual, harms. The IIPA is no exception. Although it stemmed, at least in part, from an incident that placed individual covert agents at risk, the statute provides no individual relief whatsoever. Accordingly, there is simply nothing in the IIPA from which to infer a congressional intent to omit damage remedies under *Bivens*.

Quite the contrary, allowing a *Bivens* action advances the goals of the IIPA. The IIPA provides for criminal liability for wrongly revealing an agent's secret status. A *Bivens* action supplements enforcement and encourages obedience to the law by compensating wronged individuals through a civil suit for damages.

## C. CIVIL SERVICE REMEDIES ARE NOT A REASON TO DENY A *BIVENS* CLAIM IN THIS CASE.

Civil service and administrative remedies available to aggrieved government employees also

have no relevance here. Mrs. Wilson is not complaining about any action her employer took against

her or that had an adverse or illegal effect on her. Rather, her claims stem from the rogue actions of

the defendants at the White House (and the State Department with respect to defendant Armitage).

For this same reason, Mr. Armitage's argument that the existence of CIA regulations governing

personnel grievances precludes a *Bivens* remedy here is beside the point. Mrs. Wilson is not alleging

that the CIA did anything, adverse or otherwise. In short, Mrs. Wilson has no agency action to grieve

under either the Civil Service Reform Act or CIA regulations, because the agency has taken no action

directed at her.

## V. DEFENDANTS ARE NOT PROTECTED BY ABSOLUTE OR QUALIFIED IMMUNITY.

Defendant Cheney claims that he is protected by absolute immunity and, in the alternative, by

qualified immunity. Defendants Armitage, Libby, and Rove assert that they are protected by qualified

immunity. None of these claims of immunity has merit.

### A. DEFENDANT CHENEY IS NOT PROTECTED BY ABSOLUTE IMMUNITY.

No case ever has accorded the Vice President absolute immunity. The Supreme Court has

declared that "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect

government officials in the exercise of their duties. We have been 'quite sparing' in our recognition

of absolute immunity, and have refused to extend it any 'further than its justification would warrant.'"

*Burns v. Reed*, 500 U.S. 478, 486-87 (1991) (citations omitted).

The fact that the Vice President is a part of the Executive Branch does not warrant according

him absolute immunity. The Supreme Court has explained that "a qualified immunity is available to

officers of the executive branch of government." *Scheuer v. Rhodes*, 416 U.S. 232, 247 (1974),

*overruled in part on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984). Thus, the Court has held that "the Attorney General is not absolutely immune from suit for damages arising out of his allegedly unconstitutional conduct in performing his national security functions." *Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985). Similarly, the Court has held that other Cabinet secretaries, *Butz v. Economou*, 438 U.S. 478 (1978), and top level executive officials acting at the direction of the President are protected only by qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

Defendant Cheney argues that since the President of the United States has absolute immunity, the Vice President should be accorded this as well. Cheney Mem. at 20. But the Supreme Court decision creating absolute immunity for the President, *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), provides a clear basis for distinguishing the Vice President. The Court explained that "The President occupies a unique position in the constitutional scheme." *Id.* at 749. In fact, the Court distinguished the President from all other officials in the executive branch of government: "The President's unique status under the Constitution distinguishes him from other executive officials." *Id.* at 750.

The Court justified absolute immunity for the President on functional considerations, none of which applies to the Vice President. For example, the Court said that "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Id.* at 751. The Court noted that the President "must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Id.* at 752.

The same hardly could be said of the Vice President. The Constitution does not vest in the Vice President "unique" and "singular" duties that make him the functional equivalent of the President. Instead, the Constitution carves out two limited roles for the Vice President: (1) presiding

58

over the Senate and breaking a tie in Senate votes (Art. I, § 3); and (2) succeeding the President (Art. II, § 1) or taking over as acting President under certain conditions (Amend. XXV, § 3, Amend. XXV, § 4). It is no wonder that John Adams, the first Vice President of the United States, lamented: "[M]y country has in its wisdom contrived for me the most insignificant office that ever the invention of man contrived or his imagination conceived." *Quoted in* Joel K. Goldstein, The New Constitutional Vice Presidency, 30 Wake Forest L. Rev. 505, 519 (1995). In a recent analysis, noted historian Richard Neustadt observed that little has changed over the course of American history: "[The vice presidency] has been dolled up with real estate, assistance, name recognition (and the hazards now common to celebrity). But the essentials remain the same: the other person has all the authority." At the President's Side: The Vice Presidency in the Twentieth Century 192 (Timothy Walch ed., Univ. Of Missouri Press 1997).

The Supreme Court has expressly refused to extend presidential absolute immunity to any other members of the executive branch of government. *Mitchell v. Forsyth*, 472 U.S. 511 (1985); *Butz v. Economou*, 438 U.S. 478 (1978); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). There is no basis for according absolute immunity to the Vice President.

## B. DEFENDANTS' ACTIONS ARE NOT PROTECTED BY QUALIFIED IMMUNITY.

In Part I of this brief, plaintiffs demonstrated that each of the constitutional rights asserted is clearly established. Beyond that, there is a common flaw in the assertion of qualified immunity by all of the defendants: they surely had "fair notice" that it was wrong to reveal the secret status of a CIA operative for their partisan gain.

In *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), the Supreme Court made clear that overcoming

59

qualified immunity does not require that there be a case on point disapproving the defendant's conduct. Rather, the test is whether the defendant had "fair warning" that his or her conduct was impermissible. *Id.* at 739-741.

Surely, the defendants had "fair warning" that they should not reveal that a person is a secret operative for the CIA. A federal statute prohibits specifically this. Intelligence Identities Protection Act of 1982, 50 U.S.C. §421. Recent Presidents have condemned such behavior in no uncertain terms. *See, e.g.,* George H.W. Bush, Remarks at the Dedication Ceremony for the George Bush Center for Intelligence (Apr. 26, 1999) *supra* (describing those who reveal secret intelligence sources as "the most insidious of traitors."). Also, federal statutes and presidential directives prohibit the disclosure of classified information, which includes the secret status of CIA operatives. 18 U.S.C. §793 and Executive Order 12958, as modified by Executive Order 13292.

All of this was sufficient to provide the defendants "fair warning" that their conduct was wrong, and because each of the specific rights is clearly established, defendants are not protected by qualified immunity.

## CONCLUSION

Plaintiffs' Amended Complaint alleges a serious abuse of power that caused great harms Top government officials revealed that Valerie Plame Wilson was a secret operative for the CIA to embarrass and retaliate against her and her husband, former Ambassador Joseph Wilson. Plaintiffs allege that this action violated their rights and seriously injured them. For the reasons set forth in this brief, the motions to dismiss of the defendants and the United States should be denied and this case should proceed.

Dated: January 16, 2007                          Respectfully submitted,

*/s/Anne L. Weismann*
Anne L. Weismann (D.C. Bar No. 298190)
Melanie Sloan (D.C. Bar No. 434584)
Citizens for Responsibility
  and Ethics in Washington
1400 Eye Street, N.W.
Suite 450
Washington, D.C. 20005
Phone:  (202) 408-5565
Fax:  (202) 588-5020

Erwin Chemerinsky (D.C. Bar No. 289330)
Duke University School of Law
Science Drive and Towerview Road
Durham, NC 27708-0360
Phone: (919) 613-7173
Fax:  (919) 613-7231

Joseph Cotchett (D.C. Bar No. 325498)
Cotchett, Pitre, Simon & McCarthy
840 Malcolm Road, Suite 200
Burlingame, CA  94010
Phone:  (650) 6979-6000
Fax:  (650) 697-9577

Attorneys for Plaintiffs