Westlaw.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1804315 (U.S.)
**(Cite as: --- S.Ct. ----)**

Page 1

**H**
Wilkie v. Robbins
U.S.,2007.
Only the Westlaw citation is currently available.
Supreme Court of the United States
Charles WILKIE, et al., Petitioners,
v.
Harvey Frank ROBBINS.
**No. 06-219.**

Argued March 19, 2007.
Decided June 25, 2007.

**Background:** Owner of commercial guest ranch brought Racketeer Influenced and Corrupt Organizations Act (RICO) and *Bivens* claims against Bureau of Land Management (BLM) employees who allegedly used extortion in attempt to force owner to grant easement to BLM. The United States District Court for the District of Wyoming, Clarence A. Brimmer, Jr., J., dismissed claims. The Court of Appeals reversed and remanded, 300 F.3d 1208. Subsequently, the District Court, 2004 WL 3659189, denied defendants' motion for summary judgment based on qualified immunity, and defendants appealed. The Court of Appeals for the Tenth Circuit, Murphy, Circuit Judge, 433 F.3d 755, denied employees' motion for summary judgment. Writ of Certiorari was granted.

**Holdings:**The Supreme Court, Justice Souter, held that:

(1) landowner did not have a private action against employees for the Bureau of Land Development for damages of the sort recognized under *Bivens*;

(2) alleged violations of the Hobbs Act by employees of the BLM in their efforts to obtain an easement over landowner's property for the exclusive benefit of the Government did not qualify as a predicate offense for a RICO action; and

(3) alleged violations of Wyoming's blackmail statute did not qualify as a predicate offense for a RICO action.

Reversed and remanded.

Justice Thomas, with whom Justice Scalia joined, concurred and filed opinion.

Justice Ginsburg, with whom Justice Stevens joined, concurred in part and dissented in part, and filed opinion.

**[1] United States 393 ⚖═50.10(1)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for Negligence or Misconduct
            393k50.10 Particular Acts or Claims
                393k50.10(1) k. In General. Most Cited Cases

Landowner did not have a private action against employees for the Bureau of Land Management (BLM) for damages of the sort recognized under *Bivens* on a theory of retaliation for exercising his property right to exclude, or on a general theory of unjustifiably burdening his rights as a property owner; trying to induce someone to grant an easement for public use was a perfectly legitimate purpose, and, as a landowner, the Government had a valid interest in getting access to neighboring lands.

**[2] United States 393 ⚖═50.10(1)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for Negligence or Misconduct
            393k50.10 Particular Acts or Claims
                393k50.10(1) k. In General. Most Cited Cases

A *Bivens* action to redress retaliation against those who resist Government impositions on their property rights would invite claims in every sphere of legitimate governmental action affecting property interests, from negotiating tax claim settlements to enforcing Occupational Safety and Health Administration regu-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1804315 (U.S.)
**(Cite as: --- S.Ct. ----)**

lations.

**[3] Constitutional Law 92 &#x21dd;2503(2)**

92 Constitutional Law
  92XX Separation of Powers
    92XX(C) Judicial Powers and Functions
      92XX(C)2 Encroachment on Legislature
        92k2499 Particular Issues and Applications
          92k2503 Civil Remedies and Procedure
          92k2503(2) k. Creation of Rights of Action. Most Cited Cases
Congress is in a far better position than a court to evaluate the impact of a new species of litigation against those who act on the public's behalf.

**[4] Extortion and Threats 165 &#x21dd;4**

165 Extortion and Threats
  165I Official Extortion
    165k3 Elements of Offenses
      165k4 k. In General. Most Cited Cases
The Hobbs Act does not apply when the National Government is the intended beneficiary of allegedly extortionate acts by government employees. 18 U.S.C.A. § 1951(a).

**[5] Racketeer Influenced and Corrupt Organizations 319H &#x21dd;8**

319H Racketeer Influenced and Corrupt Organizations
  319HI Federal Regulation
    319HI(A) In General
      319Hk4 Racketeering or Criminal Activity
        319Hk8 k. Extortion. Most Cited Cases
Alleged violations of the Hobbs Act by employees of the Bureau of Land Management (BLM) in their efforts to obtain an easement over landowner's property for the exclusive benefit of the Government did not qualify as a predicate offense for a Racketeer Influenced and Corrupt Organizations (RICO) action against individual employees. 18 U.S.C.A. §§ 1951(a), 1961(1)(A, B), 1962.

**[6] Racketeer Influenced and Corrupt Organizations 319H &#x21dd;8**

319H Racketeer Influenced and Corrupt Organizations
  319HI Federal Regulation
    319HI(A) In General
      319Hk4 Racketeering or Criminal Activity
        319Hk8 k. Extortion. Most Cited Cases
Alleged violations of Wyoming's blackmail statute by employees of the Bureau of Land Management (BLM) in their efforts to obtain an easement against ranch owner's property did not qualify as a predicate offense for a Racketeer Influenced and Corrupt Organizations Act (RICO) suit, given that the alleged conduct did not fit the traditional definition of extortion. 18 U.S.C.A. § 1961(1)(A); West's Wyo.Stat.Ann. § 6-2-402.
*Syllabus* FN*

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*1** Plaintiff-respondent Robbins's Wyoming guest ranch is a patchwork of land parcels intermingled with tracts belonging to other private owners, the State of Wyoming, and the National Government. The previous owner granted the United States an easement to use and maintain a road running through the ranch to federal land in return for a right-of-way to maintain a section of road running across federal land to otherwise isolated parts of the ranch. When Robbins bought the ranch, he took title free of the easement, which the Bureau had not recorded. Robbins continued to graze cattle and run guest cattle drives under grazing permits and a Special Recreation Use Permit (SRUP) issued by the Bureau of Land Management. Upon learning that the easement was never recorded, a Bureau official demanded that Robbins regrant it, but Robbins declined. Robbins claims that after negotiations broke down, defendant-petitioners (defendants) began a campaign of harassment and intimidation to force him to regrant the lost easement.

Robbins's suit for damages and declaratory and injunctive relief now includes a Racketeer Influenced

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and Corrupt Organizations Act (RICO) claim that de-
fendants repeatedly tried to extort an easement from
him and a similarly grounded *Bivens v. Six Unknown
Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999,
29 L.Ed.2d 619, claim that defendants violated his
Fourth and Fifth Amendment rights. Ultimately, the
District Court denied defendants' motion to dismiss
the RICO claim based on qualified immunity. As to
the *Bivens* claims, it dismissed what Robbins called
his Fourth Amendment malicious prosecution claim
and his Fifth Amendment due process claims, but de-
clined to dismiss a Fifth Amendment claim of retali-
ation for the exercise of Robbins's rights to exclude
the Government from his property and to refuse to
grant a property interest without compensation. It ad-
hered to this denial on summary judgment. The Tenth
Circuit affirmed.

*Held:*

1. Robbins does not have a private action for dam-
ages of the sort recognized in *Bivens.* Pp. --- -
---9-23.

(a) In deciding whether to devise a *Bivens* remedy for
retaliation against the exercise of ownership rights,
the Court's first step is to ask whether any alternative,
existing process for protecting the interest amounts to
a convincing reason for the Judicial Branch to refrain
from providing a new and freestanding damages rem-
edy. *Bush v. Lucas,* 462 U.S. 367, 378, 103 S.Ct.
2404, 76 L.Ed.2d 648. But even absent an alternative,
a *Bivens* remedy is a subject of judgment: "the feder-
al courts must make the kind of remedial determina-
tion that is appropriate for a common-law tribunal,
paying particular heed ... to any special factors coun-
selling hesitation before authorizing a new kind of
federal litigation." *Ibid.* Pp. --- - ----9-11.

(b) For purposes of step one, Robbins's difficulties
with the Bureau can be divided into four categories.
The first, torts or tort-like injuries, includes an unau-
thorized survey of the desired easement's terrain
and an illegal entry into Robbins's lodge. In each in-
stance, he had a civil damages remedy for trespass,
which he did not pursue. The second category,
charges brought against Robbins, includes adminis-
trative claims for trespass and other land-use viola-

tions, a fine for an unauthorized road repair, and two
criminal charges. Robbins had the opportunity to
contest all of the administrative charges; he fought
some of the land-use and trespass citations, and chal-
lenged the road repair fine as far as the Interior Board
of Land Appeals (IBLA), but did not seek judicial re-
view after losing there. He exercised his right to jury
trial on the criminal complaints. The fact that the jury
took 30 minutes to acquit him tends to support his
baseless-prosecution charge; but the federal trial
judge did not find the Government's case thin enough
to justify attorney's fees, and Robbins appealed that
ruling late. The third category, unfavorable agency
actions, involved a 1995 cancellation of the right-
of-way given to Robbins's predecessor in return for
the Government's unrecorded easement, a 1995 de-
cision to reduce the SRUP from five years to one, and
in 1999, the SRUP's termination and a grazing per-
mit's revocation. Administrative review was available
for each claim, subject to ultimate judicial review un-
der the Administrative Procedure Act. Robbins did
not appeal the 1995 decisions, stopped after an IBLA
appeal of the SRUP denial, and obtained an IBLA
stay of the grazing permit revocation. The fourth cat-
egory includes three events that elude classification.
An altercation between Robbins and his neighbor did
not implicate the Bureau, and no criminal charges
were filed. Bureau employees' videotaping of ranch
guests during a cattle drive, though annoying and
possibly bad for business, may not have been unlaw-
ful, depending, *e.g.*, on whether the guests were on
public or private land. Also, the guests might be the
proper plaintiffs in any tort action, and any tort might
be chargeable against the Government, not its em-
ployees. Likewise up in the air is the significance of
an attempt to pressure a Bureau of Indian Affairs em-
ployee to impound Robbins's cattle. An impound-
ment's legitimacy would have depended on whether
the cattle were on private or public land, and no im-
poundment actually occurred. Thus, Robbins has an
administrative, and ultimately a judicial, process for
vindicating virtually all of his complaints. This state
of law gives him no intuitively meritorious case for a
new constitutional cause of action, but neither does it
plainly answer no to the question whether he should
have it. Pp. --- - ----11-14.

**\*2** (c) This, then, is a case for *Bivens* step two, for weighing reasons for and against creating a new cause of action, as common law judges have always done. Robbins concedes that any single action might have been brushed aside as a small imposition, but says that in the aggregate the campaign against him amounted to coercion to extract the easement and should be redressed collectively. On the other side of the ledger is the difficulty in defining a workable cause of action. Robbins's claim of retaliation for exercising his property right to exclude the Government does not fit this Court's retaliation cases, which involve an allegation of impermissible purpose and motivation-*e.g.,* an employee is fired after speaking out on matters of public concern, *Board of Comm'rs, Wabaunsee Cty. v. Umbehr,* 518 U.S. 668, 675, 116 S.Ct. 2342-and whose outcome turns on "what for" questions-what was the Government's purpose in firing the employee and would he have been fired anyway. Such questions have definite answers, and this Court has established methods to identify the presence of an illicit reason. Robbins alleges not that the Government's means were illegitimate but that the defendants simply demanded too much and went too far. However, a "too much" kind of liability standard can never be as reliable as a "what for" one. Most of the offending actions are legitimate tactics designed to improve the Government's negotiating position. Although the Government is no ordinary landowner, in many ways it deals with its neighbors as one owner among the rest. So long as defendants had authority to withhold or withdraw Robbins's permission to use Government land and to enforce the trespass and land-use rules, they were within their rights to make it plain that Robbins's willingness to give an easement would determine how complaisant they would be about his trespasses on public land. As for Robbins's more abstract claim, recognizing a *Bivens* action for retaliation against those who resist Government impositions on their property rights would invite claims in every sphere of legitimate governmental action affecting property interests, from negotiating tax claim settlements to enforcing Occupational Safety and Health Administration regulations. Pp. ----14-23.

2. RICO does not give Robbins a claim against de-

fendants in their individual capacities. Robbins argues that the predicate act for his RICO claim is a violation of the Hobbs Act, which criminalizes interference with interstate commerce by extortion, along with attempts or conspiracies, 18 U.S.C. § 1951(a), and defines extortion as "the obtaining of property from another, with his consent ... under color of official right," § 1951(b)(2). Robbins's claim fails because the Hobbs Act does not apply when the National Government is the intended beneficiary of allegedly extortionate acts. That Act does not speak explicitly to efforts to obtain property for the Government rather than a private party, so the question turns on the common law conception of "extortion," which Congress is presumed to have incorporated into the Act in 1946, see, *e.g., Scheidler v. National Organization for Women, Inc.,* 537 U.S. 393, 402, 123 S.Ct. 1057, 154 L.Ed.2d 991. At common law, extortion "by the public official was the rough equivalent of what [is] now describe[d] as 'taking a bribe.' " *Evans v. United States,* 504 U.S. 255, 260, 112 S.Ct. 1881, 119 L.Ed.2d 57. While public officials were not immune from extortion charges at common law, that crime focused on the harm of public corruption, by selling public favors for private gain, not on the harm caused by overzealous efforts to obtain property on the Government's behalf. The importance of the line between public and private beneficiaries is confirmed by this Court's case law, which is completely barren of an example of extortion under color of official right undertaken for the sole benefit of the Government. More tellingly, Robbins cites no decision by any court, much less this one, in the Hobbs Act's entire 60-year history finding extortion in Government employees' efforts to get property for the Government's exclusive benefit. *United States v. Green,* 350 U.S. 415, 420, 76 S.Ct. 522, 100 L.Ed. 494, which held that "extortion as defined in the [Hobbs Act] in no way depends upon having a direct benefit conferred on the person who obtains the property," does not support Robbins's claim that Congress could not have meant to prohibit extortionate acts in the interest of private entities like unions, but ignore them when the intended beneficiary is the Government. Without some other indication from Congress, it is not reasonable to assume that the Hobbs Act (let alone RICO) was intended to expose all federal employees to ex-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tortion charges whenever they stretch in trying to enforce Government property claims. Because defendants' conduct does not fit the traditional definition of extortion, it also does not survive as a RICO predicate offense on the theory that it is "chargeable under [Wyoming] law and punishable by imprisonment for more than one year," 18 U.S.C. § 1961(1)(A). Pp. ----- ----23-28.

*3 433 F.3d 755, reversed and remanded.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined, and in which STEVENS and GINSBURG, JJ., joined as to Part III. THOMAS, J., filed a concurring opinion, in which SCALIA, J., joined. GINSBURG, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined.

Gregory G. Garre, for Petitioners.
Laurence H. Tribe, for Respondent.
Paul D. Clement, Solicitor General, Washington, D.C., for Petitioners.
Laurence H. Tribe, Cambridge, MA, Pamela S. Karlan, Stanford, CA, Karen Budd-Falen, Marc Stimpert, Budd-Falen Law Offices, LLC, Cheyenne, WY, Amy Howe, Kevin K. Russell, Howe & Russell, P.C., Washington, DC, Thomas C. Goldstein, Akin, Gump, Strauss, Hauer & Feld LLP, Washington, DC, for Respondent.
Paul D. Clement, Peter D. Keisler, Gregory G. Garre, Deputy Solicitor General, David B. Salmons, Assistant to the Solicitor General, Barbara L. Herwig, Edward Himmelfarb, Washington, D.C., for Petitioner.For U.S. Supreme Court briefs, see:2007 WL 128587 (Pet.Brief)2007 WL 550926 (Resp.Brief)2007 WL 748277 (Reply.Brief)
Justice SOUTER delivered the opinion of the Court.
*4 Officials of the Bureau of Land Management stand accused of harassment and intimidation aimed at extracting an easement across private property. The questions here are whether the landowner has either a private action for damages of the sort recognized in *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), or a claim against the officials in their individual capacities under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968 (2000 ed. and Supp. IV). We hold that neither action is available.

I

A

Plaintiff-respondent Frank Robbins owns and operates the High Island Ranch, a commercial guest resort in Hot Springs County, Wyoming, stretching across some 40 miles of territory. The ranch is a patchwork of mostly contiguous land parcels intermingled with tracts belonging to other private owners, the State of Wyoming, and the National Government. Its natural resources include wildlife and mineral deposits, and its mountainous western portion, called the upper Rock Creek area, is a place of great natural beauty. In response to persistent requests by environmentalists and outdoor enthusiasts, the Bureau tried to induce the ranch's previous owner, George Nelson, to grant an easement for public use over South Fork Owl Creek Road, which runs through the ranch and serves as a main route to the upper Rock Creek area. For a while, Nelson refused from fear that the public would disrupt his guests' activities, but shortly after agreeing to sell the property to Robbins, in March 1994, Nelson signed a nonexclusive deed of easement giving the United States the right to use and maintain the road along a stretch of his property. In return, the Bureau agreed to rent Nelson a right-of-way to maintain a different section of the road as it runs across federal property and connects otherwise isolated parts of Robbins's holdings.

In May 1994, Nelson conveyed the ranch to Robbins, who continued to graze cattle and run guest cattle drives in reliance on grazing permits and a Special Recreation Use Permit (SRUP) issued by the Bureau. But Robbins knew nothing about Nelson's grant of the easement across South Fork Owl Creek Road, which the Bureau had failed to record, and upon recording his warranty deed in Hot Springs County, Robbins took title to the ranch free of the easement, by operation of Wyoming law. See Wyo. Stat. Ann. § 34-1-120 (2005).

*5 When the Bureau's employee Joseph Vessels [FN1]

discovered, in June 1994, that the Bureau's inaction had cost it the easement, he telephoned Robbins and demanded an easement to replace Nelson's. Robbins refused but indicated he would consider granting one in return for something. In a later meeting, Vessels allegedly told Robbins that " 'the Federal Government does not negotiate,' " and talks broke down. Brief for Respondent 5. Robbins says that over the next several years the defendant-petitioners (hereinafter defendants), who are current and former employees of the Bureau, carried on a campaign of harassment and intimidation aimed at forcing him to regrant the lost easement.

> FN1. Vessels was named as a defendant when the complaint was filed, but he has since died.

B

Robbins concedes that any single one of the offensive and sometimes illegal actions by the Bureau's officials might have been brushed aside as a small imposition, but says that in the aggregate the campaign against him amounted to coercion to extract the easement and should be redressed collectively. The substance of Robbins's claim, and the degree to which existing remedies available to him were adequate, can be understood and assessed only by getting down to the details, which add up to a long recitation.FN2

> FN2. Because this case arises on interlocutory appeal from denial of defendants' motion for summary judgment, we recite the facts in the light most favorable to Robbins.

In the summer of 1994, after the fruitless telephone conversation in June, Vessels wrote to Robbins for permission to survey his land in the area of the desired easement. Robbins said no, that it would be a waste of time for the Bureau to do a survey without first reaching agreement with him. Vessels went ahead with a survey anyway, trespassed on Robbins's land, and later boasted about it to Robbins. Not surprisingly, given the lack of damage to his property, Robbins did not file a trespass complaint in response.

Mutual animosity grew, however, and one Bureau employee, Edward Parodi, was told by his superiors

to "look closer" and "investigate harder" for possible trespasses and other permit violations by Robbins. App. 128-129. Parodi also heard colleagues make certain disparaging remarks about Robbins, such as referring to him as "the rich SOB from Alabama [who] got [the Ranch]." *Id.,* at 121. Parodi became convinced that the Bureau had mistreated Robbins and described its conduct as "the volcanic point" in his decision to retire. *Id.,* at 133.

Vessels and his supervisor, defendant Charles Wilkie, continued to demand the easement, under threat to cancel the reciprocal maintenance right-of-way that Nelson had negotiated. When Robbins would not budge, the Bureau canceled the right-of-way, citing Robbins's refusal to grant the desired easement and failure even to pay the rental fee. Robbins did not appeal the cancellation to the Interior Board of Land Appeals (IBLA) or seek judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 702.

In August 1995, Robbins brought his cattle to a water source on property belonging to his neighbor, LaVonne Pennoyer. An altercation ensued, and Pennoyer struck Robbins with her truck while he was riding a horse. Plaintiff-Appellee's Supp.App. in No. 04-8016 (CA10), pp. 676-681 (hereinafter CA10 App.); Pl. Exh. 2, Record 164-166; Pl. Exh. 35a, *id.,* at 102-108. Defendant Gene Leone fielded a call from Pennoyer regarding the incident, encouraged her to contact the sheriff, and himself placed calls to the sheriff suggesting that Robbins be charged with trespass. After the incident, Parodi claims that Leone told him: "I think I finally got a way to get [Robbins's] permits and get him out of business." App. 125, 126.

**\*6** In October 1995, the Bureau claimed various permit violations and changed the High Island Ranch's 5-year SRUP to a SRUP subject to annual renewal. According to Robbins, losing the 5-year SRUP disrupted his guest ranching business, owing to the resulting uncertainty about permission to conduct cattle drives. Robbins declined to seek administrative review, however, in part because Bureau officials told him that the process would be lengthy and that his permit would be suspended until the IBLA reached a

decision.[FN3]

> [FN3.] According to Robbins, Bureau offi-
> cials neglected to mention his right to seek a
> stay of the Bureau's adverse action pending
> the IBLA's resolution of his appeal. See 43
> CFR § 4.21 (2006). Such a stay, if granted,
> would have permitted Robbins to continue
> to operate under the 5-year SRUP.

Beginning in 1996, defendants brought administrative charges against Robbins for trespass and other land-use violations. Robbins claimed some charges were false, and others unfairly selective enforcement, and he took all of them to be an effort to retaliate for refusing the Bureau's continuing demands for the easement. He contested a number of these charges, but not all of them, administratively.

In the spring of 1997, the South Fork Owl Creek Road, the only way to reach the portions of the ranch in the Rock Creek area, became impassable. When the Bureau refused to repair the section of road across federal land, Robbins took matters into his own hands and fixed the public road himself, even though the Bureau had refused permission. The Bureau fined Robbins for trespass, but offered to settle the charge and entertain an application to renew the old maintenance right-of-way. Instead, Robbins appealed to the IBLA, which found that Robbins had admitted the unauthorized repairs when he sent the Bureau a bill for reimbursement. The Board upheld the fine, *In re Robbins,* 146 I.B.L.A. 213 (1998), and rejected Robbins's claim that the Bureau was trying to " 'blackmail' " him into providing the easement; it said that "[t]he record effectively shows ... intransigence was the tactic of Robbins, not [the] BLM." *Id.,* at 219. Robbins did not seek judicial review of the IBLA's decision.

In July 1997, defendant Teryl Shryack and a colleague entered Robbins's property, claiming the terms of a fence easement as authority. Robbins accused Shryack of unlawful entry, tore up the written instrument, and ordered her off his property. Later that month, after a meeting about trespass issues with Bureau officials, Michael Miller, a Bureau law enforcement officer, questioned Robbins without ad-

vance notice and without counsel about the incident with Shryack. The upshot was a charge with two counts of knowingly and forcibly impeding and interfering with a federal employee, in violation of 18 U.S.C. § 111 (2000 ed. and Supp. IV), a crime with a penalty of up to one year in prison. A jury acquitted Robbins in December, after deliberating less than 30 minutes. *United States v. Robbins,* 179 F.3d 1268, 1269 (C.A.10 1999). According to a news story, the jurors "were appalled at the actions of the government" and one said that "Robbins could not have been railroaded any worse ... if he worked for the Union Pacific." CA10 App. 852. Robbins then moved for attorney's fees under the Hyde Amendment, § 617, 111 Stat. 2519, note following 18 U.S.C. § 3600A, arguing that the position of the United States was vexatious, frivolous, or in bad faith. The trial judge denied the motion, and Robbins appealed too late. See 179 F.3d, at 1269-1270.

In 1998, Robbins brought the lawsuit now before us, though there was further vexation to come. In June 1999, the Bureau denied Robbins's application to renew his annual SRUP, based on an accumulation of land-use penalties levied against him. Robbins appealed, the IBLA affirmed, *In re Robbins,* 154 I.B.L.A. 93 (2000), and Robbins did not seek judicial review. Then, in August, the Bureau revoked the grazing permit for High Island Ranch, claiming that Robbins had violated its terms when he kept Bureau officials from passing over his property to reach public lands. Robbins appealed to the IBLA, which stayed the revocation pending resolution of the appeal. Order in *Robbins v. Bureau of Land Management,* IBLA 2000-12 (Nov. 10, 1999), CA10 App. 1020.

**\*7** The stay held for several years, despite periodic friction. Without a SRUP, Robbins was forced to redirect his guest cattle drives away from federal land and through a mountain pass with unmarked property boundaries. In August 2000, Vessels and defendants Darrell Barnes and Miller tried to catch Robbins trespassing in driving cattle over a corner of land administered by the Bureau. From a nearby hilltop, they videotaped ranch guests during the drive, even while the guests sought privacy to relieve themselves. That afternoon, Robbins alleges, Barnes and Miller broke

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

into his guest lodge, left trash inside, and departed without closing the lodge gates.

The next summer, defendant David Wallace spoke with Preston Smith, an employee of the Bureau of Indian Affairs who manages lands along the High Island Ranch's southern border, and pressured him to impound Robbins's cattle. Smith told Robbins, but did nothing more.

Finally, in January 2003, tension actually cooled to the point that Robbins and the Bureau entered into a settlement agreement that, among other things, established a procedure for informal resolution of future grazing disputes and stayed 16 pending administrative appeals with a view to their ultimate dismissal, provided that Robbins did not violate certain Bureau regulations for a 2-year period. The settlement came apart, however, in January 2004, when the Bureau began formal trespass proceedings against Robbins and unilaterally voided the settlement agreement. Robbins tried to enforce the agreement in federal court, but a district court denied relief in a decision affirmed by the Court of Appeals in February 2006. *Robbins v. Bureau of Land Management,* 438 F.3d 1074 (C.A.10).

C

In this lawsuit (brought, as we said, in 1998), Robbins asks for compensatory and punitive damages as well as declaratory and injunctive relief. Although he originally included the United States as a defendant, he voluntarily dismissed the Government, and pressed forward with a RICO claim charging defendants with repeatedly trying to extort an easement from him, as well as a similarly grounded *Bivens* claim that defendants violated his Fourth and Fifth Amendment rights. Defendants filed a motion to dismiss on qualified immunity and failure to state a claim, which the District Court granted, holding that Robbins inadequately pleaded damages under RICO and that the APA and the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346, were effective alternative remedies that precluded *Bivens* relief. The Court of Appeals for the Tenth Circuit reversed on both grounds, 300 F.3d 1208, 1211 (2002), although it specified that *Bivens* relief was available only for

those "constitutional violations committed by individual federal employees unrelated to final agency action," 300 F.3d, at 1212.

On remand, defendants again moved to dismiss on qualified immunity. As to the RICO claim, the District Court denied the motion; as to *Bivens,* it dismissed what Robbins called the Fourth Amendment claim for malicious prosecution and those under the Fifth Amendment for due process violations, but it declined to dismiss the Fifth Amendment claim of retaliation for the exercise of Robbins's right to exclude the Government from his property and to refuse any grant of a property interest without compensation. After limited discovery, defendants again moved for summary judgment on qualified immunity. The District Court adhered to its earlier denial.

**\*8** This time, the Court of Appeals affirmed, after dealing with collateral order jurisdiction to consider an interlocutory appeal of the denial of qualified immunity, 433 F.3d 755, 761 (2006) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). It held that Robbins had a clearly established right to be free from retaliation for exercising his Fifth Amendment right to exclude the Government from his private property, 433 F.3d, at 765-767, and it explained that Robbins could go forward with the RICO claim because Government employees who "engag[e] in lawful actions with an intent to extort a right-of-way from [a landowner] rather than with an intent to merely carry out their regulatory duties" commit extortion under Wyoming law and within the meaning of the Hobbs Act, 18 U.S.C. § 1951. 433 F.3d, at 768. The Court of Appeals rejected the defense based on a claim of the Government's legal entitlement to demand the disputed easement: "if an official obtains property that he has lawful authority to obtain, but does so in a wrongful manner, his conduct constitutes extortion under the Hobbs Act." *Id.,* at 769. Finally, the Court of Appeals said again that "Robbins'[s] allegations involving individual action unrelated to final agency action are permitted under *Bivens." Id.,* at 772. The appeals court declined defendants' request "to determine which allegations remain and which are precluded," however, because defendants had not asked the District Court to sort them out. *Ibid.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

We granted certiorari, 549 U.S. ----, 127 S.Ct. 722, 166 L.Ed.2d 559 (2006), and now reverse.

## II

The first question is whether to devise a new *Bivens* damages action for retaliating against the exercise of ownership rights, in addition to the discrete administrative and judicial remedies available to a landowner like Robbins in dealing with the Government's employees.[FN4] *Bivens,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, held that the victim of a Fourth Amendment violation by federal officers had a claim for damages, and in the years following we have recognized two more nonstatutory damages remedies, the first for employment discrimination in violation of the Due Process Clause, *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and the second for an Eighth Amendment violation by prison officials, *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). But we have also held that any freestanding damages remedy for a claimed constitutional violation has to represent a judgment about the best way to implement a constitutional guarantee; it is not an automatic entitlement no matter what other means there may be to vindicate a protected interest, and in most instances we have found a *Bivens* remedy unjustified. We have accordingly held against applying the *Bivens* model to claims of First Amendment violations by federal employers, *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), harm to military personnel through activity incident to service, *United States v. Stanley,* 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987); *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), and wrongful denials of Social Security disability benefits, *Schweiker v. Chilicky,* 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988). We have seen no case for extending *Bivens* to claims against federal agencies, *FDIC v. Meyer,* 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994), or against private prisons, *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001).

FN4. We recognized just last Term that the definition of an element of the asserted cause of action was "directly implicated by

the defense of qualified immunity and properly before us on interlocutory appeal." *Hartman v. Moore,* 547 U.S. 250, 257, n. 5, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). Because the same reasoning applies to the recognition of the entire cause of action, the Court of Appeals had jurisdiction over this issue, as do we.

Whatever the ultimate conclusion, however, our consideration of a *Bivens* request follows a familiar sequence, and on the assumption that a constitutionally recognized interest is adversely affected by the actions of federal employees, the decision whether to recognize a *Bivens* remedy may require two steps. In the first place, there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages. *Bush, supra,* at 378, 103 S.Ct. 2404. But even in the absence of an alternative, a *Bivens* remedy is a subject of judgment: "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Bush, supra,* at 378, 103 S.Ct. 2404.

## A

**\*9** In this factually plentiful case, assessing the significance of any alternative remedies at step one has to begin by categorizing the difficulties Robbins experienced in dealing with the Bureau. We think they can be separated into four main groups: torts or tort-like injuries inflicted on him, charges brought against him, unfavorable agency actions, and offensive behavior by Bureau employees falling outside those three categories.

Tortious harm inflicted on him includes Vessels's unauthorized survey of the terrain of the desired easement and the illegal entry into the lodge, and in each instance, Robbins had a civil remedy in damages for trespass. Understandably, he brought no such action after learning about the survey, which was doubtless annoying but not physically damaging. For the incid-

ent at the lodge, he chose not to pursue a tort remedy, though there is no question that one was available to him if he could prove his allegations. Cf. *Correctional Services Corp., supra,* at 72-73, 122 S.Ct. 515 (considering availability of state tort remedies in refusing to recognize a *Bivens* remedy).

The charges brought against Robbins include a series of administrative claims for trespass and other land-use violations, a fine for the unauthorized road repair in 1997, and the two criminal charges that same year. Robbins had the opportunity to contest all of the administrative charges; he did fight some (but not all) of the various land-use and trespass citations, and he challenged the road repair fine as far as the IBLA, though he did not take advantage of judicial review when he lost in that tribunal.[FN5] He exercised his right to jury trial on the criminal complaints, and although the rapid acquittal tended to support his charge of baseless action by the prosecution (egged on by Bureau employees), the federal judge who presided at the trial did not think the Government's case thin enough to justify awarding attorney's fees, and Robbins's appeal from that decision was late. See *Robbins,* 179 F.3d, at 1269-1270. The trial judge's denial of fees may reflect facts that dissuaded Robbins from bringing a state-law action for malicious prosecution, though it is also possible that a remedy would have been unavailable against federal officials, see *Blake v. Rupe,* 651 P.2d 1096, 1107 (Wyo.1982) ("Malicious prosecution is not an action available against a law enforcement official").[FN6] For each charge, in any event, Robbins had some procedure to defend and make good on his position. He took advantage of some opportunities, and let others pass; although he had mixed success, he had the means to be heard.

FN5. There was some uncertainty, if not inconsistency, about the willingness of the IBLA to entertain the sorts of claims Robbins advances here. Compare *In re Robbins,* 146 I.B.L.A. 213, 219 (1998) (rejecting a claim of " 'blackmail' " on the merits), with *Robbins v. Bureau of Land Management,* 170 I.B.L.A. 219, 226 (2006) (holding that "the trespass decision must be upheld regardless of BLM's motive in issuing the de-

cision"). In any event, he could have advanced the claims in federal court whether or not the IBLA was willing to listen to them. Cf. *In re Robbins,* 167 I.B.L.A. 239, 241 (2005) (noting that Robbins "concede[d] that these assertions [of equal protection violations and harassment] are properly cognizable by a court and he raise[d] them only to preserve them as part of the record").

FN6. Robbins brought a Fourth Amendment claim for malicious prosecution in this litigation, but the District Court dismissed it, *Robbins v. Bureau of Land Management,* 252 F.Supp.2d 1286, 1295-1298 (Wyo.2003), and Robbins has pursued it no further.

The more conventional agency action included the 1995 cancellation of the right-of-way in Robbins's favor (originally given in return for the unrecorded easement for the Government's benefit); the 1995 decision to reduce the SRUP from five years to one; the termination of the SRUP in 1999; and the revocation of the grazing permit that same year. Each time, the Bureau claimed that Robbins was at fault, and for each claim, administrative review was available, subject to ultimate judicial review under the APA. Robbins took no appeal from the 1995 decisions, stopped after losing an IBLA appeal of the SRUP denial, and obtained a stay from the IBLA of the Bureau's revocation of the grazing permit.

**\*10** Three events elude classification. The 1995 incident in which Robbins's horse was struck primarily involved Robbins and his neighbor, not the Bureau, and the sheriff never brought criminal charges. The videotaping of ranch guests during the 2000 drive, while no doubt thoroughly irritating and bad for business, may not have been unlawful, depending, among other things, upon the location on public or private land of the people photographed. Cf. *Restatement (Second) of Torts § 652B (1976)* (defining tort of intrusion upon seclusion).[FN7] Even if a tort was committed, it is unclear whether Robbins, rather than his guests, would be the proper plaintiff, or whether the tort should be chargeable against the Government (as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

distinct from employees) under the FTCA, cf. Carlson, 446 U.S., at 19-20, 100 S.Ct. 1468 (holding that FTCA and Bivens remedies were "parallel, complementary causes of action" and that the availability of the former did not preempt the latter). The significance of Wallace's 2001 attempt to pressure Smith into impounding Robbins's cattle is likewise up in the air. The legitimacy of any impoundment that might have occurred would presumably have depended on where particular cattle were on the patchwork of private and public lands, and in any event, Smith never impounded any.

> FN7. We are aware of no Wyoming case considering this tort.

In sum, Robbins has an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints. He suffered no charges of wrongdoing on his own part without an opportunity to defend himself (and, in the case of the criminal charges, to recoup the consequent expense, though a judge found his claim wanting). And final agency action, as in canceling permits, for example, was open to administrative and judicial review, as the Court of Appeals realized, 433 F.3d, at 772.

[1] This state of the law gives Robbins no intuitively meritorious case for recognizing a new constitutional cause of action, but neither does it plainly answer no to the question whether he should have it. Like the combination of public and private land ownership around the ranch, the forums of defense and redress open to Robbins are a patchwork, an assemblage of state and federal, administrative and judicial benches applying regulations, statutes and common law rules. It would be hard to infer that Congress expected the Judiciary to stay its Bivens hand, but equally hard to extract any clear lesson that Bivens ought to spawn a new claim. Compare Bush, 462 U.S., at 388, 103 S.Ct. 2404 (refusing to create a Bivens remedy when faced with "an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations"); and Schweiker, 487 U.S., at 426, 108 S.Ct. 2460 ("Congress chose specific forms and levels of protection for the rights of persons affected"), with Bivens, 403 U.S., at 397, 91 S.Ct. 1999 (finding "no explicit congressional de-

claration that persons injured [in this way] may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress").

B

*11 This, then, is a case for Bivens step two, for weighing reasons for and against the creation of a new cause of action, the way common law judges have always done. See Bush, supra, at 378, 103 S.Ct. 2404. Here, the competing arguments boil down to one on a side: from Robbins, the inadequacy of discrete, incident-by-incident remedies; and from the Government and its employees, the difficulty of defining limits to legitimate zeal on the public's behalf in situations where hard bargaining is to be expected in the back-and-forth between public and private interests that the Government's employees engage in every day.

1

As we said, when the incidents are examined one by one, Robbins's situation does not call for creating a constitutional cause of action for want of other means of vindication, so he is unlike the plaintiffs in cases recognizing freestanding claims: Davis had no other remedy, Bivens himself was not thought to have an effective one, and in Carlson the plaintiff had none against Government officials. Davis, 442 U.S., at 245, 99 S.Ct. 2264 ("For Davis, as for Bivens, 'it is damages or nothing' " (quoting Bivens, supra, at 410, 91 S.Ct. 1999 (Harlan, J., concurring in judgment))); Carlson, supra, at 23, 100 S.Ct. 1468 ("[W]e cannot hold that Congress relegated respondent exclusively to the FTCA remedy" against the Government).

But Robbins's argument for a remedy that looks at the course of dealing as a whole, not simply as so many individual incidents, has the force of the metaphor Robbins invokes, "death by a thousand cuts." Brief for Respondent 40. It is one thing to be threatened with the loss of grazing rights, or to be prosecuted, or to have one's lodge broken into, but something else to be subjected to this in combination over a period of six years, by a series of public officials bent on making life difficult. Agency appeals, lawsuits, and crim-

inal defense take money, and endless battling depletes the spirit along with the purse. The whole here is greater than the sum of its parts.

2

On the other side of the ledger there is a difficulty in defining a workable cause of action. Robbins describes the wrong here as retaliation for standing on his right as a property owner to keep the Government out (by refusing a free replacement for the right-of-way it had lost), and the mention of retaliation brings with it a tailwind of support from our long-standing recognition that the Government may not retaliate for exercising First Amendment speech rights, see *Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)*, or certain others of constitutional rank, see, *e.g., Lefkowitz v. Turley, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)* (Fifth Amendment privilege against self-incrimination); *United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)* (Sixth Amendment right to trial by jury).

But on closer look, the claim against the Bureau's employees fails to fit the prior retaliation cases. Those cases turn on an allegation of impermissible purpose and motivation; an employee who spoke out on matters of public concern and then was fired, for example, would need to "prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination." *Board of Comm'rs, Wabaunsee Cty. v. Umbehr, 518 U.S. 668, 675, 116 S.Ct. 2342 (1996)*. In its defense, the Government may respond that the firing had nothing to do with the protected speech, or that "it would have taken the same action even in the absence of the protected conduct." *Ibid.* In short, the outcome turns on "what for" questions: what was the Government's purpose in firing him and would he have been fired anyway? Questions like these have definite answers, and we have established methods for identifying the presence of an illicit reason (in competition with others), not only in retaliation cases but on claims of discrimination based on race or other characteristics. See *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)*.

**\*12** But a *Bivens* case by Robbins could not be resolved merely by answering a "what for" question or two. All agree that the Bureau's employees intended to convince Robbins to grant an easement.[FN8] But unlike punishing someone for speaking out against the Government, trying to induce someone to grant an easement for public use is a perfectly legitimate purpose: as a landowner, the Government may have, and in this instance does have, a valid interest in getting access to neighboring lands. The "what for" question thus has a ready answer in terms of lawful conduct.

> [FN8.] This is the "simple" question Robbins presents for review: "[C]an government officials avoid the Fifth Amendment's prohibition against taking property without just compensation by using their regulatory powers to harass, punish, and coerce a private citizen into giving the Government his property without payment?" Brief for Respondent 21.

Robbins's challenge, therefore, is not to the object the Government seeks to achieve, and for the most part his argument is not that the means the Government used were necessarily illegitimate; rather, he says that defendants simply demanded too much and went too far. But as soon as Robbins's claim is framed this way, the line-drawing difficulties it creates are immediately apparent. A "too much" kind of liability standard (if standard at all) can never be as reliable a guide to conduct and to any subsequent liability as a "what for" standard, and that reason counts against recognizing freestanding liability in a case like this.

The impossibility of fitting Robbins's claim into the simple "what for" framework is demonstrated, repeatedly, by recalling the various actions he complains about. Most of them, such as strictly enforcing rules against trespass or conditions on grazing permits, are legitimate tactics designed to improve the Government's negotiating position. Just as a private landowner, when frustrated at a neighbor's stubbornness in refusing an easement, may press charges of trespass every time a cow wanders across the property line or call the authorities to report every land-use violation, the Government too may stand firm on

its rights and use its power to protect public property interests. Though Robbins protests that the Government was trying to extract the easement for free instead of negotiating, that line is slippery even in this case; the Government was not offering to buy the easement, but it did have valuable things to offer in exchange, like continued permission for Robbins to use Government land on favorable terms (at least to the degree that the terms of a permit were subject to discretion).[FN9]

> FN9. In light of Justice GINSBURG's emphasis on the extent and duration of the harm suffered by Robbins, we do not read her opinion to suggest that any single adverse action taken by the Government in response to a valid exercise of property rights would give rise to a retaliation claim. It thus appears that even if a "what for" question could be imported into this case, Robbins could not obtain relief without also satisfying an unspecified, and unworkable, "too much" standard.

It is true that the Government is no ordinary landowner, with its immense economic power, its role as trustee for the public, its right to cater to particular segments of the public (like the recreational users who would take advantage of the right-of-way to get to remote tracts), and its wide discretion to bring enforcement actions. But in many ways, the Government deals with its neighbors as one owner among the rest (albeit a powerful one). Each may seek benefits from the others, and each may refuse to deal with the others by insisting on valuable consideration for anything in return. And as a potential contracting party, each neighbor is entitled to drive a hard bargain, as even Robbins acknowledges, see Tr. of Oral Arg. 31-32. That, after all, is what Robbins did by flatly refusing to regrant the easement without further recompense, and that is what the defendant employees did on behalf of the Government. So long as they had authority to withhold or withdraw permission to use Government land and to enforce the trespass and land-use rules (as the IBLA confirmed that they did have at least most of the time), they were within their rights to make it plain that Robbins's willingness to give the easement would determine how complaisant they would be about his trespasses on public land, when they had discretion to enforce the law to the letter.[FN10]

> FN10. Justice GINSBURG says we mistakenly fail to see that Robbins's retaliation claim presents only a "what for" question: did defendants take the various actions against Robbins in retaliation for refusing to grant the desired right of way *gratis* (or simply out of malice prompted by Robbins's refusal and their own embarrassment after forgetting to record the Nelson grant)? But seeing the case as raising only a traditional "what for" question gives short shrift to the Government's right to bargain hard in a continuing contest.
>
> In the standard retaliation case recognized in our precedent, the plaintiff has performed some discrete act in the past, typically saying something that irritates the defendant official; the question is whether the official's later action against the plaintiff was taken for a legitimate purpose (firing to rid the workforce of a substandard performer, for example) or for the purpose of punishing for the exercise of a constitutional right (that is, retaliation, probably motivated by spite). The plaintiff's action is over and done with, and the only question is the defendant's purpose, which may be maliciously motivated.
>
> In this case, however, the past act or acts (refusing the right-of-way without compensation) are simply particular steps in an ongoing refusal to grant requests for a right-of-way. The purpose of the continuing requests is lawful (the Government still could use the right-of-way) and there are actions the Government may lawfully take to induce or coerce Robbins to end his refusal (presumably like canceling the nonpermanent reciprocal right-of-way originally given to Nelson). The action claimed to be retaliatory may gratify malice in the heart of the official who takes it, but the official act remains an instance of hard bargaining intended to induce the plaintiff to come to le-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

gitimate terms. We do not understand Robbins to contend that malice alone, as distinguished from malice combined with the desire to acquire an easement, caused defendants to act the way they did. See Brief for Respondent 21 (accusing defendants of "using their regulatory powers to harass, punish, and coerce a private citizen into giving the Government his property without payment"); but cf. *post,* at ----12, n. 3 (GINSBURG, J., concurring in part and dissenting in part) (" 'Their cause, if they had one, is nothing to them now; They hate for hate's sake' " (quoting There Will Be No Peace, reprinted in W.H. Auden: Collected Poems 615 (2007) (E. Mendelson ed.))). Thus, we are not dealing with one discrete act by a plaintiff and one discrete (possibly retaliatory) act by a defendant, the purpose of which is in question. Instead we are confronting a continuing process in which each side has a legitimate purpose in taking action contrary to the other's interest.

"Retaliation" cannot be classed as a basis of liability here, then, except on one or the other of two assumptions. The first is that the antagonistic acts by the officials extend beyond the scope of acceptable means for accomplishing the legitimate purpose; the acts go beyond hard bargaining on behalf of the Government (whatever spite may lurk in the defendant's heart). They are "too much." The second assumption is that the presence of malice or spite in an official's heart renders any action unconstitutionally retaliatory, even if it would otherwise have been done in the name of legitimate hard bargaining. The motive-is-all test is not the law of our retaliation precedent. If a spiteful heart rendered any official efforts actionable as unconstitutional retaliation, our retaliation discharge cases would have asked not only whether the plaintiff was fired for cause (and would have been fired for cause anyway), but whether the official who discharged the plaintiff tainted any legitimate purpose with spitefulness in firing this par-

ticular, outspoken critic. But we have taken no such position; to the contrary, we have held that proof that the action was independently justified on grounds other than the improper one defeats the claim. See *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Any other approach would have frustrated an employer's legitimate interest in securing a competent workforce (comparable to the Government's interest as a landowner here), and would have introduced the complication of proving motive even in cases in which the action taken was plainly legitimate.

Since Justice GINSBURG disclaims the second alternative, *post* at ----13, n. 6, the acts of spite and ill-will that she emphasizes will necessarily count in a "too much" calculation.

*13 Robbins does make a few allegations, like the unauthorized survey and the unlawful entry into the lodge, that charge defendants with illegal action plainly going beyond hard bargaining. If those were the only coercive acts charged, Robbins could avoid the "too much" problem by fairly describing the Government behavior alleged as illegality in attempting to obtain a property interest for nothing, but that is not a fair summary of the body of allegations before us, according to which defendants' improper exercise of the Government's "regulatory powers" is essential to the claim. Brief for Respondent 21. (Of course, even in that simpler case, the tort or torts by Government employees would be so clearly actionable under the general law that it would furnish only the weakest argument for recognizing a generally available constitutional.) Rather, the bulk of Robbins's charges go to actions that, on their own, fall within the Government's enforcement power.

[2] It would not answer the concerns just expressed to change conceptual gears and consider the more abstract concept of liability for retaliatory or undue pressure on a property owner for standing firm on property rights; looking at the claim that way would not eliminate the problem of degree, and it would raise a further reason to balk at recognizing a *Bivens*

claim. For at this high level of generality, a *Bivens* action to redress retaliation against those who resist Government impositions on their property rights would invite claims in every sphere of legitimate governmental action affecting property interests, from negotiating tax claim settlements to enforcing Occupational Safety and Health Administration regulations. Exercising any governmental authority affecting the value or enjoyment of property interests would fall within the *Bivens* regime, and across this enormous swath of potential litigation would hover the difficulty of devising a "too much" standard that could guide an employee's conduct and a judicial factfinder's conclusion.[FN11]

> [FN11.] Justice GINSBURG points out that apprehension of many lawsuits is not a good reason to refrain from creating a *Bivens* action. *Post,* at ---- - ----, ----10-11, 15. But there is a world of difference between a popular *Bivens* remedy for a well-defined violation, on the one hand, and (on the other) litigation invited because the elements of a claim are so unclear that no one can tell in advance what claim might qualify or what might not. We ground our judgment on the elusiveness of a limiting principle for Robbins's claim, not on the potential popularity of a claim that could be well defined.

The point here is not to deny that Government employees sometimes overreach, for of course they do, and they may have done so here if all the allegations are true. The point is the reasonable fear that a general *Bivens* cure would be worse than the disease.

### C

**\*14** In sum, defendants were acting in the name of the Bureau, which had the authority to grant (and had given) Robbins some use of public lands under its control and wanted a right-of-way in return. Defendants bargained hard by capitalizing on their discretionary authority and Robbins's violations of various permit terms, though truculence was apparent on both sides. One of the defendants, at least, clearly crossed the line into impermissible conduct in breaking into Robbins's lodge, although it is not clear from the re-

cord that any other action by defendants was more serious than garden-variety trespass, and the Government has successfully defended every decision to eliminate Robbins's permission to use public lands in the ways he had previously enjoyed. Robbins had ready at hand a wide variety of administrative and judicial remedies to redress his injuries. The proposal, nonetheless, to create a new *Bivens* remedy to redress such injuries collectively on a theory of retaliation for exercising his property right to exclude, or on a general theory of unjustifiably burdening his rights as a property owner, raises a serious difficulty of devising a workable cause of action. A judicial standard to identify illegitimate pressure going beyond legitimately hard bargaining would be endlessly knotty to work out, and a general provision for tortlike liability when Government employees are unduly zealous in pressing a governmental interest affecting property would invite an onslaught of *Bivens* actions.

[3] We think accordingly that any damages remedy for actions by Government employees who push too hard for the Government's benefit may come better, if at all, through legislation. "Congress is in a far better position than a court to evaluate the impact of a new species of litigation" against those who act on the public's behalf. *Bush,* 462 U.S., at 389, 103 S.Ct. 2404. And Congress can tailor any remedy to the problem perceived, thus lessening the risk of raising a tide of suits threatening legitimate initiative on the part of the Government's employees. *Ibid.* ("[Congress] may inform itself through factfinding procedures such as hearings that are not available to the courts"); cf. *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (recognizing "the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties" (internal quotation marks and brackets omitted)).

### III

[4] Robbins's other claim is under RICO, which gives civil remedies to "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Section 1962(c) makes it a crime for "any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." RICO defines "racketeering activity" to include "any act which is indictable under" the Hobbs Act as well as "any act or threat involving ... extortion ..., which is chargeable under State law and punishable by imprisonment for more than one year." §§ 1961(1)(A)-(B) (2000 ed., Supp. IV). The Hobbs Act, finally, criminalizes interference with interstate commerce by extortion, along with attempts or conspiracies, § 1951(a), extortion being defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right," § 1951(b)(2).

Robbins charges defendants with violating the Hobbs Act by wrongfully trying to get the easement under color of official right, to which defendants reply with a call to dismiss the RICO claim for two independent reasons: the Hobbs Act does not apply when the National Government is the intended beneficiary of the allegedly extortionate acts; and a valid claim of entitlement to the disputed property is a complete defense against extortion. Because we agree with the first contention, we do not reach the second.

***15** [5] The Hobbs Act does not speak explicitly to efforts to obtain property for the Government rather than a private party, and that leaves defendants' contention to turn on the common law conception of "extortion," which we presume Congress meant to incorporate when it passed the Hobbs Act in 1946. See *Scheidler v. National Organization for Women, Inc.,* 537 U.S. 393, 402, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003) (construing the term "extortion" in the Hobbs Act by reference to its common law meaning); *Evans v. United States,* 504 U.S. 255, 259, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992) (same); see also *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken").

"At common law, extortion was a property offense committed by a public official who took any money or thing of value that was not due to him under the pretense that he was entitled to such property by virtue of his office." *Scheidler, supra,* at 402, 123 S.Ct. 1057 (quoting 4 W. Blackstone, Commentaries on the Laws of England 141 (1769), and citing 3 R. Anderson, Wharton's Criminal Law and Procedure § 1393, pp. 790-791 (1957); internal quotation marks omitted). In short, "[e]xtortion by the public official was the rough equivalent of what we would now describe as 'taking a bribe.' " *Evans, supra,* at 260, 112 S.Ct. 1881. Thus, while Robbins is certainly correct that public officials were not immune from charges of extortion at common law, see Brief for Respondent 43, the crime of extortion focused on the harm of public corruption, by the sale of public favors for private gain, not on the harm caused by overzealous efforts to obtain property on behalf of the Government. FN12

> FN12. Although the legislative history of the Hobbs Act is generally "sparse and unilluminating with respect to the offense of extortion," *Evans,* 504 U.S., at 264, 112 S.Ct. 1881, we know that Congress patterned the Act after two sources of law: "the Penal Code of New York and the Field Code, a 19th-century model penal code," *Scheidler,* 537 U.S., at 403, 123 S.Ct. 1057. In borrowing from these sources, the Hobbs Act expanded the scope of common law extortion to include private perpetrators while retaining the core idea of extortion as a species of corruption, akin to bribery. But Robbins provides no basis for believing that Congress thought of broadening the definition of extortion under color of official right beyond its common law meaning.

The importance of the line between public and private beneficiaries for common law and Hobbs Act extortion is confirmed by our own case law, which is completely barren of an example of extortion under color of official right undertaken for the sole benefit of the Government. See, *e.g., McCormick v. United States,* 500 U.S. 257, 273, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991) (discussing circumstances in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----, 2007 WL 1804315 (U.S.)
**(Cite as: --- S.Ct. ----)**

which public official's receipt of campaign contributions constitutes extortion under color of official right); *Evans, supra,* at 257, 112 S.Ct. 1881 (Hobbs Act prosecution for extortion under color of official right, where public official accepted cash in exchange for favorable votes on a rezoning application); *United States v. Gillock,* 445 U.S. 360, 362, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980) (Hobbs Act prosecution for extortion under color of official right, where state senator accepted money in exchange for blocking a defendant's extradition and agreeing to introduce legislation); cf. *United States v. Deaver,* 14 F. 595, 597 (W.D.N.C.1882) (under the "technical meaning [of extortion] in the common law, ... [t]he officer must unlawfully and corruptly receive such money or article of value for *his own benefit* or *advantage* "). More tellingly even, Robbins has cited no decision by any court, much less this one, from the entire 60-year period of the Hobbs Act that found extortion in efforts of Government employees to get property for the exclusive benefit of the Government.

Of course, there is usually a case somewhere that provides comfort for just about any claim. Robbins musters two for his understanding of extortion under color of official right, neither of which, however, addressed the beneficiary question with any care: *People v. Whaley,* 6 Cow. 661, 1827 WL 2284 (N.Y.1827), and *Willett v. Devoy,* 170 App. Div. 203, 155 N.Y.S. 920 (1915). *Whaley* was about a charge of extortion against a justice of the peace who wrongfully ordered a litigant to pay compensation to the other party as well as a small administrative fee to the court. Because the case involved illegally obtaining property for the benefit of a private third party, it does not stand for the proposition that an act for the benefit of the Government alone can be extortion. The second case, *Willett,* again from New York, construed a provision of the State's Public Officers Law. That statute addressed the problem of overcharging by public officers, see Birdseye's Consol. Laws of N.Y. Ann. § 67, p. 4640 (1909), and the court's opinion on it said that common law extortion did not draw any distinction "on the ground that the official keeps the fee himself," 170 App. Div., at 204, 155 N.Y.S., at 921. But a single, two-page opinion from a state intermediate appellate court issued in 1915 is not much indication that the Hobbs Act was adopted in 1946 subject to the understanding that common law extortion was spacious enough to cover the case Robbins states. There is a reason he is plumbing obscurity.

**\*16** Robbins points to what we said in *United States v. Green,* 350 U.S. 415, 420, 76 S.Ct. 522, 100 L.Ed. 494 (1956), that "extortion as defined in the [Hobbs Act] in no way depends upon having a direct benefit conferred on the person who obtains the property." He infers that Congress could not have meant to prohibit extortionate acts in the interest of private entities like unions, but ignore them when the intended beneficiary is the Government. See Brief for Respondent 47-48. But Congress could very well have meant just that; drawing a line between private and public beneficiaries prevents suits (not just recoveries) against public officers whose jobs are to obtain property owed to the Government. So, without some other indication from Congress, it is not reasonable to assume that the Hobbs Act (let alone RICO) was intended to expose all federal employees, whether in the Bureau of Land Management, the Internal Revenue Service, the Office of the Comptroller of the Currency (OCC), or any other agency, to extortion charges whenever they stretch in trying to enforce Government property claims. See *Sinclair v. Hawke,* 314 F.3d 934, 944 (C.A.8 2003) (OCC employees "do not become racketeers by acting like aggressive regulators"). As we just suggested, Robbins does not face up to the real problem when he says that requiring proof of a wrongful intent to extort would shield well-intentioned Government employees from liability. It is not just final judgments, but the fear of criminal charges or civil claims for treble damages that could well take the starch out of regulators who are supposed to bargain and press demands vigorously on behalf of the Government and the public. This is the reason we would want to see some text in the Hobbs Act before we could say that Congress meant to go beyond the common law preoccupation with official corruption, to embrace the expansive notion of extortion Robbins urges on us.

[6] He falls back to the argument that defendants violated Wyoming's blackmail statute, see Wyo. Stat. Ann. § 6-2-402 (1977-2005),[FN13] which he says is a

separate predicate offense for purposes of RICO liability. But even assuming that defendants' conduct would be "chargeable under State law and punishable by imprisonment for more than one year," 18 U.S.C. § 1961(1)(A), it cannot qualify as a predicate offense for a RICO suit unless it is "capable of being generically classified as extortionate," *Scheidler,* 537 U.S., at 409, 410, 123 S.Ct. 1057; accord, *United States v. Nardello,* 393 U.S. 286, 296, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969). For the reasons just given, the conduct alleged does not fit the traditional definition of extortion, so Robbins's RICO claim does not survive on a theory of state-law derivation.

> FN13. Section 6-2-402 provides:
> "(a) A person commits blackmail if, with the intent to obtain property of another or to compel action or inaction by any person against his will, the person:
>
> "(ii) Accuses or threatens to accuse a person of a crime or immoral conduct which would tend to degrade or disgrace the person or subject him to the ridicule or contempt of society."

\* \* \*

**\*17** Because neither *Bivens* nor RICO gives Robbins a cause of action, there is no reason to enquire further into the merits of his claim or the asserted defense of qualified immunity. The judgment of the Court of Appeals for the Tenth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, with whom Justice SCALIA joins, concurring.

The Court correctly concludes that *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), does not supply a cause of action in this case. I therefore join its opinion. I write separately because I would not extend *Bivens* even if its reasoning logically applied to this case. "*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action." *Correctional Services Corp. v. Malesko,*

534 U.S. 61, 75, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (SCALIA, J., joined by THOMAS, J., concurring). Accordingly, in my view, *Bivens* and its progeny should be limited "to the precise circumstances that they involved." *Malesko, supra,* at 75, 122 S.Ct. 515.

Justice GINSBURG, with whom Justice STEVENS joins, concurring in part and dissenting in part.

Bureau of Land Management (BLM) officials in Wyoming made a careless error. They failed to record an easement obtained for the United States along a stretch of land on the privately owned High Island Ranch. Plaintiff-respondent Frank Robbins purchased the ranch knowing nothing about the easement granted by the prior owner. Under Wyoming law, Robbins took title to the land free of the easement. BLM officials, realizing their mistake, demanded from Robbins an easement-for which they did not propose to pay-to replace the one they carelessly lost. Their demand, one of them told Robbins, was nonnegotiable. Robbins was directed to provide the easement, or else. When he declined to follow that instruction, the BLM officials mounted a seven-year campaign of relentless harassment and intimidation to force Robbins to give in. They refused to maintain the road providing access to the ranch, trespassed on Robbins' property, brought unfounded criminal charges against him, canceled his special recreational use permit and grazing privileges, interfered with his business operations, and invaded the privacy of his ranch guests on cattle drives.

Robbins commenced this lawsuit to end the incessant harassment and intimidation he endured. He asserted that the Fifth Amendment's Takings Clause forbids government action calculated to acquire private property coercively and cost-free. He further urged that federal officials dishonor their constitutional obligation when they act in retaliation for the property owner's resistance to an uncompensated taking. In support of his claim for relief, Robbins relied on *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The Court recognizes that the "remedy" to which the Government would confine Robbins-a discrete challenge to each offending action as it occurs-is inadequate. A remedy so limited would expose Robbins' business to "death

by a thousand cuts." See *ante,* at ----15 (quoting Brief for Respondent 40). Nevertheless, the Court rejects his claim, for it fears the consequences. Allowing Robbins to pursue this suit, the Court maintains, would open the floodgates to a host of unworthy suits "in every sphere of legitimate governmental action affecting property interests." *Ante,* at ----21.

**\*18** But this is no ordinary case of "hard bargaining," *ibid.,* or bureaucratic arrogance. Robbins charged "vindictive action" to extract property from him without paying a fair price. He complains of a course of conduct animated by an illegitimate desire to "get him." That factor is sufficient to minimize the Court's concern. Cf. *Village of Willowbrook v. Olech,* 528 U.S. 562, 565-566, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (BREYER, J., concurring in result) (citations and internal quotation marks omitted). Taking Robbins' allegations as true, as the Court must at this stage of the litigation, the case presents this question: Does the Fifth Amendment provide an effective check on federal officers who abuse their regulatory powers by harassing and punishing property owners who refuse to surrender their property to the United States without fair compensation? The answer should be a resounding "Yes."

I

The Court acknowledges that, at this stage of proceedings, the facts must be viewed in the light most favorable to Robbins. *Ante,* at ----3, n. 2. The full force of Robbins' complaint, however, is not quite captured in the Court's restrained account of his allegations. A more complete rendition of the saga that sparked this suit is in order.

Upon discovering that BLM had mistakenly allowed its easement across High Island Ranch to expire, BLM area manager Joseph Vessels contacted Robbins at his home in Alabama to demand that Robbins grant a new easement. Vessels was on shaky legal ground. A federal regulation authorized BLM to require a landowner seeking a right-of-way across Government land to grant reciprocal access to his own land. See 43 CFR § 2801.1-2 (2004). But Robbins never applied for a right-of-way across federal land (the prior owner did), and the Government cites no

law or regulation commanding Robbins to grant a new easement to make up for BLM's neglect in losing the first one. Robbins was unwilling to capitulate to unilateral demands, but told Vessels he would negotiate with BLM when he moved to Wyoming. Vessels would have none of it: "This is what you're going to do," he told Robbins. Plaintiff-Appellee's Supp.App. in No. 04-8016 (CA10), p. 325 (hereinafter CA10 App.).

Edward Parodi, a range technician in the BLM office, testified that from the very beginning, agency employees referred to Robbins as "the rich SOB from Alabama [who] got [the Ranch]." App. 121. Trouble started almost immediately. Shortly after their first conversation, Vessels wrote Robbins to ask permission to survey his land, presumably to establish the contours of the easement. Robbins refused, believing there was no need for a survey until an agreement had been reached. Vessels conducted the survey anyway, and chuckled when he told Robbins of the trespass. CA10 App. 325-327. At their first face-to-face meeting in Wyoming, Robbins bridled at the one-sided deal BLM proposed. But Vessels was adamant: "The Federal Government does not negotiate," he declared. *Id.,* at 326. Over time, Parodi reported, Vessels' attitude towards Robbins changed from "professional" to "hostile," and "just got worse and worse and worse." App. 124.

**\*19** Other BLM employees shared Vessels' animosity. In one notable instance, Robbins alleged, BLM agent Gene Leone provoked a violent encounter between Robbins and a neighboring landowner, LaVonne Pennoyer. Leone knew Robbins was looking for a water source for his cattle, and he called Pennoyer to warn her to be on the lookout. Robbins, unfamiliar with the territory and possibly misled by BLM, drove cattle onto Pennoyer's land to water at a creek. Pennoyer showed up in her truck, yelling, blowing the horn, and bumping cows. Realizing that he was on Pennoyer's land, Robbins started to push his cows out of her way, when Pennoyer revved her engine and drove her truck straight into the horse Robbins was riding. *Id.,* at 49; CA10 App. 331-332, 676-681; Pl. Exh. 2, Record 164-166; Pl. Exh. 35a, *id.,* at 102-108. According to Parodi, after the dustup, Leone boasted, "I think I finally got a way to get

[Robbins'] permits and get him out of business." App. 125, 126. Leone pressed the local sheriff to charge Robbins for his conduct in the encounter with Pennoyer, but the sheriff declined to do so. CA10 App. 331-332.

Leone cited the Pennoyer incident as one ground, among others, to suspend Robbins' special recreation use permit. That permit allowed Robbins to lead ranch guests on cattle drives, which were his primary source of revenue from the property. App. 49. BLM aimed at the cattle drives in other ways too. Undermining the authenticity of the experience Robbins offered his guests, BLM employees followed along in trucks, videotaping participants. The Government suggests that this surveillance was a legitimate way to document instances when Robbins crossed onto federal land without permission. The suggestion, however, hardly explains why, on one occasion, BLM employees videotaped several female guests who were seeking privacy so they could relieve themselves. CA10 App. 506-507.

As part of the campaign against Robbins, Parodi was instructed to "look closer" for trespass violations, to "investigate harder" and "if [he] could find anything, to find it." App. 129, 130. Parodi testified, in relation to the instructions he was given, that he did not have problems with Robbins: He never found a trespass violation he regarded as willful, and Robbins promptly addressed every concern Parodi raised. *Id.*, at 124, 127.

The Court maintains that the BLM employees "were within their rights to make it plain that Robbins's willingness to give the easement would determine how complaisant they would be" about his infractions, but the record leaves doubt. *Ante*, at ----19. Parodi testified that he was asked to "do things [he] wasn't authorized [to do]," App. 124, and that Leone's projections about what BLM officers would do to Robbins exceeded "the appropriate mission of the BLM," *id.*, at 128. About Vessels, Parodi said, "[i]t has been my experience that people given authority and not being held in check and not having solid convictions will run amuck and that [is] what I saw happening." *Id.*, at 125. Eventually, Parodi was moved to warn Robbins that, if he continued to defy BLM offi-

cials, "there would be war, a long war and [BLM] would outlast him and outspend him." *Id.*, at 132. Parodi found BLM's treatment of Robbins so disturbing that it became "the volcanic point" in his decision to retire. *Id.*, at 133. "It's one thing to go after somebody that is willfully busting the regulations and going out of their way to get something from the government," Parodi said, but he saw Robbins only "as a man standing up for his property rights." Pl. Exh. 35C, Record 41.

**\*20** The story thus far told is merely illustrative of Robbins' allegations. The record is replete with accounts of trespasses to Robbins' property, vindictive cancellations of his rights to access federal land, and unjustified or selective enforcement actions. Indeed, BLM was not content with the arrows in its own quiver. Robbins charged that BLM officials sought to enlist other federal agencies in their efforts to harass him. In one troubling incident, a BLM employee, petitioner David Wallace, pressured a Bureau of Indian Affairs (BIA) manager to impound Robbins' cattle, asserting that he was "a bad character" and that "something need[ed] to be done with [him]." CA10 App. 359. The manager rejected the request, observing that the BIA had no problems with Robbins. *Ibid.*

Even more disconcerting, there was sufficient evidence, the District Court recognized, to support Robbins' allegation that BLM employees filed false criminal charges against him, claiming that he forcibly interfered with a federal officer. Federal prosecutors took up the cause, but Robbins was acquitted by a jury in less than 30 minutes.[FN1] A news account reported that the jurors "were appalled at the actions of the government," one of them commenting that "Robbins could not have been railroaded any worse ... if he worked for Union Pacific." *Id.*, at 852.

> FN1. Despite the rapid acquittal, the trial court denied Robbins' request for counsel fees, finding that he failed to prove "the position of the United States was vexatious, frivolous, or in bad faith." Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act 1998, § 617, 111 Stat. 2519, note following

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

18 U.S.C. § 3006A. The Court counts this a significant point favoring petitioners. See *ante,* at ----12 ("[T]he federal judge who presided at the trial did not think the Government's case thin enough to justify awarding attorney's fees."). But, as Robbins notes, the trial court passed only on the prosecutor's litigation position, not on whether the allegations of the BLM employees, which prompted the prosecution, were made in bad faith. Brief for Respondent 7, n. 5.

BLM's seven-year campaign of harassment had a devastating impact on Robbins' business. Robbins testified that in a typical summer, the High Island Ranch would accommodate 120 guests spread across six cattle drives. As a result of BLM's harassment, in 2003, Robbins was able to organize only one cattle drive with 21 guests. *Id.,* at 507-508. In addition, Robbins reports that he spent "hundreds of thousands of dollars in costs and attorney's fees" seeking to fend off BLM. Brief for Respondent 9, n. 6.

To put an end to the incessant harassment, Robbins filed this suit, alleging that the Fifth Amendment forbids government action calculated to acquire private property coercively and cost-free, and measures taken in retaliation for the owner's resistance to an uncompensated taking. Even assuming Robbins is correct about the Fifth Amendment, he may not proceed unless he has a right to sue. To ground his claim for relief, Robbins relies on *Bivens,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619.

II

**\*21** "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison,* 1 Cranch 137, 163, 2 L.Ed. 60 (1803). In *Bivens,* the Court drew upon that venerable principle in holding that a victim of a Fourth Amendment violation by federal officers has a claim for relief in the form of money damages. "Historically," the Court observed, "damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." 403 U.S., at 395, 91 S.Ct. 1999.

The Court's decisions recognize that the reasoning underlying *Bivens* is not confined to Fourth Amendment claims. In *Davis v. Passman,* 442 U.S. 228, 248-249, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Court allowed a suit seeking money damages for employment discrimination in violation of the equal protection component of the Fifth Amendment. "[U]nless [constitutional] rights are to become merely precatory," the Court stated, "litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for ... protection." *Id., at 242, 99 S.Ct. 2264.* Soon after *Passman,* the Court applied *Bivens* again, recognizing a federal right of action to gain damages for an Eighth Amendment violation. *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).

*Carlson* announced two exceptions to *Bivens'* rule. "The first [applies] when defendants demonstrate special factors counselling hesitation in the absence of affirmative action by Congress." 446 U.S., at 18, 100 S.Ct. 1468 (quoting *Bivens,* 403 U.S., at 396, 91 S.Ct. 1999). "The second [applies] when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Carlson,* 446 U.S., at 18-19, 100 S.Ct. 1468 (emphasis in original). Prior decisions have invoked these exceptions to bar *Bivens* suits against federal officers in only three contexts.[FN2]

> FN2. The Court cites *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (suit against private prison), and *FDIC v. Meyer,* 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (suit against federal agency), among cases in which we have declined to extend *Bivens. Ante,* at ----10. Neither was a suit against a federal officer.

In *Bush v. Lucas,* 462 U.S. 367, 368, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), a federal employee sought recovery for First Amendment violations alleged to have occurred in his workplace. As a civil servant,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the plaintiff had recourse to "an elaborate, comprehensive scheme" administered by the Civil Service Commission, in which constitutional challenges were "fully cognizable." *Id.,* at 385, 386, 103 S.Ct. 2404. The Court declined to recognize a judicial remedy, lest it interfere with Congress' carefully calibrated system. For similar reasons, in *Schweiker v. Chilicky,* 487 U.S. 412, 414, 424-429, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), the Court held that the Social Security Act's scheme of administrative and judicial remedies left no void to be filled by a *Bivens* action. Likewise, on two occasions, the Court concluded that "the unique disciplinary structure of the Military Establishment" precluded a *Bivens* action for harm to military personnel through activity incident to service. *United States v. Stanley,* 483 U.S. 669, 679, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (internal quotation marks omitted); *Chappell v. Wallace,* 462 U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983).

*22 Some Members of this Court consider *Bivens* a dated precedent. See *ante,* at ----1 (THOMAS, J., concurring) ("*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action." (quoting *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 75, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (SCALIA, J., concurring))). But the Court has so far adhered to *Bivens* ' core holding: Absent congressional command or special factors counseling hesitation, "victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Carlson,* 446 U.S., at 18, 100 S.Ct. 1468.

### III

### A

The Court does not hold that Robbins' *Bivens* suit is precluded by a carefully calibrated administrative regime like those at issue in *Bush, Chilicky, Chappell,* or *Stanley,* nor could it. As the Court recognizes, Robbins has no alternative remedy for the relentless torment he alleges. True, Robbins may have had discrete remedies for particular instances of harassment. But, in these circumstances, piecemeal litigation, the Court acknowledges, cannot forestall "death by a

thousand cuts." *Ante,* at ----15 (quoting Brief for Respondent 40). For plaintiffs in Robbins' shoes, "it is damages or nothing." *Bivens,* 403 U.S., at 410, 91 S.Ct. 1999 (Harlan, J., concurring in judgment).

Despite the Court's awareness that Robbins lacks an effective alternative remedy, it nevertheless bars his suit. The Court finds, on the facts of this case, a special factor counseling hesitation quite unlike any we have recognized before. Allowing Robbins to seek damages for years of harassment, the Court says, "would invite an onslaught of *Bivens* actions," *ante,* at ----23, with plaintiffs pressing claims "in every sphere of legitimate governmental action affecting property interests," *ante,* at ----21.

*23 The "floodgates" argument the Court today embraces has been rehearsed and rejected before. In *Passman,* the Court of Appeals emphasized, as a reason counseling denial of a *Bivens* remedy, the danger of "deluging federal courts with [Fifth Amendment based employment discrimination] claims." 442 U.S., at 248, 99 S.Ct. 2264 (internal quotation marks and citation omitted). This Court disagreed, turning to Justice Harlan's concurring opinion in *Bivens* to explain why.

The only serious policy argument against recognizing a right of action for Bivens, Justice Harlan observed, was the risk of inundating courts with Fourth Amendment claims. He found the argument unsatisfactory: "[T]he question appears to be how Fourth Amendment interests rank on a scale of social values compared with, for example, the interests of stockholders defrauded by misleading proxies. Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of legally protected interests." 403 U.S., at 410-411, 91 S.Ct. 1999 (citation omitted).

In attributing heavy weight to the floodgates concern pressed in this case, the Court today veers away from Justice Harlan's sound counsel.

### B

In the Court's view Robbins' complaint poses an inor-

dinate risk of imposing on vigilant federal officers, and inundating federal courts, for his pleading "fails to fit the [Court's] prior retaliation cases." *Ante,* at ----16. "Those cases," the Court says, "turn[ed] on an allegation of [an] impermissible purpose and motivation." *Ibid.* (citing *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); and *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)). Robbins' suit, the Court maintains, raises a different sort of claim: that BLM employees went "too far" in their efforts to achieve an objective that "[a]ll agree" was "perfectly legitimate": "trying to induce [Robbins] to grant an easement for public use." *Ante,* at ----17. Developing a legal test to determine when federal officials have gone "too far," *ibid.,* the Court asserts, would be an "endlessly knotty" task; the attendant uncertainty, the Court fears, would bring on a "tide of suits," inducing an undesirable timidity on the part of federal officials, *ante,* at ---- - ----22-23.

The Court's assertion that the BLM officials acted with a "perfectly legitimate" objective, *ante,* at ----17, is a dubious characterization of the long campaign to "bury" Robbins. See App. 49. One may accept that, at the outset, the BLM agents were motivated simply by a desire to secure an easement. But after Robbins refused to cover for the officials' blunder, they resolved to drive him out of business.[FN3] Even if we allowed that the BLM employees had a permissible objective throughout their harassment of Robbins, and also that they pursued their goal through "legitimate tactics," *id.,* at ----16,[FN4] it would not follow that Robbins failed to state a retaliation claim amenable to judicial resolution.

> FN3. Robbins agreed, the Court relates, "that the Bureau's employees intended to convince Robbins to grant an easement." *Ante,* at ----17. In support, the Court notes that Robbins posed this question: "[C]an government officials avoid the Fifth Amendment's prohibition against taking property without just compensation by using their regulatory powers to harass, punish, and coerce a private citizen into giving the Government his property without payment?" *Ante,*

at ----17, n. 8 (quoting Brief for Respondent 21; alteration in original). Robbins' descriptive words-"harass, punish, and coerce"-are hardly synonyms for "convince." Robbins has maintained throughout that the officials' motives were vindictive, a characterization amply supported by the record. Indeed, the agents' seven-year campaign of harassment calls to mind W.H. Auden's famous lines: "Their cause, if they had one, is nothing to them now; They hate for hate's sake." There Will Be No Peace, reprinted in W.H. Auden: Collected Poems 615 (E. Mendelson ed.2007).

> FN4. The Court observes that the Interior Board of Land Appeals (IBLA) approved some of BLM's enforcement actions against Robbins. *Ante,* at ---- - ----, ----5-6, 19. Significantly, however, the IBLA declared that, as it was not a court "of general jurisdiction," it had "no authority to invalidate [BLM action] based on proof of improper motive on the part of a BLM official or employee involved in the development or issuance of the decision." *Robbins v. Bureau of Land Management,* 170 I.B.L.A. 219, 227 (2006). Accordingly, the IBLA refused to entertain Robbins' contention that BLM enforcement actions were "part of a pattern of activities amounting to willful violations of civil, criminal, or constitutional law." *Ibid.*

**\*24** Impermissible retaliation may well involve lawful action in service of legitimate objectives. For example, in *Board of Comm'rs, Wabaunsee Cty. v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342 (1996), this Court held that a county board of commissioners may cross into unconstitutional territory if it fires a contractor for speaking out against members of the Board on matters of public concern. The Court recognized that terminating a contractor for public criticism of board practices might promote legitimate governmental objectives (*e.g.,* maintaining relationships of trust with those from whom services are purchased). *Id., at 674, 116 S.Ct. 2342.* The Court, furthermore, instructed that even where the background law allows a government agency to terminate a contractor at will, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agency lacks *carte blanche* to do so in retaliation for constitutionally protected conduct. *Id., at 677, 116 S.Ct. 2342.*[FN5] The same is true here: BLM officials may have had the authority to cancel Robbins' permits or penalize his trespasses, but they are not at liberty to do so selectively, in retaliation for his exercise of a constitutional right.[FN6]

> FN5. Invoking *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968),* the Court, in *Board of Comm'rs, Wabaunsee Cty. v. Umbehr,* 518 U.S. 668, 685, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), held that the Board's legitimate interests must be balanced against the free speech interests at stake to arrive at the appropriate constitutional judgment.

> FN6. In *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court held that a defendant in a First Amendment employment retaliation case can avoid liability by showing that "it would have reached the same decision as to [the plaintiff's] reemployment ... in the absence of the protected conduct." This test, the Court explained, is necessary to "distinguis[h] between a result caused by a constitutional violation and one not so caused." *Id., at 286. Mt. Healthy's* causation standard, as today's opinion notes, is applicable here; hence, Robbins' claim is not governed by a "motive-is-all test." See *ante,* at ----20, n. 10. Thus, if the BLM officials proved at trial that, even if Robbins had not refused to grant an easement *gratis,* they nonetheless would have canceled his permits, harassed his guests, and filed false criminal charges against him, they would escape liability for retaliation in violation of the Fifth Amendment (though perhaps exposing themselves to other sanctions).

I therefore cannot join the Court in concluding that Robbins' allegations present questions more "knotty" than the mine-run of constitutional retaliation claims. Because "we have established methods for identify-

ing the presence of an illicit reason ... in retaliation cases," *ante,* at ----16, Robbins' suit can be resolved in familiar fashion. A court need only ask whether Robbins engaged in constitutionally protected conduct (resisting the surrender of his property sans compensation), and if so, whether that was the reason BLM agents harassed him.[FN7]

> FN7. The Government, I recognize, should not be hampered in pursuing lawful means to drive a hard bargain. See *ante,* at ---- - ----19-20, n. 10. Trespassing, filing false criminal charges, and videotaping women seeking privacy to relieve themselves, however, are not the tools of "hard bargaining." They have a closer relationship to the armed thug's demand: "Your money or your life." By concentrating on the allegedly lawful actions the BLM agents took (*e.g.,* canceling a right-of-way), *ibid.,* the Court gives a bloodless account of Robbins' complaint.

C

The Court's opinion is driven by the "fear" that a "*Bivens* cure" for the retaliation Robbins experienced may be "worse than the disease." *Ante,* at ----22. This concern seems to me exaggerated. Robbins' suit is predicated upon the agents' vindictive motive, and the presence of this element in his claim minimizes the risk of making everyday bureaucratic overreaching fare for constitutional litigation. See *Olech,* 528 U.S., at 566, 120 S.Ct. 1073 (BREYER, J., concurring in result) ("In my view, the presence of [vindictive action] in this case is sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right.").

Indeed, one could securely forecast that the flood the Court fears would not come to pass. In *Passman,* the Courts said that it did not "perceive the potential for ... a deluge," because, under 42 U.S.C. § 1983, "a damages remedy [was] already available to redress injuries such as petitioner's when they occur under color of state law." 442 U.S., at 248, 99 S.Ct. 2264. A similar sidegance could be cast here. Because we have no reason to believe that state employees are any more or less respectful of Fifth Amendment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----, 2007 WL 1804315 (U.S.)
**(Cite as: --- S.Ct. ----)**

rights than federal agents, § 1983 provides a controlled experiment. If numerous *Bivens* claims would eventuate were courts to entertain claims like Robbins', then courts should already have encountered endeavors to mount Fifth Amendment Takings suits under § 1983. But the Court of Appeals, the Solicitor General, and Robbins all agree that there are no reported cases on charges of retaliation by state officials against the exercise of Takings Clause rights. 433 F.3d 755, 767 (C.A.10 2006); Brief for Petitioners 48; Brief for Respondent 31. Harassment of the sort Robbins alleges, it seems, is exceedingly rare. Cf. *Olech,* 528 U.S., at 565-566, 120 S.Ct. 1073 (BREYER, J., concurring in result).[FN8]

> [FN8.] The rarity of such harassment makes it unlikely that Congress will develop an alternative remedy for plaintiffs in Robbins' shoes, and it strengthens the case for allowing a *Bivens* suit. As noted above, every time the Court declined to recognize a *Bivens* action against a federal officer, it did so in deference to a specially crafted administrative regime. See *supra,* at ----9.

**\*25** One can assume, *arguendo,* that, as the Court projects, an unqualified judgment for Robbins could prompt "claims in every sphere of legitimate governmental action affecting property interests." *Ante,* at ----21. Nevertheless, shutting the door to all plaintiffs, even those roughed up as badly as Robbins, is a measure too extreme. Cf. *Hein v. Freedom From Religion Foundation, Inc.,* --- U.S. ----, ----, n. 1, --- S.Ct. ----, ---L.Ed.2d. ----, 2007 WL 1803960, \*33 (2007) (dissenting opinion) ("To the degree ... claims are meritorious, fear that there will be many of them does not provide a compelling reason ... to keep them from being heard."). There are better ways to ensure that run-of-the-mill interactions between citizens and their Government do not turn into cases of constitutional right. Cf. *Bivens,* 403 U.S., at 410, 91 S.Ct. 1999 (Harlan, J., concurring in judgment) ("I simply cannot agree ... that the possibility of frivolous claims ... warrants closing the Courthouse doors to people in Bivens' situation. There are other ways, short of that, of coping with frivolous lawsuits." (internal quotation marks omitted)).

Sexual harassment jurisprudence is a helpful guide. Title VII, the Court has held, does not provide a remedy for every epithet or offensive remark. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive work environment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks, alterations, and citations omitted). See also *National Railroad Passenger Corporation v. Morgan,* 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (hostile work environments develop "over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own"). Adopting a similar standard for Fifth Amendment retaliation claims would "lesse[n] the risk of raising a tide of suits threatening legitimate initiative on the part of the Government's employees." *Ante,* at ----23. Discrete episodes of hard bargaining that might be viewed as oppressive would not entitle a litigant to relief. But where a plaintiff could prove a pattern of severe and pervasive harassment in duration and degree well beyond the ordinary rough-and-tumble one expects in strenuous negotiations, a *Bivens* suit would provide a remedy. Robbins would have no trouble meeting that standard.[FN9]

> [FN9.] My "emphasis on the extent and duration of the harm suffered by Robbins," the Court asserts, indicates that under my approach, Robbins "could not obtain relief without ... satisfying an unspecified, and unworkable, 'too much' standard." *Ante,* at ----18, n. 9. My approach, however, is no less specific nor more unworkable than the approach courts routinely employ in Title VII harassment cases.

## IV

**\*26** Because I conclude that *Robbins* has a right to sue under *Bivens,* I must briefly address the BLM employees' argument that they are entitled to qualified immunity. In resolving claims of official immunity on summary judgment, we ask two questions. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the of-

ficer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). And, if so, was that right clearly established, such that a reasonable officer would have known that his conduct was unlawful. *Id.,* at 201-202, 121 S.Ct. 2151.[FN10]

> FN10. As I have elsewhere indicated, in appropriate cases, I would allow courts to move directly to the second inquiry. See *Brosseau v. Haugen,* 543 U.S. 194, 201-202, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (BREYER, J., joined by SCALIA and GINSBURG, JJ., concurring). See also *County of Sacramento v. Lewis,* 523 U.S. 833, 859, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (STEVENS, J., concurring in judgment).

The Takings Clause instructs that no "private property [shall] be taken for public use, without just compensation." U.S. Const., Amdt. 5. Robbins argues that this provision confers on him the right to insist upon compensation as a condition of the taking of his property. He is surely correct. Correlative to the right to be compensated for a taking is the right to refuse to submit to a taking where no compensation is in the offing. Cf. *Dolan v. City of Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (invalidating a permit condition that would have constituted a taking); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (same).

Robbins further argues that the BLM agents' persistent harassment impermissibly burdened his right to refuse to grant the Government something for nothing. Once again, he is surely correct. To cover for their mistake in failing to record the prior easement, BLM demanded, with no legal authority, that Robbins cede a new easement. Robbins refused, as was his constitutional right. At that point, BLM might have sought to take Robbins' property by eminent domain (assuming the agency was authorized to do so), or it might have attempted to negotiate with him. Instead, the agents harassed Robbins and tried to drive him out of business.

The Court has held that the Government may not un-

necessarily penalize the exercise of constitutional rights. This principle has been applied, most notably, to protect the freedoms guaranteed by the First Amendment. See, *e.g.,* *Umbehr,* 518 U.S., at 674-675, 686, 116 S.Ct. 2342 (freedom of speech); *O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 716-720, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (freedom of association); *Sherbert v. Verner,* 374 U.S. 398, 403-406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (freedom of religion). But it has also been deployed to protect other constitutional guarantees, including the privilege against self-incrimination, *Turley,* 414 U.S., at 82-84, 94 S.Ct. 316, the right to trial by a jury, *Jackson,* 390 U.S., at 581-583, 88 S.Ct. 1209, and the right to travel, *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 254-262, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). The principle should apply here too. The constitutional guarantee of just compensation would be worthless if federal agents were permitted to harass and punish landowners who refuse to give up property without it. The Fifth Amendment, therefore, must be read to forbid government action calculated to acquire private property coercively and cost-free, and measures taken in retaliation for the owner's resistance to uncompensated taking. Viewing the facts in the light most favorable to Robbins, BLM agents plainly violated his Fifth Amendment right to be free of such coercion.

The closest question in this case is whether the officials are nevertheless entitled to immunity because it is not clearly established that retaliation for the exercise of Fifth Amendment rights runs afoul of the Constitution. The "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S., at 202, 121 S.Ct. 2151. As noted, all concede that there are no reported cases recognizing a Fifth Amendment right to be free from retaliation. However, it is inconceivable that any reasonable official could have believed to be lawful the pernicious harassment Robbins alleges. In the egregious circumstances of this case, the text of the Takings Clause and our retaliation jurisprudence provided the officers fair warning that their behavior impermissibly burdened a constitutional right. See *Hope v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----, 2007 WL 1804315 (U.S.)

**(Cite as: --- S.Ct. ----)**

*Pelzer,* 536 U.S. 730, 739-741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

\* \* \*

**\*27** Thirty-six years ago, the Court created the *Bivens* remedy. In doing so, it assured that federal officials would be subject to the same constraints as state officials in dealing with the fundamental rights of the people who dwell in this land. Today, the Court decides that elaboration of *Bivens* to cover Robbins' case should be left to Congress. *Ante,* at ----23. But see *supra,* at ----12, n. 6. The *Bivens* analog to § 1983, however, is hardly an obscure part of the Court's jurisprudence. If Congress wishes to codify and further define the *Bivens* remedy, it may do so at anytime. Unless and until Congress acts, however, the Court should not shy away from the effort to ensure that bedrock constitutional rights do not become "merely precatory." *Passman,* 442 U.S., at 242, 99 S.Ct. 2264.

For the reasons stated, I would affirm the judgment of the Court of Appeals insofar as it addressed Robbins' Fifth Amendment retaliation claim.FN11

> FN11. I agree that Robbins failed to state a claim under RICO and therefore join Part III of the Court's opinion.

U.S.,2007.

Wilkie v. Robbins

--- S.Ct. ----, 2007 WL 1804315 (U.S.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.