0001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

VALERIE PLAME-WILSON,       .
et al.,                    .
                           .
      Plaintiffs,      . CA No. 06-1258
                           .
   v.                  . Washington, D.C.
                       . Thursday, May 17, 2007
I. LEWIS LIBBY, JR., et al., . 10:00 a.m.
                       .
      Defendants.      .
                       .
. . . . . . . . . . . . . ..

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:     ERWIN CHEMERINSKY, ESQ.
                        Duke University School of Law
                        Science Drive & Towerview Road
                        Box 90360
                        Durham, North Carolina 27708-0360
                        919-613-7173
                        ANNE L. WEISMANN, ESQ.
                        Citizens for Responsibility and
                        Ethics in Washington
                        1400 Eye Street, NW
                        Suite 450
                        Washington, D.C. 20005
                        204-408-5565

For Defendant           ALEX J. BOURELLY, ESQ.
I. Lewis Libby, Jr.:    Baker Botts, LLP
                        1299 Pennsylvania Avenue, NW
                        Washington, D.C. 20004-2400
                        202-639-7743

For Defendant           ROBERT D. LUSKIN, ESQ.
Karl C. Rove:           Patton Boggs, LLP
                        2550 M Street, NW
                        Washington, D.C. 20037-1350
                        202-457-6190

0002

For Defendant           JOHN G. KESTER, ESQ.
Richard B. Cheney:      Williams & Connolly

725 12th Street, NW
Washington, D.C. 20005
202-434-5069

For Defendant          MICHAEL L. WALDMAN, ESQ.
Richard L. Armitage:     Fried, Frank, Harris,
Shriver & Jacobson, LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2505
202-639-7096

For the United States:    JEFFREY S. BUCHOLTZ, ESQ.
TIMOTHY P. GARREN, ESQ.
U.S. Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Washington, D.C. 20044
202-616-4143

Court Reporter:          BRYAN A. WAYNE, RPR, CRR
Official Court Reporter
U.S. Courthouse, Room 6812
333 Constitution Avenue, NW
Washington, D.C. 20001
202-354-3186

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

0003
1              P R O C E E D I N G S
2         THE DEPUTY CLERK:  Your Honor, we have Civil Action
3    06-1258, Valerie Plame-Wilson, et al., versus I. Lewis Libby,
4    Jr., et al.  Will counsel at your table please approach the
5    lectern and identify those at your respective tables.  Counsel
6    of record.
7         THE COURT:  Let's start -- let's make sure we have
8    counsel who are going to present argument identify themselves,
9    and who they will be presenting argument on behalf of.
10         MR. CHEMERINKSY:  Good morning.  My name is Erwin
11    Chemerinsky.  I'm here to argue on behalf of the plaintiffs,
12    Valerie Plame-Wilson and Joseph Wilson, IV.  With me at counsel
13    table is my co-counsel, Anne Weismann, and my client,
14    Ms. Wilson.
15         THE COURT:  Good morning to all of you.
16         MR. BUCHOLTZ:  Good morning, Your Honor.  My name is
17    Jeffrey Bucholtz.  I'm from the Department of Justice.  I'm here
18    to argue on behalf of the United States.  At counsel table with
19    me is Timothy Garren, also from the Department of the Justice.
20         THE COURT:  Good morning.

21          MR. KESTER:  Good morning, Your Honor.  John Kester
22   from Williams & Connolly representing the Vice President of the
23   United States.
24          THE COURT:  Mr. Kester, good morning.
25          MR. LUSKIN:  Good morning, Your Honor.  Robert Luskin
0004
1    for Karl Rove, and I will be presenting common arguments on
2    behalf of all of the defendants.
3          THE COURT:  Mr. Luskin.
4          MR. LUSKIN:  And let me introduce --
5          MR. BOURELLY:  Alex Bourelly, on behalf of I. Lewis
6    Libby.
7          MR. WALDMAN:  Your Honor, Michael Waldman for Richard
8    Armitage.
9          THE COURT:  Mr. Waldman.  All right.  We're here on
10   motions to dismiss that have been filed by the defendants.  I've
11   indicated that I'm allotting an hour for each side.  I am not
12   demanding that you take the full hour, but that's what I have
13   allotted.
14         I would say at the outset that these are motions to
15   dismiss.  Therefore, while the facts relating to these events,
16   which are of some notoriety and have received a lot of public
17   attention, we are proceeding this morning on the basis of the
18   facts as alleged in the complaint filed by the plaintiffs, and
19   we're not trying to resolve those factual issues; we're trying
20   to resolve legal defenses that have been raised by the
21   defendants through their motions.
22         With that, am I going to hear first from Mr. Bucholtz?  Or
23   what is the order that you have?
24         MR. BUCHOLTZ:  Thank you, Your Honor.  Yes.  If that's
25   acceptable to you.
0005
1          THE COURT:  That's fine.
2          MR. BUCHOLTZ:  Because, as Your Honor is aware, there
3    are a number of defendants and a number of issues have been
4    raised, we've tried to divide up the issues a bit among
5    ourselves.  As Mr. Luskin mentioned, he'll be addressing some of
6    the common issues going to the merits and qualified immunity
7    issues.
8          And what I'd like do, if it's all right with Your Honor, is
9    to start off by addressing the reasons why we don't believe the
10   plaintiffs' Bivens claim should be recognized, and then briefly
11   address the government's position that the Vice President is
12   entitled to absolute immunity, and then briefly address the
13   Westfall Act scope of employment issue.

14          THE COURT:  And when you say you're going to address
15  why the Bivens claim shouldn't be recognized, are you also going
16  to address the substance of each of those claims?
17          MR. BUCHOLTZ:  No, Your Honor.  What I meant in
18  referring to Mr. Luskin addressing the merits and qualified
19  immunity issues is that he would address those common issues on
20  behalf of the individual defendants.
21          THE COURT:  Proceed.
22          MR. BUCHOLTZ:  Thank you, Your Honor.
23      As I said, I wanted to start with the question of whether
24  these Bivens claims should be recognized.  The plaintiffs
25  proceed as if that question has already been answered.  The
0006
 1  plaintiffs say they're not asking the Court to recognize new
 2  Bivens claims.  In 1979 they say the Court recognized in Davis
 3  against Passman that Bivens claims apply for violations of the
 4  Fifth Amendment, so essentially they're arguing what are we
 5  talking about that their Bivens claims shouldn't be recognized.
 6      That argument, Your Honor, just does not grapple with the
 7  last 25-plus years of Supreme Court case law.  That case law
 8  makes clear that Bivens is context sensitive, that although it's
 9  true that in Passman the Court recognized a Fifth Amendment
10  Bivens claim in the context there at issue, in Stanley and in
11  Chilicky, among other examples, the Court subsequently refused
12  to recognize Fifth Amendment Bivens claims in other contexts.
13      And most recently in Malesko, the Court emphasized that the
14  Court was reluctant to extend Bivens to any new context, and the
15  Court had repeatedly done so in the decisions since Davis
16  against Passman.
17          THE COURT:  Malesko does seem to have a little bit of
18  inconsistent language on one issue, and that is whether there
19  have to be alternative effective remedies available.  What's
20  your position on that?
21          MR. BUCHOLTZ:  Your Honor, we think that there is
22  clear precedent before Malesko, both from the Supreme Court and,
23  for example, Chilicky from this circuit, and, for example,
24  Spagnola, that the approach the Court is supposed to take in a
25  Bivens case is not to ask whether the particular plaintiff
0007
 1  trying to bring a Bivens claim has an effective remedy through a
 2  statutory scheme.
 3      In Spagnola the D.C. Circuit noted that it had previously
 4  divided on that question, but then after Chilicky, the Court
 5  took Spagnola en banc to resolve it and expressly held
 6  unanimously that's not the proper approach.  The proper approach

7  is where Congress has addressed an area through legislation,
8  that if a plaintiff has a remedy under that statutory scheme,
9  that's a reason not to create an additional Bivens remedy, but
10  it's equally true that if a plaintiff does not have a remedy
11  under that statutory scheme, as was the case in Spagnola, that
12  that's equally a reason not to create a Bivens remedy.
13       The idea is that Congress, when it enacts a statute, draws
14  the lines that it chooses to draw, strikes the balance it
15  chooses to strike, and creates the remedies that it as Congress
16  is responsible for creating.  And if a Bivens plaintiff falls
17  between the cracks, for whatever reason, of the remedies that
18  Congress has created, that's not a reason for the Court to
19  somehow improve on what Congress has done or fill that gap.
20       THE COURT:  So any disclosure of information by a
21  government officer or employee would be the subject matter that
22  cannot be brought through a constitutional claim against the
23  government official because of the existence of the Privacy Act,
24  whether or not the Privacy Act gives any relief against that
25  official or against the government with respect to that
0008
1  particular disclosure.
2       MR. BUCHOLTZ:  Exactly, Your Honor.  That's what the
3  circuit held in Spagnola with respect to the Civil Service
4  Reform Act which had been at issue in Chilicky.
5       THE COURT:  The Civil Service Reform Act is a little
6  different from the Privacy Act in that it was created, was it
7  not, in order to calm the waters and eliminate a somewhat
8  disjointed personnel system and focus it all through one
9  statutory structure, a comprehensive scheme, and address
10  everything by giving relief in some instances and not in other
11  instances.  The Privacy Act didn't really come about in that
12  way, did it?
13       MR. BUCHOLTZ:  The history of the development of the
14  Privacy Act may be different than the CSRA, different statutes,
15  so of course they're different circumstances, but the principle
16  is the same.  The principle is the Privacy Act was Congress'
17  careful, well-considered and comprehensive response to the
18  problem of disclosure of information by government officials.
19       And Congress could have gone further than it went in the
20  Privacy Act, or created different standards or different types
21  of remedies, but Congress considered the issue carefully and it
22  created the remedies that it saw fit to create.  Just as
23  Congress had done in the CSRA.  Just as the Court held in
24  Spagnola, where the plaintiffs did not have any judicial
25  remedies under the CSRA.  The Court said that's not a reason for

0009
1  the Court to jump in and give them judicial remedies.
2      Rather, the inference is Congress created the remedies it
3  wanted to exist, and if Congress didn't create a remedy for
4  them, that's because Congress didn't want them to have a remedy.
5  Of course, the answer is different if Congress makes clear that
6  it wants Bivens remedies to coexist in addition to the statutory
7  remedies.  But Congress hasn't done so in the Privacy Act,
8  plaintiffs don't argue that Congress has, and every court to
9  have addressed the Privacy Act has held that it is a
10  comprehensive remedial scheme, like the CSRA, that precludes
11  Bivens claims.
12      THE COURT:  There's no exception to that?  Every court
13  has done so?
14      MR. BUCHOLTZ:  That's my understanding, yes.  I'm not
15  aware of any court that has rejected that proposition.  The D.C.
16  Circuit adopted it in Chung, and --
17      THE COURT:  Very brief adaptation, in one sentence.
18      MR. BUCHOLTZ:  Well, that's true, but what the circuit
19  said is that the Bivens claims were properly dismissed because
20  they were encompassed by the remedial scheme of the Privacy Act,
21  for the reasons given by the District Court, citing the District
22  Court's opinion, which relied on Spagnola and related cases.
23      So I think the inference to draw from the circuit treatment
24  of it is the circuit thought the issue was really a pretty easy
25  one.
0010
1      The plaintiffs try to argue, I guess implicitly, that the
2  difference between their case and the other Privacy Act special
3  factors cases is that in those cases the plaintiffs had a viable
4  Privacy Act remedy.  For the reasons I've just explained, I
5  think legally that's misplaced.  I think legally under Spagnola
6  that isn't the proper question.
7      But anyway, it's not -- there's no basis factually for the
8  plaintiffs to say that.  In Chung itself, for example, the
9  District Court had dismissed the Privacy Act claim as time
10  barred in the same decision that it dismissed the Bivens claims
11  in reliance on the Privacy Act.  It's true that the circuit
12  remanded for more consideration of the time bar issue, but it
13  didn't hold that the Privacy Act claim was timely.
14      It certainly didn't hold that if timely it was otherwise
15  meritorious, and it didn't suggest that its affirmance of the
16  dismissal of the Bivens claims in reliance on the Privacy Act
17  was somehow conditional, such that you had to wait and see
18  whether the plaintiff actually got money at the end of the day

19  under the Privacy Act before you knew whether the Bivens claim
20  was precluded.
21      So it's just not the case that the plaintiffs are helped
22  under Bivens by the fact that they don't have a viable Privacy
23  Act remedy.
24         THE COURT:  Does it matter at all where the
25  information that was disclosed here came from?
0011
1         MR. BUCHOLTZ:  I think if it matters at all it cuts
2   against, further against the plaintiffs' Bivens claims.
3   Congress, when it enacted the Privacy Act, didn't cover the
4   White House.  Cases in this district, like Jones and Schwartz,
5   recognized that the reason Congress didn't is because it
6   recognized that that would cause separation of powers concerns;
7   applying a statute like the Privacy Act to offices like that
8   would be a separation of powers issue.
9      So the fact that Congress exercised restraint in how far it
10  went in the Privacy Act because it recognized the separation of
11  powers concerns that might be raised if it went further is a
12  reason for the Court to be doubly reluctant to create a Bivens
13  remedy that goes further and raises the separation of powers
14  concerns that Congress decided not to raise.
15      So the fact that the White House is not covered by the
16  Privacy Act, first under Spagnola, simply doctrinally is not a
17  reason to create a Bivens claim any more than the plaintiff's
18  exclusion from the CSRA was in Spagnola.  But on a deeper level,
19  considering the separation of powers concerns that underlie the
20  special factors doctrine in the first place, it would be doubly
21  bizarre for a court to raise separation of powers considerations
22  where Congress has expressly not done so by going only so far
23  and not further in a statute.
24         THE COURT:  The record before me now, which is
25  factually basically the amended complaint, does it clarify where
0012
1   the information in this particular setting came from that was
2   disclosed?  The information that was disclosed.
3         MR. BUCHOLTZ:  I think, Your Honor, on this record --
4   that the record that the Court should address the Bivens
5   question on is that some of the information was disclosed from
6   the State Department, which of course is covered by the Privacy
7   Act.  Whether the plaintiffs would have a viable Privacy Act
8   claim relating to that disclosure, I don't know, they haven't
9   pleaded one, and that's their choice.  But at least the State
10  Department is covered.
11      Some of the information, the plaintiffs allege I guess,

12  came from offices like the White House that are not covered by
13  the Privacy Act. But for the reasons I've just explained, I
14  don't think the Court needs to parse exactly where each
15  disclosure came from, because whether the disclosures came from
16  offices covered by the Privacy Act or offices not covered by the
17  Privacy Act, the answer under Bivens is the same.
18          THE COURT:  What if the disclosure came from somewhere
19  other than the government, the source of the information?
20          MR. BUCHOLTZ:  What the plaintiffs have alleged is
21  that the information was disclosed by government officials.
22          THE COURT:  I'm asking you a hypothetical.  What if
23  the information came -- let's say the disclosure came from
24  something that a reporter told whichever defendant we're looking
25  at, who then disclosed the information?  Is that within the
0013
1  Privacy Act and is a Bivens claim precluded?
2          MR. BUCHOLTZ:  Well, it wouldn't change the Privacy
3  Act preclusion if a reporter had instigated the conversation
4  that led to a government official's disclosure, because the
5  claim -- and again the claim that they brought, I understand
6  Your Honor's asking a hypothetical, but it really isn't this
7  case -- the claim they brought is alleging disclosures by
8  government officials.
9          THE COURT:  No, I'm not saying the disclosure wasn't
10  made by a government official, but the source of the government
11  official's information was a reporter.  In other words, a
12  nongovernmental source of the information.
13          MR. BUCHOLTZ:  I don't think that makes a difference,
14  Your Honor, because in the Privacy Act Congress created the
15  standards that it created and it imposed, for example, a willful
16  and intentional requirement, it imposed a requirement that the
17  information come from a system of records.  It defined a system
18  of records in a particular way.
19          THE COURT:  But isn't my hypothetical that it isn't
20  within a system of records; it's not covered by the Privacy Act?
21          MR. BUCHOLTZ:  Well, it's not covered by the Privacy
22  Act in the same sense that the White House is not covered by the
23  Privacy Act, because Congress chose not to cover it.  Again, the
24  fact that in a certain hypothetical a claim would fall between
25  the cracks of the Privacy Act is not a reason for the Court to
0014
1  sort of finish what Congress started and step in and go further
2  than Congress went.  That's the lesson in Spagnola and that
3  would apply to the Privacy Act here.
4      To return to Your Honor's question if I may from a minute

5  ago, whether it's necessary to have a comprehensive statutory
6  scheme in order to preclude a Bivens remedy.  There's a separate
7  line of cases that makes it even clearer that that's not the
8  case.  We've been talking about Spagnola and the CSRA and the
9  Privacy Act, where there is a comprehensive remedial scheme.
10      But there are also cases like United States against Stanley
11  in the Supreme Court, and Sanchez-Espinoza in this circuit,
12  where there was no comprehensive remedial scheme.  The Court
13  didn't rely on, like in Bush against Lucas and Schweiker against
14  Chilicky, on a comprehensive remedial scheme.  The Court relied
15  instead on the separation of powers more squarely.  The Court
16  relied on considerations of institutional competence, in the
17  words of then Judge Scalia in Sanchez-Espinoza, and in Stanley
18  the court relied on the -- the special factor that the court
19  identified was that it would be inappropriate for courts
20  uninvited to intrude into military affairs by creating a Bivens
21  action where Congress hadn't given them a warrant do so.
22      So even where there isn't a comprehensive remedial scheme,
23  it's perfectly clear that there are contexts that are sensitive
24  enough that courts shouldn't create --
25          THE COURT:  What's the context that is a special
0015
1  factor here?
2          MR. BUCHOLTZ:  Well --
3          THE COURT:  Separate from a comprehensive legislative
4  scheme.
5          MR. BUCHOLTZ:  At one level of generality the context
6  is the disclosure of information by government officials, which
7  is encompassed by the Privacy Act.  But more specifically, the
8  context is the disclosure of information allegedly concerning
9  classified intelligence operatives or activities.  That is an
10  obviously sensitive context in which courts are generally
11  reluctant to go, and where, for the same reasons as applied to
12  foreign affairs in Sanchez-Espinoza, and military affairs --
13          THE COURT:  Is this a political question argument, or
14  a Totten doctrine argument?  What hope do you want to hang your
15  hat on, the United States' hat on?
16          MR. BUCHOLTZ:  The United States' hat is hung on the
17  special factors argument.  Sanchez-Espinoza is very instructive
18  on this point.  The District Court had dismissed
19  Sanchez-Espinoza on political question grounds, holding that
20  Article 3 precluded jurisdiction.  And the circuit, speaking
21  through then Judge Scalia, said we don't have to reach political
22  question.  We don't necessarily disagree with that, but we don't
23  have to reach that; we can dismiss on special factors grounds

24  instead.
25      Similarly, the Supreme Court in Chilicky itself noted in
0016
1  the concluding footnote of the majority opinion that the
2  government had argued not only that there were special factors
3  counseling against Bivens claims, but that there was a statute
4  that directly precluded jurisdiction.  The Court said we don't
5  have to reach that argument.  Even if there isn't jurisdiction
6  under that statute, we can still dismiss based on special
7  factors.
8      The lesson is special factors is the kind of threshold,
9  non-merits determination that the Court can make without
10  reaching strict questions of jurisdiction.
11      Your Honor referred to the Totten doctrine and political
12  question.  And I think it's important to note that the
13  separation of powers considerations at issue in Sanchez-Espinoza
14  and in Stanley and in this case are similar to or related to the
15  considerations underlying the political question doctrine and
16  the Totten doctrine.
17      That's not to say that this court has to hold that Totten
18  per se precludes jurisdiction here.  For the reasons I've just
19  explained, the Court doesn't have to go nearly that far.  But it
20  is the same general family of considerations animating those
21  doctrines, having to do with the role of the courts in areas
22  that are as sensitive as intelligence.
23      THE COURT:  I'm sure we'll get into this with some of
24  the other counsel a little bit deeper, but this is not the
25  situation with the CIA that Totten most clearly addresses, and
0017
1  the Tenet case from the Supreme Court makes that clear, that
2  there is a difference between the suit by an acknowledged, even
3  if covert, employee of the CIA, and one of, a suit that is, that
4  is filed by an alleged spy.  Alleged spy.  And it's really the
5  latter circumstance that Totten addresses, not the former
6  circumstance.  Don't we have the former circumstance here?
7      MR. BUCHOLTZ:  It is true that Tenet makes that
8  distinction, and it is true that this case for that reason, as
9  the Totten doctrine is explained in Tenet, may not be squarely a
10  core Totten case per se.
11      THE COURT:  I don't see how the United States can
12  argue that I should steal the themes of Totten to incorporate
13  into a special factors analysis if Totten would not be
14  applicable in the first instance.
15      MR. BUCHOLTZ:  In the same way that the circuit did
16  that with the political question doctrine in Sanchez-Espinoza

17  and in the same way that the Supreme Court in Stanley did that
18  with the separation of powers concerns relating to the special
19  sensitivities of the military context.  There's nothing novel
20  about relying on those kinds of separation of powers
21  considerations in the special factors doctrine.  After all, the
22  whole point of the special factors doctrine is the separation of
23  powers.
24        THE COURT:  But those weren't situations where the
25  separation of powers didn't apply, or that political question
0018
1  didn't apply.  Whereas here we may have a situation where the
2  Totten doctrine doesn't apply.  Not that the Court didn't so
3  hold, but just that it wasn't applicable.  And I'm questioning
4  whether Totten is really an applicable doctrine here in the
5  context that we have.
6        MR. BUCHOLTZ:  Your Honor, again the government is not
7  arguing that Totten itself is per se applicable.
8        THE COURT:  I understand.
9        MR. BUCHOLTZ:  But if Your Honor looks at
10  United States against Stanley, the methodology the Supreme Court
11  applied there is very instructive.  The Supreme Court considered
12  the notion that what it should do is consider on a case-by-case
13  basis whether a given Bivens claim, relating to military
14  service, would in fact cause the harms that the Court was
15  concerned about, would in fact intrude on military affairs or
16  raise separation of powers problems.
17     The Court considered and rejected that notion.  It said
18  instead Bivens is context sensitive, there is no rule or even
19  presumption that there always is a Bivens claim where you're
20  talking about extending Bivens to a new context.  If it's a
21  sensitive context where concerns are likely, you don't extend
22  Bivens to that context.  The Court expressly held the entire
23  category of Bivens claims incident to military service was
24  precluded, without regard to whether any individual Bivens claim
25  would be strictly speaking jurisdictionally precluded.
0019
1     So the same thing is true here and the same thing was true
2  in Sanchez-Espinoza.  This court doesn't need to hold that the
3  political question doctrine per se applies or that Totten per se
4  applies.  This court only needs to hold that there are
5  sensitivities that counsel against extending Bivens to this
6  context.  That's the doctrinal approach that we believe the
7  Court should follow.
8        THE COURT:  Let me get a couple of other things
9  clearer from the United States.  Does the United States have a

10  position as to whether the existence of the covert relationship
11  involved here has been disclosed by the government?
12      MR. BUCHOLTZ:  Your Honor, the indictment against
13  Mr. Libby alleges in paragraph 1f that Mrs. Wilson was a
14  classified CIA employee.  So that is the United States'
15  position, and that has been publicly stated.
16      THE COURT:  All right.
17      MR. BUCHOLTZ:  I think it's important to note that
18  that's all that the United States has publicly stated.  And if
19  this case were to proceed beyond the pleading stage -- and there
20  are any number of reasons why we don't think it should -- but if
21  it were to, in order to adjudicate, for example, the plaintiffs'
22  due process claim alleging a property deprivation having to do
23  with exclusion from an entire range --
24      THE COURT:  That may be the place where the Totten
25  doctrine is most obviously applicable, because, as I assume
0020
1  you're going to say, there might be a need to go into other
2  classified relationships.
3      MR. BUCHOLTZ:  That's right.  There may well be.  It's
4  impossible to know for sure in advance that the government would
5  raise problems along those lines, but it's sufficiently clear
6  that that's a reasonable prospect.  That just as in Stanley, the
7  Court shouldn't require the case to proceed that far under
8  Bivens and wait to see whether on a case-by-case basis those
9  problems are created.
10     Instead, the Court should recognize, as in Stanley and as
11  in Sanchez-Espinoza, that the context at issue is sensitive
12  enough, those concerns are likely enough that whether or not a
13  particular case would be strictly --
14      THE COURT:  That's only some of the claims, I think.
15  I think that issue only arises with respect to some of the
16  claims.  The equal protection claim is probably the most
17  obvious.  That wouldn't necessarily argue to dismiss all of the
18  claims.
19      MR. BUCHOLTZ:  I think the issue --
20      THE COURT:  Except going back to the argument that
21  you've made already with respect to special factors.
22      MR. BUCHOLTZ:  It's true that the preclusion of
23  employment issue is particularly raised by the due process
24  claim, because you can only state a due process property claim
25  if you're precluded not just from one particular narrow job, but
0021
1  from a whole broad field.  So you'd have to know a lot about the
2  person's employment to evaluate that claim, not just the bare

3    fact, as alleged in the indictment, that the person was a
4    classified employee.
5        But it's also true on the state-created danger theory that
6    the plaintiffs have alleged, that you'd have to know a lot more
7    than that bare fact to be able to evaluate how much danger the
8    plaintiffs may have been put in.  You'd have to know more about
9    the nature of the plaintiffs' activities with the CIA to be able
10   to evaluate that claim.  And that, as with the property claim,
11   might get into the kinds of sensitive issues that under Bivens
12   the Court is not supposed to get into.
13       The last thing I wanted to say about this issue is the
14   plaintiffs say that the Intelligence Identities Protection Act
15   isn't a special factor because it's a criminal statute and
16   criminal statutes aren't special factors, like the CSRA or the
17   Privacy Act.
18       THE COURT:  Well, let's start with the general
19   proposition.  Has a criminal statute ever been recognized as a
20   special factor?
21       MR. BUCHOLTZ:  Not that I'm aware of.  But I think
22   that really isn't the point.  The point is not that the IIPA is
23   or is not a special factor.  As I was just explaining, there's a
24   line of cases, like Spagnola, where there is a statute that is
25   identified as a special factor.
0022
1        THE COURT:  You want to look at everything in
2    combination, and you want the IIPA to be part of that assessment
3    even if it standing alone is not a comprehensive scheme that
4    would be a special factor.
5        MR. BUCHOLTZ:  Exactly.  In Stanley and in
6    Sanchez-Espinoza there was no comprehensive statutory scheme.
7    That's not the special factor the Court identified.  The Court
8    identified the inappropriateness of uninvited judicial
9    intrusion --
10       THE COURT:  The problem with that argument is that in
11   many instances, particularly when you're dealing with law
12   enforcement, there is going to be a criminal provision.  Indeed,
13   we've seen Bivens cases where there would be criminal penalties
14   available.  For instance, the death of a prisoner inside a
15   prison system and an Eighth Amendment claim.
16       The availability of a criminal case against the government
17   official hasn't really been viewed, and I think it's difficult
18   to view it as a special factor because of the breadth of that
19   proposition.
20       MR. BUCHOLTZ:  Your Honor, I don't dispute that, and
21   as I said, I'm not aware of any cases that expressly hold that a

22  criminal statute is a special factor in the sense that the CSRA
23  is or the Privacy Act is.  But that isn't really the point here,
24  I think.
25      The point is that the sensitivity of the context of
0023
1  classified intelligence information is obvious to begin with.
2  But if confirmation were needed, Congress provided a data point
3  of confirmation in enacting the IIPA, in order to protect the
4  sensitivity of that information.
5      The plaintiffs say their Bivens claims would further the
6  goals of the IIPA, but that's not right, because their Bivens
7  claims skip or circumvent a very critical step that Congress
8  specified under the IIPA, and that is the exercise by the
9  executive branch of its authority to make classification and
10  declassification decisions, and exercise prosecutorial
11  discretion.  In order to bring a prosecution under the IIPA, the
12  executive branch has to make those determinations which it is
13  entitled to make.
14      And if Your Honor looks back at Sanchez-Espinoza, in
15  addition to the Bivens holding, the plaintiffs there were trying
16  to bring implied rights of action under various statutes.  And
17  the Court said those statutes would be strange tools for private
18  civil damages actions because they related to the sensitive
19  context of foreign affairs.
20      The same thing is true here.  There's no reason to think
21  that Congress wanted private civil plaintiffs to be able to
22  provoke the kinds of classification and declassification
23  decisions that the IIPA relates to.
24      THE COURT:  Mr. Bucholtz, I think we're probably
25  beyond the time that was allotted to you, so why don't you wrap
0024
1  up in one minute.
2      MR. BUCHOLTZ:  I apologize.
3      THE COURT:  No apology necessary.
4      MR. BUCHOLTZ:  Let me wrap up in 30 seconds on the
5  Vice Presidential immunity question by just making two points.
6  One is in Nixon against Fitzgerald the Supreme Court has already
7  held the President is entitled to absolute immunity.  In Cheney,
8  which the plaintiffs don't cite, but can't make go away, the
9  Supreme Court five times quoted cases about the President, not
10  about the Vice President, for the proposition that the case
11  against the Vice President raised special considerations.
12      The Court then went beyond that and it quoted Nixon against
13  Fitzgerald, against the President, a damages action.  And it
14  took the quote about the unique susceptibility of the President

15  because of the breadth and importance of his duties.  It took
16  the first part of that quote, it broke it up, and it added "or
17  the Vice President," and then it picked up with the rest of the
18  quote.  It couldn't be any clearer that the Supreme Court
19  equates the President and the Vice President for that purpose.
20        THE COURT:  I'm not so sure it's absolutely clear.  It
21  certainly is clear that, off the Cheney decision from the
22  Supreme Court, that the Vice President has a lot of the same
23  attributes and considerations that relate to the President.  But
24  there's been no assessment by the Supreme Court in the context
25  of immunity, and indeed there's no decision either way with
0025
1  respect to absolute immunity for the Vice President, correct?
2        MR. BUCHOLTZ:  That's correct.
3        THE COURT:  Absolute immunity has been conferred on
4  the President by the Supreme Court, but not on very high, close
5  presidential aides.
6        MR. BUCHOLTZ:  That's correct.
7        THE COURT:  And there's no other government official,
8  including cabinet officials, who have gotten absolute immunity.
9        MR. BUCHOLTZ:  There are plenty of other governmental
10  officials that have absolute immunity, like prosecutors and
11  judges.
12        THE COURT:  In particular functional contexts.
13        MR. BUCHOLTZ:  Correct.  Correct.  Our position is not
14  that the Supreme Court has held the Vice President is entitled
15  to absolute immunity from civil damages claims.  That issue has
16  never been decided to our knowledge in any case one way or the
17  other.  Our point is simply that if you combine Nixon against
18  Fitzgerald's analysis on the question of immunity from civil
19  damages with Cheney's analysis of the equation essentially of
20  the President and the Vice President, for the slightly different
21  issue presented in that case, what that adds up to is absolute
22  immunity is equally applicable to the Vice President.
23    I apologize for taking so much of Your Honor's time.  On
24  the Westfall Act issue, I'd be happy to answer questions if Your
25  Honor has any, but in light of how much time I've already taken,
0026
1  I'll recede.
2        THE COURT:  There are scope of employment issues that
3  relate to the Westfall context.  Why don't you address that for
4  a moment.
5        MR. BUCHOLTZ:  I'd be happy to.  First point I'd like
6  to make on that is the plaintiffs challenge what is known as the
7  intent prong of the scope analysis.  But if Your Honor looks --

8   and one might think that something called the intent prong is
9   about subjective intent at the particular moment of given
10  conduct.  But if Your Honor looks at the case law, it's clear
11  that is not the analysis that D.C. follows.
12      From cases like Ballenger and Weinberg, it's perfectly
13  clear that the required analysis is focusing on the underlying
14  controversy, and that the intent prong is broad enough to cover
15  any intentional tort that arises out of a dispute originally
16  undertaken on the employer's behalf.  So the issue is not --
17      THE COURT:  So here there is nothing, absolutely
18  nothing, that any of these officials could have said in the
19  context of their communications with reporters, or alleged
20  communications with reporters, that would be beyond the scope of
21  their employment?  Nothing?
22      MR. BUCHOLTZ:  I agree with that, Your Honor.
23      THE COURT:  True or false?  Nothing they could have
24  said that would be beyond the scope --
25      MR. BUCHOLTZ:  It has nothing to do with the truth or
0027
1   falsity of anything the defendants said.  I certainly agree with
2   that.  Because the underlying controversy here, as the
3   plaintiffs have alleged it, was that Mr. Wilson was publicly
4   criticizing government policy on a question of extraordinary
5   importance.
6      The defendants, according to the plaintiffs, tried to
7   discredit Mr. Wilson's criticism of government policy because
8   they were part of the people who set the government policy.
9   That's a government policy dispute.  That's not a personal
10  dispute.  Personal means the situation like in a case like
11  Schechter, where deliverymen are in someone's house because
12  they're supposed to deliver a washing machine and they take
13  advantage of their presence in someone's house for what the
14  Court says is a personal adventure, to steal the person's
15  jewelry and money.  They weren't stealing jewelry and money out
16  of some misguided attempt to enrich their employer; that was a
17  purely personal adventure made possible by their employment.
18  But that was the only connection to their employment.
19      THE COURT:  So what if here the disclosure had been
20  that Mr. Wilson was in drug treatment, and that information had
21  come from another reporter telling the government official, who
22  then told a reporter?  First of all, on Westfall, that would be
23  within the scope of employment?
24      MR. BUCHOLTZ:  Yes, Your Honor, because the underlying
25  controversy, which is the required focus of the analysis, as the
0028

1  plaintiffs have alleged, is a dispute over government policy and
2  criticism thereof.
3       THE COURT:  And saying that Mr. Wilson was in drug
4  treatment would have some relation to that because it would be
5  the government official trying to undermine the credibility of
6  Mr. Wilson on the issues that were of importance to the
7  government?
8       MR. BUCHOLTZ:  Exactly, Your Honor.  The case law
9  makes clear that scope is not about whether conduct is proper or
10  improper, lawful or wise or unwise or anything like that.
11  Conduct -- alleged conduct, nothing less than torture has been
12  held to be within scope as a matter of law in cases like Rasul.
13  And we're talking about the scope issue as it arises in tort
14  cases.  Torts are almost by definition not likely to in fact
15  advance the employer's interest, or almost likely by definition
16  to involve alleged improper conduct.
17       THE COURT:  Switch back to the constitutional claim,
18  and would that disclosure that came from a nongovernment source,
19  that was a false statement that Mr. Wilson was in drug
20  treatment, nonetheless be such that a Bivens claim would be
21  precluded because of the existence of the Privacy Act?
22       MR. BUCHOLTZ:  Let me make sure I understand
23  Your Honor's hypothetical.  A reporter tells --
24       THE COURT:  Reporter A tells the government official
25  that Mr. Wilson is in drug treatment, and that government
0029
1  official then passes that on to reporter B.
2       MR. BUCHOLTZ:  I think if the essence of the claim is
3  still challenging the government official's disclosure, then
4  that's still the context of the Privacy Act.
5       THE COURT:  But if the information doesn't appear
6  anywhere in government coffers, nowhere, not in the personnel
7  record or anywhere else.  Privacy Act still precludes the
8  constitutional claim?
9       MR. BUCHOLTZ:  All that means is that the plaintiff
10  doesn't have a viable Privacy Act claim.  I don't see why that's
11  any more relevant than the fact in Spagnola that the plaintiffs
12  did not have a viable CSRA claim was relevant.
13       THE COURT:  Another way to put it, though, is that the
14  Privacy Act does not cover that kind of government conduct.  It
15  doesn't cover a government official making a true or false
16  statement that has nothing to do with information that is in the
17  government's records.  So how would the Privacy Act preclude a
18  Bivens case there, where the Privacy Act has nothing to do with
19  that particular event?  It's not the kind of event that's

20  covered by the Privacy Act.  It's not the disclosure of
21  government information.
22      MR. BUCHOLTZ:  If Congress in enacting the Privacy Act
23  had done something to suggest that disclosures by government
24  officials that fell outside the lines drawn by Congress in the
25  Privacy Act should be the kinds of disclosures that could give
0030
1  rise to Bivens claims, then that might be a consideration in
2  favor of allowing a Bivens claim, assuming, as is not the case
3  here, that there are no other considerations weighing against
4  allowing a Bivens claim.
5      THE COURT:  What is it about the Privacy Act, either
6  its language or legislative history or purpose, that would
7  indicate -- that you can point to that would indicate that
8  Congress intended to preclude an action on the basis of the
9  hypothetical that I've expressed?  What is there in the
10  language, purpose or legislative history of the Privacy Act?
11      MR. BUCHOLTZ:  I can't point to anything affirmative,
12  Your Honor, but I can point to the circuit's decision in
13  Spagnola, where the Court said that's not the right question.
14  The Court said the most that can be said about the legislative
15  history in the CSRA is that Congress did not intend to eliminate
16  Bivens remedies, but that's not the right question, the Court
17  said.  The Court said instead, the burden is on Congress to say
18  we want Bivens remedies to coexist in addition to the statutory
19  remedies.
20      THE COURT:  All right.
21      MR. BUCHOLTZ:  In any event, the hypothetical that
22  Your Honor raises is just a hypothetical.  It's not what the
23  plaintiffs have alleged here.  The Court doesn't have to reach
24  it.
25      THE COURT:  Thank you, Mr. Bucholtz.
0031
1      MR. BUCHOLTZ:  Thank you very much, Your Honor.
2      THE COURT:  Let's move on to whoever's going to come
3  next.  I'll let you determine the order of your presentations.
4      MR. LUSKIN:  And that's me, Your Honor.  I'm Robert
5  Luskin.  I'm an attorney for Karl Rove but I'm going to speak to
6  the constitutional issues on behalf of all of the defendants.
7    Your Honor has nine briefs citing hundreds of cases, and I
8  want to make two observations, I think, about what they teach in
9  the aggregate.  The first is that when it comes to these
10  constitutional torts, the cases reflect a consistent reluctance
11  by the Court to expand the areas of constitutional torts into
12  the areas of either defamation, reputation, or employment law.

13     The second thing they reflect is a desire for the courts --
14  by the courts to draw bright lines in order to avoid intrusion
15  into the decision-making of the executive branch agencies, even
16  erroneous decision-making by executive branch agencies.
17     And the third is a desire through various mechanisms to
18  enhance the opportunities for early adjudication of these
19  claims, recognizing that the pendency of the suit itself imposes
20  huge costs upon public officials.
21        THE COURT:  That's basically the qualified immunity
22  approach here.
23        MR. LUSKIN:  It's both the qualified immunity, Your
24  Honor, but if you look at the decisions themselves defining the
25  contours of the rights themselves --
0032
 1        THE COURT:  Is there any difference in your view
 2  between the first prong of the qualified immunity assessment,
 3  whether there's a constitutional right, and a straight 12(b)(6)
 4  failure to state a claim?
 5        MR. LUSKIN:  I think that there is no substantive
 6  difference, Your Honor.  I think the first prong of that test
 7  invites the Court on the facts alleged to answer the question of
 8  whether or not there has been a clear violation of a known
 9  constitutional right.  And it's then the second test which
10  asks --
11        THE COURT:  I think "clear" isn't in the first prong;
12  it's in the second prong.  But go ahead, Mr. Luskin.
13        MR. LUSKIN:  Of course I misspeak, Your Honor.  And
14  the second prong invites the Court to entertain the objective
15  analysis about what a reasonably competent official would have
16  known.
17     But if you look at the decisions, for example Butera, which
18  the plaintiffs cite, if you read the circuit's opinion there,
19  they over and over again in defining what they understand the
20  contours of that right to be, establish very bright lines
21  precisely because they are concerned about the notion of
22  adjudicating in this area without clear guideposts, both because
23  of a concern on separation of powers grounds of the Court's
24  intrusion into deliberations of the executive branch, but also
25  out of concern that public officials need to have those bright
0033
 1  lines in order to be able to act effectively.  And so those
 2  concerns are incorporated themselves into the decisions that
 3  define what the contours of the rights are.
 4        THE COURT:  All right.  Let's deal with those rights.
 5        MR. LUSKIN:  And let me turn to them, Your Honor.  And

6  let me start with the First Amendment.
7        THE COURT:  It is first, after all.
8        MR. LUSKIN:  It's first and it's the first.  It's
9  unfortunate, Your Honor, I think, that Saucier requires us to do
10  it this way, but I don't see that there's any way out of it,
11  because I guess before I touched on this, the second point that
12  I guess I would have made in the aggregate is to say we are
13  simply aware of no case that does not involve government action
14  which involves speech by -- true speech, concededly true speech,
15  by public officials on issues of public importance that resulted
16  in no loss of employment, no broad preclusion from employment,
17  and no physical harm, in which constitutional liability has been
18  found on any of the theories --
19        THE COURT:  What do you do with the following language
20  from Hartman v. Moore, an old Supreme Court case --
21        MR. LUSKIN:  Not that old.
22        THE COURT:  One year old.  Where the Court stated --
23  and this is a bit of a long quote -- the following:  "Official
24  reprisal for protected speech offends the Constitution because
25  it threatens to inhibit exercise of the protected right," citing
0034
1  Crawford-El v. Britton, "and the law is settled that as a
2  general matter the First Amendment prohibits government
3  officials from subjecting an individual to retaliatory actions,
4  including criminal prosecutions for speaking out.
5    "Some official actions adverse to such a speaker might well
6  be unexceptionable if taken on other grounds, but when
7  nonretaliatory grounds are in fact insufficient to provoke the
8  adverse consequences, we have held that retaliation is subject
9  to recovery as the but-for cause of official action offending
10  the Constitution.  When the vengeful officer is federal, he is
11  subject to an action for damages on the authority of Bivens."
12    Is that language relevant here?
13        MR. LUSKIN:  It is relevant, Your Honor.  And let me
14  make two points.  The first is in the quote that you read the
15  Court refers over and over again to government action.  And the
16  fact is that the cases looking at First Amendment retaliation
17  have drawn different lines between government action and
18  government speech, where that speech is itself protected, and
19  have erected a higher bar in circumstances where we are talking
20  about conduct that is pure speech.
21    And so to that extent, the notion that there is some
22  obviousness to the fact that there is a cause of action here is
23  really -- it's not the case.  Hartman was talking about what
24  causation requirement is required in a case of retaliatory

25  prosecution.
0035
1        THE COURT:  The pure speech you're talking about here
2  is the speech of the government officials.
3        MR. LUSKIN:  That's correct.
4        THE COURT:  Now, it is curious, because if you flip
5  that and go back to, within the CIA, go back to Haig v. Agee,
6  will find a pretty strong statement by the Supreme Court that
7  disclosures of such secret information regarding the CIA's
8  activities are not protected by the Constitution.
9      In other words, if in that sentence -- in that setting,
10  Agee's conduct in disclosing such information the Supreme Court
11  said was not protected by the Constitution, why would these
12  government officials have any kind of protection for their
13  speech that is alleged to be doing exactly the same thing?
14        MR. LUSKIN:  I think two responses, Your Honor.  First
15  of all, in Agee, of course, there is a difference between an
16  individual talking about matters that are subject to
17  classification, and government officials, where the disclosure
18  of that information is vested in the discretion of those public
19  officials, by statute and by case law.  The second --
20        THE COURT:  Did your client have authority to
21  declassify?
22        MR. LUSKIN:  I believe the Vice President does.  My
23  client did not.
24        THE COURT:  Is there, on the facts alleged in this
25  case, a declassification that took place?
0036
1        MR. LUSKIN:  I'm not aware of it, and indeed,
2  Your Honor, there is no allegation that the individual
3  defendants were aware that the information was classified.
4  There is an averment that it was classified.  There is no
5  allegation that they were knowingly disclosing classified
6  information.
7      And I think, Your Honor, in light of the Supreme Court's
8  decision in Bartnicki and en banc decision by the D.C. Circuit
9  in Boehner against McDermott, I think -- I don't think that the
10  inferences that Your Honor suggests that might be drawn from the
11  Agee case would be applicable under these circumstances to
12  public officials who are not alleged to have violated a law in
13  making this disclosure.  Under those circumstances, I think what
14  Boehner against McDermott and Bartnicki teach is that this is
15  protected speech.
16      But picking up on Hartman, I think there's something very
17  important that we do draw from Hartman in relation to the First

18  Amendment claim here.  It is the first flaw in the claim, and
19  that is that there must be causation.
20      As one reads the complaint -- and indeed, Hartman is all
21  about causation, which is to say the harm that flows from the
22  government retaliation in that case must be in fact the cause of
23  the harm to First Amendment --
24          THE COURT:  We're going to get into actual chilling or
25  not?
0037
 1          MR. LUSKIN:  We're going to get to that in a minute,
 2  Your Honor.  But I think actual chilling and causation are two
 3  conceptually different matters.  The amended complaint pleads
 4  that Mr. Novak's article was the cause in fact of the harm to
 5  the plaintiffs, and it also pleads that Mr. Armitage was the
 6  source for the Novak article.  It pleads in addition that
 7  Mr. Rove had a conversation with Mr. Cooper, that Mr. Libby had
 8  a conversation with Ms. Miller, and that Mr. Cheney had a
 9  conversation with Mr. Libby.  But none of those is either the
10  cause in fact or the proximate cause of the harm that they
11  allege.
12      And as Hartman teaches, proximate cause is an essential
13  element in a First Amendment claim.  The other essential element
14  is chilling.  And there is no allegation of a chill here, by the
15  plaintiff Mr. Wilson --
16          THE COURT:  Of an actual chilling.
17          MR. LUSKIN:  There's no allegation of a chill at all.
18  And that is not a mere pleading requirement, Your Honor.  The
19  objective test that most of the circuits have adopted --
20          THE COURT:  Including the D.C. Circuit?
21          MR. LUSKIN:  Including the D.C. Circuit really has two
22  separate functions, Your Honor.  The first is to protect a
23  public official from, I suppose borrowing the law school terms,
24  an eggshell mouthed plaintiff, who might be chilled by an act of
25  retaliation where an ordinary person would not.  And so it
0038
 1  permits government officials to have some predictability in
 2  understanding what it is that they do.
 3      The second interest served by that objective test,
 4  Your Honor, is to permit the courts an opportunity to adjudicate
 5  as a legal matter whether or not there is any risk of chill.
 6      But in the absence of any allegation of chill, and in the
 7  absence of any allegation that the plaintiff himself was
 8  actually chilled, you turn that objective test completely upside
 9  down.  You permit a plaintiff to come in and say the government
10  retaliated against me.  It didn't hurt me because I am an

11  unusually resilient plaintiff, and therefore I did not suffer
12  any damages, but I would like vicariously to assert a Fifth
13  Amendment claim on behalf of a hypothetical objective plaintiff
14  who might have been chilled under those circumstances.
15      The absence of any allegation of chill, as Hatfill finds
16  pretty clearly, is fatal to that First Amendment claim.
17          THE COURT:  Hatfill, a very comprehensive case by
18  Judge Walton, did on this particular issue go to the 2nd
19  Circuit -- 2nd Circuit actually has a split line of cases on
20  this issue, but to the 2nd Circuit actual chill requirement more
21  than the objective test that the D.C. Circuit and other
22  circuits --
23          MR. LUSKIN:  Of course, Your Honor.  But even if we
24  were to undertake a purely objective analysis, every court that
25  adopts the objective test nevertheless recognizes that the
0039
 1  actual effect on the real plaintiffs standing in front of the
 2  Court is highly relevant to determining whether or not the
 3  hypothetical plaintiff would have been injured.  And here we
 4  don't have any allegation of that.
 5      Let me move on to the equal protection.
 6          THE COURT:  What kind of allegation is necessary?  If
 7  the test is for the First Amendment claim that it only -- the
 8  response by the defendants only need be sufficiently severe to
 9  chill a person of ordinary firmness, what is it that you think
10  has to be alleged in the complaint in order to state a cause of
11  action?
12          MR. LUSKIN:  Well, Your Honor, I think the plaintiff
13  must state that his First Amendment rights were effectively
14  chilled by virtue of the defendant's conduct, and at that
15  point --
16          THE COURT:  Through a causation requirement, you would
17  argue that it isn't really an objective chilling test; it's a
18  subjective, actual chill test.
19          MR. LUSKIN:  Well, the subjective allegation is
20  necessary both for causation and standing purposes, Your Honor.
21  The objective test is a test that the Courts have adopted in
22  order to permit early adjudication of these claims and to
23  protect public officials.  But the fact that we move on to an
24  objective test does not dispense with the need for a plaintiff
25  actually to have been injured, and for him actually to have been
0040
 1  injured by the conduct of the defendants.  We don't have
 2  allegations of either in this case.
 3          THE COURT:  No allegation of injury?

4          MR. LUSKIN:  No, sir.
5          THE COURT:  What about the allegations in the amended
6   complaint?  I think it's in paragraphs 42 and 44, that even
7   apart from the chill suffered by Mr. Wilson, that he suffered
8   fear for his safety and the safety of his children, and
9   impairment in pursuing his professional opportunities.  Why
10  isn't that sufficient allegation of injury?
11          MR. LUSKIN:  Because the First Amendment claim speaks
12  to the right to free speech, Your Honor.  The employment claims
13  or fear would be considered under a Fifth Amendment due process
14  substantive or liberty interest.
15          THE COURT:  So those injuries -- the allegation of
16  those injuries is insufficient for a First Amendment claim in
17  your view.
18          MR. LUSKIN:  That's exactly right, Your Honor.  They
19  allege gross invasions of privacy, fear for their safety,
20  impairment in Mrs. Wilson's ability to carry out her duties,
21  impairment of both of them in their professional opportunities,
22  and a general deprivation of their constitutional rights.  But
23  that is not an allegation that his First Amendment rights were
24  effectively chilled.  Neither factually nor in any reasonable
25  inference of them.  It's not even a conclusory allegation of it,
0041
1   much less an allegation with some specificity of what harm was
2   suffered.
3          THE COURT:  You don't think fear for personal safety
4   and the safety of one's children, or fear that one's
5   professional opportunities are impaired would chill someone in
6   their future speech?
7          MR. LUSKIN:  I suppose that if someone were placed in
8   fear in retaliation for the exercise of speech, there is some
9   possibility --
10          THE COURT:  Well, that's the allegation, that they
11  were.
12          MR. LUSKIN:  I know.  But Your Honor, I suppose the
13  answer is it might, but that's not what's here.
14          THE COURT:  Not here factually or not here by virtue
15  of the allegations?
16          MR. LUSKIN:  Either way, Your Honor.
17          THE COURT:  Well, factually is not what we're doing.
18  I'm not resolving the facts.
19          MR. LUSKIN:  And I guess what I would say, Your Honor,
20  is when we deal in a 12(b)(6) context, the bad news from the
21  defendant's perspective is we have to take the facts and the
22  allegations as pled.  The good news is that they do too.  And I

23  look at this complaint and see no allegation that First
24  Amendment rights were effectively chilled, and that is both
25  fatal to a First Amendment claim, it is fatal on standing
0042
1  grounds, and it is fatal in terms of causation.
2     Let me move very briefly to the equal protection claim,
3  because as pled it's derivative of the First Amendment claim.
4  The short answer here, Your Honor, and we've cited cases from a
5  number of circuits squarely on point, is that you simply cannot
6  repackage a First Amendment claim as an equal protection claim.
7  The First Amendment rights are personal rights.  Those are
8  rights that can be asserted through a claim under the First
9  Amendment, but they can't be treated as equal protection claims.
10     And Olech is not to the contrary.  Olech simply states that
11  it is possible to bring an equal protection claim on behalf of a
12  class of one.  It does not speak to the substance of what
13  constitutes an equal protection violation.  And the cases before
14  and after Olech make clear that essentially serving a First
15  Amendment claim is an equal protection leftover; it does not
16  state a violation of equal protection.
17          THE COURT:  Those aren't D.C. Circuit cases.
18          MR. LUSKIN:  No, sir.  And those are elsewhere, which
19  of course is obviously relevant to the second prong of the
20  qualified immunity analysis.  But the fact is that the case law
21  that we have canvassed, and certainly the plaintiffs have come
22  forth with nothing that's different --
23          THE COURT:  What do they need to allege for purposes
24  of a class of one equal protection claim?  Is it basically the
25  two things from Olech, disparate treatment of similarly situated
0043
1  parties, and that there's no rational basis for that disparate
2  treatment?
3          MR. LUSKIN:  That's right, but the disparate treatment
4  I think, as the courts have said in the context of the First
5  Amendment, is -- either has to do with an invidious
6  classification or government action.  I think Olech involved
7  creation of an easement.
8          THE COURT:  It did.  The municipality was recognizing
9  a larger easement than the plaintiff wanted.
10          MR. LUSKIN:  Right.
11          THE COURT:  But have they satisfied the disparate
12  treatment -- in other words, that similarly situated agents were
13  not outed?
14          MR. LUSKIN:  It hasn't -- it's not pled and, going
15  back to Mr. Bucholtz's explanation, it's precisely the sort of

16  issues that would create terrific problems of justiciability.
17          THE COURT:  And if it's not pled, is that a fatal
18  flaw?
19          MR. LUSKIN:  Yes, Your Honor, it is.  In order to
20  plead an equal protection violation, there has got to be an
21  allegation of disparate treatment in some meaningful,
22  constitutionally recognizable way.  And I guess what we're
23  saying is that there is both the absence of an allegation of
24  disparate treatment, and the substance of the treatment that
25  they allege, which is being singled out for criticism, the
0044
1  courts of appeals, although not the D.C. Circuit, have said
2  simply and squarely being singled out for criticism, fairly or
3  unfairly, does not constitute an equal protection violation.  It
4  may be a First Amendment violation; it's not a violation of
5  equal protection.
6          THE COURT:  All right.  So let's move into the Fifth
7  Amendment.
8          MR. LUSKIN:  For the Fifth Amendment, let me start
9  first with the concept the First Amendment -- the Count 3, which
10  is the privacy count.  There are two distinct problems here,
11  Your Honor.  The first is that the D.C. Circuit simply has not
12  recognized any right to informational privacy, and has indicated
13  that it would be reluctant to do so.  The second is --
14          THE COURT:  That really goes more to the clearly
15  established prong of the qualified immunity analysis, does it
16  not?
17          MR. LUSKIN:  It does, Your Honor, although I think it
18  would be difficult to read the Court's decision in the AFGE
19  case, which involved concededly highly personal information, and
20  believe that the Court was receptive to recognizing such a
21  claim.  I think --
22          THE COURT:  Other circuits have recognized it.
23          MR. LUSKIN:  Yes, sir, they have.  And the second
24  problem is that the information that we are talking about here
25  is not personal information, it is employment information.  And
0045
1  the decisions in Blazy against Tenet and others have made clear
2  that one's status as a covert agent or classified information is
3  not personal information which is personal to a potential
4  employee.  While it may be sensitive, it is information that
5  belongs, in the largest sense of the term, to the government.
6      The fact remains, going back to your first hypothetical,
7  that the director of Central Intelligence certainly could
8  concededly have issued a statement the week of July 7 that said

9  among other things that Mrs. Wilson was responsible for sending
10  her husband on the mission and that he lacked qualifications for
11  that, and she is a covert agent of the CIA, and she used her
12  position to do that.  And I'm speaking hypothetically here.
13      That would have resulted in exactly the same harm that the
14  plaintiffs allege, under their informational privacy theory,
15  would have been a tort just as clearly as the torts that they
16  have alleged against us.  There's no analytical difference.
17          THE COURT:  Except for the statutory --
18          MR. LUSKIN:  Except for the fact --
19          THE COURT:  -- and case law.
20          MR. LUSKIN:  But as I understand their constitutional
21  claim, it doesn't turn on the absence of statutory authority.
22  It turns on the disclosure of sensitive information which
23  exposed her to risk.  And that is precisely the sort of
24  circumstance where I think the courts should not be intruding,
25  to second-guess the judgments of the executive branch in those
0046
1  areas.
2      But the short answer on informational privacy, Your Honor,
3  is that this circuit not only has not recognized it, has cast
4  doubt on it, but second of all, the substance of the information
5  that is at issue here is not personal information, it is
6  employment information.  It belongs to her employer, not to her.
7  It was for her -- and her employer had complete discretion, as
8  they concede, to have revealed that information, with the same
9  adverse consequences.
10          THE COURT:  For cause or without cause.
11          MR. LUSKIN:  That's exactly right.
12      In their opposition, the plaintiffs move to a state
13  endangerment theory, and they cite Butera against Briscoe, and
14  although that is a substantive due process, not a privacy due
15  process, let me deal with it here, since they dealt with it, in
16  defending Count 3.  There are two clear problems that Butera
17  makes clear elements of this.  The first is there has to be
18  actual harm.
19      And as you recall, the Butera court goes through a very
20  extended discussion of the case law on state endangerment among
21  all the other circuits, and expresses its concern that without
22  clear guideposts it opens the door for actions under a variety
23  of circumstances that really undermine the decision of the
24  Supreme Court in DeShaney.  So they say we hold that we'll
25  recognize a state endangerment theory only when there is in fact
0047
1  actual harm.

2      And the subsequent decisions in Briscoe and Williams are
3  entirely consistent with that.  There is no allegation of actual
4  harm.  There is allegation of fear, but no allegation that the
5  plaintiffs have in any respect become -- actually been
6  victimized in the way in which the plaintiffs in Williams and
7  Briscoe and Butera were in fact victimized.
8           THE COURT:  How were they victimized?
9           MR. LUSKIN:  Butera was beaten to death, Your Honor.
10  In Williams, the prison guards were subject to assault by
11  prisoners because they were placed into the facility with
12  inadequate protection.  In Briscoe, they were subject to anthrax
13  exposure.  They were ordered to clean up contaminated machinery.
14  They were exposed to anthrax and suffered in fact tangible ill
15  effects.
16      The second is, as the Court makes clear in Butera, is that
17  the conduct must shock the conscience in that it must be conduct
18  that is intended to inflict harm, unjustified by any government
19  purpose.  In the absence of an allegation, which I think
20  plaintiffs cannot make, that any of these defendants were aware
21  of Mrs. Wilson's covert status, they simply do not make an
22  allegation and could not make an allegation that the conduct
23  reaches the deliberate level --
24           THE COURT:  There is an allegation in the complaint,
25  at least with respect to Mr. Libby, that he acknowledged that
0048
1  this was sensitive information that he could not really discuss
2  on a nonsecure line.
3           MR. LUSKIN:  Well, I think there's a difference
4  between sensitive information and a clear allegation that the
5  defendants were aware of her classified status and the
6  consequences --
7           THE COURT:  Not much of a difference, but.
8           MR. LUSKIN:  And certainly no such allegation as to
9  either Defendant Cheney or Defendant Rove, or Armitage for that
10  matter.  And there needs to be that level of willful intent to
11  inflict injury in order to meet the intent standard for any
12  substantive due process violation.
13      Let me move on to Count 4, Your Honor, which is the
14  property count.  And I think the short answer is, and I think
15  plaintiffs acknowledge, they simply have no employment -- no
16  property interest in employment.  And in a long line of Supreme
17  Court cases, going back to Roth, that's dispositive.
18      The plaintiffs make an argument in their opposition about
19  some sort of springing property right, which is to say that
20  Mrs. Wilson had no property interest with respect to her

21    employer, but might have had a property interest with respect to
22    third parties.  And to be candid, Your Honor, I just don't
23    understand it.  I don't understand what that means and I don't
24    understand what that means in light of the clear line of
25    authority on due process property cases from the Supreme Court,
0049
1    starting from Roth and continuing, that there's got to be a
2    tangible property interest for there to be a property violation.
3         THE COURT:  Where do we look to find that tangible
4    property interest?
5         MR. LUSKIN:  Pardon me?
6         THE COURT:  Where do we look to find whether there's a
7    tangible property interest?
8         MR. LUSKIN:  Well, the place we look to know that it
9    isn't there is the concession by the plaintiffs that she was an
10    employee who was terminable at will without cause.  And the
11    short answer is, under those circumstances, there is no property
12    interest in continued employment.
13        Now, the courts have found liberty interests relevant to
14    employment, and although not pled by the plaintiffs, let me
15    touch on them briefly.  And those include both the
16    reputation-plus cases and the stigma cases.  And again, there
17    are not facts pled in the complaint that would satisfy either of
18    these.
19        In the first place, a reputation plus liberty interest
20    violation requires defamation and adverse job action.  And as
21    the Court made clear in Hatfill, true statements do not
22    constitute defamation for purposes of reputation-plus.  In
23    addition, while there is a general allegation of impairment of
24    job opportunities, there is no allegation of demotion, loss of
25    pay, loss of status.
0050
1        The stigma cases are similar, Your Honor.  In the first
2    place there again is no evidence, which there must be, of
3    demotion.  And second, there isn't an allegation -- there's an
4    allegation of impairment, but not the kind of broad preclusion
5    that would satisfy the stigma concept.  I look most clearly to
6    the O'Donnell case in the D.C. Circuit, where the Court found
7    that the fact that the plaintiff there was moved laterally into
8    what they characterized as a dead-end job, and went from being a
9    senior official of the D.C. police department to the chief of
10    the Brunswick, Maryland police department, a town of 6,000
11    people, simply didn't state either the kind of adverse job
12    action or the kind of broad preclusion, sort of tantamount to a
13    debarment, in a government proceeding, that is required to make

14  out a stigma case.
15        THE COURT:  I think that your time is more than gone,
16  but take a minute to make whatever closing point you would like
17  to make.
18        MR. LUSKIN:  Your Honor, let me just use the few
19  seconds that you'll allot me just to touch briefly on the second
20  prong of the qualified immunity analysis.  I think our
21  interchange this morning makes as clear as it could possibly be
22  that a reasonably competent public official would not be aware
23  that there were clear violations of known constitutional rights
24  under these circumstances.  And under the unbroken line of
25  authority from the Supreme Court in this circuit, the defendants
0051
1  are entitled to qualified immunity.
2        THE COURT:  Thank you, Mr. Luskin.
3        MR. LUSKIN:  Thank you.
4        MR. BOURELLY:  Good morning, Your Honor.  Alex
5  Bourelly on behalf of Mr. Libby.  The intention this morning was
6  not to speak but to join in the common arguments that Mr. Luskin
7  made on behalf of all of the defendants.
8      I do want to address one issue that you raised with
9  Mr. Luskin with respect to the plaintiffs' state endangerment
10  claim, and that is that their pleading indicates in, I think
11  it's I -- pardon me, L of paragraph 19, that shortly after the
12  publication of the New Republic article, Libby spoke by
13  telephone with his then principal deputy and discussed the
14  article.
15      The principal deputy asked Libby whether information about
16  Wilson's trip could be shared with the press to rebut the
17  allegation that the Vice President had sent Wilson.  Libby
18  responded that there would be complications, and that the CIA,
19  in disclosing that information publicly, and that he could not
20  discuss the matter on a nonsecure line.
21      Your Honor, that falls far short of what the plaintiffs
22  state in their brief, which is that Mr. Libby and others
23  intentionally disclosed to the press for publication
24  Mrs. Wilson's status as a covert CIA operative, which goes to
25  the shocking the conscience prong of the state endangerment
0052
1  analysis.  And there simple is no allegation in the complaint
2  that would support that.
3      And with that, Your Honor, I don't have anything further to
4  add.  I just wanted to make sure that the record was clear on
5  that point.
6        THE COURT:  You have raised an argument that the Civil

7   Service Reform Act itself, and perhaps CIA personnel regulations
8   are somehow relevant to the Bivens special factors analysis.
9   Why is the CSRA relevant when there's no allegation of an
10  adverse employment action in this case?
11       MR. BOURELLY:  Well, you're right, Your Honor, that
12  there's certainly no clear allegation of an adverse employment
13  action.  There is some suggestion that she was unable to pursue
14  the career that she loved, and as a result she simply could go
15  no further within the agency.
16      But you're right, Your Honor, and we agree there was no
17  adverse personnel action in this matter.  And I'm not going to
18  go -- I don't want to go beyond what's in the pleadings
19  themselves, even though there is testimony that Mrs. Wilson gave
20  under oath in front of the House committee --
21       THE COURT:  If it's not in the pleadings, don't go
22  there.
23       MR. BOURELLY:  I'll stay away from it then,
24  Your Honor.
25       THE COURT:  There's a lot of information out there --
0053
1        MR. BOURELLY:  No, I understand, Your Honor.
2        THE COURT:  I don't need it right now.
3        MR. BOURELLY:  I understand, Your Honor.  It does go
4   to the point that there are some things that the Court can take
5   judicial notice of that are outside the --
6        THE COURT:  What about the CIA regulations?  How are
7   they of any importance here?  They weren't promulgated by
8   Congress, were they?  How is that any part of a comprehensive
9   scheme or a special factor?  That's just the CIA doing what it
10  wants to do.
11       MR. BOURELLY:  But within the CIA itself they have set
12  forth a scheme to deal with precisely these types of employees.
13       THE COURT:  Yeah, but the special factors analysis is
14  really a deference to Congress analysis.  That's what it's all
15  about.  It's about the courts deferring to Congress and not
16  implying a constitutional claim pursuant to Bivens, in
17  recognition of the fact that Congress has spoken in the area.
18  CIA regulations don't indicate that Congress has spoken.
19       MR. BOURELLY:  Well, they don't, Your Honor, but
20  again, it's all -- none of our special factors that we've set
21  forth in our brief are intended to operate alone and by
22  themselves.  Rather, the purpose of making that argument is to
23  sort of further elucidate what would be available.  And so quite
24  frankly, I think that the government has set forth precisely
25  what our arguments would be with respect to the various statutes

0054
1   that would apply.  And with that, I'll pass the mic to the next
2   person.
3          THE COURT:  All right.  Thank you.
4          MR. WALDMAN:  Good morning, Your Honor.
5          THE COURT:  Good morning.  For the court reporter,
6   your name?
7          MR. WALDMAN:  Michael Waldman for Richard Armitage.
8          THE COURT:  Thank you.
9          MR. WALDMAN:  On behalf of Mr. Armitage, we wish to
10  join in the arguments previously made by my colleagues.  These
11  arguments for dismissal are equally applicable to Mr. Armitage.
12  But in addition, in the case of Mr. Armitage, the factual
13  allegations in the first amended complaint are in certain
14  respects more detailed and slightly different, and we believe
15  that these specific facts alleged by plaintiffs provide an even
16  stronger basis for dismissal of Mr. Armitage here.
17      For example, one of the plaintiffs' arguments as to why the
18  Privacy Act is not a special factor is that the Privacy Act
19  fails to provide plaintiffs a remedy because it supposedly does
20  not apply to the office of the President or the Vice President,
21  as mentioned earlier.  Well, Mr. Armitage was not in the office
22  of the President or the Vice President.  He was an employee of
23  the Department of State.
24      There is no dispute that the Department of State is covered
25  by the Privacy Act.  So the plaintiffs' arguments about whether
0055
1   the Privacy Act does or does not cover the office of the
2   President clearly is irrelevant to claims against Mr. Armitage.
3          THE COURT:  Although we don't know whether there
4   actually is a viable Privacy Act claim against Mr. Armitage
5   based on the allegations of the complaint, do we?
6          MR. WALDMAN:  Well, Your Honor, I believe we do.  You
7   raised a hypothetical earlier that whether the information came
8   from reporters that was then disclosed by the defendants.  We
9   have factual allegations, at paragraphs 36 through 38 of the
10  complaint, as to the disclosure by Mr. Armitage.  It says that
11  he learned of the status of Ms. Wilson as a CIA employee from a
12  State Department memo.  It was within the files of the
13  government.  It was traceable to the files of the government.
14      The Privacy Act provides a civil remedy for disclosure of
15  information about an individual where the information is
16  maintained and governed by a government agency.  So the
17  plaintiffs' own allegations about exactly what occurred here
18  make it clear that it is covered by the Privacy Act.

19       The plaintiffs also allege a deliberate and intentional
20   conspiracy to retaliate against the Wilsons, and they argue that
21   that conspiracy somehow takes it outside the Privacy Act,
22   somehow takes it outside the other statutes that we cite, the
23   Civil Service Reform Act, the Intelligence Identities Protection
24   Act.  And while we frankly don't understand the legal basis for
25   that argument, again in the case of Mr. Armitage, the
0056
 1   allegations by the plaintiff make it clear that he is not
 2   alleged to have engaged in any conspiracy.
 3       He is not named in Count 1, which is an intentional
 4   retaliation count.  He is not named in Count 2, the equal
 5   protection which requires vindictiveness and improper animus.
 6   And if the Court looks at paragraph 24 of the complaint, it most
 7   clearly states that Mr. Armitage is not alleged to have acted in
 8   the conspiracy; paragraph 24 states that there was an agreement
 9   to discredit, to punish, and to seek revenge against the
10   Wilsons, but Mr. Armitage is not named as having been part of
11   that conspiracy.  So it is simply just not alleged against
12   Mr. Armitage.
13           THE COURT:  So it's Fifth Amendment due process claims
14   in the constitutional context that are alleged against
15   Mr. Armitage.
16           MR. WALDMAN:  That's correct, Your Honor.  I guess the
17   only point we were making is to the extent that somehow being
18   part of the conspiracy takes you outside of the special factors
19   analysis, he's not -- that argument by plaintiffs wouldn't even
20   apply to him because he's not alleged to have been engaged in
21   any conspiracy.  Moreover --
22           THE COURT:  The substantive due process claim is also
23   alleged against Mr. Armitage; is that correct?
24           MR. WALDMAN:  That's correct, Your Honor.  Count 3,
25   the right to privacy, and Count 4, the property right claim, are
0057
 1   both against Mr. Armitage.  Nonetheless, we would -- although we
 2   believe the allegations in the complaint relating to
 3   Mr. Armitage in particular show that the Privacy Act is a remedy
 4   available to the plaintiffs, we would reiterate the point made
 5   earlier, because we believe it's correct, that plaintiffs'
 6   arguments focusing on whether they have an actual remedy or do
 7   not have an actual remedy under the Privacy Act and the other
 8   acts asks the wrong question.
 9       The Supreme Court and this circuit have repeatedly made
10   clear that the absence or inadequacy of a statutory remedy does
11   not affect the special factors analysis.  And here we have the

12  D.C. Circuit in Chung and the various district courts, in
13  Hatfill and in the Sudnick case more recently, where they have
14  addressed leaks by government employees and found that the
15  Privacy Act is a comprehensive remedial scheme, and that it
16  precludes a Bivens action, and we believe that clearly applies
17  here.
18      Also, as to the Westfall Act, Count 5, again the
19  complaint's specific allegations against Mr. Armitage directly
20  contradict their arguments against dismissal.  Plaintiffs argue,
21  for example, that the fact discovery is necessary as to the
22  scope of employment determination, since the Court supposedly
23  needs discovery into when and where the tort occurred.  I think
24  Your Honor referenced it earlier.
25      Yet for Mr. Armitage, again the complaint, at paragraph 36
0058
1  through 88, is clear that he met with Mr. Woodward and Mr. Novak
2  in his State Departmental office.  There's no dispute here,
3  never been challenged, that he met during business hours.  So
4  there's no need for discovery as to when and where
5  Mr. Armitage's allegedly tortious conduct occurred.
6      There also can be no serious doubt as to Mr. Armitage that
7  talking to reporters about U.S. foreign policy was part of his
8  duties.  The State Department Web site lists more than 150
9  separate occasions in 2004 where Mr. Armitage provided press
10  interviews or public remarks.
11      THE COURT:  So what is your definition for the
12  underlying event for purposes of scope of employment?
13      MR. WALDMAN:  The conversation with the reporters
14  about foreign affairs, about a key important issue of foreign
15  affairs, is the alleged tortious conduct, and that is what the
16  scope of employment analysis should --
17      THE COURT:  And you would agree with Mr. Bucholtz, I
18  take it, that no matter what is said in that context to a
19  reporter, it's still within the scope of employment?
20      MR. WALDMAN:  Yes, Your Honor.  We believe the
21  Ballenger case is very clear on that point.  Ballenger again
22  found that -- the D.C. Circuit found that talking to a
23  journalist was part of a congressman's duties.  Here talking to
24  journalists was part of Mr. Armitage's duties.
25      And in fact, in Ballenger, the plaintiffs in Ballenger made
0059
1  almost the exact same argument, that the defamatory statement
2  could not have been within the scope of his duties, and
3  plaintiffs here argue that releasing the identity of the secret
4  operative could not have been in furtherance of his official

5  duties.  But Ballenger stated that, and let me quote Ballenger:
6  "The appropriate question, then, is whether the telephone
7  conversation, not the alleged defamatory sentence, was the kind
8  of conduct the defendant congressman was employed to perform."
9      So it's not the defamatory sentence, it's the conversation
10  with the reporter.  Here it's the same thing.  It's not what is
11  said in that conversation, it's the fact that he was talking to
12  reporters about foreign policy events and events that related to
13  his official duties.
14      Your Honor, in closing, as set out in our briefs and by the
15  various defense counsel today, there are a myriad of legal
16  reasons why each and every one of plaintiffs' claims fails and
17  should be dismissed.  On virtually every legal issue there is a
18  Supreme Court or a D.C. Circuit case directly on point, and in
19  each instance it supports dismissal.
20      The reality is that plaintiffs' case here is principally
21  based on a desire for publicity and book deals and lacks any
22  sound legal justification.  And we would ask Your Honor to
23  dismiss this complaint with prejudice as to Mr. Armitage.
24          THE COURT:  All right.  Mr. Kester.  Anything left for
25  you to say?
0060
1      MR. KESTER:  Yes, actually, there is, Your Honor.
2  I'll try not to take too much of the Court's time with it.  The
3  Court pointed out at the beginning that we're dealing with legal
4  issues in this hearing this morning, and there is so much wrong
5  with this complaint that one hardly knows where to start.  The
6  Court will be relieved to know I don't intend to cover all of
7  those things, and I don't intend to replow the ground that my
8  friends have already covered this morning.
9      I think I was supposed to get 10 minutes.  I'd hope to save
10  a couple of minutes for reply and keep it to eight.  I'll try to
11  compress.
12          THE COURT:  I'm not going to give every one of counsel
13  who has argued on behalf of defendants a chance for rebuttal or
14  reply time, but I will let one or two speak.  You're going to
15  have to decide who gets that honor.
16          MR. KESTER:  We'll try not to abuse your generosity in
17  that regard.  I will say one thing that's kind of an overview of
18  so much of the rather meticulous discussion we've heard up to
19  now about the causes of action here.  We need to look at it from
20  the point of view that federal courts have no obligation to
21  create new causes of action somehow based on the Constitution
22  when plaintiffs say they are unhappy or injured with something.
23      The claims in this case legally are fanciful claims that

24  have never been attempted or allowed before.  This court is
25  being asked to create four new vague, open-ended causes of
0061
 1  action.  Congress has never granted a damage remedy for any of
 2  them.  And they're asking the Court to do that based on a
 3  40-year-old case, Bivens, that this court has not extended --
 4  the Supreme Court has not extended for more than a generation.
 5     And the most useful word from the Supreme Court on that, I
 6  will read one line from the Correctional Services case, which I
 7  commend to Your Honor's attention.  2001 opinion by the U.S.
 8  Supreme Court written by the Chief Justice.  On page 68 of that
 9  opinion the Court says, "Since Carlson, we have consistently
10  refused to extend Bivens liability to any new context or new
11  category of defendants."  And I think that is the text from
12  which the Court may want to approach.
13        THE COURT:  What does "new context" mean in that
14  quote?
15        MR. KESTER:  Well, the Supreme Court has said that
16  Bivens remedies are specific not only to whatever piece of the
17  Constitution is being invoked, but to the --
18        THE COURT:  Both First Amendment and Fifth Amendment
19  claims have been recognized under Bivens.
20        MR. KESTER:  But not in this sort of a situation, and
21  that's what the cases say.  And the cases say -- we've talked
22  about how the Supreme Court has said there should be caution in
23  this situation, caution in that other situation.  Certainly
24  caution where issues of national security are involved.  And
25  that gets into Totten, which I'm going to discuss in a minute.
0062
 1     But when the Supreme Court is talking about caution in
 2  creating new things on a Bivens basis, that's like a mother
 3  cautioning her child not to wander out into a busy street.  It
 4  doesn't mean be cautious as you do it; it means don't do it.
 5  And that's, I think, the message that the Supreme Court has
 6  delivered in this.  The federal courts are not a residual
 7  Congress to sit and create new damage actions.
 8     Another thing about this complaint is that, as has been
 9  pointed out, there are no particularized allegations of harm.
10  And that brings you into a subject matter jurisdictional problem
11  to start with, under Lujan, and the Court I know is familiar
12  with that, so I won't go into that.  For the rest I plan to talk
13  about the immunity, the absolute immunity of the Vice President,
14  and something on Totten and that line of cases.  Totten v. Doe.
15        THE COURT:  All right.
16        MR. KESTER:  I don't want the statute of limitations

17  to be forgotten, Your Honor, and I don't intend to argue it,
18  given the time.  But the plaintiffs have effectively conceded
19  that Count 5 is out on the statute of limitations.  We believe
20  it's out on other grounds as well.
21       THE COURT:  And you think that if the common law claim
22  is out on statute of limitations, then the Bivens claims can't
23  be far behind?
24       MR. KESTER:  Same statute of limitations, Your Honor.
25  Exactly.  Now I'm going to talk from the point of view of the
0063
1  Vice President of the United States.  If you look at this
2  complaint, as imaginative as it is, all it says about the Vice
3  President is that he transmitted to Mr. Libby a perfectly legal
4  and appropriate order from the President of the United States to
5  explain part of a national intelligence estimate to a New York
6  Times reporter.  Nothing wrong with that.
7     It says that the Vice President told Mr. Libby, who had
8  multiple security clearances, that Mrs. Wilson worked at the
9  CIA.  Even if you take that as alleged, there's nothing unlawful
10  there.  There's no basis for relief.
11       THE COURT:  But this leads to the following question:
12  You're making, I assume, a fairly persuasive qualified immunity
13  argument.
14       MR. KESTER:  I'm making an absolute immunity --
15       THE COURT:  Just a minute.  Listen to my question.
16  You're making a fairly persuasive qualified immunity argument.
17  If qualified immunity is so readily available, why the need for
18  absolute immunity?
19       MR. KESTER:  Well, I will -- may I turn to that in one
20  moment?  I just want to finish the complaint.  It also says that
21  there was an agreement that was reached, but they dropped their
22  conspiracy complaint.  And it says that the Vice President of
23  the United States made a marginal comment on a press clipping of
24  an opinion article by Mr. Wilson.
25       Your Honor, if making marginal comments on newspaper
0064
1  clippings is unlawful or a source of damage actions, then a
2  whole lot of us are in trouble.  I know I'm in trouble.
3       THE COURT:  A whole lot of us, including you, are not
4  in the government.
5       MR. KESTER:  I am representing someone who is in the
6  government and I'm speaking for him in that regard, Your Honor.
7     All right.  Your Honor asked about the absolute immunity of
8  the Vice President.  Your Honor said, if I understood earlier,
9  that it's clear that the Vice President has a lot of the same

10  attributes and considerations that apply to the President.
11  Your Honor's absolutely right.
12      The Vice President, however, is not a high aide to the
13  President.  The Vice President isn't an aide to the President.
14  The Vice President is a unique constitutional officer.  The
15  Supreme Court has recognized this.  The Vice President does not
16  serve at the pleasure of the President.  The President can't
17  remove the Vice President.  The Vice President and President are
18  the only two officers of the federal government who are chosen
19  by the entire country.  The Vice President has numerous duties,
20  the most recent of them being added in the 25th Amendment to the
21  Constitution.
22          THE COURT:  But the duties are different than the
23  duties of the President --
24          MR. KESTER:  They are different.
25          THE COURT:  And I will say less in terms of our
0065
 1  constitutional structure and their significance.  And it seems
 2  to me that the argument for absolute immunity for the Vice
 3  President necessarily transforms the Supreme Court's use of the
 4  term "unique" in describing the President into meaning that both
 5  the President and the Vice President are unique.  And I'm not
 6  sure that in Nixon v. Fitzgerald the Supreme Court was really so
 7  indicating, by constantly -- I mean repeatedly stressing the
 8  unique, one-of-a-kind aspect of the President.
 9      It seems to me that the Supreme Court might have been
10  indicating that there's no one else who's in that unique
11  category.  There's nothing express.  We both know that.  They
12  weren't dealing with absolute immunity for the Vice President.
13          MR. KESTER:  That's correct.  But the word "unique"
14  means unique.  It means only one.  The Vice President, however,
15  also has unique attributes of his office --
16          THE COURT:  Every cabinet level official does have
17  unique aspects of their office.  Some of them come from the
18  Constitution for those cabinet officials.
19          MR. KESTER:  Exactly, Your Honor.
20          THE COURT:  But they don't get absolute immunity.
21          MR. KESTER:  But they don't come from the
22  Constitution, Your Honor.
23          THE COURT:  Some of them do.
24          MR. KESTER:  Not the attorney general.  Not the
25  cabinet officers.  Who else has absolute immunity in the
0066
 1  performance of their duties?  Legislators, members of Congress,
 2  Senators, under the speech and debate clause.  The Chief Justice

3   of the United States as a judge performing his functions.
4        THE COURT:  All judicial officers do by virtue of
5   function, and limited to a judicial function, as opposed to
6   something that is not a judicial function.
7        MR. KESTER:  Exactly.  Exactly.  We don't have to go
8   beyond.  The Vice President -- and we've now exhausted the
9   offices that are created in the Constitution of the United
10   States.  And it would make no sense not to include the Vice
11   President.
12       Your Honor talked about Nixon and Fitzgerald.  Let's look
13   at Nixon and Fitzgerald.  The Court in Cheney against United
14   States District Court, which the plaintiffs in this case
15   remarkably do not mention, although it was argued at length in
16   the briefs, decided in 2004, unanimous opinion by the late Chief
17   Justice.  It relied entirely, in providing a bar to discovery
18   against the functioning of the Vice President, it totally went
19   back to Nixon and Fitzgerald.  If you look at 542 U.S. at 342,
20   it talks about, the Supreme Court talks about separation of
21   powers considerations that affect and protect "the President or
22   Vice President."  At 386, it talks about the offices of the
23   President and Vice President.  In 392 it says, I quote, "special
24   considerations applicable to the President and the Vice
25   President."
0067
1        And finally, at 381 of that opinion, it says "were the Vice
2   President not a party in the case," then the case "might present
3   different considerations."
4        So Nixon against Fitzgerald was the basis of Cheney against
5   U.S. District Court, which was a case that involved the Vice
6   President.  And the Court in Nixon also said that there's no
7   specific textual basis that has to be considered a prerequisite
8   to the recognition of immunity.
9        It also says, and I think it's important to point out, that
10   there is a lesser public interest in actions for civil damages,
11   especially actions as thinly founded as this kind of
12   never-before-recognized Bivens action, that there is a lesser
13   public interest in that when it comes to issues of immunity than
14   for something like, say, a grand jury subpoena or something of
15   that sort.
16       Unless the Court has further questions on that, I think
17   I'll move on to the Totten point so as not to abuse your time.
18        THE COURT:  Go ahead.
19        MR. KESTER:  With respect to Totten, I don't think,
20   Your Honor, with respect, that there's any way that Your Honor
21   can avoid addressing the Totten issue.  It's a threshold issue,

22  much like the immunity issue.
23      THE COURT:  What issue do you think I need to --
24  assume that you're going to win on the issue.  What issue do you
25  think I should address first?
0068
1       MR. KESTER:  I think you've got some flexibility
2  there, Your Honor.
3    (Laughter)
4       THE COURT:  That's a nonanswer, Mr. Kester, although I
5  appreciate the flexibility.
6       MR. KESTER:  I think we should win on all of them,
7  Your Honor.
8       THE COURT:  That's not my question.  I said which do I
9  address first from a jurisprudential perspective.
10      MR. KESTER:  Well, look.  Standard procedure would
11  say, and Justice Scalia talks about this a lot in various
12  opinions, first you look at subject matter jurisdiction before
13  you look at the merits.  On the other hand, in Tenet v. Doe,
14  there are a couple of concurring opinions which are kind of
15  interesting, and a footnote by the court which is also
16  interesting, on Your Honor's very question.
17    And in Tenet v. Doe, they said because of Totten we don't
18  have to reach some other issues even though they might be
19  considered subject matter jurisdiction.  And Justice Stevens
20  wrote a concurring opinion kind of needling Justice Scalia.
21      THE COURT:  What's subject matter jurisdiction here?
22  What's one of the arguments that you or the other defendants
23  make on subject matter jurisdiction?
24      MR. KESTER:  The Lujan argument is subject matter
25  jurisdiction.  The Totten argument is really subject matter
0069
1  jurisdiction or something close to it, because if you go back to
2  Totten, 1875 case, the Supreme Court sua sponte said get out of
3  this court.  Federal courts won't look at things involving
4  intelligence, spying, that sort of thing.
5       THE COURT:  This is the Totten argument on its own,
6  not as part of the special factors --
7       MR. KESTER:  Well, and Totten in this case is within
8  the broader scope of political questions.  Matters involving the
9  foreign intelligence of the United States and the foreign policy
10  of the United States, under Baker and Carr's list of six, which
11  I know Your Honor's familiar with, are matters committed to the
12  political officers of the government, not to the courts.  This
13  is a protection for the courts as much as anybody else.
14      THE COURT:  All right.  Since you want to talk about

15  Totten, how do you deal with the Tenet observation that there's
16  a difference between cases that are brought by acknowledged,
17  even if covert, CIA employees and ones who are just alleged
18  former spies?  We have, as the government has candidly pointed
19  out, an acknowledgement by the government of just what is
20  asserted to have been disclosed to the plaintiffs' injury here.
21  So how does Totten really apply in light of Tenet?
22        MR. KESTER:  Well, I think in the context of this
23  case, Your Honor, it's a distinction without a difference,
24  because in this case it's easier in some respects because there
25  has been an acknowledgement.  The plaintiffs themselves have put
0070
1  the classified nature of the job --
2        THE COURT:  That's not a Totten argument.  That's a
3  different argument.  How does Totten apply, given the situation
4  that we have?
5        MR. KESTER:  With respect, Your Honor, and I think the
6  government pointed this out as well, it is a Totten argument.
7  It is a Tenet argument.  The complaint says that the plaintiff
8  was unable to perform her duties, and that her duties were of a
9  covert classified nature.  All of these are things that if this
10  court were to allow this case to proceed, how in the world would
11  this court be able not to be pulled into discovery about the
12  nature of the activities of the CIA?
13     The plaintiff has put in issue the classified nature of her
14  duties, how her duties changed presumably after these alleged
15  disclosures.  What -- you'd have to ask, what did she do before?
16  What did she do afterwards?  What changed?  What did her
17  supervisor say to her, if anything?  You are right into the
18  morass that Totten and Tenet say you have to cut off at the
19  beginning.  The courts just don't go there, Your Honor, and they
20  should not go there, and I don't think the courts want to go
21  there.
22     But this is not -- this is a fishing expedition inevitably
23  about duties at the CIA.  And if Totten and Tenet stand for
24  anything, it's that courts leave that alone.  The Supreme Court
25  in Tenet v. Doe said that Totten forbids "the maintenance of any
0071
1  suit, the trial of which would lead to disclosure of matters
2  which the law regards as confidential."
3     That includes the duties and activities of the plaintiff
4  when she worked for the CIA before she quit, as well as the fact
5  alleged, alleged fact, that she had a covert office that she was
6  holding.
7     And I -- Your Honor asked a moment ago about subject matter

8  jurisdiction.  That of course involves political questions, and
9  two cases I would call to Your Honor's attention.  Schneider
10  against Kissinger, Gonzalez-Vera against Kissinger, both
11  decisions of this circuit which speak of the lack of judicially
12  discernible and manageable standards.  Nixon against
13  Fitzgerald --
14         THE COURT:  This case isn't really about foreign
15  policy decisions.
16         MR. KESTER:  It's about foreign intelligence,
17  Your Honor.
18         THE COURT:  Or foreign intelligence decisions.  It's
19  really more about how certain officials reacted to public
20  criticism of their policy decisions.  Why would it be difficult
21  to come up with standards to address those claims?
22         MR. KESTER:  I can imagine few things more difficult,
23  Your Honor, than coming up with standards on how the Vice
24  President of the United States, for example, responds to
25  statements in the press, we would say false statements, that
0072
1  affect the policy of the United States, the functioning of the
2  intelligence agencies with respect to military threats against
3  the United States.  How could courts get into that?  How could
4  courts want to get into that?
5     Baker and Carr speaks of matters textually committed to
6  another branch, lack of ascertainable standards -- it's only one
7  of the reasons to stay out -- and also disrespect to another
8  branch.  And if there is any branch that is constitutionally
9  charged with matters of national security and foreign
10  intelligence, it's certainly the President and Vice President.
11         THE COURT:  All right.  Mr. Kester, I think I have to
12  ask you to wrap up.
13         MR. KESTER:  Okay.  I will just wrap up saying,
14  Your Honor, that as I stand here, it calls to mind -- and
15  forgive me, I may not be quoting perfectly correctly, but
16  there's a line I've always liked from Chief Justice Marshall in
17  Marbury against Madison where the Chief Justice says these are
18  issues of great interest and moment to the United States, but
19  happily not of a difficulty proportionate to their interest.  So
20  we would ask you to dismiss.  Thank you.
21         THE COURT:  Okay.  Thank you, Mr. Kester.
22     I think, given the length of time that we've gone already,
23  out of kindness to all of you, I'll take a five-minute break and
24  we'll resume with Mr. Chemerinsky's argument at that point.
25  Thank you.
0073

1      (Recess from 11:41 a.m. to 11:53 a.m.)
2      THE COURT:  Mr. Chemerinsky.
3      MR. CHEMERINKSY:  Thank you.  As I listened to the
4   five lawyers talk for an hour and 45 minutes, what was striking
5   to me was not one recognized that the complaint alleges that the
6   defendants committed an egregious wrong, to reveal the secret
7   status of a CIA operative for their own partisan gain, and put
8   the plaintiffs and their family in grave danger.
9      As you said at the outset, this is on a motion to dismiss,
10   so the question is is there any claim that's stated that can go
11   forward?  I think it's easiest to take each of the claims in
12   order and deal with all of the defenses that pertain to that
13   claim when I discuss it.  Obviously, having discussed some of
14   the defenses as to the first claim, there will be no need to go
15   back to those that are common to all of the claims.
16      The first of the claims is to the First Amendment.  What's
17   simply alleged here is that Mr. Wilson was punished for his
18   speech, and that great harms resulted from that.  The Court
19   quoted from Hartman, that said that reprisals for speech are
20   actionable under the First Amendment.
21      I think that the D.C. Circuit case in Toolasprashad v.
22   Bureau of Prisons is on point in stating a two-part analysis.
23   First, was the plaintiff engaged in protected activity, and
24   second, was the defendant's conduct such that it would chill a
25   person of reasonable firmness from speaking in the future.  Both
0074
1   of these elements are met here.  Obviously, when Mr. Wilson
2   wrote his op-ed in the New York Times, went on "Meet the Press,"
3   he was engaged in protected activity.  And second, the conduct
4   that was done to him and his family would chill someone of
5   ordinary firmness from speaking in the future.
6      Those who have loved ones with secret status will certainly
7   be reluctant to criticize the government in the future when they
8   know that the reprisal could be that their secret status could
9   be revealed, their loved one's career ruined, their families put
10   in danger.
11      THE COURT:  What's the allegation in the complaint
12   with respect to chill?
13      MR. CHEMERINKSY:  Your Honor, what the allegation is
14   is that the speech was being punished.  I think it's important
15   to put chill in the appropriate context.  Toolasprashad says you
16   do not need to show that the plaintiff was himself or herself
17   chilled.  What chill is relevant to is determining whether or
18   not there was punishment for speech.
19      Imagine that somebody was punished for speech by being

20   executed.  That certainly would violate the First Amendment,
21   even though that person could not speak again in the future.
22   And so I think what you have to ask is was the conduct to which
23   Mr. Wilson was subjected to enough to cause a reasonable person
24   in the future to refrain from coming forward.
25       And there I would suggest the paragraphs that you pointed
0075
 1   to earlier, the specific paragraphs in the complaint, 42 and 43,
 2   are sufficient to make the allegations with regard to punishment
 3   that would chill a person of reasonable firmness from coming
 4   forward in the future.
 5       THE COURT:  And is that also sufficient on a standing
 6   and causation basis?
 7       MR. CHEMERINSKY:  Absolutely, Your Honor.  In terms of
 8   standing, what Mr. Wilson is saying is that he was punished for
 9   his speech.  The fact that the injury was suffered by his wife,
10   and also by him in terms of the danger, is enough for standing.
11   We cite in our brief to several cases where the punishment that
12   was imposed on a person was an injury inflicted on a family
13   member, and all of these cases are sufficient to show that it is
14   enough.
15       In terms of causation here, the complaint clearly alleges,
16   in fact it does so right at the outset, beginning in paragraphs
17   2 and 3 on page 2 of the complaint, that it was a concerted
18   effort by the defendants to punish Mr. Wilson for his speech by
19   revealing the secret status of his wife's work for the CIA that
20   resulted in all of the harms suffered, including this cause of
21   action.
22       One of the arguments that was made was that it should be
23   different because the defendants' conduct here was in the form
24   of speech.  I see no reason why that would matter.  The question
25   is did the action taken by the defendants punish Mr. Wilson; and
0076
 1   clearly it did.
 2       In fact, the case that was cited by the lawyer for the
 3   other side, Bartnicki v. Vopper, really helps the plaintiffs
 4   here.  In Bartnicki v. Vopper, the Supreme Court said that
 5   broadcasting a tape of a secret conversation was protected by
 6   the First Amendment so long as it was obtained legally and so
 7   long as there was a public interest in disclosure of the
 8   information.  There was no public interest served by revealing
 9   that Ms. Plame was a secret agent for the CIA.
10       THE COURT:  But on this issue, although it's 15 years
11   ago, the D.C. Circuit has said it's not aware of any case in
12   which the First Amendment has been held to be implicated by

13  government action that is no more than government criticism of
14  someone's speech.
15      MR. CHEMERINKSY:  Exactly, Your Honor.  If this was
16  just a case about the government choosing to criticize
17  Mr. Wilson, I believe then that case would be on point.  But
18  that's not what occurred here.  This isn't a complaint about the
19  fact that the government might have said things, or that
20  the defendants might have said mean things about Mr. Wilson.
21  This is an action about punishing Mr. Wilson by revealing the
22  secret status of his wife's occupation.  That's very different
23  than just criticism of somebody.
24      THE COURT:  Why is it not just criticism in the form
25  of speech?  No action was taken, was it?
0077
 1      MR. CHEMERINKSY:  But speech can be a form of action.
 2  It's often a form of action.  If you think of the labor
 3  picketing cases where the Supreme Court often recognizes speech
 4  as action.
 5      THE COURT:  That may be true, but this is not the type
 6  of speech that is action.  How is this the type of speech that
 7  is action?
 8      MR. CHEMERINKSY:  Quite the contrary, Your Honor.
 9  This was speech that was action.  This was speech that revealed
10  secret information that had the effect of destroying somebody's
11  career.  I go back to the distinction you just drew a moment ago
12  between criticizing somebody and revealing secret information.
13  Those are two very different things.
14      I certainly believe that Mr. Wilson was, to use the words
15  of one of the defendants, fair game for criticism by the
16  defendants.  And if they wanted to respond to his op-ed in the
17  New York Times, or statements in "Meet the Press" by attacking
18  him personally in speech, if they wanted to say nasty things
19  about him, they could.  But that's not what we're alleging here.
20  That's not what this lawsuit is about.  This lawsuit is about
21  the action that was taken in revealing his wife's secret status
22  with the CIA.
23      Let me then go through the defenses as they would apply as
24  to the First Amendment cause of action, as I said earlier.
25  Obviously what I say now is going to apply to some of the other
0078
 1  causes of action as well.
 2      The first, which wasn't discussed much, was the statute of
 3  limitations.  But the statute of limitations shouldn't be any
 4  problem with regard to the First Amendment.  There could be a
 5  question as to whether the one-year statute of limitations under

6   D.C. Code 12-301(4) applies to the privacy actions, both
7   constitutional and tort, and I can get to that with regard to
8   privacy.  But I don't think there's any doubt with regard to the
9   First Amendment the appropriate statute of limitations is
10   12-301(8), which is a three-year statute of limitations.
11          THE COURT:  The D.C. Circuit hasn't quite gone there
12   yet.  Its principal on-point decision is McClam, and there
13   really isn't a D.C. Circuit case that has said in the Bivens
14   context that you apply the residual three-year statute of
15   limitations.  Is that what you're looking to, the residual
16   three-year statute of limitations?
17          MR. CHEMERINKSY:  I think there would be the argument
18   with regard to the privacy claims where there's a specific
19   statute of limitations is the one you would apply there.  But
20   McClam would say you look to the closest statute of limitations,
21   and obviously if there's no statute of limitations on point,
22   then you would have to look to the residual statute of
23   limitations, which is three years.
24      Now, there is a D.C. Circuit case that without discussion
25   affirmed the three-year statute of limitations, and this is the
0079
1   Lederman v. United States case from the D.C. Circuit.
2      Also, I do think --
3          THE COURT:  Without discussion affirmances aren't
4   really worth all that much, are they?
5          MR. CHEMERINKSY:  I understand, Your Honor, but I
6   think with regard to everything but the privacy claims, the
7   three-year statute of limitations would clearly apply.  And when
8   I get to the privacy we can talk about what's appropriate there.
9          THE COURT:  But how do you get the three-year statute
10   for the constitutional claims if you don't first look to what
11   the appropriate statute for the common law claim is?
12          MR. CHEMERINKSY:  But Your Honor, what McClam says is
13   you look to the closest analogous statute of limitations, and so
14   for privacy you could look to the defamation statute of
15   limitations, because that's analogous.  There isn't an analogous
16   statute of limitations for the First Amendment, for the equal
17   protection, or for the due process claim.  So there you would
18   have to look to the residual statute of limitations.
19          THE COURT:  It all comes from a single, pretty
20   discretely defined event.  There's not any real difference in
21   terms of what the event that gives rise to the cause of action
22   is, either the common law or the four constitutional causes.
23          MR. CHEMERINKSY:  But there could be different causes
24   of action for different claims -- different statute of

25  limitations for different claims.
0080
1        THE COURT:  Certainly.  There could be.
2        MR. CHEMERINKSY:  That's why I say at the very least,
3  since there isn't a comparable statute of limitations in the
4  D.C. Code for the First Amendment, equal protection or property,
5  you would have to go to the residual statute of limitations.
6  But I actually think the Supreme Court's decision in Owens v.
7  Okure is instructive here, because that's exactly the issue the
8  Supreme Court was concerned about there with regard to 1983,
9  where there are multiple statutes of limitations.  And there the
10  Supreme Court expressly held, when there are multiple statutes
11  of limitations, use the residual statute of limitations.
12     Now, you're right, the D.C. --
13        THE COURT:  That certainly is the direction with not
14  only Owens but Wilson v. Garcia as well, and that's the
15  direction that other circuits have gone in.  The D.C. Circuit
16  hasn't yet grappled with that.  So what do I do?  Do I follow
17  the D.C. Circuit case in McClam, or do I follow the Supreme
18  Court cases, saying well, I think the D.C. Circuit would go that
19  way?
20        MR. CHEMERINKSY:  I think as to the First Amendment
21  claim it's easy, since there's no comparable statute of
22  limitations in the D.C. Code.  For the First Amendment claim,
23  you use the residual statute of limitations, it's three years.
24  As to the privacy claims, I think then Owens v. Okure is on
25  point, and the reason I think you should follow what all of the
0081
1  other circuits have done is that the Supreme Court has
2  consistently analogized Bivens actions to 1983 actions.  For
3  example, the immunity cases all say you use the same analysis.
4        THE COURT:  They do.
5        MR. CHEMERINKSY:  There's no reason, therefore, not to
6  follow the Owens v. Okure analysis with regard to the Bivens
7  causes of action as well.
8        THE COURT:  Even though the D.C. Circuit has, at least
9  post Wilson v. Garcia -- I'm not sure that it was post Owens --
10  has said there may well be a difference between Bivens statute
11  of limitations and 1983 statute of limitations.  But go ahead.
12        MR. CHEMERINKSY:  The second defense that's raised,
13  and this is common to all of the claims, is the secrecy claim.
14  I want to point out here that if you look at the United States
15  briefs filed here, nowhere do they cite to Tenet v. Doe, nowhere
16  do they invoke Totten, let alone the state secrets doctrine.
17     The reason that's relevant is that the United States

18   Supreme Court said in Reynolds that only the government can
19   invoke the state secrets doctrine.  To the extent that Totten
20   and Tenet are siblings or at least cousins of the state secrets
21   doctrine, if the government doesn't invoke it in its brief, it
22   seems to me that the defendants shouldn't be able to.
23        THE COURT:  I read the government as not invoking it
24   as a free-standing argument, but invoking it instead only in a
25   special factors assessment.
0082
1        MR. CHEMERINKSY:  They did in their oral argument.  I
2   just went back here when I was sitting here and looked at the table
3   of cases, and they don't cite to Tenet v. Doe.  They don't argue
4   it even in that way.
5        But what I want to argue to you, and you made this point
6   earlier, Totten is concerned and Tenet v. Doe is concerned with
7   the identity of a secret agent being revealed, the action of the
8   defendants that revealed the identity of the secret agent.  This
9   lawsuit isn't going to do that.  And I think -- I was going to
10   say, I think Chief Justice Rehnquist's conclusion to Tenet v.
11   Doe is so important.
12        He says, "The possibility that an espionage relationship
13   might be revealed, if the state secrets privilege is found not
14   to apply, is unacceptable.  Even a small chance that some court
15   will order disclosure of a source's identity could well impair
16   intelligence gathering and cause sources to close up like a
17   clam."
18        THE COURT:  But there are two things, are there not,
19   that your claims would inevitably lead to exploration of?  First
20   is the details, if you will, maybe not the existence but the
21   details of your client's, Ms. Plame's covert job
22   responsibilities, et cetera, because you'll have to explore
23   those in order to succeed on some of your injury claims, and
24   also as those causation and injury requirements are part of
25   elements of some of your causes of action.
0083
1        In addition, on the equal protection claim, you're going to
2   have to compare similarly situated individuals, and somehow
3   establish that she, by being outed, if you will, was treated
4   differently than others were.  That necessarily is going to take
5   you, me, the parties, into the question of other covert
6   relationships.
7        MR. CHEMERINKSY:  Let me deal with each of those
8   questions in turn.  As to the former, there's no reason that the
9   First Amendment claim is going to require any examination of
10   anything that she did that was classified for the government.

11   The question of the First Amendment is, was Mr. Wilson punished
12   for his speech, and can they show harms as a result of that.
13   You don't need to go to secret information as to that.
14      Even if there is some secret information that's revealed,
15   Tenet doesn't say just because there might be some secret
16   information, the entire case has to be dismissed.  Tenet says if
17   there's a risk of revealing that someone was a secret operative,
18   the case has to be dismissed.  Obviously, many cases involve
19   secret information, and courts manage that under the CIPA
20   statute and otherwise.  I think it reads too much into Tenet to
21   say because there might be some secret information, the entire
22   case has to be dismissed.
23      In fact, the Supreme Court has allowed those who work for
24   the CIA to bring actions even with the possibility of revealing
25   secret information.  Webster v. Doe specifically said those who
0084
1   work for the CIA could bring employment actions against the CIA.
2      One other thing too.  We have to put this in context.
3   There was a criminal trial against Mr. Libby that went on for
4   weeks and was in public.  There was no problem there with
5   revealing secret information.  It was handled --
6      THE COURT:  I wouldn't say there was no problem.  It
7   was quite an elaborate context -- endeavor.
8      MR. CHEMERINKSY:  But it was handled.  That would be
9   the better word.  And that's my point.  The other point you make
10   is with regard to equal protection.  I'm going to, though I'm
11   talking about the First Amendment, shift to answer that question
12   here.
13      The cases have indicated that there's two ways of bringing
14   an Olech claim.  One is if you can show malice against a
15   specific individual, the other is if you can show that a person
16   was treated differently than others similarly situated without a
17   rational basis.  Now, at the very least there is an allegation
18   here, the equivalent of malice, and so if we could prove that
19   that would be enough for equal protection.
20      THE COURT:  Which case allows a class of one equal
21   protection claim post Olech for a malice equal protection?
22      MR. CHEMERINKSY:  The Squaw Valley case from the 9th
23   Circuit phrased it exactly the way I just did, saying that
24   either malice or irrational differential treatment is
25   sufficient.
0085
1      In terms of the equal protection, treating her different
2   part, if the government wants to come forward and say we have
3   some agents that we treated the same way but we can't tell you

4  that, then I think there would be a concern with regard to the
5  equal protection.  But the mere possibility can't be enough to
6  say that she can't go forward.
7        THE COURT:  Well, the problem is you haven't even made
8  an allegation in the complaint, I don't believe, that there has
9  been disparate treatment of similarly situated parties.
10       MR. CHEMERINKSY:  I disagree, Your Honor, and here I
11  point you to the language of the complaint itself.  If you look
12  on page 19 of the second amended complaint, specifically
13  paragraphs 51 and 52.  Paragraph 51, "The defendants' actions
14  described herein violate the equal protection clause of the
15  Fifth Amendment which prohibits government officials from
16  intentionally subjecting any individual to treatment that is
17  different from that accorded to others similarly situated
18  without rational basis."  In addition --
19       THE COURT:  That's just a statement of law.  There's
20  no allegation there.
21       MR. CHEMERINKSY:  "Defendants' actions in subjecting
22  the plaintiffs to differential treatment were motivated by
23  vindictiveness and illegitimate animus, thereby violating the
24  equal protection clause of the Fifth Amendment of the
25  Constitution."  We would say that those two paragraphs taken
0086
1  together meet what we believe Olech states as the two ways of
2  having an equal protection claim.
3     While I'm dealing with secrecy, I also want to address this
4  political question doctrine notion.  Your Honor, we're not
5  challenging here any foreign policy decision made by the
6  United States.  In fact, the President of the United States, in
7  a speech quoted in our brief, said revealing Ms. Plame's secret
8  status was an illegal act.  The President has never tried to say
9  it's a foreign policy decision.  There's no reason here under
10  any Supreme Court case dealing with the political question
11  doctrine that says this can't be adjudicated.  To go back to
12  Marbury v. Madison --
13       THE COURT:  Ah, with Mr. Kester.
14       MR. CHEMERINKSY:  That's right.
15     (Laughter)
16       MR. CHEMERINKSY:  It's the province and duty of the
17  judicial department to say what the law is.  The third defense
18  that's raised is Bivens factors and special factors counseling
19  hesitation.  I want to focus here on the First Amendment.
20  Dellums v. Powell in 1977 said that there's a Bivens action for
21  violation of the First Amendment.  We're not asking for
22  recognition of anything new.

23          THE COURT:  I think that's, with all due respect, a
24  little too facile.  One has to look a little more specifically
25  than just saying there has been a First Amendment Bivens claim
0087
 1  in some contexts.  You've got to look and see if on a more
 2  specific level this kind of First Amendment claim has been
 3  recognized.
 4          MR. CHEMERINKSY:  Of course, Your Honor, but the
 5  question is what level of abstraction to phrase that at.  If the
 6  level of abstraction is can we point to a case where defendants
 7  at the highest level government revealed the secret status of a
 8  CIA operative is a reprisal for speech, of course, in that
 9  context --
10          THE COURT:  We know you don't need that, but there are
11  cases -- since we're into a special factors analysis, there are
12  also cases that decline to allow a First Amendment claim because
13  of special factors.  Bush v. Lucas is one such case.
14          MR. CHEMERINKSY:  But I do think it's important to
15  separate two things with regard to Bivens.  Is there a Bivens
16  claim based on precedent, and then is there a special factor
17  counseling hesitation?
18          Several of the counsel for the defendants wanted to raise
19  Correction Department v. Malesko.  I really think they take that
20  case very much out of context.  The issue in that case was
21  whether or not to allow a Bivens action against a private
22  prison.  And Chief Justice Rehnquist said Bivens are about
23  actions against individuals and we're going to hesitate before
24  extending it to a very different context, allowing suits against
25  entities.
0088
 1      To go back to what you were talking about a moment ago with
 2  regard to the level of abstraction, I think the relevant level
 3  of abstraction is is there a First Amendment claim for reprisals
 4  recognized with regard to Bivens?  And many cases, including
 5  Toolasprashad, specifically allowed a Bivens claim for
 6  reprisals.  And I think beyond that just gets to the facts of
 7  the specific case.
 8      In terms of the special factors counseling hesitation, the
 9  Privacy Act might be a special factor with regard to the two
10  privacy claims, the constitutional privacy claim and the common
11  law privacy claim.  But there's no reason why the Privacy Act is
12  a special factor counseling hesitation with regard to the First
13  Amendment claim, with the equal protection claim, or the
14  property claim.
15          Now, even --

16          THE COURT:  The problem with that analysis is, as we
17  all know, just about anything can be pled in due process terms
18  as well as in other constitutional terms.  So in effect, it
19  would be allowing an end run on the special factors limitation
20  with respect to Bivens claims.
21          MR. CHEMERINKSY:  No, Your Honor.  I think it's very
22  important, if the Privacy Act is going to be considered as a
23  special factor, to use it to what it applies to, privacy claims.
24  The First Amendment claim is about punishment for speech.  The
25  equal protection claim, as we talked about, is treating
0089
1  Ms. Wilson differently than others similarly situated.
2          THE COURT:  But all the claims are about fundamentally
3  disclosure of a certain fact by a government official.  That's
4  all the constitutional claims, is it not?
5          MR. CHEMERINKSY:  Sure.  It's that action by the
6  defendants that led to the various constitutional violations.
7          THE COURT:  And why isn't the Privacy Act that
8  comprehensive scheme that addresses disclosure of facts by the
9  government?
10          MR. CHEMERINKSY:  I think that takes special factors
11  counseling hesitation out of the context in which the Supreme
12  Court articulated it.  The Supreme Court's focus on special
13  factors with regard to statutes is to whether or not there's a
14  statute that's an alternative to the Bivens action.  Bush v.
15  Lucas, the first time the Supreme Court ever talked about a
16  statute being special factors, said he shouldn't bring his
17  Bivens action because he's suing his employers, and that's what
18  the Civil Service Reform Act is.
19          Schweiker v. Chilicky, seeking benefits for denial of
20  Social Security disability benefits, the Court in Justice
21  O'Connor's opinion said we've got the Social Security remedies
22  for that.  The Privacy Act was never meant to deal with First
23  Amendment violations or equal protection violations or property
24  violations.  But if I'll take your question --
25          THE COURT:  But people can phrase their employment
0090
1  actions in First Amendment or equal protection terms.  The best
2  example is Title VII, and while the Supreme Court hasn't had a
3  case where it actually decided that issue on a special factors
4  basis, it has decided in Brown v. GSA that you can't bring a
5  constitutional claim, be it First Amendment, equal protection,
6  or whatever, for employment discrimination with respect to the
7  federal government.  You just can't do it.
8          And the circuits have gone further with that and said, yes,

 9  and one of the reasons you can't do it is because of the special
10  factors analysis.  That's the same thing as with the Privacy
11  Act.  There is a means to address the disclosure by the
12  government or its officials of information with respect to an
13  individual.  That means is a, I'll say for the moment, a
14  comprehensive scheme in the form of the Privacy Act.
15       Whether you can frame your claim in terms of the First
16  Amendment, equal protection, or due process, doesn't really
17  matter because you can do that in the Bush v. Lucas context,
18  which is a First Amendment claim, not a CSRA claim; you can do
19  that in the Chilicky context, which is a due process claim, not
20  a "you denied me benefits" claim; you can do it in the Title VII
21  context where you can argue due process, First Amendment, equal
22  protection.  But none of them can proceed.  Why is this any
23  different?
24       MR. CHEMERINKSY:  Let me explain it in a different
25  way, then.  In Bush v. Lucas he was covered by the Civil Service
0091
 1  Act.  In Schweiker v. Chilicky the person was covered by the
 2  Social Security Disability Act.
 3       THE COURT:  You're running square into Spagnola in
 4  this circuit when you argue that, because this circuit has said,
 5  and it's not alone in saying, that you don't look to whether
 6  there's a specific remedy.  You look to whether there's a
 7  comprehensive scheme that Congress has created.
 8       MR. CHEMERINKSY:  No, I disagree, Your Honor, because
 9  in Spagnola it was a person who was suing as to an agency that
10  was covered by the statute.  The President and the Vice
11  President are not covered by the Privacy Act.  And the fact that
12  they're not covered by the Privacy Act makes it different than
13  Spagnola, different than Bush, different than Schweiker v.
14  Chilicky.
15       THE COURT:  Does it mean your claim against
16  Mr. Armitage fails for that reason?
17       MR. CHEMERINKSY:  Well, in terms of the Privacy Act,
18  right, Mr. Armitage would be in a different situation with
19  regard to the Privacy Act, though I think that only relates with
20  regard to the privacy claims, for the reasons I said.  But with
21  regard to the President and the Vice President, the fact that
22  Congress may not have wanted to impose the burdens of the
23  Privacy Act on the President and the Vice President certainly
24  doesn't indicate that Congress meant to say that the President
25  and the Vice President were free to violate privacy any way they
0092
 1  wanted and never be held liable.

2       THE COURT:  The problem with that is -- and I'm sorry
3   to put it this way -- that you run head on into the body of law
4   in Bivens that really is very protective of government
5   officials, and indicates that the burdens on government
6   officials from Bivens actions are even greater than from other
7   actions and really should be guarded against.  I don't think you
8   can get very far by saying oh, the Privacy Act would be a
9   greater burden on the Vice President than would a Bivens action.
10      MR. CHEMERINKSY:  No, Your Honor.  What I disagree
11  with about that is that there's never been a case that I know of
12  that said that a statute that doesn't apply at all to a
13  government officer can be a reason to not allow a Bivens action
14  against that officer.  It's one thing to say that where the
15  Privacy Act applies but doesn't create a remedy, that's a
16  special factor.  It's another thing to say that the Privacy Act
17  is a special factor counseling hesitation to officers who are
18  not even covered by that statute.  That's my point.
19      THE COURT:  All right.  I think that is a difference
20  from most of the cases.  Whether I agree with your conclusion
21  that that means that you should not undertake a special factors
22  analysis is an open question.
23      MR. CHEMERINKSY:  In terms of the Intelligence
24  Identities Act as a special factor, as you pointed out, no case
25  has ever found a criminal statute to be a special factor
0093
1   counseling hesitation with regard to Bivens.  And the reason for
2   that is the whole analysis of special factor is is there a
3   statute that provides the possibility of some alternative
4   relief, or that Congress saw as an alternative relief.  A
5   criminal statute, for just the reasons you said, doesn't do
6   that.
7      And likewise with regard to the Civil Service Reform Act,
8   Ms. Wilson isn't complaining that the agency she worked for took
9   an adverse action against her, so the Civil Service Reform Act
10  wouldn't apply.
11      Now, the final set of defenses that have been raised go to
12  immunity.  And I think it's easiest to deal with qualified
13  immunity claim by claim.
14      THE COURT:  Before we go there, can you refer me to
15  the cases that you would principally rely on for the proposition
16  that a Bivens claim that is predicated on the disclosure of
17  information maintained by the executive branch should be
18  permitted, any case that allows such a claim?
19      MR. CHEMERINKSY:  I can't think of a Bivens action
20  that either accepted or rejected such a claim in terms of

21  information --
22          THE COURT:  I think that such claims have been
23  rejected in the cases that have been cited in the briefs with
24  respect to the Privacy Act as a comprehensive scheme.
25          MR. CHEMERINKSY:  Where the Privacy Act does apply,
0094
1  that's right.  But I would be glad to see if I can find a case
2  on that point and file a subsequent brief with the Court.  But I
3  don't have a case in mind as to that proposition.
4      With regard to qualified immunity as to the First
5  Amendment, we would argue that the law is clearly established in
6  many cases that punishing a person for speech violates the First
7  Amendment, and that this is clearly established law, and that
8  the reasonable officer should know it.
9      As long as I'm in immunity, I'll deal here with the
10  absolute immunity issue.  It's the same as to the First
11  Amendment as to all of the claims.
12      The United States Supreme Court in Nixon v. Fitzgerald
13  repeatedly said, and we quote the language in our brief, that
14  the President of the United States is unique with regard to
15  immunity.  The Supreme Court has rejected absolute immunity for
16  cabinet officials, like the Attorney General, like the Secretary
17  of Health and Human Services.
18      The defendants point to the Cheney case.  Cheney is about
19  secrecy and whether or not the protections of secrecy that go to
20  the President can be invoked by the Vice President.  Cheney
21  isn't about absolute immunity.  As you pointed out, no Supreme
22  Court case has yet dealt one way or another with whether the
23  Vice President has absolute immunity to suits for damages.
24          THE COURT:  Indeed, has any case decided it one way or
25  another?
0095
1          MR. CHEMERINKSY:  To my knowledge this is a question
2  of first impression before the Court.  When it's a question of
3  first impression, I think you have to look to the exact language
4  from the Supreme Court in Nixon v. Fitzgerald, and the Court in
5  several different places stressed the unique nature of the
6  presidency.
7      The Court talked about how the President would be uniquely
8  vulnerable to a large number of suits, how the President holds
9  office that's a symbol different from all others, and it's on
10  the basis of that language there's no reason to extend it to any
11  other executive official, even the Vice President of the
12  United States.
13          THE COURT:  Although there's a lot of language in

14  Cheney, even though it's in a secrecy context, as you point out,
15  that supports the proposition, the general proposition, that the
16  same kinds of separation of powers consideration as apply to the
17  President apply to the Vice President as well.
18      MR. CHEMERINKSY:  But I think secrecy is different
19  than damages, and here I point the Court to Nixon v. Fitzgerald,
20  457 at page 751, and the Court says there, I'm quoting, "Because
21  of the singular importance of the President's duties, diversion
22  of his energies by concern with private lawsuits would raise
23  unique risks to effective functioning of government."
24      THE COURT:  That's the very issue that -- I mean the
25  singular part I think is very important, but the exposure to
0096
 1  lawsuits is the very issue that in Cheney the Supreme Court said
 2  was virtually the same for the Vice President.
 3      MR. CHEMERINKSY:  No, I think it's different in
 4  Cheney.  There's no doubt that the Vice President is often
 5  dealing with secret information, just like the President is
 6  often dealing with secret information.  So extending in essence
 7  executive privilege concerns from the President and the Vice
 8  President makes sense.
 9      But for damages, it's different.  Because what the concern
10  of the Supreme Court was in Nixon, like in many cases about
11  absolute immunity, is whether the person is taking so many
12  actions that might lead to lawsuits by disgruntled individuals.
13  That's why the courts created absolute immunity for police
14  officers testifying as witnesses in Briscoe v. LaHue.  It's why
15  I said judges have absolute immunity for their judicial acts.
16      There's no indication that the Vice President of the
17  United States is involved in the range of activities that would
18  lead to the kind of litigation that the Court was concerned
19  about in Nixon v. Fitzgerald.  And that's why I think you have
20  to take the language of Nixon v. Fitzgerald so literally.
21      Let me go then to the second cause of action, though
22  thankfully I've already dealt with a lot of the defenses.  And
23  that's equal protection.  The defendants argue that it's
24  derivative of the First Amendment, and very much disagree with
25  that.  It's a separate claim.  The First Amendment claim is that
0097
 1  Mr. Wilson was punished for his speech.  The equal protection
 2  claim is that Ms. Wilson was treated with malice or at the very
 3  least treated differently from others similarly situated.
 4      The defendant asserts, and they said it in the brief too,
 5  that the cases say you can't bring a First Amendment claim here.
 6  Olech, the underlying conduct was speech.  I mean, in Olech he

7   said that it was a reprisal for things that he had done that
8   were protected by the First Amendment that caused the government
9   to impose an easement on him twice as long as anybody else.  The
10  fact that it's Mr. Wilson's speech that caused this doesn't mean
11  that Ms. Wilson is denied an equal protection claim for the
12  malice that's alleged, for the way she's treated differently
13  than others.
14      It was suggested by one of the defendants that this malice
15  is not alleged, and I've already quoted to you from paragraph 52
16  of the complaint that specifically alleges that there was the
17  malice, and in fact if you go back to Olech itself, in his per
18  curiam opinion, Justice Breyer wrote a separate concurrence in
19  which he said malice is sufficient for an Olech claim.  He
20  raised questions as to whether or not if there's not malice that
21  would be enough.
22          THE COURT:  What's the language in the majority
23  opinion from Olech that you would point to in terms of the
24  malice claim?
25          MR. CHEMERINKSY:  The Court in the majority opinion
0098
1   doesn't deal with the issue of malice, but as I mentioned to you
2   earlier, there are circuits that have said specifically either
3   malice or differential treatment without rational basis is
4   enough.  And the case that most explicitly says this is the
5   Squaw Valley case in the 9th Circuit, very clearly says either
6   malice or differential treatment is sufficient.  The D.C.
7   Circuit of course has in many cases recognized the Olech cause
8   of action.
9       And in terms of the defenses with regard to equal
10  protection, I think pretty much covered them.  Statute of
11  limitations I would argue is the same as the First Amendment,
12  that it's a three-year statute of limitations no matter what you
13  would decide as to the privacy claim.
14      In terms of confidentiality, I've already addressed the
15  point that we believe that the Olech claim could go forward on
16  malice without any need to consider how others are treated.  And
17  if the government wants to come forward and allege that they've
18  treated other operatives similarly, they should at least have to
19  make that allegation before saying you might have to get into
20  some confidential information.
21          THE COURT:  Although it's your burden, the plaintiff's
22  burden to demonstrate unequal treatment.
23          MR. CHEMERINKSY:  Yes, Your Honor.
24          THE COURT:  Both to allege and demonstrate.
25          MR. CHEMERINKSY:  But that's again why it's so

0099
1  important on a motion to dismiss.  What we've alleged at this
2  stage is that she's treated differently from others similarly
3  situated.  What proof would be allowed by the Court and would
4  discovery be allowed would happen after the motion to dismiss
5  stage.  But all that's necessary here is the allegation.
6      The same special factors analysis that I went through with
7  regard to Bivens would apply in this way.  And likewise, the
8  same with immunity.  We would argue in terms of this being
9  clearly established law that the reasonable officers should
10  know.  Olech clearly says that a class of one claim can be
11  maintained, and the D.C. Circuit in many cases has recognized
12  it, so we've met both prongs with regard to the two-step
13  analysis.
14         THE COURT:  Although the D.C. Circuit in the 3883
15  Connecticut case was pretty specific about requiring, under an
16  Olech model, an allegation and eventual proof that other
17  similarly situated persons were treated differently.
18         MR. CHEMERINKSY:  Yes, Your Honor.  We believe we
19  allege that in paragraphs 52 and 53.  I don't think that that
20  case precludes the possibility of malice being sufficient as an
21  alternative.  And the reason is -- you went to what language in
22  the very short per curiam opinion in Olech.  In Olech there was
23  both the allegation of malice and also the allegation of being
24  treated differently from others similarly situated without
25  rational basis.  And the D.C. Circuit had never had occasion yet
0100
1  to say that malice by itself would be insufficient.
2      The third of the claims is the privacy claim here.  Our
3  position is that the defendants revealed private information
4  that put Ms. Wilson and her family in danger.
5         THE COURT:  This is the right to informational privacy
6  claim?
7         MR. CHEMERINKSY:  We believe it's informational
8  privacy with state-created danger.
9         THE COURT:  Let's treat them separately to begin with.
10  How can you survive a qualified immunity analysis on the right
11  to informational privacy claim when the D.C. Circuit has said
12  that it has grave doubts as to the existence of such a claim?
13      Now, other circuits may have recognized it, but the D.C.
14  Circuit, which is controlling here, has said that it has grave
15  doubts whether such a claim exists.
16         MR. CHEMERINKSY:  First, I would prefer not to
17  separate informational privacy from state-created danger.  I
18  really see them as together, and that's why I think the --

19       THE COURT:  All right.  If that means that your only
20   claim is a state-created danger claim, that's fine, that you
21   don't have any independent privacy claim aside from
22   state-created danger.
23       MR. CHEMERINKSY:  I think as the Kallstrom case points
24   out, from the 6th Circuit -- what we're arguing here is that
25   there was private information revealed that put Ms. Wilson and
0101
 1   her family in danger.
 2       But in answer to your question, if I were to separate it,
 3   how can I respond to the AFGE case that says there's danger.
 4   The question for qualified immunity under Hope v. Pelzer is not
 5   whether there's a case on point.  The question is did the
 6   defendants have fair notice that their conduct would be
 7   wrongful.  Justice Stevens' opinion very specifically says there
 8   doesn't have to be a case on point to overcome qualified
 9   immunity.
10       THE COURT:  That's certainly true.  But if you have a
11   case that says, by the controlling circuit, we have grave doubts
12   that such a cause of action exists, it seems to me that that's a
13   problem for you under the qualified immunity analysis, which
14   requires you to show that the constitutional violation was
15   clearly established.
16       MR. CHEMERINKSY:  The United States Supreme Court, in
17   cases like Nixon v. GSA and Whalen v. Roe, have recognized that
18   there are informational privacy claims.  As we cite in our
19   brief, and as you just alluded to, the 2nd Circuit, the 3rd
20   Circuit, the 5th Circuit, the 6th Circuit, the 7th Circuit, the
21   9th Circuit have all recognized informational privacy claims.
22       I would say even notwithstanding that language from the
23   D.C. Circuit, in light of Hope v. Pelzer, and given the weight
24   of authority, and we ask the question, did the defendants have
25   fair notice that their conduct was wrongful, I think we would
0102
 1   overcome qualified immunity.  But as I say, I don't see any need
 2   for the Court to separate informational privacy and
 3   state-created danger.
 4       THE COURT:  We'll get to state-created danger in just
 5   a second.  What is the personal privacy interest that the
 6   plaintiffs have in Ms. Plame's employment status as a covert
 7   agent?
 8       MR. CHEMERINKSY:  We would say it was precisely the
 9   secret nature of that status that was personal.  And while we
10   recognize that the director of the CIA had the ability to
11   disclose that information, it doesn't mean that everybody else

12   within the government has the authority to disclose that
13   information.  It was --
14        THE COURT:  But if the director has the ability to
15   disclose it, if it can be disclosed, totally discretionary by
16   the director, how then is there any privacy interest?
17        MR. CHEMERINKSY:  I very much disagree.  If I tell the
18   Court something in camera that the Court then could have the
19   ability to disclose, but somebody overhears me and reveals that
20   very private information, that doesn't mean it's no longer
21   private information.  That if I'm in your chambers and I say
22   something to you with the understanding it's confidential, and
23   you have to keep it confidential, but if you choose you have the
24   authority to disclose it, that doesn't mean that somebody else
25   who's there has the authority to disclose it too.
0103
1      We all know that some things that are private we tell to a
2    few, some we tell to more, some things we tell to many in the
3    world.  The fact that the director of the CIA had authority over
4    it doesn't make it any less private information.
5         THE COURT:  Even though the government is free to
6    disclose it, there is a privacy interest, recognizable in the
7    constitutional sense, privacy interest in the CIA employee?
8         MR. CHEMERINKSY:  I think the flaw in what you just
9    said is the government can do so.  Because that assumes that
10   anyone in the government can disclose that information.  That's
11   not so.  In fact, the Intelligence Identities Protection Act is
12   a criminal statute that makes it clear.
13     We accept that the director of the CIA could have chosen to
14   do this, but that doesn't deny that it's private as to others in
15   the government, and that the defendants didn't have the
16   authority to disclose this information.
17        THE COURT:  Now -- all right.  I'll save the next
18   question for when you get to the property interest.
19        MR. CHEMERINKSY:  Okay.  With regard to -- the way I
20   was presenting the privacy claim, it was revealing private
21   information that placed them in danger.  I strongly urge this
22   court to look at the Kallstrom case from the 6th Circuit,
23   because it's so close on point, is where the secret status of an
24   officer was revealed and placed him and his family in great
25   danger, and the Court didn't separate privacy from state-created
0104
1    danger, seeing them as one and a piece.
2         THE COURT:  What do you think you have to allege in
3    your brief -- I'm sorry, in the amended complaint in order to
4    state a state-created danger claim?

5        MR. CHEMERINKSY:  I think it's exactly what we allege,
6   that this was private information that was revealed, and it
7   placed the plaintiffs and their family in great danger.
8        THE COURT:  Is there any allegation of a right to be
9   free from third-party violence that's stated in the complaint?
10        MR. CHEMERINKSY:  I don't believe that we have to
11   state such a right under the complaint -- under the give notice
12   pleading.  The reason I read the exact language from the
13   complaint earlier with regard to the danger that they suffered
14   was because it does clearly allege that the plaintiffs and their
15   family were in danger.  I think that the Court read some of that
16   language when defense counsel was here.  And that's enough for
17   state-created danger.
18      Defendant made a couple of arguments with regard to the
19   danger.  First they said it's only actionable if there's "actual
20   harm."  That of course requires that you define what is actual
21   harm.  Surely, it doesn't require that the plaintiffs be killed
22   or maimed or assaulted in order to have actual harm.  And here
23   Kallstrom is the case closest on point.  There was no need to
24   show that revealing the undercover status caused the person to
25   die in order for the Court to say that's an actual harm that
0105
1   they've suffered.
2        THE COURT:  What's the actual harm, however you want
3   to define it, that you think is satisfactory here?
4        MR. CHEMERINKSY:  The tremendous fear that plaintiffs
5   and their family have once the secret status of Ms. Wilson was
6   revealed.
7        THE COURT:  So fear of harm you think is equivalent to
8   actual harm?
9        MR. CHEMERINKSY:  I think when it is as real and as
10   tangible in this case, it is, yes, Your Honor.  And I think
11   again Kallstrom is the case that is closest on point.
12      In terms of the Privacy Act, obviously -- well, let me go
13   back to the statute of limitations and do it in the same order I
14   did before.  If there is going to be any application of the
15   statute of limitations, the D.C. one-year, it would be with
16   regard to the constitutional and tort privacy claims.
17      I think I've already addressed this by saying, I think with
18   regard to the constitutional privacy claim, Owens v. Okure would
19   say where there's multiple statutes of limitations in a 1983
20   action, you should use the residual statute of limitations.
21   Most circuits around the country have said that applies to
22   Bivens as well.
23      But one point I have not made previously is we believe that

24  even if the Court were to say it's the one-year statute of
25  limitations for the privacy claim, we believe that it's met;
0106
 1  that the appropriate time that the statute of limitations began
 2  to run is when the special prosecutor filed the indictment
 3  against Mr. Libby, because it was only at that point that the
 4  plaintiffs knew who it is that they could file their lawsuit
 5  against.
 6      I've already talked about the --
 7          THE COURT:  You think I'm in a position to resolve
 8  that tolling argument on the record before me now?
 9          MR. CHEMERINKSY:  I would say so, Your Honor,
10  because --
11          THE COURT:  You think I have a sufficient record to
12  decide when the plaintiffs were sufficiently on notice?  Or is
13  that a factual question that's going to have to go through
14  discovery?
15          MR. CHEMERINKSY:  I think at the very least there
16  could be discovery on that, but I also think here you're dealing
17  with secret information in the hands of the top officials in the
18  government.  There is no way that Mr. Wilson and Ms. Wilson had
19  access to the defendants to know who was responsible.
20  Obviously, they didn't have access to the reporters who were the
21  others who were part of the conversation.
22      So the point at which they reasonably could have known who
23  to sue was when the indictment was filed against Mr. Libby, and
24  they did so less than a year after that indictment was filed.
25          THE COURT:  I just want to get clear.  On the common
0107
 1  law claim, are you conceding that a one-year statute of
 2  limitations applies?
 3          MR. CHEMERINKSY:  Yes, Your Honor, as to the common
 4  law claim.  Just to be -- and I actually thought of coming in
 5  here with a chart to try to make this clearer.  I think what's
 6  clear is that it's a three-year statute of limitations for First
 7  Amendment, equal protection, and property, because there's no
 8  comparable statute of limitations in the D.C. Code.
 9      As to the privacy constitutional claim, I think that Owens
10  v. Okure is the guidance there.  Though it's 1983, most circuits
11  have followed it.  But as to the common law privacy, that's the
12  one-year statute of limitations.  And there my argument is that
13  they filed within one year of the time at which they reasonably
14  could have known who to sue.  That's when the Libby indictment
15  came down.
16          THE COURT:  All right.

17      MR. CHEMERINKSY:  That then will take me to the fourth
18  of our claims which is the constitutional property claim.  Here
19  the argument is that Ms. Wilson had a reasonable expectation to
20  continued employment as a secret operative for the CIA, and it
21  was the actions of the defendants that denied her property
22  without due process.
23      THE COURT:  And this is a process claim.  It's a due
24  process claim.
25      MR. CHEMERINKSY:  That's correct, Your Honor.
0108
1      THE COURT:  And what process is it that these
2  defendants, none of whom are in the CIA and therefore in her
3  employment chain, what process is it that they could have
4  provided?
5      MR. CHEMERINKSY:  Well, it's interesting.  When I hear
6  that question, it seems that the defendants want to have it both
7  ways.  What they want to say is -- and they've implied they had
8  the authority to reveal this information, but on the other hand,
9  they want to say we had no authority and so therefore we
10  couldn't provide due process.
11      Obviously due process could have said there could have been
12  some form of notice, hearing, procedural due process.  But now I
13  understand your question better, this can also be thought of as
14  a due process claim in a substantive sense, that she was denied
15  her property interest without an adequate justification.  So due
16  process can imply here both the lack of procedures, but also the
17  lack of adequate justification for the defendants' actions.
18      The defendants, when they were up here, made a couple of
19  arguments on the property claim.
20      THE COURT:  I'm not sure that's how it's framed in the
21  complaint, but go ahead.
22      MR. CHEMERINKSY:  In that case, Your Honor, we would
23  just ask for leave to amend under Rule 15 to make clear there's
24  both the -- as a procedural and as a substantive due process
25  claim.
0109
1      The first argument they made was that she had no
2  expectation as to continued employment.  Here I think it's very
3  important to focus on what was her reasonable expectation,
4  because all of the Supreme Court cases about government
5  employment as property focus on reasonable expectation.
6      And her expectation was to continued employment as a secret
7  operative unless the director of the CIA chose to terminate her
8  or to reveal that status.  We don't deny that the director of
9  the CIA could have ended her secret operative status, could have

10  terminated her.  That doesn't mean the defendants could.
11      THE COURT:  The Doe v. Gates case in the D.C. Circuit
12  states it a little more broadly, by saying that the law is clear
13  that if a statute relegates termination decisions to the
14  discretion of the director, no property entitlement exists.
15      MR. CHEMERINKSY:  But, Your Honor, Doe v. Gates didn't
16  involve a situation like this.
17      THE COURT:  That's true, but it says no property
18  entitlement exists.  It doesn't say no property entitlement
19  exists in this context but in another context it might exist.
20      MR. CHEMERINKSY:  Well, you're right, Your Honor,
21  except when you see language like that you have to ask what was
22  the holding of the case and what was reasonably contemplated.
23  We agree, there is no property claim that Ms. Wilson could have
24  ever asserted against the director of the CIA.  That's what Doe
25  v. Gates stands for, and we agree with that proposition.
0110
 1      But that doesn't say whether there could be a property
 2  claim as against somebody outside the CIA.  That wasn't the Doe
 3  v. Gates situation.  So the language you just read I think says
 4  as to the director of the CIA no property claim ever exists.
 5  That we agree to.  But it doesn't deal with the issue before the
 6  Court here.
 7      Now, the other issue the defendants make --
 8      THE COURT:  I'm not sure that the question of the
 9  property entitlement, which is determined by reference to
10  statutes and regulations, really is specific to a particular
11  defendant.
12      MR. CHEMERINKSY:  I think that's definitely true under
13  Doe v. Gates, and it is with regard to the authority to reveal
14  Ms. Wilson's status or to even terminate her, but it doesn't
15  mean that there's no property interest relative to others.  The
16  fact that somebody works for the government, might be able to be
17  fired by one person, doesn't mean if somebody else
18  constructively discharged them, forced them out of the job, they
19  don't have a cause of action as against those.
20      THE COURT:  They might have a cause of action.  The
21  question is whether they have a property interest that gives
22  rise to a due process claim.
23      MR. CHEMERINKSY:  You're absolutely right, and here
24  again I think under cases like Roth or Bishop v. Wood, the
25  question is what was the reasonable expectation that Ms. Wilson
0111
 1  had.  And I think here her reasonable expectation is she would
 2  be a secret operative unless the director of the CIA chose

3    otherwise.  That's why I think Doe v. Gates helps our position.
4        The final claims, and I think I've dealt with all of the
5    defenses that apply to that already, the final claims, the
6    fifth, are the common law privacy claims.
7            THE COURT:  Well, let's just make sure, are you
8    arguing for a liberty interest, either in the reputation-plus or
9    stigma context?
10            MR. CHEMERINKSY:  We did not allege that in the
11    complaint, Your Honor.
12        The final claim is the common law privacy claim.  We've
13    already talked about the statute of limitations there being the
14    one year, which we believe was met by one year after the time of
15    the discovery.  The key issue, I think, with regard to the
16    common law privacy claim is the Westfall Act.
17            THE COURT:  Therefore is scope of employment.
18            MR. CHEMERINKSY:  Exactly.  We make two points in our
19    brief.  First, it has to be within the scope of the person's
20    duties as opposed to for the personal gain of the individual.
21    And the question would then be was this within the scope of
22    their duties.  Now, we certainly accept that talking to the
23    media was part of the scope of their duties, but I think that
24    phrases it in the wrong way.  The question is was revealing
25    Ms. Wilson's secret status within the scope of their duties?
0112
1            THE COURT:  That doesn't seem to be how it's generally
2    phrased in the cases in terms of what the relevant inquiry is.
3    What case would frame it that way?
4            MR. CHEMERINKSY:  In terms of scope of duties, well,
5    here -- in terms of the cases, this all goes to the law of the
6    District of Columbia, which defines the respondeat superior
7    relationship.  And I think here the Moseley v. Second New St.
8    Paul Baptist Church case, which is a D.C. Court of Appeals case,
9    is the one that defines how you determine whether or not it's
10    for personal gain, whether it's within scope of duties.  And I
11    think that that would be the case that I'd rely on and urge the
12    Court to look to, because the D.C. Circuit has said you look to
13    the underlying law of the District of Columbia --
14            THE COURT:  I don't understand.  If someone delivers a
15    mattress to someone's home and rapes and kills that person even,
16    and that's within the scope of employment, how would this not
17    be?
18            MR. CHEMERINKSY:  I think it's quite different
19    situation here, Your Honor.
20            THE COURT:  It's different, but why does it lead to a
21    different result?

22          MR. CHEMERINKSY:  That's what I was just going to try
23   to explain.  You've got to put this in the context where the
24   President of the United States said that revealing Ms. Wilson's
25   identity was illegal, the President of the United States --
0113
1          THE COURT:  And the law says that rape and murder are
2   illegal.
3          MR. CHEMERINKSY:  That's right, Your Honor.  What I'm
4   saying here is that in light of what the President of the United
5   States said, it can't be said that it was within the scope of
6   the duties of these individuals to reveal their identity.  And
7   that's all we need --
8          THE COURT:  How then could it be said, on that same
9   rationale, how could it be said that raping and murdering a
10   customer are within the scope of employment?
11          MR. CHEMERINKSY:  Obviously, raping and murdering
12   isn't within the scope of employment.
13          THE COURT:  But it has been so held.
14          MR. CHEMERINKSY:  Your Honor --
15          THE COURT:  By the D.C. Court of Appeals.
16          MR. CHEMERINKSY:  I understand that, Your Honor, but I
17   think that here, when you look at what the President of the
18   United States has said about the illegal nature of it, what you
19   have to ask is the simple question, were they acting within
20   their jobs as government officials, or were they acting for
21   their own partisan political gain?
22      But Your Honor, there's concern over those cases in the
23   D.C. Circuit.  I think there's also the D.C. Circuit cases that
24   say if there are facts that are in dispute, the appropriate
25   thing to do on the Westfall Act is to go to discovery.
0114
1          THE COURT:  What's the fact in dispute?
2          MR. CHEMERINKSY:  I think it's just exactly what you
3   and I were talking about, whether or not revealing the identity
4   of Ms. Plame can reasonably be said to be within the scope of
5   the duties of these defendants.
6          THE COURT:  The inquiry would seem, under Ballenger,
7   to focus on whether the actions were of the general nature as
8   authorized or incidental to the conduct authorized.  You would
9   agree, would you not, I think you already have, that having
10   conversations with journalists to rebut Mr. Wilson's statements
11   would be within the scope of employment?
12          MR. CHEMERINKSY:  Absolutely.
13          THE COURT:  And would you also agree that attacking
14   Mr. Wilson's credentials in those conversations would be within

15  the scope of employment?

16        MR. CHEMERINKSY:  Absolutely.

17        THE COURT:  Or attacking his credibility?

18        MR. CHEMERINKSY:  So long as it was focusing on

19  Mr. Wilson, there's no doubt.  But our point is that once they

20  revealed Ms. Wilson's secret status, then it was no longer in

21  the scope of their duties.

22        THE COURT:  What about talking about his marital

23  status?

24        MR. CHEMERINKSY:  That he was married to Valerie

25  Plame-Wilson is certainly different than saying that she was a

0115

1  secret operative for the CIA.

2        THE COURT:  Assume for the moment that he was in the

3  midst of a messy divorce from her.  Would that be within the

4  scope of employment, to disclose that?

5        MR. CHEMERINKSY:  I don't know, Your Honor.  I think

6  it would have to depend on whether or not it really related.

7        THE COURT:  Or maybe it depends on whether it's a

8  representative, a member of Congress, or a high executive branch

9  official, because those are the facts of Ballenger.

10        MR. CHEMERINKSY:  In Ballenger what they said was the

11  defamatory statements were within the scope of employment.  So

12  as I listen to your hypothetical, I say, if what we're concerned

13  about here was the defamatory statements, I would say yes; if

14  they're making defamatory statements under Ballenger, that's

15  within the scope of employment.  But what I'm arguing is in

16  light of the Intelligence Identities Protection Act, in light of

17  what the President of the United States has said, the defendants

18  did not have as part of the scope of their employment revealing

19  the secret status of Ms. Wilson.

20        THE COURT:  Because that was illegal?

21        MR. CHEMERINKSY:  That's exactly right, Your Honor.

22        THE COURT:  But there's so many cases that deal with

23  illegal activities being within the scope of employment.

24        MR. CHEMERINKSY:  That's right, but I don't think that

25  means that anything that's illegal automatically becomes in the

0116

1  scope of employment.  I think you have to have a more

2  particularized inquiry.  And what I'm arguing here is in light

3  of the criminal statute that even the defendants mentioned, and

4  in light of the President's statements, it can't be said it's in

5  the scope of duties.  But if there's a question, have discovery.

6     So I conclude as I began, that this case poses countless

7  fascinating legal issues.  But in the end, it's about egregious

8  conduct by defendants that ruined a woman's career and put a
9  family in danger.
10       THE COURT:  All right.  Thank you, Mr. Chemerinsky.
11  I'll give two counsel -- I hope you've agreed which two it will
12  be -- the opportunity to each make two minutes of rebuttal.
13  Mr. Kester.
14       MR. KESTER:  Your Honor's very generous, and I'm the
15  one who brought up the subject in the first place.  I think the
16  amount of time we ask for in rebuttal, unless the Court has
17  questions, is zero for anybody.  So we're done then.
18       THE COURT:  All right.  We're done.  I appreciate the
19  quality of the arguments today and of the briefing.  And these
20  are serious issues in a serious case, notwithstanding some of
21  the categorization of the case by defense counsel, which is a
22  fair thing to do, I'm not criticizing that.  But I will look at
23  these issues very seriously and expect to issue a ruling
24  sometime in the future.
25    (Laughter)
0117
1    I'm not promising a specific day or week, but I will try to
2  be conscientious with respect to it.  And thank you again.
3    (Proceedings adjourned at 12:51 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0118

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.

_____

BRYAN A. WAYNE