## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VALERIE PLAME WILSON, et al.,

        Plaintiffs,

          v.

I. LEWIS LIBBY, JR., et al.,

        Defendants.

Civil Action No. 06-1258 (JDB)

## MEMORANDUM OPINION

      Plaintiffs Valerie Plame Wilson and Joseph C. Wilson IV bring this action against four high-level Executive Branch officials, including the Vice President of the United States and his former Chief of Staff, based on the widely-publicized disclosure of the fact that Mrs. Wilson worked as a covert operative for the Central Intelligence Agency. Plaintiffs allege that defendants undertook a concerted effort to reveal this information to reporters in order to retaliate against and discredit Mr. Wilson for his public criticism of the Bush Administration's handling of foreign intelligence prior to this country's military involvement in Iraq. The Wilsons have sued the defendants personally for money damages based on claims brought directly under the First and Fifth Amendments of the Constitution and on a common-law tort claim for the public disclosure of private facts. Now pending before the Court are motions to dismiss filed by each of the four named defendants and the United States pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

      This is a case of some notoriety and public interest. The merits of plaintiffs' claims pose

important questions relating to the propriety of actions undertaken by our highest government officials. Defendants' motions, however, raise issues that the Court is obliged to address before it can consider the merits of plaintiffs' claims. As it turns out, the Court will not reach, and therefore expresses no views on, the merits of the constitutional and other tort claims asserted by plaintiffs based on defendants' alleged disclosures because the motions to dismiss will be granted.

For the reasons explained below, the Court finds that, under controlling Supreme Court precedent, special factors -- particularly the remedial scheme established by Congress in the Privacy Act -- counsel against the recognition of an implied damages remedy for plaintiffs' constitutional claims. The Court also finds that it lacks subject-matter jurisdiction over the tort claim because plaintiffs have not exhausted their administrative remedies under the Federal Tort Claims Act, which is the proper, and exclusive, avenue for relief on such a claim.

## BACKGROUND[1]

In the 2003 State of the Union address, President George W. Bush told the nation that "[t]he British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa." Am. Compl. ¶ 19(a). As it turned out, the veracity of the claim asserted in these "sixteen words" had previously been disputed to some degree within the Executive Branch. See id. ¶ 19(b). Newspaper articles published in May and June 2003 revealed that plaintiff Joseph C. Wilson IV, a former Senior Director for Africa at the National Security

_____

[1]The circumstances giving rise to this action have been recounted extensively in the media, including in press coverage of the criminal trial against defendant I. Lewis Libby, Jr. that took place earlier this year. See United States v. Libby, No. 05-cr-394 (D.D.C.). It is therefore worth reiterating that the facts as recounted in this opinion are drawn from the amended complaint, which is presumed true and is liberally construed for purposes of a motion to dismiss. See, e.g., Leatherman v. Tarrant County Narcotics & Coordination Unit, 507 U.S. 163, 164 (1993).

Council under President Clinton and the former U.S. ambassador to Gabon and São Tomé and Principé under President George H.W. Bush, id. ¶ 8, was sent to Niger in 2002 to investigate claims that Iraq had attempted to purchase uranium yellowcake from that country, id. ¶ 19(b), (i). Mr. Wilson's trip was reportedly taken at the behest of the CIA, in response to inquiries made by the Office of the Vice President into the alleged Iraqi activities. See id. Upon the conclusion of the Niger trip, and well before the State of the Union address, Mr. Wilson advised the CIA and the State Department that the allegations were based on forged documents and were wholly untrue. Id. ¶ 19(b), (i).

The first newspaper column recounting this information, which was published in the New York Times on May 6, 2003, referred to Mr. Wilson only as an unnamed former ambassador. Id. ¶ 19(b). In response to the article, defendant I. Lewis Libby, Jr., the Vice President's Chief of Staff and Assistant for National Security Affairs, id. ¶ 9, asked the Under Secretary of State for further information about the Niger trip, id. ¶ 19(c). The Under Secretary in turn directed the State Department's Bureau of Intelligence and Research to prepare a report on the trip. Id. On or before June 10, 2003, the Under Secretary received that report, which was labeled "Secret" and referred to Valerie Plame Wilson as a Weapons of Mass Destruction ("WMD") manager for the CIA. Id. ¶ 36. The particular paragraph mentioning Mrs. Wilson was prefaced with the letters "S/NF," which indicate that the information was both secret and not to be shared with foreigners. Id. Based on information gathered for this report, the Under Secretary informed Libby by early June 2003 that Mr. Wilson was the former ambassador in question. See id. ¶ 19(c). The Under Secretary also advised Libby by June 12, 2003, that Mr. Wilson's wife worked at the CIA and the scuttlebutt around the State Department was that she was involved in planning his trip. Id.

¶ 19(e).  At about the same time, Libby spoke with a senior officer at the CIA, who told Libby that Mr. Wilson's wife worked at the CIA and was thought (erroneously) to have been responsible for Wilson's trip.  Id. ¶ 19(f).  Libby further learned from Vice President Cheney, who obtained the information from the CIA, that Wilson's wife worked in the CIA's Counterproliferation Division. Id. ¶ 19(h).  Libby additionally heard, sometime between June 1 and July 8, 2003, that Wilson's wife worked at the CIA from the Assistant to the Vice President for Public Affairs, who in turn had learned that information "from another government official."  Id. ¶ 19(t).

When a second article about the sixteen words and the Niger trip was published in the Washington Post on June 12, 2003, it also referred to Wilson only as a retired ambassador.  Id. ¶ 19(i).  The author of the Post article, Walter Pincus, had contacted the Office of the Vice President prior to its publication.  Pincus's call generated discussions in the Office of the Vice President that involved Libby, among others.  Id. ¶ 19(g).  Two days after the Post article was published, Libby met with a CIA briefer and "expressed displeasure that CIA officials were making comments to reporters critical of the Vice President's office."  Id. ¶ 19(j).  Furthermore, on June 13, 2003, defendant Richard L. Armitage, Deputy Secretary of the Department of State, met with reporter Bob Woodward in Armitage's office at the State Department and told Woodward that Mrs. Wilson worked as a WMD analyst at the CIA -- information he had learned from a State Department memorandum.  Id. ¶ 37.

A third related article, entitled "The First Casualty: The Selling of the Iraq War," appeared in the online edition of  The New Republic on June 19, 2003.  Id. ¶ 19(k).  This article again referred to Mr. Wilson as an unnamed ambassador and quoted him anonymously as saying that officials in the Bush Administration "'knew the Niger story was a flat-out lie.'"  Id.  The article

also accused the Bush Administration of suppressing dissent from the intelligence agencies with respect to Iraq's WMD capacity.  Id.  The publication of The New Republic article prompted further activity within the Office of the Vice President.  Libby discussed the article with his principal deputy, who asked Libby whether he could counter the reports that Vice President Cheney had arranged for Mr. Wilson's trip by discussing that trip with journalists.  Id. ¶ 19(l).  Libby "responded that there would be complications at the CIA in disclosing that information publicly, and that he could not discuss the matter on a non-secure line."  Id.  Libby did, however, meet with reporter Judith Miller on June 23, 2003, and offered criticism of the CIA and "informed Miller that Wilson's wife might work at a bureau of the CIA."  Id. ¶ 19(m).

Two additional publications are central to the events leading up to this action.  First, an op-ed written by Mr. Wilson, entitled "What I Didn't Find in Africa," appeared in the July 6, 2003, edition of the New York Times.  Id. ¶ 19(n).  In that op-ed, Mr. Wilson asserted "that he had taken a trip to Niger at the request of the CIA in February 2002 to investigate allegations that Iraq had sought or obtained uranium yellowcake from Niger, . . . that he doubted Iraq had obtained uranium from Niger recently" and "that the Office of the Vice President had been advised of the results of his trip."  Id.  This information was also publicly conveyed by Mr. Wilson in the course of his appearance as a guest on the July 6 edition of the television show "Meet the Press," and in an interview with a reporter that provided the basis for a July 6 Washington Post article about the Niger trip.  Id.

Subsequently, on July 14, 2003, several national newspapers, including the Chicago Sun Times and The Washington Post, published a column by writer Robert Novak that discussed the Niger trip.  Id. ¶ 14.  Novak's column stated, in relevant part:  "[Joseph] Wilson never worked for

the CIA, but his wife, Valerie Plame, is an Agency operative on weapons of mass destruction. Two senior administration officials told me Wilson's wife suggested sending him to Niger . . . ." Id.  The publication of Novak's column revealed to the public, for the first time, Mrs. Wilson's "previously secret and classified CIA identity." Id.  The disclosure of this information "destroyed her cover as a classified CIA employee." Id.  The Government has conceded that Mrs. Wilson's identity was classified in July 2003 and that her "cover was blown" when Novak's column was published. Id. ¶¶ 21, 22.

According to plaintiffs, "[t]here is evidence that multiple officials in the White House discussed [Valerie Wilson's] employment with reporters prior to . . . July 14." Id. ¶ 33 (quoting Gov't's Resp. to Def.'s Third Mot. to Compel Disc. at 30 n.10, United States v. Libby, No. 05-cr-394 (D.D.C. Apr. 5, 2006)).  For example, on or before July 8, 2003, Vice President Cheney informed Libby that President Bush "specifically had authorized Libby to disclose to New York Times reporter Judith Miller certain information from an October 2002 National Intelligence Estimate concerning Iraq and weapons of mass destruction in order to rebut Mr. Wilson." Id. ¶ 19(q).  Libby met with Judith Miller on July 8, 2003.  Id. ¶ 19(r).  Libby and Miller discussed Mr. Wilson's trip:  Libby "criticized the CIA reporting concerning Wilson's trip" and "advised Miller of his belief that Wilson's wife worked at the CIA." Id.  Also on that day, Libby asked the Counsel to the Vice President "in sum and substance, what paperwork there would be at the CIA if an employee's spouse undertook an overseas trip." Id. ¶ 19(s).

On July 10 or 11, 2003, Libby was told by a senior White House official, thought by plaintiffs to be defendant Karl C. Rove, that Robert Novak would be writing a story about Wilson's wife based on a conversation that Rove had with him earlier that week.  Id. ¶ 19(u).

Libby conversed with the press again himself on July 12, 2003. He spoke first with Matthew Cooper, who asked whether Libby had heard that Mr. Wilson's wife was involved in sending Mr. Wilson to Niger; Libby confirmed that he had also heard that information. Id. ¶ 19(w). Libby then spoke with Judith Miller and discussed the fact that Mr. Wilson's wife worked at the CIA. Id. ¶ 19(x).

Rove, who held several positions in the Bush White House, including Deputy Chief of Staff and head of the Office of Political Affairs, id. ¶ 10, also spoke with reporters during this time period. On July 11, 2003, Matthew Cooper of Time magazine called Rove at the White House. Id. ¶ 27. Rove spoke to Cooper on the condition that the conversation was on "deep background," meaning that Cooper could use the information provided by Rove but could not quote it or reveal its source. Id. Rove then told Cooper that Mrs. Wilson worked "at the agency," clearly referring to the CIA, and that she "worked on 'WMD'" issues and had been responsible for sending Mr. Wilson to Niger. Id. ¶ 28. Rove ended the call by saying, "I've already said too much." Id. ¶ 29. According to Cooper, who later wrote a Time article about the incident entitled "What I Told the Grand Jury," his July 11 conversation with Rove was the first time he had heard about Mr. Wilson's wife. Id. ¶¶ 26, 28. Shortly after the publication of Novak's article, Rove also called Chris Matthews, the host of the television program "Hardball," and told him off the record that "Mr. Wilson's wife was 'fair game.'" Id. ¶ 30.

Plaintiffs also assert that Armitage spoke with reporters about Mrs. Wilson between the publication of Mr. Wilson's op-ed and the date of the Novak article. On July 6, 2003, the day that the op-ed appeared in the Times, Armitage directed that the Bureau of Intelligence and Research update its report on the Wilson trip and send the report to the Secretary of State. Id. ¶ 38.

Armitage also met with Robert Novak at the State Department on July 8, 2003, and told Novak

that Mrs. Wilson worked for the CIA on WMD issues. <u>Id.</u> ¶ 39.

    The Wilsons initiated this lawsuit on July 13, 2006. The complaint originally named

Libby, Rove, Cheney, and John Does 1-10 as defendants. The amended complaint, now the

operative complaint, was filed on September 13, 2006, and substituted Armitage for one of the

Doe defendants. Plaintiffs seek money damages for injuries they allegedly suffered as a result of

the public disclosure of Mrs. Wilson's covert operative status. In particular, plaintiffs assert that

they both fear for their safety and the safety of their children because they are potential targets for

"those persons and groups who bear hostility to the United States and/or its intelligence officers."

<u>Id.</u> ¶ 42. Additionally, both plaintiffs allege that they have been impaired in pursuing professional

opportunities, <u>id.</u> ¶ 44, and that Mrs. Wilson was unable to continue with her chosen career path at

the CIA, <u>id.</u> ¶ 43.

    Now pending before the Court are motions to dismiss filed by each of the four named

defendants. The United States has also filed both a Statement of Interest and a motion to dismiss.

On May 17, 2007, the Court heard argument on the many issues raised in these motions.

### <u>STANDARD OF REVIEW</u>

    All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a

short and plain statement of the claim showing that the pleader is entitled to relief,' in order to

'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Bell</u>

<u>Atl. Corp. v. Twombly</u>, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting <u>Conley v. Gibson</u>,

355 U.S. 41, 47 (1957)); <u>accord</u> <u>Erickson v. Pardus</u>, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007)

(per curiam). Although "detailed factual allegations" are not necessary to withstand a Rule

-8-

12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Bell Atl. Corp., 127 S. Ct. at 1964-65; see also Papasan v. Allain, 478 U.S. 265, 286 (1986).  Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp., 127 S. Ct. at 1965 (citations omitted).  Hence, although "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is impossible, and 'that a recovery is very remote and unlikely,'" id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the "threshold requirement" of Fed. R. Civ. P. 8(a)(2) is "that the 'plain statement' possess enough heft to 'sho[w]' that the pleader is entitled to relief,'" id. at 1966 (quoting Fed. R. Civ. P. 8(a)(2)).

    The notice pleading rules, however, are not meant to impose a great burden on a plaintiff. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005); see Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002).  When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor.  Leatherman v. Tarrant County Narcotics & Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 973 (D.C. Cir. 1979); see also Erickson, 127 S. Ct. at 2200 (citing Bell Atl. Corp., 127 S. Ct. at 1965). The plaintiff must be given every favorable inference that may be drawn from the allegations of fact.  Scheuer, 416 U.S. at 236; Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions

-9-

cast in the form of factual allegations." Kowal v. MCI Commc'n Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see also Domen v. Nat'l Rehab. Hosp., 925 F. Supp. 830, 837 (D.D.C. 1996) (citing Papasan, 478 U.S. at 286).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. See Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (noting that court has "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"); see also Pitney Bowes, Inc. v. U.S. Postal Serv., 27 F. Supp. 2d 15, 18 (D.D.C. 1998). A court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts. See Leatherman, 507 U.S. at 164; EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997).

## ANALYSIS

Plaintiffs have asserted five causes of action in their amended complaint. Four are what are commonly known as Bivens claims: they seek money damages directly under the Constitution for alleged violations of plaintiffs' constitutional rights. See Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971). The fifth cause of action, for the public disclosure of private facts, is asserted under District of Columbia tort law. Because defendants have raised arguments common to all of the Wilsons' Bivens claims, the Court will turn to them first.

## I.    Plaintiffs' Constitutional Claims

Each of plaintiffs' four Bivens claims is predicated on the alleged violation of a distinct constitutional right. The first claim, pled on Mr. Wilson's behalf alone, alleges that defendants

Libby, Rove, and Cheney violated the First Amendment by disclosing Mrs. Wilson's covert status in order to retaliate against Mr. Wilson for exercising his speech rights.  See Am. Compl. ¶¶ 46-49.  The remainder of the Bivens claims are grounded in alleged Fifth Amendment violations.  Both plaintiffs assert a cause of action against defendants Libby, Rove, and Cheney for the violation of plaintiffs' rights under the Equal Protection Clause.  Am. Compl. ¶¶ 50-54.  This "class of one" Equal Protection claim is premised on defendants having allegedly subjected plaintiffs to treatment different than that accorded to others similarly situated.  See id. ¶¶ 51-52.  See generally Vill. of Westbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam) (recognizing "class of one" Equal Protection claims).  The third cause of action alleges that all four named defendants violated Mrs. Wilson's constitutional right to privacy -- specifically, a right to informational privacy with respect to her covert identity -- which plaintiffs argue is protected by the Due Process Clause, at least where the public disclosure of that information constitutes a state-created danger.  See Am. Compl. ¶¶ 55-58.  Plaintiffs' final Bivens claim, which is asserted under the procedural and substantive elements of the Due Process Clause, alleges that the four named defendants deprived Mrs. Wilson of a constitutionally protected property interest in her continued employment with the CIA.  See id. ¶¶ 59-64.

      Defendants have challenged each of these Bivens claims on qualified-immunity grounds.  Under general qualified-immunity principles, government officials are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "A court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so,

proceed to determine whether that right was clearly established at the time of the alleged violation.'" Wilson v. Layne, 526 U.S. 603, 609 (1999) (quoting Conn v. Gabbert, 526 U.S. 286, 290 (1999)). Whether evaluated under this qualified-immunity analysis, or for failure to state a claim upon which relief can be granted, see Broudy v. Mather, 460 F.3d 106, 116 (D.C. Cir. 2006), defendants have raised substantial questions as to the viability of plaintiffs' constitutional claims. The Court need not resolve these questions, however, because all of plaintiffs' Bivens claims spring from a common event -- the alleged disclosure by defendants of Mrs. Wilson's identity as a covert CIA agent -- that implicates "special factors counselling hesitation" in the recognition of a Bivens remedy.[2]

The special-factors analysis originated in the Bivens decision itself. The Supreme Court in Bivens implied a cause of action for money damages directly under the Constitution against federal officers who allegedly violated the plaintiff's Fourth Amendment rights. See 403 U.S. at 397. In weighing whether to recognize this implied private right of action, however, the Court noted that "[t]he present case involves no special factors counselling hesitation in the absence of affirmative action by Congress." Id. at 396. Although the Bivens Court did not elaborate fully on the meaning of "special factors," the concept has since been applied where an "alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." Wilkie v. Robbins, 551 U.S. ___, 127 S. Ct. 2588, 2598 (2007). Furthermore, even in the absence of an existing remedial

---

[2] The Supreme Court has treated the special-factors analysis as a prudential matter that can be addressed prior to jurisdictional issues. See Schweiker v. Chilicky, 487 U.S. 412, 429 n.3 (1988). This Court therefore finds it unnecessary to reach defendants' argument that Mr. Wilson lacks standing to assert the First Amendment claim. Cf. Pub. Citizen v. U.S. Dist. Ct., 486 F.3d 1342, 1347-49 (D.C. Cir. 2007).

process, a district court should determine whether any other special factors weigh against the

recognition of a new Bivens remedy.  See id.  This Court will follow the course recently laid out

by the Supreme Court in Wilkie v. Robbins and begin with the question whether the existence of a

comprehensive, remedial statutory scheme precludes plaintiffs' claims.

### A.    Comprehensive Remedial Scheme

The Supreme Court first declined to recognize a Bivens remedy because of the existence

of an alternative remedial scheme in Bush v. Lucas, 462 U.S. 367 (1983).  Bush presented the

question whether a federal employee could obtain money damages under the First Amendment for

an adverse personnel action taken against him in alleged retaliation for critical comments he had

made about his employer to the news media.  See id. at 369.  The Supreme Court declined to

recognize such a claim because a complex mix of legislation, executive orders, and detailed Civil

Service Commission regulations comprised an "elaborate, comprehensive scheme" that provided

substantive and procedural remedies for improper federal personnel actions.  Id. at 385.  Even

though the Court assumed that "a federal right [had] been violated and Congress [had] provided a

less than complete remedy for the wrong," id. at 373, it noted that the proper question was "not

what remedy the court should provide for a wrong that would otherwise go unredressed," id. at

388.  Rather, the Court asked "whether an elaborate remedial system that has been constructed

step by step, with careful attention to conflicting policy considerations, should be augmented by

the creation of a new judicial remedy."  Id.  It answered no:  "In all events, Congress is in a far

better position than a court to evaluate the impact of a new species of litigation between federal

employees on the efficiency of the civil service."  Id. at 389.

The Supreme Court revisited this line of special-factors analysis in Schweiker v. Chilicky,

487 U.S. 412 (1988), a case brought by recipients of Social Security disability benefits who

sought money damages for alleged due process violations in the termination of those benefits. See

id. at 420. After reviewing its prior pronouncements on the meaning of "special factors," the

Court observed that

> the concept of "special factors counselling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional Bivens remedies.

Id. at 423. The Court declined to recognize a Bivens claim for respondents because Congress had,

through the Social Security Act, already "addressed the problems created by state agencies'

wrongful termination of disability benefits." Id. at 429. Although the Act did not provide for the

exact remedy sought, i.e., money damages against the officials responsible for the wrongful

terminations, id. at 424, the Court deferred to Congress as "the body charged with making the

inevitable compromises required in the design of a massive and complex welfare benefits

program," id. at 429.

Just last month in Wilkie v. Robbins, 551 U.S. ___, 127 S. Ct. 2588 (2007), the Supreme

Court again considered whether the existence of alternative means for protecting a

constitutionally-based interest precluded a Bivens remedy. The plaintiff in Wilkie alleged that

officials of the Bureau of Land Management violated his Fourth and Fifth Amendment rights

when they undertook a prolonged course of "harassment and intimidation" in an effort to obtain an

easement across his property. Id. at 2593. Although the plaintiff had "an administrative, and

ultimately a judicial, process for vindicating virtually all of his complaints," that process took the

form of "an assemblage of state and federal, administrative and judicial benches applying

regulations, statutes and common law rules." <u>Id.</u> at 2600.  The Court held that this "patchwork" of remedies was unlike the "'elaborate remedial scheme[s]'" that were designed to protect the interests of the plaintiffs in <u>Bush</u> and <u>Chilicky,</u> and could not definitively support an inference that "Congress expected the Judiciary to stay its <u>Bivens</u> hand." <u>Id.</u> (quoting <u>Bush,</u> 462 U.S. at 388). The Court ultimately concluded, however, that other special factors counseled against recognizing a <u>Bivens</u> remedy for the plaintiff's alleged injuries.  <u>See id.</u> at 2604-05.

Relying on <u>Bush</u> and <u>Chilicky,</u> and fully consistent with <u>Wilkie,</u> the D.C. Circuit has gleaned several "general principles" governing when the existence of a statutory remedial scheme counsels hesitation in creating a <u>Bivens</u> remedy.  <u>Spagnola v. Mathis,</u> 859 F.2d 223, 228 (D.C. Cir. 1988) (en banc) (per curiam).  "If the comprehensiveness of a statutory scheme cannot be gainsaid and it appears that 'congressional inaction [in providing for damages remedies] has not been inadvertent[,]' courts should defer to Congress' judgment with regard to the creation of supplemental <u>Bivens</u> remedies." <u>Id.</u> at 227-28 (alterations in original) (quoting <u>Chilicky,</u> 487 U.S. at 423).  When these circumstances exist, "courts must withhold their power to fashion damages remedies" unless Congress has "plainly expressed an intention that the courts preserve <u>Bivens</u> remedies." <u>Id.</u> at 228.  Furthermore, "the <u>Chilicky</u> Court made clear that it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention." <u>Id.</u> at 227.  Applying these principles, the D.C. Circuit has held that, for purposes of the special-factors analysis, the Civil Service Reform Act ("CSRA"), Title VII, and the congressionally created administrative process governing veterans' benefits decisions are all comprehensive statutory schemes precluding <u>Bivens</u> remedies. <u>See</u> <u>Thomas v. Principi,</u> 394 F.3d 970, 975-76 (D.C. Cir. 2005) (veterans' benefits); <u>Spagnola,</u> 859

F.2d at 229 (CSRA); Ethnic Employees of Library of Congress v. Boorstin, 751 F.2d 1405, 1415

(D.C. Cir. 1985) (Title VII).

Defendants in this action argue that two statutes, whether considered independently or in

combination, counsel hesitation under the special-factors analysis.  The first and most important

of these statutes is the Privacy Act, 5 U.S.C. § 552a (2000), which "regulate[s] the collection,

maintenance, use, and dissemination of information" about individuals by federal agencies.

Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896, 1896.  The second statute, the

Intelligence Identities Protection Act of 1982, 50 U.S.C. §§ 421-426 (2000), criminalizes the

intentional public disclosure of information identifying a covert agent.[3]  Defendants contend that

by enacting these statutes, Congress considered the proper recourse for individuals whose

personal information has been improperly disclosed by government officials -- the alleged activity

giving rise to plaintiffs' claims.  Furthermore, the absence in these statutory schemes of a civil

damages action against the offending officials was not inadvertent, and Congress has not plainly

---

[3] Libby also suggests that the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.), which governs personnel actions taken against federal employees, precludes any Bivens remedy here.  He argues that, to the extent plaintiffs' claims involve adverse effects on Mrs. Wilson's employment, those claims fall within the purview of, and thus are precluded by, the CSRA.  Libby's Mem. in Support of Mot. to Dismiss at 13; see, e.g., Spagnola, 859 F.2d at 228-29.  Armitage makes a similar argument based on the internal grievance procedures available to CIA employees.  Armitage's Mem. in Support of Mot. to Dismiss at 13-14.  See generally U.S. Gen. Accounting Office, GAO/NSIAD-96-6, Intelligence Agencies: Personnel Practices at CIA, NSA, and DIA Compared with Those of Other Agencies 31 (1996) (describing CIA grievance procedures).

Although plaintiffs allege that Mrs. Wilson was unable to continue with her work as a covert CIA operative as a result of defendants' actions, see Am. Compl. ¶¶ 14, 43, they have not alleged that any adverse employment actions were taken against Mrs. Wilson, or otherwise described any actions taken against Mrs. Wilson by her employer.  The crux of plaintiffs' claims concerns the alleged disclosure of private information -- conduct that is not addressed by the CSRA or the CIA grievance procedures one way or the other.

expressed an intention that the courts preserve Bivens remedies. Therefore, defendants argue, this Court should not imply additional damages remedies under the Constitution.

Plaintiffs respond as an initial matter that the special-factors analysis urged by defendants is less compelling, if not irrelevant, because their complaint alleges violations of constitutional provisions that have given rise to viable Bivens claims in the past. In support of this argument, plaintiffs cite Davis v. Passman, 442 U.S. 228, 248 (1979), in which the Supreme Court permitted a damages action directly under the Due Process Clause of the Fifth Amendment, and two cases in which the D.C. Circuit recognized Bivens claims for First Amendment violations, see Haynesworth v. Miller, 820 F.2d 1245, 1255 (D.C. Cir. 1987), overruled in part on other grounds by Hartman v. Moore, 547 U.S. 250, 126 S. Ct. 1695 (2006); Dellums v. Powell, 566 F.2d 167, 194 (D.C. Cir. 1977). As defendants point out, however, Bivens actions are not recognized Amendment by Amendment in a wholesale fashion. Rather, they are context-specific. "For example, a Bivens action alleging a violation of the Due Process Clause of the Fifth Amendment may be appropriate in some contexts, but not in others." FDIC v. Meyer, 510 U.S. 471, 484 n.9 (1994). Notably, the Supreme Court has "consistently refused to extend Bivens liability to any new context" in the twenty-seven years since Carlson v. Green, 446 U.S. 14 (1980) (Eighth Amendment). Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 68 (2001); see also Wilkie, 551 U.S. at ___, 127 S. Ct. at 2597 ("[I]n most instances we have found a Bivens remedy unjustified.").

Thus, it is not enough for plaintiffs to point to cases recognizing Bivens actions under the First and Fifth Amendments generally. Although damages actions have been permitted under the First Amendment against federal officials who instituted criminal prosecutions in retaliation for

the exercise of protected speech rights, see Hartman, 126 S. Ct. at 1701; see also Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 190 & n.22 (D.C. Cir. 2006), the Supreme Court has nonetheless "declined to create a Bivens remedy against individual Government officials for a First Amendment violation arising in the context of federal employment," Malesko, 534 U.S. at 68 (citing Bush v. Lucas). And while Davis established that a congressional employee may assert a Bivens remedy under the Due Process Clause for unconstitutional employment discrimination, see 442 U.S. at 248, the Supreme Court later refused to imply a remedy under the Due Process Clause for the improper denial of social security disability benefits, see Chilicky, 487 U.S. at 420. The proper question, then, is not whether plaintiffs may assert a Bivens remedy for a First or Fifth Amendment violation, but whether they may do so on the basis of the disclosure by federal officials of allegedly private information concerning Mrs. Wilson that was maintained within the Executive Branch. Answering this question requires consideration of the Privacy Act.

1. Privacy Act

The Privacy Act, as noted, regulates how federal agencies maintain and disseminate information pertaining to individuals. Among its requirements, the Act prohibits the disclosure of "any record which is contained in a system of records by any means of communication to any person, or to another agency," unless the disclosure occurs pursuant to the request of the individual to whom the record pertains, or if one of twelve enumerated exceptions to the disclosure prohibition applies. § 552a(b). Agencies must account for certain types of disclosures made under these provisions. § 552a(c). The Act also "provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with [its] requirements." Doe v. Chao, 540 U.S. 614, 618 (2004). One such form of relief enables an individual to seek

-18-

money damages when an agency intentionally or willfully fails to comply with the disclosure requirements "in such a way as to have an adverse effect on an individual." § 552a(g)(1)(D), (g)(4). Although Congress did not create a civil cause of action against individual government officials for violations of the Act, those agency officers or employees who improperly disclose information covered by the Act face possible criminal penalties. See § 552a(i)(1).

The D.C. Circuit has already confirmed that the Privacy Act may constitute a comprehensive statutory scheme precluding Bivens remedies against government officials who improperly disclose a plaintiff's personal information. See Chung v. U.S. Dep't of Justice, 333 F.3d 273, 274 (D.C. Cir. 2003), aff'g in relevant part, No. 00-cv-1912, 2001 WL 34360430, at *10-*12 (D.D.C. Sept. 20, 2001). In doing so, it has joined a number of courts from other circuits, including the Court of Appeals for the Sixth Circuit. See Downie v. City of Middleburg Heights, 301 F.3d 688, 698-99 (6th Cir. 2002); Khalfani v. Sec'y, Dep't of Veterans Affairs, No. 94-cv-5720, 1999 WL 138247, at *7 (E.D.N.Y. Mar. 10, 1999); Sullivan v. U.S. Postal Serv., 944 F. Supp. 191, 195-96 (W.D.N.Y. 1996); Williams v. Dep't of Veteran Affairs, 879 F. Supp. 578, 587-88 (E.D. Va. 1995); Patterson v. FBI, 705 F. Supp. 1033, 1045 n. 16 (D.N.J. 1989). The plaintiff in Chung brought an action against Department of Justice officials who disclosed information to journalists revealing Chung's participation in a confidential investigation. See 2001 WL 34360430, at *10-*12. Chung alleged that "he suffered substantial emotional distress and mental anguish, fearing for his life and the lives of his family members" as a result of the publication of national news stories describing his role in the investigation. Id. at *1. The court of appeals affirmed "the dismissal of Chung's constitutional claims because, as the district court correctly held, they are encompassed within the remedial scheme of the Privacy Act." 333 F.3d at

274.  As the district court noted, Congress has, with the Privacy Act, "crafted what it considers to be appropriate remedies for disclosure and record access violations." Id. at *10 (quoting Williams, 879 F. Supp. at 587).  Furthermore, the congressional findings accompanying the Act make it "quite clear that Congress found constitutional implications and concerns respecting privacy matters as part of its reason for enacting the Privacy Act of 1974." Id. at *11.  "Given the extensiveness of this remedial scheme, its failure to include additional remedies, such as damages against individual officials or punitive damages, does not appear to be inadvertent." Id. at *10 (quoting Williams, 879 F. Supp. at 587).  Accordingly, the district court in Chung declined to supplement the Privacy Act with additional Bivens remedies.

Chung has since been applied by two other judges of this Court on facts also very similar to those alleged in this action.  In Hatfill v. Ashcroft, 404 F. Supp. 2d 104 (D.D.C. 2005), Judge Walton dismissed a Fifth Amendment Bivens claim asserted against unnamed federal officials by Steven Hatfill, who was publicly named a "person of interest" in connection with the anthrax attacks that terrorized the northeast United States in 2001.  See id. at 116.  Hatfill alleged that the officials conspired to release false information about him to the public in order to "render him unemployable in his field of chosen profession," namely, "biowarfare preparedness and countermeasures." Id. at 113, 115.  The district court held that "the Privacy Act, being a comprehensive legislative scheme that provides a meaningful remedy for the kinds of harm Dr. Hatfill alleges he has suffered, qualifies it [as] a special factor counselling hesitation against the applicability of Bivens." Id. at 116.

Likewise, the plaintiff in Sudnick v. Dep't of Defense, 474 F. Supp. 2d 91 (D.D.C. 2007), filed suit against an official at the Department of Defense ("DoD") who allegedly "publicly

stigmatiz[ed] [plaintiff] through a campaign of making false representations and allegations against [plaintiff] within and outside of DoD, including to print and broadcast media." Id. at 98 (second and third alterations in original). The plaintiff sought a Bivens remedy under the Fifth Amendment on the ground that the disclosures "deprived him of the liberty to work in his chosen field as a senior manager in a government agency." Id. at 98. In an opinion released after the briefing in this action was completed, Judge Huvelle dismissed the claim, which was "based entirely on [defendant's] alleged disclosure of 'Privacy Act-covered information pertaining to [plaintiff],'" for the reasons stated in Chung. Id. at 100 (second alteration in original).

Plaintiffs attempt to distinguish these cases by suggesting that their claims, unlike those of Chung and Hatfill, simply fall outside of the Privacy Act's scope altogether. In support of this argument, they observe that both Chung and Hatfill pled Privacy Act claims in addition to seeking Bivens remedies. Pls.' Mem. in Opp'n to Mots. to Dismiss at 53-54. Plaintiffs then contend that the Act is a "highly technical statute" that only applies to a subset of federal agency records, and there is "no factual predicate" for the presumption that the alleged disclosures here involved information covered by the Act. Id. Taking the amended complaint's allegations as true, however, Libby learned about Mrs. Wilson's employment from various sources within the CIA, the State Department, and the Office of the Vice President. Am. Compl. ¶ 19. Vice President Cheney obtained the information from the CIA. Id. ¶ 19(h). Armitage learned about Mrs. Wilson from a State Department memorandum. Id. ¶ 37. Although there are no allegations explicitly naming the source of Rove's knowledge, the only logical inference that can be drawn from the facts that are asserted in the amended complaint is that Rove learned about Mrs. Wilson from one of the aforementioned sources: the CIA, a White House office, or the State Department.

Notably, plaintiffs do not contest that the Department of State and the CIA are federal agencies required to abide by the Privacy Act's disclosure requirements.[4] To the extent plaintiffs are suggesting that <u>Bivens</u> claims can only fall within the scope of the Privacy Act for purposes of the special-factors analysis when they are pled in terms of the Privacy Act's requirements, the Court simply does not agree. Otherwise, any plaintiff could assert a <u>Bivens</u> claim in lieu of an arguably less-desirable Privacy Act claim by way of artful pleading.

The Wilsons do contest the application of the Privacy Act to the Office of the Vice President, which they argue is not an agency and therefore does not come within the Act's purview for special-factors purposes. The Privacy Act defines "agency" by reference to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2000). <u>See</u> § 552a(a)(1) (cross-referencing FOIA § 552(e), now codified at § 552(f)). FOIA, in turn, defines "agency" as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." § 552(f)(1). Despite the statute's explicit reference to the Executive Office of the President, the Supreme Court has held on the basis of "unambiguous" legislative history that the Office of the President does not fall within FOIA's definition of "agency." <u>See</u> <u>Kissinger v. Reporters Comm. for Freedom of the Press</u>, 445 U.S. 136, 156 (1980) (citing H.R. Rep. No. 93-1380 ("FOIA Conference Committee Report"), at 15 (1974) (Conf. Rep.)). The vast majority of courts faced with the issue in the Privacy Act context have followed <u>Kissinger</u> in holding that the Office of the President and the Vice President do not

---

[4]Although the Director of the Central Intelligence Agency may promulgate regulations exempting records maintained by the CIA from some Privacy Act obligations, <u>see</u> § 552a(j)(1), he or she may not do so with respect to the Act's disclosure requirements, <u>see</u> § 552a(j).

fall within the Privacy Act's definition of agency. See, e.g., Jones v. Exec. Office of President, 167 F. Supp. 2d 10, 19 (D.D.C. 2001); Dale v. Exec. Office of President, 164 F. Supp. 2d 22, 26 (D.D.C. 2001); see also Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group, 219 F. Supp. 2d 20, 55 (D.D.C. 2002) (Office of Vice President); Schwarz v. U.S. Dep't of Treasury, 131 F. Supp. 2d 142, 147-48 (D.D.C. 2000) (same). But see Alexander v. FBI, 971 F. Supp. 603, 606-07 (D.D.C. 1997).

This Court does not need to resolve the issue here. Even assuming that the Office of the Vice President is not an agency under the Privacy Act for the reasons given in Kissinger, it still comes within the purview of the Act for purposes of the special-factors analysis. It is enough to observe that Congress contemplated whether the Privacy Act should adopt a definition of agency that explicitly excluded "units in the Executive Office whose sole function is to advise and assist the President," FOIA Conference Committee Report at 15, and then did so. As the district court in Jones explained with reference to conference reports and floor debates, "[t]here is every indication from the legislative history that the drafters of the Privacy Act, in choosing to apply the FOIA definition of 'agency' to the Privacy Act, were cognizant of the Conference Committee Report prepared in connection with the 1974 FOIA Amendments." Jones, 167 F. Supp. 2d at 19. Furthermore, the Conference Committee Report suggests congressional awareness of the potential constitutional difficulties that would arise from the inclusion of close presidential advisors within the definition of "agency." See FOIA Conference Committee Report at 15 (stating intention to codify Soucie v. David, 448 F.2d 1067 (D.C. Cir. 1971), in which D.C. Circuit observed potential difficulties of applying FOIA to the Executive, see id. at 1071-72 & nn.9-12). Thus, this Court concludes that if the Office of the Vice President is exempt from the requirements of the Privacy

Act, that exemption "has not been inadvertent," see Chilicky, 487 U.S. at 423.

Plaintiffs also attempt to distance themselves from Chung and Hatfill on the slightly different ground that the Privacy Act afforded a possible remedy to the plaintiffs in those cases but does not afford a possible remedy to plaintiffs here.  Assuming arguendo that the Wilsons do not have any potential Privacy Act remedies for at least some of the alleged disclosures, there is language from the district judges in Chung and Hatfill that, when read in isolation, might seem to support plaintiffs' view.  See Hatfill, 404 F. Supp. 2d at 116 ("[T]he Privacy Act, being a comprehensive legislative scheme that provides a meaningful remedy for the kinds of harm Dr. Hatfill alleges he has suffered, qualifies it [as] a special factor counselling hesitation against the applicability of Bivens."); Chung, 2001 WL 34360430, at *10 ("Congress has specifically addressed the circumstances alleged by Williams and has provided significant and meaningful remedies that he may pursue." (quoting Williams, 879 F. Supp. at 587)); see also Downie, 301 F.3d at 696; Sudnik, 474 F. Supp. 2d at 100.  But these cases cannot stand for the proposition that a statutory scheme must provide "meaningful remedies" to a plaintiff in order to preclude a Bivens claim under the special-factors analysis.  The D.C. Circuit has clearly indicated that a Bivens remedy may be precluded by a statutory scheme that provides a plaintiff with "'no remedy whatsoever.'"[5]  Spagnola, 859 F.2d at 228 (quoting Chilicky, 487 U.S. at 423).  Other circuits have held exactly that with respect to the CSRA.  See Lee v. Hughes, 145 F.3d 1272, 1275 (11th Cir. 1998) (dismissing Bivens claim brought by plaintiff for whom CSRA provided no judicial or administrative remedies); accord Saul v. United States, 928 F.2d 829, 840 (9th Cir. 1991);

---

[5]The D.C. Circuit did not face that situation directly in Spagnola because the plaintiffs had a limited administrative remedy under the CSRA.  See 859 F.2d at 225-26 & n.9.

Lombardi v. Small Bus. Admin., 889 F.2d 959, 961 (10th Cir. 1989); Volk v. Hobson, 866 F.2d 1398, 1403-04 (Fed. Cir. 1989).

These courts have followed to its logical conclusion the Supreme Court's directive to defer to Congress's judgment when Congress has constructed "an elaborate remedial system" encompassing a plaintiff's claim. Bush, 462 U.S. at 388. This deference is no less proper when Congress denies rather than provides a remedy to certain classes of plaintiffs or claims. See Lee, 145 F.3d at 1276 ("In light of Congress's deliberate exclusion of certain employees from the protections of the CSRA and this country's long-respected separation of powers doctrine, courts should be hesitant to provide an aggrieved plaintiff with a remedy where Congress intentionally has withheld one."). As the Supreme Court observed in Bush, the relevant question in such a situation "is not what remedy the court should provide for a wrong that would otherwise go unredressed," but instead whether a carefully constructed statutory scheme "should be augmented by the creation of a new judicial remedy." 462 U.S. at 388; see also Chilicky, 487 U.S. at 421-22 ("The absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation."). To the extent that plaintiffs lack a Privacy Act remedy here, then, it is because Congress failed to provide relief for individuals in plaintiffs' position, and has not done so inadvertently. For the Court nonetheless to provide those remedies would upset the careful balance created by the statutory scheme. The Court finds, therefore, that the Privacy Act is a special factor counselling against the implication of a Bivens remedy for plaintiffs' claims.

Finally, plaintiffs assert that a Bivens remedy is necessary because for them, as for the plaintiffs in Bivens and Davis, "it is damages or nothing." See Pls.' Opp'n at 51 (quoting Davis,

-25-

442 U.S. at 245; Bivens, 403 U.S. at 410 (Harlan, J., concurring in judgment)).  Of course, as just

explained, the adequacy of some other remedy is not determinative.  See Bush, 462 U.S. at 372-

73; Spagnola, 859 F.2d at 227.  Moreover, the Supreme Court has indicated that it is the

availability of an alternative avenue of relief, rather than the plaintiff's level of success in pursuing

other remedies, that is the relevant consideration.  The plaintiff in Wilkie, for example, "took

advantage of some opportunities, and let others pass; although he had mixed success, he had the

means to be heard."  Wilkie, 551 U.S. at __, 127 S. Ct. at 2599.  Thus the Court held that the

"situation does not call for creating a constitutional cause of action for want of other means of

vindication."  Id. at 2600 (emphasis added)); see also Malesko, 534 U.S. at 74 (noting that

plaintiff's "lack of alternative tort remedies was due solely to strategic choice" and therefore he

was "not a plaintiff in search of a remedy").  But the Supreme Court has never directly answered

the question "whether the Constitution itself requires a judicially fashioned damages remedy in the

absence of any other remedy to vindicate the underlying right, unless there is an express textual

command to the contrary."  Bush, 462 U.S. at 378 n.14 (emphasis added); see also Malesko, 534

U.S. at 72.  But cf. Tenet, 544 U.S. at 8 (dismissing due process claims against Director of Central

Intelligence as non-justiciable under Totten doctrine).  The courts of appeals, however, have not

hesitated to dismiss Bivens actions under such circumstances when special factors are present.

See, e.g., Lee, 145 F.3d at 1275 ("[M]ore recent Supreme Court cases do not reflect the Davis

Court's willingness to recognize a Bivens claim in instances where there is a clear congressional

intent to exclude certain classes of employees from a statute's comprehensive remedial scheme.").

        This Court would not hesitate either, were it actually confronted with the issue.  As an

initial matter, it appears that plaintiffs could have stated colorable Privacy Act claims based on

some of the alleged disclosures, particularly those involving information allegedly learned by Armitage from a State Department memorandum. See § 552a(g)(1)(D), (g)(4). Furthermore, plaintiffs have asserted a state-law tort claim against the individual federal officials named in this action. Although this cause of action has now been converted into an FTCA claim against the United States, see infra, it nonetheless negates plaintiffs' assertion that a Bivens claim must be implied because they are left without any other possible remedy.[6]

### 2. Intelligence Identities Protection Act

Defendants have also asserted that the Intelligence Identities Protection Act of 1982 ("IIPA") is a comprehensive statutory scheme barring plaintiffs' Bivens claims. See Pub. L. No. 97-200, 96 Stat. 122 (codified as amended at 50 U.S.C. §§ 421-426 (2000)). The IIPA prohibits the intentional disclosure of information identifying a covert agent and subjects an individual making such a disclosure to fines and a prison sentence of up to ten years. § 421. It does not provide for civil enforcement or for any other civil remedies. Defendants contend that Congress exhaustively considered the appropriate means of preventing the disclosure of a covert operative's

---

[6]Carlson v. Green, 446 U.S. 14 (1980), is not to the contrary. Carlson held that the possibility of an FTCA claim does not preempt a Bivens claim based on the same underlying allegations. Id. at 23. Unlike in Davis, however, the Court in Carlson did not imply a Bivens remedy based on a "damages or nothing" rationale. See Malesko, 534 U.S. at 70 (distinguishing between rationales of Carlson and Davis); Holly v. Scott, 434 F.3d 287, 295-96 (4th Cir. 2006) (same). Instead, Carlson created a Bivens action to "provide an otherwise nonexistent cause of action against individual officers alleged to have acted unconstitutionally," Malesko, 534 U.S. at 70, where Congress had "made it crystal clear" that the FTCA and Bivens were "parallel, complementary causes of action," Carlson, 446 U.S. at 20, and "no special factors counselling hesitation" were present, id. at 19.

Plaintiffs' failure to exhaust their FTCA remedies cannot justify the recognition of their Bivens claims. If that were true, plaintiffs could seek perhaps greater remedies under a Bivens implied right of action than they otherwise would have obtained had they been more diligent in protecting their statutory rights.

identity when it passed the IIPA and made the calculated decision to impose criminal sanctions to the exclusion of civil remedies. In support of the argument that the lack of civil remedies was deliberate, Libby contrasts the IIPA with the Foreign Intelligence Surveillance Act of 1978, which provides for private causes of action in addition to criminal penalties. See 50 U.S.C. §§ 1809, 1810 (2000).

One of Congress's goals in enacting the IIPA certainly was "to protect intelligence officers and sources from [the] harm" that results from the disclosure of covert identities. S. Rep. No. 97-201, at 11 (1981). But defendants do not cite, and the Court is unaware of, any legislative history indicating that Congress rejected or even considered the possibility of civil remedies for such disclosures. If anything, the legislative history shows that Congress was responding to a series of high-profile incidents in which individuals had purposefully put covert agents at risk, and the IIPA was a targeted effort to punish such behavior criminally. See, e.g., S. Rep. No. 97-201, at 1 (referencing "systematic effort by a small group of Americans . . . to disclose the names of covert intelligence agents" and noting that "[n]umerous proposals have been made . . . for a criminal statute to punish such disclosure"); id. at 8-9 (characterizing IIPA as "a definitive affirmation . . . that anyone who engages in . . . identification and exposure of the identities of [undercover agents] should be punished"). More generally, defendants have not been able to point to any case in which a criminal statute has been found to constitute a Bivens special factor. In this Court's view, the existence of a purely criminal statute that provides for no civil remedies at all cannot fairly be said to constitute a comprehensive remedial statutory scheme for purposes of assessing the availability of a Bivens remedy. See Bush, 462 U.S. at 388 (asking "whether an elaborate remedial system . . . should be augmented by the creation of a new judicial remedy" (emphasis

added)).  Criminal provisions are generally not remedial, and extending the special-factors

analysis to defer to criminal statutes would radically alter the analytical framework that the

Supreme Court has cautiously employed.  This Court is thus not willing to say that the IIPA,

standing alone, constitutes an "alternative, existing process for protecting the interest" of plaintiffs

for purposes of the <u>Bivens</u> analysis.  <u>Wilkie</u>, 551 U.S. at ___, 127 S. Ct. at 2598.  That is not to

say that the IIPA is altogether irrelevant to the special-factors analysis.  Certainly it is, in

combination with the Privacy Act and other special factors discussed below, part of the panoply of

reasons weighing against the judicial creation of a new <u>Bivens</u> cause of action.  <u>See id.</u> at 2600.

### B.    Other Special Factors Counselling Against a <u>Bivens</u> Remedy

Even if this Court did not conclude that the Privacy Act is a comprehensive remedial

scheme "amount[ing] to a convincing reason for the Judicial Branch to refrain from providing a

new and freestanding remedy in damages," <u>id.</u>, plaintiffs' claims would nonetheless fail under

"step two" of the <u>Bivens</u> analysis, which requires "weighing reasons for and against the creation of

a new cause of action, the way common law judges have always done."  <u>Id.</u>  As the Supreme

Court has recently noted in <u>Wilkie</u>, "any freestanding damages remedy for a claimed

constitutional violation has to represent a judgment about the best way to implement a

constitutional guarantee; it is not an automatic entitlement no matter what other means there may

be to vindicate a protected interest."  <u>Id.</u> at 2597.  In this case, the <u>Bivens</u> remedy requested by

plaintiffs -- a cause of action implied under the Constitution for the alleged disclosure of Mrs.

Wilson's status as a covert CIA operative -- raises significant separation-of-powers and

justiciability concerns.  Given these considerations, this Court believes that the decision whether

to recognize a new <u>Bivens</u> remedy in this context "'is more appropriately for those who write the

laws, rather than for those who interpret them.'" <u>Sanchez-Espinoza v. Reagan</u>, 770 F.2d 202, 208 (D.C. Cir. 1985) (quoting <u>Bush</u>, 462 U.S. at 380); <u>see also</u> <u>Wilkie</u>, 551 U.S. at __, 127 S. Ct. at 2604-05.

Defendants argue that creating a private right of action for the disclosure of covert identity would "be inimical to" the Executive Branch's broad exercise of discretion to protect information pertaining to national security. <u>See</u> Rove's Mem. in Support of Mot. to Dismiss at 18. "The authority to protect such information falls on the President as head of the Executive Branch and as Commander in Chief" and "exists quite apart form any explicit congressional grant." <u>Dep't of Navy v. Egan</u>, 484 U.S. 518, 527 (1988). Of course, Congress has acknowledged the need for Executive Branch discretion over intelligence matters in a number of its enactments, including in the National Security Act, which "vested in the Director of Central Intelligence [now the Director of National Intelligence] very broad authority to protect all sources of intelligence information from disclosure," <u>CIA v. Sims</u>, 471 U.S. 159, 168-69 (1985); <u>see</u> National Security Act of 1947, ch. 343, § 102(d)(3), 61 Stat. 495, 498 (current version at 50 U.S.C.A. § 403-1(i) (2007)), and in statutory exemptions for the CIA from certain Privacy Act requirements, <u>see</u> § 552a(j)(1). Defendants note that the IIPA is also consistent with this discretion because it criminalizes the disclosure of only that information the United States "is taking affirmative measures to conceal," § 421, and enforcement of the Act is left to the government's prosecutorial discretion.

The need to maintain Executive Branch discretion regarding the protection of national security information raises serious questions of justiciability with respect to a civil damages remedy for unauthorized disclosure of covert identity. In particular, the doctrine established in <u>Totten v. United States</u>, 92 U.S. 105 (1876), "prohibit[s] suits against the Government based on

covert espionage agreements." Tenet v. Doe, 544 U.S. 1, 3 (2005).  The Totten Court stated "as a general principle, that public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." 92 U.S. at 107 (emphasis added).  This broad prohibition applies to suits alleging constitutional violations:  "No matter the clothing in which alleged spies dress their claims, Totten precludes judicial review in cases . . . where success depends upon the existence of their secret espionage relationship with the Government." Tenet, 544 U.S. at 8; see id. (dismissing due process claim).

Plaintiffs argue that the Totten doctrine does not apply in this case because the relationship between Mrs. Wilson and the CIA has been publicly revealed.  For a slightly different reason, this Court agrees that Totten does not squarely apply to plaintiffs' claims.  The Government has officially acknowledged, in documents filed in the Libby criminal case and at oral argument in this matter, that Mrs. Wilson was a covert operative for the CIA, see Mot. Hearing Tr. 19:12-15, and the Supreme Court has explained that "Totten's core concern" -- "preventing the existence of the plaintiff's relationship with the Government from being revealed" -- is not implicated in "a suit brought by an acknowledged (though covert) employee of the CIA." Tenet, 544 U.S. at 10.  The principles underlying Totten might yet have special applicability to specific causes of action, however.  For example, in order to prevail on the merits of their equal protection claim, plaintiffs would have to allege and eventually demonstrate "disparate treatment of similarly situated parties." 3833 Conn. LLC v. District of Columbia, 336 F.3d 1068, 1075 (D.C. Cir. 2003).  In other words, plaintiffs would need to introduce evidence pertaining to the Government's treatment of other covert agents whose espionage relationships have not been acknowledged -- evidence that

might reveal the identities of those agents.[7]  Ultimately, however, although the <u>Totten</u> doctrine

might not altogether preclude plaintiffs' action on its own accord, the principles reflected in the

doctrine weigh in the special-factors analysis for two reasons.

First, as explained above, <u>Bivens</u> remedies are context-specific.  As the Supreme Court has

observed, "there are varying levels of generality at which one may apply 'special factors' analysis."

<u>United States v. Stanley</u>, 483 U.S. 669, 681 (1987); <u>see also</u> <u>Wilkie</u>, 551 U.S. at ___, 127 S. Ct. at

2604.  Yet courts have consistently avoided focusing on the specific facts of a given case when

determining whether to recognize an implied damages remedy.  <u>See, e.g.</u>, <u>Stanley</u>, 483 U.S. at 681

("A test for liability that depends on the extent to which particular suits would call into question

military discipline and decisionmaking would itself require judicial inquiry into, and hence

intrusion upon, military matters."); <u>Spagnola</u>, 859 F.2d at 228 ("[T]he Court regards a case-by-

case examination of the particular administrative remedies available to a given plaintiff as

unnecessary.").  For example, the D.C. Circuit declined to recognize a <u>Bivens</u> action by foreign

nationals for allegedly unconstitutional actions taken abroad because "<u>as a general matter</u> the

danger of foreign citizens using the courts in situations <u>such as this</u> to obstruct the foreign policy

of our government is sufficiently acute that we must leave to Congress the judgment whether a

damage remedy should exist."  <u>Sanchez-Espinoza</u>, 770 F.2d at 209 (emphasis added).  The court

did not consider whether "the present litigation [was] motivated by considerations of geopolitics

_____

[7]Alternatively, this claim might be subject to dismissal under the state-secrets doctrine, assuming that the United States properly asserted the privilege.  <u>See, e.g.</u>, <u>Sterling v. Tenet</u>, 416 F.3d 338, 346-48 (4th Cir. 2005); <u>Linder v. Dep't of Defense</u>, 133 F.3d 17, 23 (D.C. Cir. 1998).  However, the Supreme Court has confirmed that in certain circumstances the state-secrets doctrine provides insufficient protection for intelligence sources, and dismissal under <u>Totten</u> is required: "The possibility that a suit may proceed and an espionage relationship may be revealed, if the state secrets privilege is found not to apply, is unacceptable . . . ."  <u>Tenet</u>, 544 U.S. at 11.

rather than personal harm," or whether the particular suit would actually result in the obstruction of foreign policy.  Id.  But, although Totten would not require the dismissal of all of plaintiffs' claims here, there may well be situations in which a Bivens claim for the intentional disclosure of a covert operative's status would directly implicate the Totten doctrine.  This possibility, which arises because the alleged public disclosure of information pertaining to covert identity does not equate to official government recognition of an espionage relationship, weighs generally against recognizing a Bivens claim in this context.

Second, even those claims that do not fall directly under the Totten doctrine will inevitably require judicial intrusion into matters of national security.  For example, in this case plaintiffs have alleged that "Mrs. Wilson was impaired in her ability to carry out her duties at the CIA."  Am. Compl. ¶ 43.  This statement not only speaks to her injuries generally but also relates to the merits of her Fifth Amendment deprivation of property claim, at least under certain legal theories.  See O'Donnell v. Barry, 148 F.3d 1126, 1140-41 (D.C. Cir. 1998) (describing Fifth Amendment stigma claims).  Plaintiffs' substantive due process claim depends upon whether defendants increased the danger of third-party violence against plaintiffs.  See generally Butera v. District of Columbia, 235 F.3d 637, 651 (D.C. Cir. 2001).  The resolution of these claims therefore might require an exploration into Mrs. Wilson's specific duties as a covert operative.  Her class-of-one equal protection claim would necessitate an even broader investigation into CIA practices.  Plaintiffs argue that the United States could invoke the state secrets privilege or utilize other established methods for the protection of sensitive information.  But, in this and in future cases, "[s]uch procedures, whatever they might be, still entail considerable risk" of revealing sensitive information.  Sterling, 416 F.3d at 348; see also Sims, 471 U.S. at 175 ("Even a small chance that

some court will order disclosure of a source's identity could well impair intelligence gathering."). At least one other district court has accordingly denied a Bivens remedy in light of the risks incurred by discovery into issues of national security. See Arar v. Ashcroft, 414 F. Supp. 2d 250, 281-83 (E.D.N.Y. 2006) (denying constitutional claims premised on "extraordinary rendition" of plaintiff to Syria).

Such potential difficulties associated with claims based on the disclosure of information relating to covert CIA operatives gives the Court reason to pause before extending Bivens to this context. "[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." Egan, 484 U.S. at 530 (citing Chappell v. Wallace, 462 U.S. 296 (1983)). Here, given that Congress has not provided a private right of action for the disclosure of a covert operative's identity, and in light of the "host of considerations that must be weighed and appraised" in deciding whether to imply such an action directly under the Constitution, Sanchez-Espinoza, 770 F.2d at 208, the nature of the information disclosed in this suit provides sound reason to hesitate before judicially implying a Bivens remedy. Cf. Wilkie, 551 U.S. at ___, 127 S. Ct. at 2604-05 (declining to recognize Bivens remedy because of "difficulty of devising a workable cause of action" and observing that "any damages remedy . . . may come better, if at all, through legislation").

* * * * *

In sum, the Court finds that the existence of special factors counsels against judicial implication of plaintiffs' Bivens claims in this setting. Accordingly, there is no need to address defendants' alternative arguments for dismissal of these claims, including their assertions of

qualified immunity and the Vice President's claim of absolute immunity.

## II.    Public Disclosure of Private Facts

Plaintiffs have also asserted against all defendants a common-law claim for the public disclosure of private facts, which is a form of the tort of invasion of privacy. This tort claim is based on the same underlying allegations as their <u>Bivens</u> claims -- that defendants caused the publication of the allegedly private fact that Mrs. Wilson was a covert CIA operative -- and contends that defendants did so in a manner that would be highly offensive to a reasonable person of ordinary sensibilities. <u>See</u> Am. Compl. ¶¶ 65-68.

The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, 28 U.S.C. § 2679 (2000), provides the exclusive remedy for a claim of damages arising from any "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." § 2679(b)(1). The Act thus "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." <u>Osborn v. Haley</u>, 549 U.S. ___, 127 S. Ct. 881, 887 (2007). Upon certification by the Attorney General or his designee that the individual defendant was acting within the scope of his office or employment, the United States is substituted as the sole defendant, and the action proceeds under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680 (2000). <u>See</u> § 2679(d)(1). A scope-of-employment certification has been filed in this action on behalf of all defendants. <u>See</u> U.S. Mot. to Dismiss Ex. 1 (Certification of Scope of Employment); <u>see also</u> 28 C.F.R. § 15.4 (2005). The United States has also filed a motion to dismiss the tort claim on the ground that plaintiffs have failed to exhaust their administrative remedies under the FTCA.

Plaintiffs challenge the Westfall certification in this action.  The scope-of-employment certification is subject to judicial review.  Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 420 (1995).  However, the certification "must be respected unless and until the District Court determines that [the original defendant], in fact, engaged in conduct beyond the scope of his employment."  Osborn, 127 S. Ct. at 900.  In other words, the Westfall certification "constitute[s] prima facie evidence that the employee was acting within the scope of his employment."  Council on Am. Islamic Relations v. Ballenger ("CAIR"), 444 F.3d 659, 662 (D.C. Cir. 2006) (per curiam).  Hence, "a plaintiff challenging the government's scope-of-employment certification bears the burden of coming forward with specific facts rebutting the certification."  Stokes v. Cross, 327 F.3d 1210, 1214 (D.C. Cir. 2003) (internal quotation marks omitted).  The plaintiff must "raise a material dispute" regarding the certification "by alleging facts that, if true, would establish that the defendants were acting outside the scope of their employment."  Id. at 1215.  "If there is a material dispute as to the scope issue the district court must resolve it at an evidentiary hearing."  Kimbro v. Velten, 30 F.3d 1501, 1509 (D.C. Cir. 1994).

The ensuing scope-of-employment inquiry is governed by the law of agency as applied in the District of Columbia, where the tort allegedly occurred.  See Stokes, 327 F.3d at 1214.  "As its framework for determining whether an employee acted within the scope of employment, the Court of Appeals for the District of Columbia looks to the Restatement (Second) of Agency (1957)."  Majano v. United States, 469 F.3d 138, 141 (D.C. Cir. 2006) (internal quotation marks omitted).

> Under the Restatement, an employee's conduct falls within the scope of employment if: 1) it is of the kind of conduct he is employed to perform; 2) it occurs substantially within the authorized time and space limits; 3) it is actuated, at least in part, by a purpose to serve the master; and 4) if force is intentionally used by the servant against another, the use of force is not unexpected by the master.

Id. at 141 (citing Restatement (Second) of Agency § 228).  The fourth Restatement element is

irrelevant in this action because plaintiffs have not alleged the use of force.  The remaining three

elements are contested by plaintiffs, however, and will be considered by the Court in turn.

With respect to the first Restatement element, plaintiffs argue that defendants' actions

were different in kind from that authorized because their conduct was illegal and "placed the

national security at risk."  Pls.' Opp'n at 36.  As plaintiffs describe the conduct at issue, defendants

engaged "in a deliberate campaign to discredit and punish Mr. Wilson for his constitutionally

protected public statements by intentionally disclosing classified information."  Id.  The test for

this element of the scope-of-employment inquiry is disjunctive:  defendant's conduct is of the

kind he or she was employed to perform if it was either "'of the same general nature as that

authorized' or 'incidental to the conduct authorized.'"  CAIR, 444 F.3d at 664 (quoting Haddon v.

United States, 68 F.3d 1420, 1424 (D.C. Cir. 1995)).  By focusing on the alleged public

disclosure of Mrs. Wilson's covert status, plaintiffs have therefore taken too narrow a view of the

relevant conduct.  D.C. agency law "directs courts to look beyond alleged intentional torts" when

assessing whether the actions were of the kind authorized.  Id.  Instead, the "proper inquiry . . .

'focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad

enough to embrace any intentional tort arising out of a dispute that was originally undertaken on

the employer's behalf.'"  Id. (quoting Weinberg v. Johnson, 518 A.2d 985, 992 (D.C. 1986)).  In

short, plaintiffs cannot rebut the Westfall certification simply by arguing that defendants' actions

were illegal.  See Ramey v. Bowsher, 915 F.2d 731, 734 (D.C. Cir. 1990) (per curiam) ("[I]f the

scope of an official's authority or line of duty were viewed as coextensive with the official's

lawful conduct, then immunity would be available only where it is not needed . . . .").

The <u>CAIR</u> case is illustrative.  The Council on American-Islamic Relations ("CAIR") brought an action for defamation and slander against Congressman Cass Ballenger based on his statement that CAIR was the fund-raising arm of a foreign terrorist organization.  444 F.3d at 662.  Ballenger made the statement to a reporter during a conversation about Ballenger's marital difficulties.  <u>See</u> <u>id.</u> The district court accepted the Attorney General's Westfall certification and dismissed the case.  <u>See</u> <u>id.</u> at 663.  On appeal, CAIR argued (like plaintiffs do here) that Ballenger's tortious act -- the allegedly defamatory statement -- was not conduct of the kind he was authorized to perform.  <u>Id.</u> at 664.  The court of appeals explained that CAIR's argument ignored the possibility that the statement was made incidentally to authorized conduct and clarified that the relevant "underlying dispute or controversy" for purposes of the scope-of-employment inquiry "was the phone call between Ballenger and [the reporter] discussing the marital separation"  <u>Id.</u>  "The appropriate question, then, [was] whether that telephone conversation -- not the allegedly defamatory sentence -- was the kind of conduct Ballenger was employed to perform."  <u>Id.</u>  The court held that it was.  <u>See</u> <u>id.</u> ("Speaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'").

As <u>CAIR</u> makes clear, this Court must look beyond the alleged disclosure of Mrs. Wilson's covert identity and assess whether the underlying conduct was of the type defendants were employed to perform.  The proper inquiry in this Court's view, then, is whether talking to the press (or, in Cheney's case, participating in an agreement to do so, <u>see</u> Am. Compl. ¶ 24) in order to discredit a public critic of the Executive Branch and its policies is within the scope of defendants' duties as federal employees.  <u>See</u> Am. Compl. ¶ 3.  The alleged <u>means</u> by which

defendants chose to rebut Mr. Wilson's comments and attack his credibility may have been highly unsavory. But there can be no serious dispute that the act of rebutting public criticism, such as that levied by Mr. Wilson against the Bush Administration's handling of prewar foreign intelligence, by speaking with members of the press is within the scope of defendants' duties as high-level Executive Branch officials.[8] Thus, the alleged tortious conduct, namely the disclosure of Mrs. Wilson's status as a covert operative, was incidental to the kind of conduct that defendants were employed to perform.

Plaintiffs' arguments with respect to the third element of the scope-of-employment test -- whether the conduct is actuated by a purpose to serve the master -- suffer from the same flawed focus on the tort itself rather than the underlying conduct. Plaintiffs observe, undoubtedly correctly, that the unauthorized disclosure of classified information, and in particular of the identity of a covert agent, can never be in the interest of the United States. But, like the inquiry into the kind of conduct authorized, the "'intent criterion focuses on the underlying dispute or controversy, not on the nature of the tort, and it is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf.'" Stokes, 327 F.3d at 1216 (quoting Weinberg, 518 A.2d at 992). Furthermore, "even a partial desire to serve the master is sufficient" to satisfy the requirement. CAIR, 444 F.3d at 665. Plaintiffs have alleged that defendants' conversations with reporters were intended, at least in part, to discredit Mr. Wilson. Am. Compl. ¶ 2. The Court finds that attempts by high-ranking officials to discredit a critic of the Executive Branch's policies satisfy the Restatement's purpose requirement.

---

[8]Armitage, as Deputy Secretary of State, was accorded "all authorities and functions vested in the Secretary of State." Delegation of Authority 245, 66 Fed. Reg. 22,065, 22,065 (May 2, 2001).

Finally, the second element of the scope-of-employment inquiry looks to whether the alleged conduct occurs substantially within authorized time and space limits. Plaintiffs concede that this element is satisfied as to Armitage, who allegedly met with reporters in his State Department office. Plaintiffs admittedly have not alleged the time and place of the other defendants' actions; they now argue that discovery is necessary to determine those facts. But "[n]ot every complaint will warrant further inquiry into the scope-of-employment issue." Stokes, 327 F.3d at 1216. In order to obtain discovery, plaintiffs must first "plead sufficient facts that, if true, would rebut the certification." Id. To allow discovery based on the absence of factual allegations in plaintiffs' complaint would turn this standard on its head.

In any event, there would seem to be little utility in applying the concept of authorized time and space limits to high-level government officials such as the Vice President, his Chief of Staff, and a close advisor to the President. As the United States observed in its reply brief, the "Vice President does not turn into a private citizen on Sundays." U.S. Reply in Support of Mot. to Dismiss at 8-9. The amended complaint underscores this very point: it alleges, for example, that before Libby spoke with reporters Cooper and Miller on Sunday, July 12, 2003, he had flown that morning with Vice President Cheney and "other officials" on Air Force Two and discussed with those officials how to respond to media inquiries. Am. Compl. ¶ 19(v). The bare assertion that these actions took place on a Sunday -- a day on which plaintiffs also allege that at least some official government business had taken place -- is not sufficient to rebut the certification that the actions occurred within the scope of employment.

In sum, the Court finds that plaintiffs have not pled sufficient facts that, if true, would rebut the Westfall certification filed in this action. Hence, neither further discovery nor an

evidentiary hearing on the scope-of-employment issue is warranted, and the United States is substituted as the sole defendant for the claim of public disclosure of private facts. Furthermore, plaintiffs have not contested defendants' assertions that they have not exhausted their administrative remedies as required by the FTCA. See § 2679(d)(4); § 2675(a) ("An action shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing . . . ."). This Court therefore lacks subject-matter jurisdiction over plaintiffs' tort claim for public disclosure of private facts. See Jackson v. United States, 730 F.2d 808, 809 (D.C. Cir. 1984) (per curiam).[9]

## CONCLUSION

For the reasons given above, plaintiffs have failed to state a claim upon which relief can be granted with respect to their four causes of action asserted directly under the Constitution. Furthermore, this Court lacks subject-matter jurisdiction over plaintiffs' claim for public disclosure of private facts. Accordingly, defendants' motions to dismiss are granted. A separate order accompanies this memorandum opinion.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated: July 19, 2007

---

[9]Given this Court's lack of subject-matter jurisdiction over the tort claim, this opinion will not address defendants' alternative arguments, including their statute-of-limitations defense, as to why the claim fails as a matter of law.